IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| In re:<br><br>NESV ICE, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br>Case No. 21-11226<br><br>Jointly Administered |

**AFFIDAVIT OF STUART SILBERBERG IN SUPPORT OF
FIRST DAY MOTIONS AND APPLICATIONS**

Pursuant to 28 U.S.C. § 1746, I, Stuart Silberberg, hereby declare as follows:

1.      I am the sole manager of each of the Debtors (as defined below). In my capacity as manager, I am familiar with the Debtors' day-to-day operations and financial affairs. As described below, Debtor NESV Ice, LLC owns and operates an ice-skating facility and related facilities and real estate, while the remaining Debtors own portions of the 138.3-acre site that the Debtors plan to develop into a multi-sport complex destination and develop various other real estate projects.

2.      Except as otherwise indicated, all statements in this affidavit are based upon (a) my knowledge as manager of each of the Debtors, (b) my review of relevant documents, including the Debtors' books and records, (c) information supplied to me by other employees of the Debtors' and/or the Debtors' professionals, and (d) my opinion based on my experience and knowledge of the Debtors'

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, are as follows: NESV Ice, LLC (1262), NESV Swim, LLC (5919), NESV Tennis, LLC (6937), NESV Land East, LLC (4138), NESV Field, LLC (5539), NESV Hotel, LLC (9151), and NESV Land, LLC (2353).

operations and financial affairs. If called upon to testify, I would testify to the facts

set forth in this affidavit.

3.    On August 26, 2021 (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code").

4.    To enable the Debtors to minimize the adverse effects of the

commencement of their Chapter 11 cases on their businesses, the Debtors have

requested various types of relief in certain so-called "first-day" applications and

motions (collectively, the "First Day Motions"). The First Day Motions seek relief

directed toward continuing business operations and providing services to

customers without interruption or undue disruption.

5.    I submit this affidavit in support of the First Day Motions. Part I of

this affidavit provides an overview of the Debtors and their operations. Part II of

this affidavit provides an overview of the Debtors' capital structure. Part III of this

affidavit describes the primary causes of the Debtors' financial challenges and

their Chapter 11 filings. Part IV of this affidavit describes the First Day Motions.

## I.    OVERVIEW OF THE DEBTORS

6.    The Debtors were organized in contemplation of the development,

construction and operation of the New England Sports Village (the "Village"), a

planned athletic, entertainment, and hospitality complex located on a 138.3-acre

site in Attleboro, Massachusetts. Non-debtor Ajax 5Cap NESV, LLC ("Ajax 5Cap"),

of which I am the sole manager, owns 100% of the membership interests of each

Debtor. Each Debtor owns a parcel of real property. Only Debtor NESV Ice, LLC is operating a business or owns any assets other than real property.

7.      The Village project has three phases which would occupy approximately 50 acres. Phase one, which saw the construction of a premier ice facility owned and operated by NESV Ice, LLC, is complete. Phase two provides for the construction of a field house and a 150-room hotel catering to visitors and corporate events. The planned field house provides for indoor and outdoor fields, and will cater to sports such as soccer, lacrosse, field hockey, baseball, and gymnastics, and offer other recreational and food and beverage amenities. Phase three contemplates the construction of a tennis, aquatics, and wellness center. The Village also has plans for an outdoor adventure course with ropes and zip-lining. The remaining acreage on the other side of the property is intended to be developed, subject to zoning variances with the City of Attleboro, into various other real estate projects including but not limited to warehouse/distribution, various forms of residential and various elements of a Continuing Care Retirement Community ("CCRC"), and is a valuable asset and potential source of funding for the project and the reorganization.

### a. NESV Ice, LLC

8.      NESV Ice, LLC ("Ice") is a Delaware limited liability company that was organized on January 29, 2016 and registered to do business in Massachusetts on February 23, 2016. Ice has a principal place of business of 1395 Commerce Way, Attleboro, MA  02703, and owns the 12.4 acre parcel of real property shown on the

site plan attached as **Exhibit A**. Ice also owns and operates the ice-skating rink (the "Rink") that forms the heart of the current operations of the Village. Ice has twenty-six (26) employees, four (4) of whom are full-time, the remainder part-time, and approximately three (3) independent contractors.

9.      The Rink is approximately 110,000 square feet with two full sheet NHL ice surfaces, and a three-quarter sheet studio rink. The Rink has additional features that complement its status as a premiere ice facility, and increase Ice's revenue opportunities, including a full restaurant (approximately 3,000 square feet), indoor recreation space (approximately 6,500 square feet), retail space (approximately 5,000 square feet) that includes a coffee shop, training facility, physical therapy tenant and boxing studio, and an ice level function area (approximately 2,500 square feet) that hosts Ice's Rapid Hockey Academy skills center. The Rapid Hockey Academy skills center utilizes, among other things, a two-person wide skating instruction treadmill that Ice purchased for approximately $200,000.

10.      Ice grants various third parties non-exclusive licenses to use and enjoy the Rink, primarily for ice hockey games, practices, and figure skating, in exchange for fees. Those licenses generate approximately 35% of Ice's revenue and are based on longer-term agreements with third-party sports managers. The remaining 65% of Ice's revenues come from hockey and figure skating programming (*i.e.,* activities, teams and events planned by rink management), lease revenues, private rentals and short-term sponsorships.

11.     I believe that the combined value of the Rink and Ice's land totals approximately $20,880,000 using a cost method, and approximately $18,000,000 if valuing the various components of the Rink (*e.g.,* full ice sheets, three-quarter ice sheet, retail space, skills center). The latter result is derived by valuing the full size rinks at $5,000,000 per sheet (which in my experience is the high end of rink comparables, and is appropriate for the Rink given its age, seating capacity and amenities), the three-quarter sheet at $3,750,000, 15,000 square feet of retail space at $150 per square foot (realized and estimated annual net rents of $20 per square foot) or $1,875,000 and the skills center at $2,000,000 (based on estimated revenue generating capability of $250,000 or more annually). Alternatively, management estimates that the rink will generate approximately $1.5 million or more in net operating income annually in the next few years, which at a 10-12 times multiple results in a sales value of approximately $15 – 18 million.  The most recent tax assessment by the City of Attleboro valued Ice's property at $15,997,700.

### b. NESV Swim, LLC

12.     NESV Swim, LLC ("Swim") is a Delaware limited liability company that was organized on January 29, 2016, and registered to do business in Massachusetts on February 23, 2016. Swim has a principal place of business of 1395 Commerce Way, Attleboro, MA 02703, and owns the 7.1 acre parcel of real property shown on **Exhibit A**. The most recent tax assessment by the City of Attleboro valued Swim's property at $722,800.

### c. NESV Tennis, LLC

13. NESV Tennis, LLC ("Tennis") is a Delaware limited liability company that was organized on January 29, 2016, and registered to do business in Massachusetts on February 23, 2016. Tennis has a principal place of business of 1395 Commerce Way, Attleboro, MA 02703, and owns the 21.5 acre parcel of real property shown on **Exhibit A**. The most recent tax assessment by the City of Attleboro valued Tennis's property at $1,172,200.

### d. NESV Field, LLC

14. NESV Field, LLC ("Field") is a Delaware limited liability company that was organized on January 29, 2016, and registered to do business in Massachusetts on February 23, 2016. Field has a principal place of business of 1395 Commerce Way, Attleboro, MA 02703, and owns the 19.6 acre parcel of real property shown on **Exhibit A**. The most recent tax assessment by the City of Attleboro valued Field's property at $1,111,900. I believe that the development of a $40 million as of right field house on this parcel would value the land at approximately 10% of the overall development cost (a conservative figure) of approximately $4,000,000 ($200,000 per acre).

### e. NESV Hotel, LLC

15. NESV Hotel, LLC ("Hotel") is a Delaware limited liability company that was organized on January 29, 2016, and registered to do business in Massachusetts on February 23, 2016. Hotel has a principal place of business of 1395 Commerce Way, Attleboro, MA 02703, and owns the 9.2 acre parcel of real property

shown on **Exhibit A**. The most recent tax assessment by the City of Attleboro valued Hotel's property at $788,400. Despite its name, this site is more likely to be developed into a self-storage facility or an ancillary sports facility, both as of right. As a self-storage facility, it could likely support a 120,000 square foot building worth between $20 – 30 per buildable square foot or $2.4 – 3.6 million.

16.     Hotel, Tennis, Field, and Swim's long-term business plans include the construction and operation of fields and athletic facilities (field house, tennis courts, aquatics center and/or wellness center) and a hotel. The hotel would offer 150-rooms, primarily to accommodate families who visit the Village facilities, and to host corporate events. Management believes that the hotel would have a land value of approximately $17,500 per key or $2.6 million.  However, it is more likely that the hotel would be developed on a contiguous parcel that is not currently owned by NESV.

### f.  NESV Land, LLC

17.     NESV Land, LLC ("Land") is a Delaware limited liability company that was organized on January 29, 2016, and registered to do business in Massachusetts on February 23, 2016. Land has a principal place of business of 1395 Commerce Way, Attleboro, MA 02703. Land owns the 34.6 acre parcel of real property located shown on **Exhibit A**. The most recent tax assessment by the City of Attleboro valued Land's property at $1,581,900. I believe that this parcel could support between 250 – 300 residential units on approximately 15 acres at an estimated value of $15,000 per unit for a value range of $3,000,000 – $4,500,000, with land remaining for

potential townhouse development.

### g.  NESV Land East, LLC

18.    NESV Land East, LLC ("Land East") is a Delaware limited liability company that was organized and registered to do business in Massachusetts on October 5, 2018. Land East has a principal office at 28 Marjory Lane, Scarsdale, NY, 10583, and a local address of 1395 Commerce Way, Attleboro, MA  02703. Land East owns the 33.9 acre parcel of real property shown on **Exhibit A**. The most recent tax assessment by the City of Attleboro valued Land East's property at $489,100.

19.    Subject to zoning approvals, this parcel may be developed into a 250,000 to 300,000 square foot bulk warehouse distribution. Investment sale professionals specializing in land sales at Jones Lang LaSalle, a nationally recognized real estate service firm, value the land at approximately $40 per buildable square foot providing a potential value range of $10 - 12 million. Alternatively, the Land and Land East parcels could be combined into an overall residential and CCRC facility that could accommodate an estimated 600 – 800 units at an average value of $25,000 each, creating a value range of $15 – 20 million.

20.    Each of Ice, Swim, Tennis, Field, Hotel, Land and Land East is a "Debtor" and collectively shall be referred to herein as the "Debtors."

21.    The Debtors are in the process of obtaining formal appraisals of their properties. I believe that the aggregate value of the Debtors' combined real property (including the Rink) is no less than $18,000,000 and likely to be well in excess of $20,000,000, and that those values are increasing. The most recent tax assessments

of those properties valued them in the aggregate at $21,864,000.

## II.   CAPITAL STRUCTURE

### A.   HarborOne Secured Debt

22.    On or about June 24, 2016, Swim, Field, Hotel, Tennis, and Land entered into a certain Loan Agreement (Term Loan) (the "Term Loan Agreement") with HarborOne Bank ("HarborOne") in the principal amount of $1,960,000 (the "Term Loan"). Ice, Land East, Ajax 5Cap and I guarantied certain obligations under the Term Loan Agreement. The Term Loan is purportedly secured by mortgages on the Debtors' real estate and liens on the Debtors' personal property.

23.    As of the Petition Date, the Debtors believe that $1,960,000 in principal and $234,379 in interest has accrued under the Term Loan Agreement.

24.    On or about June 24, 2016, Ice entered into a certain Construction Loan Agreement (Construction Loan) (the "Construction Loan Agreement," and together with the Term Loan Agreement, the "Loan Agreements") with HarborOne in the principal amount of $9,506,000.00 (the "Construction Loan" and together with the Term Loan, the "Loans"). Swim, Tennis, Land East, Field, Hotel, Land, Ajax 5Cap, and I guarantied certain obligations under the Construction Loan Agreement. The Construction Loan is purportedly secured by mortgages on the Debtors' real estate and liens on the Debtors' personal property.

25.    As of the Petition Date, the Debtors believe that $9,284,035 in principal and $433,323 in interest has accrued under the Construction Loan Agreement.

26.     In December 2020, SHS ACK, LLC ("SHS") purportedly acquired HarborOne's rights in connection with the Loans.

## B.   Other Secured Claims

27.     On or about November 21, 2019, Debtors Ice, Field, Swim, Tennis, Hotel and Land also granted mortgages on their respective real property to secure up to $7,500,000 of Ajax 5Cap's obligations pursuant to a certain Loan Agreement between Ajax 5Cap and Ashcroft Sullivan Sports Village Lender, LLC (the "EB-5 Lender"), whereby the EB-5 Lender agreed to loan up to $20,000,000 to Ajax 5Cap to support the development of the Village. Upon information and belief, the EB-5 Lender's rights are subordinate to HarborOne's rights arising from the Loan Agreements.

28.     CSM (defined below) asserts a statutory lien on Ice's real property pursuant to Chapter 54 of the Massachusetts General Laws arising from alleged work performed by CSM. The Debtors dispute CSM's claims, which are the subject of pending litigation.  *See infra*, ¶¶ 32-33.

## C.   Trade Debt and Other Obligations

29.     As discussed further below, as of the Petition Date, Ice owed approximately $7,000 in unpaid wages and benefits that I understand are entitled to priority treatment pursuant to Section 507(a)(4) of the Bankruptcy Code.[2] I understand that any taxes associated with those unpaid wages are entitled to

---

[2]     Contemporaneously with the filing of this Affidavit, the Debtors have filed a motion requesting to pay unpaid pre-petition wages and benefits to the extent such claims are entitled to priority under the Bankruptcy Code.

priority treatment pursuant to Section 507(a)(8) of the Bankruptcy Code.

30.    Swim, Tennis, Land East, Field, Hotel, and Land have no monetary
obligations other than those arising from the Loans and real property taxes owed
to the City of Attleboro, which are in arrears due to cash shortfalls caused by the
Covid-19 pandemic.

31.    As of the Petition Date, the aggregate non-priority, non-insider
unsecured claims against the Debtors totaled approximately $1,800,000, excluding
interest, the vast majority of which consists of legal fees owed to one outside law
firm and arrearages for electricity service that accrued primarily due to the
pandemic.

## III.    EVENTS PRECIPITATING THE BANKRUPTCY FILING

32.    Since 2017, Ice has been embroiled in litigation (the "CSM
Litigation") with the contractor which built the Rink, Construction Source
Management, LLC ("CSM"), and its principal, John C. Kelly ("Kelly"), arising from
the project. As a precursor to and component of the CSM Litigation, CSM has
asserted statutory lien rights in Ice's real property, claiming that Ice (among
others) owes it more than $5,000,000. Ice and its co-defendants have denied CSM's
and Kelly's claims and asserted counterclaims against CSM and Kelly.  The CSM
Litigation is presently scheduled for trial in Bristol County Superior Court in
November 2021.

33.    The pressures of the CSM Litigation, along with certain project
delays, cost overruns, and operational difficulties in the Rink's early stages, gave

rise to liquidity shortfalls for the Debtors and made it difficult to attract additional investment.

34.   The Debtors' liquidity was also hampered by an extraordinarily high 2017 tax assessment by the City of Attleboro which, while eventually lowered after an appeal process, put additional pressure on the Debtors' cash flow, further constraining Ice's operations and the Debtors' ability to attract additional financing.

35.   In April 2019, HarborOne issued a notice of default to the Debtors arising from, among other things, certain non-monetary defaults under the Construction Loan Agreement. HarborOne agreed to forbear from taking action in connection with those defaults, and agreed not to charge default interest under the Construction Loan Agreement at that time.

36.   In August 2019, HarborOne issued a notice of default to the Debtors arising from, among other things, the failure to repay the Term Loan in full at maturity. HarborOne nonetheless agreed to continue to accept periodic payments in accordance with the Term Loan Agreement and not to charge default interest under that agreement.

37.   Early 2020 saw Ice's programming and revenue continue to improve, as Ice attracted new teams, hockey programs, and revenue sources. In mid-March of 2020, however, COVID-19 caused operations to shut down. Additionally, I contracted COVID-19, was hospitalized, and was unwell for most of March and April of 2020.

38.    At least initially, and informally, HarborOne entered into a period of forbearance on the Construction Loan and the Term Loan during the pandemic.

39.    The Rink partially reopened in July 2020, but struggled to operate and enforce adherence to state protocols and restrictions. Moreover, approximately 35% of Ice's customers, who are from Rhode Island, were unable to cross state borders to travel to the Rink due to COVID-19 restrictions.

40.    In July 2020, the Debtor and HarborOne partially restructured the Debtors' obligations under the Loan Agreements. In exchange for continued forbearance, HarborOne received, among other things, a mortgage on Land East's real property.

41.    Although Ice secured some funding through the Payroll Protection Program, that financing was not nearly sufficient to materially defray operating losses.

42.    To increase revenues, Ice intensified its marketing efforts and continued to attract new teams and hockey programs to the rink, including Johnson & Wales men's and women's programs and area teams including the Generals, the Hitmen, the Pioneers and others.

43.    Ice also improved its facilities by, among other things: (i) building men's and women's locker rooms to NCAA standards and relocating the APT training facility to a more suitable space with increased visibility; (ii) converting a function room and former APT space into an athletic space to be utilized for floorball, pickleball, birthdays parties, and other activities; (iii) converting the

former family entertainment center into a classroom/study area for the Generals
Academy; (iv) converting the former pro shop into a boxing studio operated under
the Title 9 brand; and (v) leasing space on Ice's roof to a solar power tenant to
accommodate the installation of solar panels. Ice anticipates these efforts will
result in approximately $450,000 in additional annual operating profits.

44.     As a result of management's efforts, and despite the Rink being closed
for approximately four months and operating with restrictions during the rest of
the year, Ice's revenues in 2020 were only approximately $1.3 million lower than
management's forecasts.

45.     Additionally, the Debtors during 2020 entered into discussions with
Amazon about the potentially purchase of a portion of the site. Those talks,
however, stalled due to the cloud on title presented by CSM's asserted mechanic's
lien and the related lawsuit.

46.     On December 22, 2020, unbeknownst to the Debtors, HarborOne
allegedly sold the Loans to SHS. The Debtors were not informed of this sale until
they received a letter from SHS on January 6, 2021. Upon information and belief,
SHS is a Massachusetts limited liability company, which, according to certificate of
organization, was formed to "own, manage and develop real estate."

47.     Also on December 22, 2020, the same day it sold the Loans to SHS,
HarborOne delivered to the Debtors additional notices of default by which
HarborOne began to charge default interest, retroactive to March 1, 2017, and
accelerated all amounts allegedly due under the Loans. In so doing, HarborOne

(and subsequently SHS) ostensibly added approximately $6,000,000 in additional interest to the Debtors' payment obligations under the Loans.

48.    Despite COVID-19, the first quarter of 2021 was Ice's most successful ever. The second quarter was similarly bolstered by end of season hockey tournaments and other events in May and June. This activity signaled an upward trajectory for Ice's business and revenues.

49.    Shortly after acquiring the Loans, however, SHS stated its intention to foreclose on the Debtors' properties. This intention was made public in April 2021 via a foreclosure notice posted prematurely on the website of a real property auctioneer, before the Debtors had received notice of any foreclosure, undermining the confidence of Ice's customers and employees. Several hockey tournaments and other programming events were canceled as a result of the premature announcement. Needless to say, the foreclosure process has significantly hampered the business.

50.    The Debtors' continued efforts to raise capital with potential investors have been hampered by the CSM lawsuit and the complexity of the Debtors' capital structure. Those same issues similarly prevent further progression of talks with multiple parties who expressed interest in purchasing portions of the Debtors' land for industrial and residential development.

51.    On or about April 21, 2021, SHS noticed a foreclosure sale of the Debtors' 138.3 acre site. Initially scheduled for May 7, 2021, the foreclosure sale was postponed to June 30, 2021, and then again to August 27, 2021.

52.   As of the filing date, the business is performing significantly better than it has previously. As noted above, new teams, programming, an academy, floor sports and other revenue-enhancing activities will add significant new revenue. Much of this new activity will start in September 2021.  Despite continually fighting uphill against operational start-up issues, Covid and the perpetual threat of foreclosure, NESV Ice is poised to post its best-ever quarterly and annual results beginning in the fall of 2021.

53.   Nonetheless, because of the pending foreclosures, the Debtors were forced to file these Chapter 11 cases to preserve the value of their assets and to reorganize their balance sheets and operations.

## IV.   SUMMARY OF FIRST DAY MOTIONS

### A.   Cash Collateral Motion

54.   In the *Motion of the Debtor for an Order Under Sections 105, 361, 362 and 363 of the Bankruptcy Court (A) Authorizing Use of Cash Collateral; (B) Granting Adequate Protection; (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001; and (D) Granting Related Relief (the* "Cash Collateral Motion"), Ice seeks to use SHS's alleged Cash Collateral (as defined in the Cash Collateral Motion). The Cash Collateral Motion requests the entry of an order authorizing the emergency use of the Cash Collateral to prevent immediate and irreparable harm to the Debtors' operations pending the scheduling of a hearing on the continued use of the Cash Collateral.

55.   As a consequence of the Chapter 11 filings, Ice is unable to continue

operating their business without using the Cash Collateral. Without the use of the Cash Collateral, Ice lacks the ability to pay expenses essential to the operations of its business. Without the use of the Cash Collateral, the continued operation of Ice's business would not be possible, resulting in serious and irreparable harm to the Debtors' estates.

56.     Attached to the Cash Collateral Motion is a proposed cash collateral budget (the "Budget") that shows that Ice has adequate cash to operate its business and pay expenses that are incurred during the Budget Period (as defined in the Cash Collateral Motion).

57.     The Cash Collateral Motion describes and details the adequate protection that Ice propose to grant to SHS ACK. LLC, namely the granting of replacement liens, if the Court determines that SHS is entitled to adequate protection.

58.     The purpose of the use of the Cash Collateral is to preserve the going concern value of the Debtors' operations, as well as to protect creditors and other persons dependent on the Debtors' continued operations.

**B.     Motion To Pay Prepetition Wages**

49.     In the *Motion of Debtor NESV Ice, LLC for Authority to Pay Wages, Compensation, Employee Benefits, and other Related Obligations.* (the "Prepetition Wages Motion"), Ice seeks entry of an Order authorizing, but not directing, Ice to pay its employees' prepetition wages, salaries, compensation, reimbursable expenses, and employee benefits. Ice also requests authority to pay

taxes associated with such wages and salaries, and to pay benefit claims accruing in favor of its employees.

50.    Ice requests this relief in order to ensure that the prepetition payroll is paid and honored in the ordinary course of business. Ice's business operations will suffer disruption due to the loss of employees and/or harm to employee morale if Ice is unable to pay the prepetition wages in the ordinary course of business. Harm to Ice's business operations will harm the Debtors' creditors. A potential loss (or delay in receipt) of earned wages or salaries would work a hardship on the employees.

51.    Under standard payroll procedures, Ice – the only operating Debtor – processes its payroll bi-weekly, on Mondays. Ice's employees are paid in arrears through the day preceding the processing date. Ice most recently paid payroll on Monday, August 23, 2021 for services during the period from August 9, 2021 to August 22, 2021. Ice seeks authority to pay employees their prepetition wages, salaries, compensation, expenses and benefits earned from August 23, 2021 until the Petition Date, and to continue to honor such obligations in the ordinary course of business. The total amount of such obligations is approximately $7,000.

52.    In addition, Ice requests authority to pay: (i) amounts withheld from employees' wages and Ice's matching payment obligations to taxing authorities (the "Payroll Taxes"), and (ii) amounts owed for health and dental benefits (the "Employee Benefits") attributable to the prepetition period of August 23, 2021 until the Petition Date. The amount attributable to the prepetition period for the

outstanding Payroll Taxes and Employee Benefits is approximately $5,000 in the aggregate.

53.     No employee will receive payment or benefit as a result of the Prepetition Wages Motion exceeding the $13,650 cap established by Sections 507(b)(4) & (5) of the Bankruptcy Code.

### C.   Utilities Motion

54.     In the *Motion of Debtor NESV Ice, LLC for Entry of Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment* (the "Utilities Motion"), Ice seeks entry of an order deeming utilities adequately assured of payment from Ice by Ice's conformance with the procedures proposed in the Utilities Motion.

55.     Pursuant to the Utilities Motion, Ice proposes to establish a new, segregated account containing an amount equal to Ice's estimate of two weeks of aggregate utility payments.

56.     If a Utility Company is not satisfied with the assurance of future payment provided by Ice, the Utility Company must serve a written request (a "Request") upon proposed counsel to the Debtors, setting forth certain information described in the Utilities Motion. Ice may then either agree with the new terms or ask the Court for a further hearing to resolve the dispute.

E.      Joint Administration

57.     In the *Motion by Debtors for Joint Administration of Chapter 11 Cases* (the "Joint Administration Motion"), the Debtors requested an order for joint administration of their Chapter 11 cases for administrative purposes only. The Debtors are affiliated entities, and joint administration would dispense with unnecessary duplication and filing, and ease the administrative burden on all interested parties and the Court.  The Court granted this Motion on August 27, 2021.


[*Remainder of this page intentionally left blank*]

I declare under the penalties of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Stuart Silberberg

Executed this 30th day of August, 2021