**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)**

| | |
|---|---|
| In re:<br><br>NESV ICE, LLC, *et al.*[1],<br><br>Debtors. | Chapter 11<br>Case No. 21-11226-CJP<br><br>Jointly Administered |

**PLAN PROPONENTS' MOTION TO ESTIMATE
CONSTRUCTION SOURCE MANAGEMENT, LLC'S CLAIM**

Pursuant to 11 U.S.C. § 502(c) and Fed. R. Bankr. P. 3018, the above-captioned debtors (the "Debtors"), Shubh Patel, LLC ("SP") and Ashcroft Sullivan Sports Village Lender, LLC ("ASVL," and together with the Debtors and SP, the "Plan Proponents") hereby move for an order estimating the amount of and temporarily allowing the claim Construction Source Management, LLC ("CSM") filed against NESV Ice, LLC ("Ice"), proof of claim no. 5 (the "Claim"), for voting purposes and other issues relating to confirmation of the *Modified Second Amended Joint Plan of Reorganization of the NESV Ice, LLC, NESV Swim, LLC, NESV Tennis, LLC, NESV Land East, LLC, NESV Field, LLC, NESV Hotel, LLC, and NESV Land, LLC, Ashcroft Sullivan Sports Village Lender, LLC and Shubh Patel, LLC* (the "Plan") [doc. no. 345].

Ice and CSM have been embroiled in construction litigation since January 2017. That litigation will not be resolved prior to the hearing on confirmation of the

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, are as follows: NESV Ice, LLC (1262), NESV Swim, LLC (5919), NESV Tennis, LLC (6937), NESV Land East, LLC (4138), NESV Field, LLC (5539), NESV Hotel, LLC (9151), and NESV Land, LLC (2353).

Plan. The estimation of CSM's Claim, which is unliquidated, is appropriate because fixing the amount of that claim would "unduly delay the administration of" the Debtors' bankruptcy cases. 11 U.S.C. § 502(c).

For the reasons discussed below, the Plan Proponents request, for purposes of voting and confirmation issues, that the Court estimate CSM's claim in the amount of $157,850. In support of this motion, the Plan Proponents respectfully represent as follows:

## JURISDICTION

1. This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. Determination of this motion is a core proceeding under 28 U.S.C. § 157(b)(2). Venue of this case is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### *A. Prepetition Events*

2. On or about May 25, 2016, Ice, as owner, entered into a written contract (the "Contract") with CSM, as general contractor, for the construction of an ice-skating rink located at 1395A Commerce Way, Attleboro, MA with a Guarantied Maximum Price of $13,707,855.00. *See* **Exhibit 1**. The rink was granted a temporary occupancy permit and opened in November 2016. Other than punch-list items, construction was substantially complete.

3. CSM agreed to *negative* charge orders in the amount of $2,638,369, which resulted in an adjusted contract amount of $11,069,486. *See, e.g.*, Claim,

Attachment II. CSM acknowledges Ice made payments totaling $10,344,021.30. *See* Claim, Attachments I and II (showing payments of $10,344,021.30), leaving a remaining balance on the adjusted contract price of $725,464.70.

4. CSM's managing partner, John Kelly, certified each requisition for payment on behalf CSM. *See generally* **Exhibit 4** (copies of CSM requisitions).

5. On November 11, 2016, CSM certified Requisition 7, which reflected payment due of $1,298,496, a balance to finish of $1,800,243, retainage of $320,643, and change orders totaling *negative* $2,638,369. **Exhibit 4** at 32-33.

6. On November 23, 2016, CSM recorded a notice of contract pursuant to G.L. c. 254 § 2 giving notice of a written contract dated May 25, 2016 between Ice and CSM. *See* **Exhibit 2**. That same day, and contrary to Requisition 7, CSM recorded a statement of account reflecting a total balance due of $6,814,821, including so-called "pending change orders" of $3,482,330. *See id.*

7. On December 23, 2016, CSM recorded a Partial Release of Notice of Contract and Subordination of Lien Mass. G. L. c. 254, Section 32 (the "Waiver"), pursuant to which CSM agreed that upon payment of $577,891.05, CSM waived any lien rights for labor, materials, rental equipment, appliances or tools performed or furnished through November 30, 2016, except for: (1) pending change orders ($3,509,139.00); (2) disputed claims ($206,944.00); and (3) retainage ($376,505).[2]

[2] The same day, December 23, 2016, CSM recorded a separate lien waiver providing that upon payment of $739,623.30, CSM waived any lien rights for labor, materials, rental equipment, appliances or tools performed or furnished through October 31, 2016, except for: (1) pending change orders ($3,275,386); (2) disputed claims ($206,944.00); and (3) retainage ($320,843.00). **Exhibit 3** at 4-6. CSM received the payments that triggered the lien waivers. *See* Claim (Attachment I) (showing payments to CSM on December 27, 2016 totaling $1,317,514.35, which is the sum of $577,891.05 and $739,623.30).

**Exhibit 3**. As of December 23, 2016, however, CSM had submitted requisitions numbered 1-8R, reflecting change orders of *negative* $2,638,369. *See generally* **Exhibit 4** (copies of CSM's requisitions).

8. On January 5, 2017, CSM certified requisitions 9R and 10. Requisition 9R, for the period December 1 to December 31, 2016, showed that CSM performed just $348,961 in work during that period and that CSM's work was 100% complete. *See* **Exhibit 4** at 41-42, 46-47. Total change orders at this point remained at *negative* $2,638,369. *Id.* Requisition 10 also reflected total change orders of *negative* $2,638,369, and a total contract amount (including change orders) of $11,069,466, current payment due of $205,685, and retainage of $188,226. *Id.* at 46-47.

9. On January 17, 2017, CSM recorded a second Statement of Account (the "SOA") asserting a mechanic's lien in the amount of $5,825,492.70, including pending change orders of $5,100,028, and an adjusted contract balance of $725,464.70. *See* Claim (Attachment II).

10. On January 23, 2017, CSM certified Requisition 10R dated January 24, 2017, which lists change orders 9 through 14, which together totaled $5,100,022, and which work CSM represented was performed during "this period," meaning between January 1, 2017 and January 24, 2017. **Exhibit 4** at 51-52. Ice did not sign these change orders.[3]

11. On January 26, 2017, CSM filed Bristol County civil action no. 17-0077 asserting claims against Ice for, among other things, CSM's mechanic's lien claim.

---

[3] On information and believe, Ice never received a copy of change order 14 for $16,591. Additionally, the amounts listed in Requisition 10R for change orders 9 and 10 differ from the amounts shown on those change orders.

The Debtors first learned of CSM's alleged right to payment in the amount of $5,825,492.70, including pending change orders of $5,100,028, when it read CSM's complaint.

*B. Post-Petition Events*

12. On August 26, 2021 (the "Petition Date"), the Debtors filed voluntary petitions initiating the above-referenced bankruptcy cases.

13. On November 3, 2021, CSM filed the Claim against Ice asserting a secured claim in the amount of $14,106,762.75. The basis of CSM's Claim is "breach of contract" and the basis for perfection is "Mechanic's Lien on 1395 Commerce Way, Attleboro, MA." *See* Claim at 2.

14. Three attachments were filed with the Claim: (1) CSM's accounting of what it alleges is owed (Attachment I); (2) CSM's January 17, 2017 SOA pursuant to G.L. c. 254 § 8 (Attachment II); and (3) CSM's First Amended Complaint against Ice and its co-defendants (Attachment III).[4]

15. The alleged amount of CSM's mechanic's lien, as set forth in the SOA (Attachment II), is $5,825,492.70.

16. The balance of CSM's Claim[5] is comprised of 1.5% per month compounding interest from February 2017 to the Petition Date. Claim (Attachment I).

[4] CSM did not attach a copy of the Contract or any change orders to the Claim.

[5] CSM's Accounting (Attachment I) and the First Amendment Complaint (Attachment III) reflect a mechanic's lien in slightly different amounts ($5,825,247 and $5,825,486, respectively) than the SOA (Attachment II), which is $5,825,492.70. The SOA sets the amount of CSM's alleged mechanic's lien. M.G.L. c. 254 § 8.

17. Pursuant to the Court's comments at the April 27, 2022 hearing, the Plan Proponents are filing this motion to request that the Court estimate the amount of CSM's Claim for the purpose of Plan confirmation. For that limited purpose only, the Plan Proponents ask the Court to estimate CSM's Claim at $157,850. The Plan Proponents expressly reserve any and all rights, claims, objections to, and defenses against CSM, including with respect to the Claim, which the Plan Proponents submit that CSM has overstated in amount.

## ARGUMENT

### I. THE COURT HAS AUTHORITY TO ESTIMATE THE AMOUNT OF CSM'S CLAIM FOR PLAN CONFIRMATION PURPOSES

18. Section 502(c) provides in relevant part:

> There shall be estimated for purpose of allowance under this section–
>
> (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the estate.

11 U.S.C. § 502(c); *see also In re Chemtura Corp.*, 448 B.R. 635, n 46 (Bankr. S.D.N.Y. 2011) (estimating claim for voting on and/or determining the confirmability of the Plan); *In re Mangia Pizza Investments, L.P.*, 480 B.R. 669 (Bankr. W.D. Tex. 2012) (same); *In re Harmony Holdings, LLC,* 395 B.R. 350, 354 (Bankr. Dist. S.C. 2008) (same); *In re PG&E*, 295 B.R. 635 (Bankr. N.D. Cal. 2003) (same); *In re Farley*, 146 B.R. 748, 753 (Bankr. N.D. Ill. 1992) (same); *In re MacDonald*, 128 B.R. 161, 164 (Bankr. W.D. Tex. 1991) (same).

19. Fed. R. Bankr. P. 3018(a) provides in relevant part:

> Notwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan.

20. Additionally, Section 105(a) of the Bankruptcy Code authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Here, estimation is appropriate under Section 502(c) and Rule 3018(a), and to carry out the provisions of, among other things, Section 1129(a)(1), (a)(11) and (b)(2).[6]

21. Moreover, estimation is "committed to the reasonable discretion of the court as befits the circumstances of the case." *See, e.g., In re Lloyd E. Mitchell, Inc.*, 373 B.R. 416, 423 (Bankr. D. Md. 2007); *see also In re FRG, Inc.*, 121 B.R. 451, 456 (Bankr. E.D. Pa. 1990) ("bankruptcy court is accorded broad discretion as to the method used by the court in the process of valuation and obtaining useful results from that process"). Claimants in the estimation process have an obligation to show that their claims have merit. *FRG*, 121 B.R. at 456.

22. Bankruptcy Courts have generally followed one of three approaches in estimating claims in a chapter 11 case: (a) base a decision upon a cursory review of the documents filed and temporarily allow the claim in the full amount or at zero; *see, e.g., Mangia Pizza*, 480 B.R. at 681*; Innovasystems,* 2014 Bankr. LEXIS 5103, at *24-25 (Bankr D.N.J. Dec. 18, 2014); *Bittner v. Bourne Chemical Co.*, 691 F.2d 134 (3rd Cir. 1982); (b) adopt a process to assess the probability of the claimant's

---

[6] Notably, estimation for purposes of plan feasibility applies to any sort of claim. *See, e.g., Pizza of Hawaii, Inc. v. Shakey's. Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1375 (9th Cir. 1985); *In re Nova Real Estate Inv. Trust*, 23 B.R. 62, 65 (Bankr. E.D. Va. 1982).

success on the merits and discount the claim appropriately; *see, e.g., Innovasystems*, 2014 Bankr. LEXIS at *6; *In re Pacific Sunwear of Cal., Inc.*, 2016 Bankr. LEXIS 2976 (Bankr. D. Del. 2016); *In re Federal Press*, 116 B.R. 650 (Bankr. N.D. Ind. 1989); or (c) attempt to determine the claimant's "actual economic interest" in the case and allow the claim accordingly; *see, e.g., Pension Benefit Guar. Corp. v. Enron Corp.*, 2004 U.S. Dist. LEXIS 21810 (S.D.N.Y. 2004).

23. In estimating claims, bankruptcy court processes have ranged from merely conducting a summary review of the relevant pleadings to conducting multi-day evidentiary hearings. *See, e.g., In re M Waikiki, LLC*, 2012 Bankr. LEXIS 2398 (Bankr. D. Haw. May 29, 2012)(court conducted five-day evidentiary hearing); *In re PG&E*, 295 B.R. 635 (Bankr. N.D. Cal. 2003)(abbreviated mini-trial used to predict what future judge or jury might conclude from evidence presented at full trial); *In re Adelphia Bus. Sols, Inc.*, 341 B.R. 415 (Bankr. S.D.N.Y. 2003)(two-day evidentiary hearing conducted on 20 days' notice following motion for estimation for feasibility); *In re Lane*, 68 B.R. 609 (Bankr. D. Haw. 1986)(court reviewed pleadings and briefs followed by oral argument of counsel); *In re Hydrox Chem. Co.*, 194 B.R. 617 (Bankr. N.D. Ill. 1996)(resolution of RICO cause of action implemented through submission of pleadings, affidavits, deposition transcripts, and briefs); *In re Innovasystems,* 2014 Bankr. LEXIS 5103 (court reviewed the pleadings and conducted a nonevidentiary hearing at which counsel intimately familiar with the patent litigation made arguments; court disallowed claim after reviewing prior court decisions and submissions).

24. Some courts describe "the estimation process" as "merely a microcosm of the ordinary claims-determination process." *FRG*, 121 B.R. at 456. The burden of proof is with the claimant. *See id.* ("Merely because the Debtors invoked the B.Rule 3018(a) process should certainly not place the burden of proof upon them" and finding "burdens of proofs in the B.Rule 3018(a) estimation process is the same as in deciding objections to proofs of claim").[7]

25. Ultimately, a trier of fact must determine in litigation which version of the case is more probable and then proceeds to determine an award in a fixed amount, but an estimation hearing pursuant to section 502(c) necessarily implies no certainty. An estimator of claims should take into account the likelihood that each party's version might or might not ultimately be established. *See In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 521 (Bankr. E.D.N.Y. 1994). The estimated value of the claim is then calculated to be the amount of the claim, reduced by the probability that an objection to the claim could be sustained in part or not at all. *Id.* In accomplishing this task, the estimator should follow the legal rules that would govern the ultimate determination of the claim. When estimating a claim based upon a breach of contract, the court should estimate the claim based upon the governing contracts. *See In re Federal-Mogul Global, Inc.*, 2005 U.S. Dist. LEXIS 17569, at *62 (D. Del. 2005).

---

[7] The Debtors intend to file an objection to CSM's claim in due course.

## II. MASSACHUSETTS MECHANIC'S LIEN LAW

26. To initiate a mechanic's lien, pursuant to M.G.L. c. 254 § 2, general contractors that have a written contract with the property owner must record a notice of contract. The statute provides:

> A person entering into a *written contract* with the owner of any interest in real property, or with any person acting for, on behalf of, or with the consent of such owner for the whole or part of the erection, alteration, repair or removal of a building, structure, or other improvement to real property, or for furnishing material or rental equipment, appliances, or tools therefor, shall have a lien upon such real property, land, building, structure or improvement owned by the party with whom or on behalf of whom the contract was entered into, as appears of record on the date when notice of said contract is filed or recorded in the registry of deeds for the county or district where such land lies, *to secure the payment of all labor, including construction management and general contractor services, and material or rental equipment, appliances, or tools which shall be furnished by virtue of said contract*. Said notice may be filed or recorded in the registry of deeds in the county or registry district where the land lies by any person entitled under this section to enforce a lien, and shall be in substantially the following form . . .

M.G.L. c. 254 § 2 (emphasis supplied). To perfect a mechanic's lien, the general contractor must timely record a statement of account that, among other things, gives "a just and true account of the amount due or to become due him, with all just credits," and timely file a civil action in the appropriate county. *See* M.G.L. c. 254 § 8; *see also* M.G.L. c. 254 §§ 5, 11.[8]

27. To facilitate payment, M.G.L. c. 254 § 32 authorizes the use of partial lien waivers by general contractors. The mechanic's lien statute is strictly construed

---

[8] For purpose of estimation, the Plan Proponents do not contest the timeliness of CSM's notice of contract, statement of account, or filing of the civil action.

against the party claiming the lien. *Ng Bros. Const., Inc. v. Cranney*, 436 Mass. 638, 644 (2002).

## III. CSM'S SECURED CLAIM IS CAPPED AT THE AMOUNT IN THE SOA AND CANNOT INCLUDE INTEREST

28. Although CSM asserts a mechanic's lien of $14,106,762.75, the most it can be is $5,825,492.50, which is the alleged "Total Balance Due" in CSM's SOA Under M.G.L. c. 254 § 8. *See* Claim at Attachment II. As a matter of law, interest on the amount due is not properly included in a mechanic's lien. *See Nat'l Lumber Co. v. United Casualty Ins. Co.*, 440 Mass. 723, 727 (2003) (confirming that mechanic's liens are limited to the amount due for labor and materials and noting that "[a]llowing a lien holder to record a claim for one amount, pursuant to s. 8, and, as here, later to assert a higher amount because of terms in the contract, would subvert the statute's purpose to protect those with an interest in the property."); *see also* M.G.L. c. 254 § 8 ("Liens under sections two and four shall be dissolved unless the contractor . . . file or record in the registry of deeds in the county or district where the land lies a statement, *giving a just and true account of the amount due or to become due him*, with all just credits, a brief description of the property, and the names of the owners set forth in the notice of contract. . . .") (emphasis supplied).

## IV. THE AMOUNT OF CSM'S CLAIM IS OVERSTATED AND MUST BE REDUCED FOR ESTIMATION PURPOSES

### *A. The Alleged Total Balance Due and Amount of Pending Change Orders in the SOA are Unsupportable*

29. The alleged amount of CSM's Claim, including "Pending Change Order" and "Total Balance Due" set forth in the SOA, are unsupportable and are contradicted by CSM's own requisitions.

30. *First,* CSM's requisitions show that as of December 31, 2016, and after CSM certified that 100% of the work was complete and all change orders were accounted for, total change orders remained *negative* $2,638,369. **Exhibit 4.**[9] CSM certified that it performed just $348,961 in work between November 30, 2016 (the date through which it had waived lien rights) and December 31, 2016. *See* **Exhibit 4** at 41-42, 46-47 (Requisitions 9R and 10). The rink partially opened in November 2016.

31. *Second*, CSM's requisitions show that as of December 31, 2016, when CSM certified that the work was 100% complete, the total contract price, including change orders, was $11,069,486. *Id.* at 46-47. This is the same amount as the "Adjusted Contract" price in the SOA. *Compare id. with* Claim (Attachment II). CSM acknowledges in the SOA and in its Claim (Attachment I) that it was paid $10,344,021.30. Deducting that amount from the total contract price of $11,069,486

[9] CSM's requisitions also show that there were not $3,509,139 in "Pending Change Orders" as of November 31, 2016, the date through which CSM waived its mechanic's lien, and at all relevant times, change orders totaled *negative* $2,638,369. *See* **Exhibit 4** at 32-33 (Requisition 7 – *negative* $2,638,369 through October 31, 2016), 36-37 (Requisition 8R - *negative* $2,638,369 through November 30, 2016); *see also* Exhibit 4 at 46-47 (Requisition 10 change orders *negative* $2,638,369 through December 31, 2016).

leaves a remaining contract balance of $725,464.70—which is the amount stated in the SOA.

32. *Third,* Requisition 10R dated January 24, 2017, pursuant to which CSM asserts a right to payment in the amount of $5,198,936.00, including $5,100,022 in change orders, is contradicted by CSM's own certified requisitions, each of which, like Requisition 10R, was certified by John Kelly. Weeks earlier, Kelly, on behalf of CSM, certified that CSM's work was 100% complete and the total contract price (including change orders) was $11,069,486. **Exhibit 4** at 46-47 (Requisition 10). Based on CSM's own certified requisitions, it should be estopped from claiming a right to payment in the amount of $5,198,936.00, or change orders of $5,100,022.

### *B. The Change Orders are Inflated and Substantially All of the Charges are for Work that was Not Authorized or Not Performed, or are Double Charges*

33. In January 2017, the amount of CSM's Claim skyrocketed by more than $5,000,000 based on Requisition 10R and the amounts associated with Change Orders 9, 10, 11, 12, and 13. *See* Claim, SOA (Attachment II, Pending Change Orders of $5,100,028.00), (Attachment I – showing total requisitions of $16,169,508.30,[10] including 12/31/16 requisition 10R ($5,198,936)).

34. Ice did not sign Change Orders 11, 12, or 13, each dated January 11, 2017, as required by the Contract. *See* **Exhibit 5**; **Exhibit 1** at 4, § 5.2.5 (changes in scope require Change Order) and § 7.2 (defining "Change Order" as "a written

[10] This amount ignores the Guarantied Maximum Contract price of $13,707,855.00, which was further reduced by change orders totaling *negative* $2,638,369.

instrument prepared by the Architect and *signed by the Owner*, Contractor and Architect stating their agreement upon all of the following: .1 The change in the Work; .2 The amount of the adjustment, if any; and .3 the Contract Sum."); *see also* § 15.1.4 (If the "Contractor wishes to make a Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work"). Accordingly, there is no written contract for such labor or materials pursuant to which CSM may assert a mechanic's lien for the labor and services reflected in Change Orders 11, 12, or 13. *See* M.G.L. c. 254 § 2.[11]

35. Mechanic's lien issues aside, Ice does not owe CSM, period, for charges reflected in Change Orders 11, 12 or 13. *See* **Exhibit 5**. Change Order 11, for $2,518,074, is comprised largely of false claims, including:

a. Change estimate ("CE") # 22, an electrical switchgear quick ship, which the supplied never delivered on time for quick ship;

b. CE # 34 – proposed hydrogen detectors were never furnished or installed;

c. CE # 41 – miscellaneous electrical related changes were not authorized and CSM was paid in full for the electrical subcontractor's work in December 2016;

d. CE # 42A and 42B – proposed bidirectional amplifier survey and amplifier work not performed by CSM or its subcontractor;

e. CE # 43 - concrete related adds and credits were part of base contract and no adds were requested or authorized;

[11] To the extent any labor and materials comprising Requisition 10R were provided *before* November 30, 2016, CSM waived any associated lien rights as none of those change orders (each of which is dated *after* November 30, 2016) were "pending" as of November 30, 2016. Similarly, any work outside the scope of CSM's May 25, 2016 written contract with Ice, which is the only contract referenced in the Notice of Contract, is not properly considered as part of its mechanic's lien. *See Lampasona v. Capriotti,* 296 Mass. 34, 40 (1936) (finding no lien exists for "extra work beyond what was comprehended in the original [written] agreement").

f. CE # 45 – addition of center rail at premier rink bleacher stairs was not performed by CSM or its subcontractor;

g. CE # 50 - site work related changes were not authorized and CSM provided no backup for alleged work;

h. CE # 53 - handling, waste removal, and dumpsters relating to owner vendors was covered under general conditions and no change order was submitted or authorized;

i. CE # 54 - access road related work for trenching and paving was paid in full under separate agreements that predated the Contract;

j. CE # 56 – proposed addition of toilet partitions, work was neither authorized nor performed; and

k. CE # 57 - allocation to the Racquet Sports site balance and cost to complete the culvert. As agreed, Ice paid $200,000 for the culvert/bridge, which was done incorrectly and rejected. Charges to complete culvert are inappropriate, as the work was never completed. The additional work relating to Racquet Sports was never authorized or performed.

l. Ice acknowledges that it received the benefit of certain work, and accepts charges of $99,121 for pole work and street repair work (CE # 38, #16 and #17), modification to the bleachers (CE # 44), cladding and finishing of concrete wall at rink 2 (CE # 46), framing and drywall of added soffits due to rerouting of duct work (CE # 48), modifications to stair 3 (CE # 49), and additional counters in room 056 (CE # 55).

36. Change Order 12 is an attempt to double bill Ice. It seeks payment of $206,943 for a dividing wall between rink 2 and the studio rink. *See* **Exhibit 5**. This wall is made up of masonry and drywall. The charge for masonry ($64,210) was part of the accepted charges for Change Order 10, discussed below. **Exhibit 5** ($64,210 line item for masonry). The charge for drywall, reflected in CE # 47, was denied by the architect because it was part of original scope of work and was paid. *Compare* CE#47 (Drywall/Cement Board of interior unfinished HONCO walls) *with* **Exhibit 1**

at 67, Scope of Work at division 9 (E) ("Provide labor and materials for gypsum board for 1 sided walls").

37. Change Order 13 seeks $1,360,486, and is comprised almost entirely of improper charges for equipment, alleged time delays, and materials:

a. CE # 51 seeks $4,360 for a one-megawatt generator that provided power to the building until permanent power was in place. Ice denied this claim because CSM fraudulently overcharged it for this generator. Ice denied this claim and paid the rental company directly.

b. CE # 58 – seeks $349,086 for time delays because CSM claims Ice was unable to provide permanent power by September 6, 2016. But the one-megawatt generator provided sufficient power for the entire facility until permanent power was turned on, meaning there was no delay. Moreover, any alleged delay in Ice achieving permanent power was due to CSM not being ready to meet National Grid's schedule.

c. CE # 61 – seeks $1,064,004 for "processed materials," but Ice never authorized or approved such processed materials, and therefore denied this charge.

d. Ice acknowledges that it received the benefit of certain work, and accepts charges of $8,972 for fire extinguishers and cabinets (CE # 24), winter conditions related charges (CE # 65), fire watches (CE # 66), and four additional wall packs (lights) (CE # 67).

38. Thus, of the charges reflected in Change Orders 11, 12, 13, Ice is responsible for, at most, $108,093.

39. Ice is similarly entitled to signification reductions to the charges set forth in Change Orders 9 ($233,753) and 10 ($757,313), which Ice also did not sign. **Exhibit 5**.

40. Ice is entitled to a $5,914 reduction to Change Order 9 because work relating to the locker room shelving and benches in the General's locker room was

not performed. For Change Order 10 (which Ice did not sign), Ice is only responsible for at most $214,674 of the requested $757,313, which are accepted charges for masonry ($64,210), miscellaneous metals ($81,851), roofing ($10,300), doors, frames, and hardware ($5,152), aluminum entries and glass window ($19,704), overhead doors ($8,330), and acoustical ceiling tile ($25,127).[12] Ice denied the remaining charges, which relate to plumbing ($240,100), HVAC ($250,600), and refrigeration for $98,602, which are overages to the Guarantied Maximum Price Contract and were not authorized or accepted. *See* **Exhibit 1** § 5.2.5 (requiring Change Order). Thus, of the charges reflected in Change Orders 9 and 10, Ice is responsive for, at most, $442,512.

41. Thus, based on all the foregoing, the principal amount of CSM's Claim totals, at most, $1,464,276, calculated as follows:

| | |
|---|---|
| Adjusted Contract Price | $11,069,466 |
| *Minus* Payments | $10,344,021.30 |
| **TOTAL** | **$725,444.70** |
| *Plus Uncontested Charges in Change Order 9* | $227,839 |
| *Plus Uncontested Charges in Change Order 10* | $214,674 |
| *Plus Uncontested Charges in Change Order 11* | $99,121 |

[12] CSM's paperwork suggests Ice is entitled to further reductions for some of these items. Such discounts appear to be why the sum of accepted and disputed charges listed herein total $803,975, instead of $757,313, which is the amount of Change Order 10.

for the remaining $542,640

| | |
|---|---|
| *Plus Uncontested Charges in Change Order 12* | $0 |
| *Plus Uncontested Charges in Change Order 13* | $8,972 |
| **TOTAL** | **$1,276,050.70** |

42. As discussed below, the amount of CSM's Claim is subject to the following reductions.

***C. CSM's Claim is Subject to Setoff and Further Reduction***

43. Ice has valid defenses and is entitled to setoff amounts allegedly due to CSM under the Contract for, among other things, CSM's inferior or unperformed work, including:

(1) Site work

a) inferior CDS stormwater treatment work, which did not conform to civil engineer's designs ($50,000);

b) failure to provide or install swinging gate bar per civil drawings ($6,000);

c) failure to perform line striping for entryways, fire lanes, and parking spaces ($7,500);

d) failure to install bituminous cape cod berm around perimeter of paved area ($9,000);

e) failure to screen loam ($7,500);

f) failure to export loam from site ($100,000);[13]

g) failure to provide and install modular blocks in retaining walls ($150,000);

h) failure to install fencing per civil drawings ($55,000);

i) failure to install guardrail alongside of perimeter and over culvert per civil drawings ($40,000); and

[13] Based on remaining yardage onsite and cost to remove.

j) failure to perform planting, landscape, and irrigation ($55,000). *See* **Exhibit 1** at 64-65, §§ 2.H, 2.J, 2.L, 2.P, 2.Q, 2.R.

(2) Concrete work

a) failure to form and pour concrete housekeeping pads, per architectural drawings ($2,500). *See id.* at 65, § 3.S.

(3) Miscellaneous Iron

a) access ladder missing safety cage ($2,500). *See id.* at 66, § 5.D.

(4) Woods & Plastics

a) failure to furnish and install 16 square foot rubber covering at skate sharpening and rental counters, per architectural drawings ($1,500). *See id.* at 66, § 6E.

(5) Doors and Windows

a) failure to furnish and install security grills at front desk and skate sharpening ($2,500). *See id.* at 66, § 8H.

(6) Finishes

a) failure to provide fire resistant panels at wet walls in locker room restrooms ($10,000);

b) failure to perform dry-fall painting (moisture resistant paint) in locker rooms ($18,000); and

c) failure to paint twelve protective bollards ($1,200), *See id.* at 67, §§ 9F, 9.R, 9.P.

44. Ice also paid CSM $200,000 to build a culvert/bridge, which was intended to provide ingress and egress to Ice through NESV's planned main roadway entrance to the entire NESV facility and to Ice. CSM improperly installed the culvert, which is unusable for its intended purpose, and failed to remove or correct its defective work. As a result, the main roadway entrance to Ice's facility remains closed. Ice is entitled to a credit for the $200,000 it paid to CSM, and the

cost to correct CSM's work and install the culvert/bridge will be not less than $300,000.

45. CSM also failed to pour slab on grade concrete in the restaurant space ($10,000). Lastly, Ice paid CSM's subcontractor Cardi $90,000 directly, which is included under the Contract.

46. Together, these rights of setoff total not less than $1,118,200, and reduce CSM's claim to $157,850.

| | |
|---|---|
| CSM's claim | $1,276,050 |
| Minus Credits due to Ice (described above) | $1,118,200 |
| **TOTAL** | $157,850 |

47. In addition to its defenses, Ice asserts counterclaims against CSM for violation of Chapter 93A for filing the mechanic's lien to leverage, coerce, and extort Ice into paying CSM monies it was not entitled to, and fraud. Among other things, to induce Ice to make payments, CSM submitted *eight* separate falsified Subcontractor/Supplier Affidavits of Payment, Waivers of Liens and Final Release (the "Releases"). Although the Releases were signed and notarized, Ice subsequently discovered that the notarized signatures were forgeries.

48. CSM also overcharged Ice by at least $60,000 for the rental of a generator. Specifically, CSM charged Ice approximately $100,000 for a generator CSM obtained from Sunbelt Rentals. Ice later received a copy of the actual Sunbelt

Rentals invoice, which revealed a price of just $26,496.91. Ice paid Sunbelt Rentals directly for these and other related charges.

49. CSM has repeatedly refused to provide information concerning claims of payments to subcontractors, or accounting records as required by Section 11 of the contract.

50. Ice also asserted counterclaims against CSM for slander of title and intentional interreference with business or contractual relations.

51. Although these claims are difficult to quantify, for estimation purposes, they provide further evidence to rebut CSM's efforts to satisfy its burden to establish the amount of its Claim.

## V. THE PRINCIPAL AMOUNT OF CSM'S CLAIM, AT MOST, SHOULD BE $157,850 FOR ESTIMATION PURPOSES

52. As illustrated above, the amount of CSM's claim is disputed. For any contested charges for Change Orders 9 through 13, CSM will need to demonstrate either that written authorization from Ice exists or prove the benefit associated with work that actually was requested by Ice, was actually performed by CSM or its subcontractors, was not defective or subject to reduction, and does not otherwise fall within the scope of work under the Contract. In other words, prove its quantum meruit claim. *But see BloomSouth Flooring Corp. v. Boys' & Girls' Club of Taunton Inc.*, 440 Mass. 618, 623 (2003) ("where the default is wilful there can be no recovery either on the contract or on a quantum meruit"). For the reasons discussed above, the amount of such Claim will be subject to further reduction.

53. The Plan Proponents submit that, based on the foregoing, for estimation purposes CSM will be unable to meet is burden to establish a claim in the amount that exceeds the amount of Ice's rights of setoff and counterclaims. In any event, the Plan Proponents request that the Court estimate the amount of CSM's Claim to be $157,850 based on the above arguments and calculations. *See supra*,¶ 46.

## VI. CSM HAS NO CONTRACTUAL OR OTHER RIGHT TO CHARGE COMPOUND INTEREST

54. CSM improperly included interest upon interest as part of its alleged $14,106,762.75 Claim. The Contract, however, does not provide for compound interest. Instead, it states at Section 15.2 :"Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below," which is "1.5 % One and a half percent monthly." *See* **Exhibit 1** at 11. By compounding interest, CSM has inflated the amount of its Claim by millions of dollars in violation of the Contract.

55. Given the factual disputes discussed herein and the uncertainties relating to the amount of CSM's Claim, the Plan Proponents submit that the Court, in its discretion, not include interest in the estimated amount of CSM's Claim.[14]

## VII. CSM'S MECHANIC'S LIEN SHOULD BE DISSOLVED IN ITS ENTIRETY

56. Whatever the amount of CSM's claim, for the foregoing reasons, there are ample grounds for the Court to conclude, for estimation purposes, that CSM intentionally overstated the amount of its mechanic's lien, and as a consequence, its

[14] If interest is included, the Contract provides for simple interest of 1.5% per month (*see id.*), calculated from February 1, 2017 to the Petition Date. Claim (Attachment I) (calculating interest starting in February 2017).

mechanic's lien is invalid under M.G.L. c. 254, § 11 ("[t]he validity of the lien shall not be affected by an inaccuracy in description of the property to which it attaches, if the description is sufficient to identify the property, or by an inaccuracy in stating the amount for labor or material *unless it is shown that the person filing the statement has willfully and knowingly claimed more than is due him*") (emphasis supplied). CSM purposefully inflated its claim by approximately $5 million based on associated change orders that were incontinent with its own certified requisitions and to which Ice never agreed.[15] CSM knew it had no signed Change Orders 9, 10, 11, 12, and 13, and thus no "written contract" with Ice for the contested work, as required by M.G.L. c. 254 §§ 2, 8. CSM nonetheless included such amounts in its SOA. CSM also charged Ice for work it never performed and for work CSM knew was defective.

57. By any measure, CSM has willfully and knowingly claimed more than was due to it, and failed to provide in the SOA "a just and true account of the amount due or to become due him, with all just credits," as required by M.G.L. c. 254 § 8.[16] In construing the mechanic's lien statute strictly against CSM, as it must (*see Ng Bros.*, 436 Mass. at 644), the Court should dissolve CSM's mechanic's lien for estimation purposes.

[15] In filing the Claim, CSM ignored established law and impermissibly included $8,181,270 of compound interest as part of its mechanic's lien claim.

[16] In view of the pending dispute concerning the valuation of Ice's property, it seemingly would be premature to estimate the amount of CSM's secured claim. But based on the conduct described above, the Plan Proponents submit that the Court could fairly estimate CSM's secured claim at $1 for voting purposes.

## CONCLUSION

58. There can be no legitimate dispute that CSM has significantly overstated the amount of its Claim. The Plan Proponents submit that the Court should estimate the amount of CSM's Claim to be $157,850.

**WHEREFORE**, the Plan Proponents respectfully request entry of an order:

(1) estimating CSM's Claim in the amount of $157,850; and

(2) granting the Plan Proponents such other and further relief as this Court deems just and proper.

Respectfully submitted,

Counsel for Debtors,

/s/ *Joseph M. Downes III*
Joseph M. Downes III, Esq.
William S. McMahon, Esq.
DOWNES MCMAHON LLP
215 Lewis Wharf
Boston, MA 02110
Telephone: (617) 600-6430
Email: jdownes@dmlawllp.com

Counsel for Ashcroft Sullivan Sports Village Lender, LLC,

/s/ *Gary M. Hogan*
Gary M. Hogan, Esq.
Baker, Braverman & Barbadoro, P.C.
300 Crown Colony Drive, Suite 500
Quincy, MA 02169-0904
Telephone: (781) 848-9610
Email: garyh@bbb-lawfirm.com

Counsel for Shubh Patel, LLC,

/s/ *D. Ethan Jeffery*
Harold B. Murphy, Esq. (BBO #362610)
D. Ethan Jeffery, Esq. (BBO #631941)
MURPHY& KING, P.C.
One Beacon Street
Boston, MA 02108
Telephone: (617) 423-0400
Email: EJeffery@murphyking.com

and

Donald R. Lassman, Esq.
LAW OFFICE OF DONALD R.
LASSMAN
P.O. Box 920385
Needham, MA 02492
Telephone: (781) 455-8400
Email: don@lassmanlaw.com