**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**(Eastern Division)**

| | |
|---|---|
| **In re:**<br><br>**NESV ICE, LLC, et al.,**[1]<br><br>**Debtors.** | **Chapter 11**<br><br>**Case No. 21-11226-CJP**<br><br>**Jointly Administered** |

**MOTION BY DEBTORS, ASHCROFT SULLIVAN SPORTS VILLAGE LENDER, LLC, AND SHUBH PATEL, LLC TO ESTIMATE SHS ACK, LLC CLAIM FOR PURPOSE OF VOTING ON AND DETERMINING CONFIRMABILITY OF PLAN**

The debtors and debtors-in-possession in the above-captioned case (collectively the "Debtors"), Ashcroft Sullivan Sports Village Lender, LLC ("ASVL") and Shubh Patel, LLC ("SP" and with the Debtors and ASVL, the "Proponents"), request, pursuant to section 502(c) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3018, that the Court estimate the claim of SHS ACK, LLC ("SHS") for purposes of voting on and determining the confirmability of the *Second Amended Joint Plan of Reorganization of NESV Ice, LLC, NESV Swim, LLC, NESV Tennis, LLC, NESV Land East, LLC, NESV Field, LLC, NESV Hotel, LLC, NESV Land, LLC, Ashcroft Sullivan Sports Village Lender, LLC, and Shubh Patel, LLC* (the "Plan") [doc. no. 345].

SHS asserts the single largest claim against the Debtors, in the amount of approximately $18.9 million, and asserts that its claim is secured by first mortgages on all of the Debtors' real properties. The Debtors have filed suit against SHS (the "SHS Litigation") seeking, among other

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, are: NESV Ice, LLC (1262), NESV Swim, LLC (5919), NESV Tennis, LLC (6937), NESV Land East, LLC (4138), NESV Field, LLC (5539), NESV Hotel, LLC (9151), and NESV Land, LLC (2353).

things, a declaration that SHS has improperly overstated the amount of its claim, the equitable subordination of SHS' claim, and the avoidance of SHS' guaranty from and mortgage on the real property owned by NESV Land East, LLC ("Land East"). The Plan proposes to pay $11.5 million to SHS on account on the effective date of the Plan, with the balance of SHS' claim paid in full, either over time or in cash upon the determination of SHS Allowed Claim (as defined in the Plan). The amount of SHS' claim is, therefore, an important part of the confirmation of the Plan, but the SHS Litigation will not be resolved prior to the hearing on confirmation of the Plan. The estimation of SHS' claim under section 502(c) is therefore appropriate as it is an unliquidated claim the fixing of which will "unduly delay the administration of" these bankruptcy cases. 11 U.S.C. § 502(c).

The Proponents request that, for purposes of voting on and determining the confirmability of the Plan, the Court: (a) in accordance with the Court's decision in the SHS Litigation, limit SHS' claim for default interest to periods after August 2, 2019, for the Term Loan (as defined below), and December 22, 2022, for the Construction Loan (as defined below), (b) limit the default rate of interest assessable by SHS at the contract rate plus five percent (5%), and (c) estimate SHS' attorneys' fee claim at not more than $375,000.

In further support of this motion, the Proponents aver as follows:

## JURISDICTION

1. The Court has jurisdiction to determine this motion pursuant to 28 U.S.C. §§ 157 and 1334. The estimation of claims is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). *See A.H. Robins Co., Inc. v Piccinin,* 788 F.2d 994 (4th Cir. 1986); *In re Baldwin-United Corp.,* 57 B.R. 751, 758 (S.D. Ohio 1985). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**A. The Debtors.**

2. The Debtors were organized in contemplation of the development of the New England Sports Village (the "Village"), a planned athletic, entertainment, and hospitality complex located on a 138.3-acre site in Attleboro, Massachusetts. Ajax 5Cap NESV, LLC ("Ajax 5Cap") owns 100% of the membership interests of each Debtor. Each Debtor owns a separate parcel of real property. Only NESV Ice, LLC ("Ice") is operating a business with significant assets other than its real property.

3. The Village, as planned, has three phases. Phase one was the construction of the full service ice rink facility currently operated by Ice (the "Rink"). Phase two contemplates the construction of a field house and a 150-room hotel catering to visitors and corporate events. The field will provide for indoor and outdoor fields, and will cater to sports such as soccer, lacrosse, field hockey, baseball, and gymnastics, as well as other entertainment events. Phase three contemplates the construction of a tennis, aquatics, and wellness center.

**B. The HarborOne Loans.**

4. On or about June 24, 2016, NESV Swim, LLC ("Swim"), NESV Tennis, LLC ("Tennis"), NESV Field, LLC ("Field"), NESV Hotel, LLC ("Hotel") and NESV Land, LLC ("Land"), as borrowers, entered into a Loan Agreement (Term Loan) (the "Term Loan Agreement") with HarborOne Bank ("HarborOne") pursuant to which they borrowed $1,960,000 (the "Term Loan") from HarborOne. Swim, Tennis, Field, Hotel and Land executed a promissory note (the "Term Note") in the principal amount of $1,960,000 in favor of HarborOne. Ice, Ajax 5Cap, and Stuart Silberberg, the manager of each of the Debtors, guarantied certain

obligations under the Term Loan Agreement. The Term Loan is purportedly secured by first priority mortgages on the Debtors' real estate and liens on the Debtors' personal property.

5. On or about June 24, 2016, Ice, as borrower, entered into a Construction Loan Agreement (Construction Loan) (the "Construction Loan Agreement," and together with the Term Loan Agreement, the "Loan Agreements") with HarborOne pursuant to which Ice could borrow up to $9,506,000 to build the Rink (the "Construction Loan" and together with the Term Loan, the "Loans"). Ice executed a promissory note (the "Construction Note" and together with the Term Note, the "Notes") in the face amount of $9,506,000.00 in favor of HarborOne. HarborOne made advances to Ice under the Construction Loan Agreement and Construction Note totaling $9,284.035.40. Swim, Tennis, Field, Hotel, Land, Ajax 5Cap, and Stuart Silberberg guarantied certain obligations under the Construction Loan Agreement. The Construction Loan is purportedly secured by mortgages on the Debtors' real estate and liens on the Debtors' personal property.

6. On or about July 24, 2020, Land East executed a Payment Guaranty [NESV Land East, LLC] (the "Land East Guaranty") whereby it guaranteed the other Debtors' obligations to HarborOne under the Loan Agreements. As security for its guaranty, Land East executed a certain Mortgage, Financing Statement and Security Agreement [NESV Land East, LLC] (the "Land East Mortgage") whereby it granted HarborOne a mortgage on its real property.

7. Interest under each of the Notes accrued at the "LIBOR Rate," which the Notes defined as the sum of the applicable "Published LIBOR Rate" (i.e., the 30-day LIBOR rate) and 3.5%. Each of the Notes also provides that "[p]rincipal, interest and other fees, charges, costs and expenses not paid when due shall accrue interest . . . at the Default Rate." The Notes define the Default Rate as the greater of (i) the "Published Base Rate" (as defined in each Note) plus

four percent (4%) and (ii) eighteen percent (18%) per annum. Upon information and belief, at all relevant times the Default Rate under the Notes was eighteen percent (18%) per annum.

8. Section 6 of the Construction Note provides that the:

> entire unpaid Principal balance of this Note and all accrued and unpaid interest thereon and all other fees, charges, costs and expenses hereunder shall become immediately due and payable, without demand, *at the sole option of Lender*, upon the earlier of (a) the Maturity Date, or (b) the occurrence of any one or more of the Events of Default set forth in the Loan Agreement.

Construction Note, § 6 (emphasis added).

9. Before assessing default interest HarborOne was therefore required to exercise its option to accelerate the amounts due under the Construction Loan and provide notice to the Debtors of that acceleration. SHS has failed to produce any documents establishing its claim for default interest under the Construction Loan prior to December 20, 2020.

**C. The Debtors' Financial Difficulties.**

10. Commencing in 2017, Ice became embroiled in a dispute with Construction Source Management ("CSM"), the general contractor for the construction of the Rink, over amounts allegedly due under the contract between CSM and Ice. CSM asserted statutory liens against Ice's real property and subsequently filed suit against Ice and others (the "CSM Litigation"). Ice disputes CSM's claims and asserted counterclaims against CSM and its principal, John Kelly, in the CSM Litigation.

11. The pressures of the CSM Litigation, along with certain project delays, cost overruns, and operational difficulties in the Rink's early stages, caused liquidity shortfalls for the Debtors and made it difficult to attract additional investment needed to continue to develop the Village.

12. By letter dated April 10, 2019 (the "April 10 Notice"), HarborOne notified the Debtors of the occurrence of certain events of default under the Construction Loan Agreement. After enumerating the non-exclusive list of alleged existing non-monetary defaults, HarborOne singled out one of them, Ice's failure to pay a deposit (defined in the April 10 Notice as the "Initial Deposit") that had been due, pursuant to section 7.19 of the Construction Loan Agreement, no later than February 24, 2017, as purportedly triggering HarborOne's right to assess default interest under the Construction Note as of March 1, 2017. HarborOne's agreement in the April 10 Notice "not to demand payment of additional interest at the Default Rate from such date forward but nevertheless reserves its right to demand payment of the same and to pursue its remedies related thereto at a later date . . ." demonstrates that HarborOne did not accelerate the Construction Loan under the April 10 Notice.

13. The Initial Deposit was specifically characterized in the Construction Loan Agreement as "a non-monetary default to which section 9.1(b) below shall apply in determining when an Event of Default occurs with regard to the same." Construction Loan Agreement, § 7.19(f). Section 9.1(b) provides that defaults other than payment defaults ripen into "Events of Default" only after the lender provides written notice, within the boundaries of the agreement's notice provision, and at least 30 days opportunity to cure the default. *Id*. at § 9.1(b).

14. HarborOne did not give the Debtors notice of Ice's failure to pay the Initial Deposit in accordance with section 9.1(b) of the Construction Loan Agreement prior to delivering the April 10 Notice. But even it had, a section 9.1(b) default did not entitle HarborOne to assess Default Interest because it was not a payment default under section 5(a) of the Construction Note or a monetary default pursuant to section 9.1(a) of the Construction Loan Agreement.

15. HarborOne, therefore, had no right under the Construction Loan Agreement to assess interest at the Default Rate as a result of any default, noticed or otherwise, resulting from a failure to comply with section 7.19 of the Construction Loan Agreement.

16. Monthly interest payments continued to be made on the Construction Loan until February 2020, when COVID-19 negatively impacted the Rink's operations. HarborOne accepted these payments without reservation.

17. On August 2, 2019, HarborOne issued a notice of default (the "August 2 Notice") to the Debtors arising from, among other things, the failure to repay the Term Loan in full on or before its June 24, 2019, maturity date. Notwithstanding the maturity of the Term Loan, HarborOne agreed to continue to accept periodic payments in accordance with the Term Loan Agreement and not to require the payment of default interest.

18. On or about July 24, 2020, the Debtors and HarborOne, among others, entered into a First Omnibus Amendment to Loan Agreement and Other Loan Documents [Construction Loan] (the "First Omnibus Construction Loan Amendment") and a First Omnibus Amendment to Loan Agreement and Other Loan Documents [Term Loan] (the "First Omnibus Term Loan Amendment," and together with the First Omnibus Construction Loan Amendments, the "First Omnibus Amendment"). Among other things, the First Omnibus Amendment provided that Land East would execute the Land East Guaranty and the Land East Mortgage.

19. The First Omnibus Amendment also amended section 10.3 of the Loan Agreements, titled "Assignments." In its original form, section 10.3 restricted assignments of the Loans to a "financial institution." By the amendment, the term "financial institution" was replaced with the phrase "any Person acceptable to the Lender, at its sole discretion." Prior to the First Omnibus Amendment, HarborOne did not disclose its intent to sell the Loans.

**D. The Assignment of the HarborOne Loans.**

20. SHS alleges that it acquired the Loans from HarborOne on December 22, 2021. On information and belief, as a condition of the sale of the Loans, SHS requested that HarborOne assess interest at the Default Rate under the Notes, eighteen percent (18%), retroactively to March 1, 2017.

21. On December 22, 2020, HarborOne sent the Debtors additional notices of default by which, for the first time, HarborOne purported not only to impose the Default Rate of interest, but did so retroactively to March 1, 2017, almost four years earlier. By these notices, HarborOne alleged that it was owed retroactive default interest of approximately $5,136,000. The December 22, 2020, notices of default calculated default interest through December 11, 2020, which was the day before HarborOne appears to have signed the documents assigning the Loans to SHS.[2]

22. As of December 31, 2020, the unpaid principal of the Loans was $11,244,035.40.

23. Shortly after acquiring the Loans, SHS stated its intention to foreclose on the Debtors' properties. This intention was made public in April of 2021, before the Debtors had received notice of any foreclosure, via a foreclosure notice posted on an auctioneer's website. That disclosure adversely affected all of the Debtors' operations.

24. Among other things, employees, customers and vendors expressed a fear that NESV would close. Customers and vendors refused to pay deposits or extend credit to Ice. As a result, Ice lost considerable revenue due to SHS's publication of its plan to foreclose.

[2] It is unclear when the documents assigning the Loans to SHS were signed. If they were signed before the December 22, 2020, letter to the Debtors, then HarborOne did not have the authority to send those letters, and SHS may not rely on those letters as evidence that the amount due under the Construction Loan was accelerated.

25. SHS refused to provide the Debtors with a detailed accounting of the alleged balances due under the Loans, including its calculations of interest. SHS refused to disclose its purported basis for claiming interest at the Default Rate retroactively to March 1, 2017.

26. On August 26, 2021 (the "Petition Date"), in order to stay SHS' foreclosure sales, the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

**E. The SHS Litigation.**

27. On November 29, 2021, SHS filed proofs of claim against each of the Debtors asserting a claim in the amount of $18,928,809.92 (collectively the "SHS Claims"). While these SHS Claims do not describe how the amount of the claim was calculated, it is clear that the amount asserted includes Default Interest under the Notes from March 1, 2017.

28. On October 21, 2021, the Debtors filed a complaint against SHS seeking, among other things, a declaration that SHS has improperly overstated the amount of its claim, the equitable subordination of SHS' claims, and the avoidance of the Land East Guaranty and the Land East Mortgage (the "SHS Litigation"). The SHS Litigation is pending before the Court under adversary proceeding number 21-1093.

29. SHS filed a motion to dismiss the SHS Litigation and the matter was briefed and argued to the Court.

30. On February 3, 2022, the Debtors objected to the SHS Claims.

31. On February 25, 2022, the Court issued its *Memorandum of Decision and Order* (the "Decision") [adv. proc. doc. no. 15] denying, in part, and granting in part, with leave to amend, SHS' motion to dismiss the SHS Litigation.

32. Among other things, the Decision provides:

- Section 6 of the Construction Note requires an act by the Lender (as defined in the Decision) to exercise its option to accelerate all indebtedness upon the occurrence of an Event of Default and written notice to the Debtors of such acceleration.

- Other than the December 22, 2020, letter, SHS has produced no proof that written notice of acceleration was provide to the Debtors under the Construction Note.

- SHS contention that Default Interest can be assessed retroactively to March 1, 2017, is contradicted by the December 31, 2020, account statements from HarborOne attached to the Complaint, which show that HarborOne was only assessing non-default interest.

- Other than the August 2, 2019, letter, SHS has produced no proof that written notice of the acceleration of the Term Loan was provided to the Debtors.

Decision at pp. 8-10.

33. On March 11, 2022, the Debtors filed an amended complaint in the SHS Litigation that, among other things, incorporated their objections to the SHS Claims into the SHS Litigation.

34. The hearing on confirmation of the Plan will commence on July 25, 2022, with hearings on the estimation of, among other things, SHS' Claims also scheduled to commence on that date.

## ARGUMENT

### A. Estimation of Claims.

35. Section 502(c)(1) of the Bankruptcy Code provides that:

> There shall be estimated for purpose of allowance under this section –
>
> (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case.
>
> * * *

36. Because the SHS Claims are unliquidated claims, the fixing of which will "unduly delay the administration of" the Debtors' bankruptcy cases, the Court may estimate the SHS Claims for purposes of both voting on and determining the confirmability of the Plan. *See In re Chemtura Corp.*, 448 B.R. 635, fn 46 (Bankr. S.D.N.Y. 2011); *In re Mangia Pizza Investments, L.P.*, 480 B.R. 669 (Bankr. W.D. Tex. 2012); *In re Harmony Holdings, LLC,* 395 B.R. 350, 354 (Bankr. Dist. S.C. 2008); *In re PG&E*, 295 B.R. 635 (Bankr. N.D. Cal. 2003); *In re MacDonald*, 128 B.R. 161, 164 (Bankr. W.D. Tex. 1991).

37. Bankruptcy courts have considerable discretion to determine the method for estimating claims, and the process for doing so is subject to the discretion of the Court. *See In re Innovasystems, Inc.*, 2014 Bankr. LEXIS 5103 (Bankr D.N.J. 2014); *In re Ralph Lauren Womenswear*, 197 B.R. 771 (Bankr. S.D.N.Y. 1996).

38. Bankruptcy Courts have generally followed one of three approaches in estimating claims in a chapter 11 case: (a) base a decision upon a cursory review of the documents filed and temporarily allow the claim in the full amount or at zero; *see, e.g., Mangia Pizza*, 480 B.R. at 681*; Innovasystems*, 2014 Bankr. LEXIS 5103, at *24-25); *Bittner v. Bourne Chemical Co.*, 691 F.2d 134 (3rd Cir. 1982); (b) adopt a process to assess the probability of the claimant's success on the merits and discount the claim appropriately; *see, e.g., Innovasystems,* 2014 Bankr. LEXIS at *6; *In re Pacific Sunwear of Cal., Inc.*, 2016 Bankr. LEXIS 2976 (Bankr. D. Del. 2016); *In re Federal Press*, 116 B.R. 650 (Bankr. N.D. Ind. 1989); or (c) attempt to determine the claimant's "actual economic interest" in the case and allow the claim accordingly; *see, e.g., Pension Benefit Guar. Corp. v. Enron Corp.*, 2004 U.S. Dist. LEXIS 21810 (S.D.N.Y. 2004).

39. In estimating claims, bankruptcy court processes have ranged from merely conducting a summary review of the relevant pleadings to conducting multi-day evidentiary

hearings. *See, e.g., In re M Waikiki, LLC,* 2012 Bankr. LEXIS 2398 (Bankr. D. Haw. May 29, 2012)(court conducted five-day evidentiary hearing); *In re PG&E,* 295 B.R. 635 (Bankr. N.D. Cal. 2003)(abbreviated mini-trial used to predict what future judge or jury might conclude from evidence presented at full trial); *In re Adelphia Bus. Sols, Inc.*, 341 B.R. 415 (Bankr. S.D.N.Y. 2003)(two-day evidentiary hearing conducted on 20 days' notice following motion for estimation for feasibility); *In re Lane*, 68 B.R. 609 (Bankr. D. Haw. 1986)(court reviewed pleadings and briefs followed by oral argument of counsel). *In re Hydrox Chem. Co.*, 194 B.R. 617 (Bankr. N.D. Ill. 1996)(resolution of RICO cause of action implemented through submission of pleadings, affidavits, deposition transcripts, and briefs); *In re Innovasystems, infra*, 2014 Bankr. LEXIS 5103 (Court reviewed the pleadings and conducted a nonevidentiary hearing at which counsel intimately familiar with the patent litigation made arguments; court disallowed claim after reviewing prior court decisions and submissions).

40. While a trier of fact must determine in litigation which version of the case is more probable and then proceeds to determine an award in a fixed amount, an estimation hearing pursuant to section 502(c) necessarily implies no certainty. An estimator of claims should take into account the likelihood that each party's version might or might not ultimately be established. *See In re Windsor Plumbing Supply Co*., 170 B.R. 503, 521 (Bankr. E.D.N.Y. 1994). The estimated value of the claim is then calculated to be the amount of the claim, reduced by the probability that an objection to the claim could be sustained in part or not at all. *Id*. In accomplishing this task, the estimator should follow the legal rules that would govern the ultimate determination of the claim. When estimating a claim based upon a breach of contract, the court should estimate the claim based upon the governing contracts. *See In re Federal-Mogul Global, Inc.*, 2005 U.S. Dist. LEXIS 17569, at *62 (D. Del. 2005).

**B. <u>The Amount of SHS Claims</u>.**

i. <u>SHS is Not Entitled to Default Interest Retroactively to March 1, 2017</u>.

41. The amount of the SHS Claims, $18,928,809.92, is based on assessing Default Interest retroactively to March 1, 2017. Since the Notes and Loan Agreements do not provide for the automatic acceleration of the Loans upon an event of default, SHS must show, as a condition to assessing Default Interest, that HarborOne provided written notice of acceleration to the Debtors. *See* Decision at 8-9, *citing Perry v. Wolaver*, 506 F.3d 48, 53–54 (1st Cir. 2007) (applying Maine law and rejecting creditor's assertion that late payment automatically accelerated note without written notice as being expressly contradicted by the note at issue, which made acceleration an option creditor could affirmatively exercise in the event of a default and that creditor's conduct in sending a notice letter that only sought default rate interest and late fees made clear that creditor did not accelerate the note or reflect a belief by the creditor that the note had been automatically accelerated); *Beal Bank S.S.B. v. Krock*, 201 F.3d 426, 2000 WL 18959, *2 (1st Cir. 2000) (unpublished table decision) (stating that "[a]n event of default triggers acceleration, at the holder's option, but both the note and Massachusetts law require written notice first.") (*citing Clark v. Trumble*, 692 N.E.2d 74, 79 (Mass. App. Ct. 1998)); Clark, 692 N.E.2d 74, 79 (Mass. App. Ct. 1998) (contrasting self-executing acceleration clause, providing as an example, "[f]ailure to pay any instalment as the same becomes due shall render the entire obligation then due and payable," with acceleration clause including language that it is at "the option of the holder, which interjects the right of an election by the holder. This language generally requires the holder to take some action to accelerate maturity, such as making demand for payment or filing suit" (emphasis in original) (citations and internal quotations omitted)); *Butter v. Melrose Sav. Bank*, 435 N.E.2d 1057, 1057 (Mass. App. Ct. 1982) (determining that

"[a]cceleration requires a positive act, but the act may consist of an unequivocal declaration by a mortgagee to a mortgagor that he is exercising the option.") (citations omitted).

ii. The Debtors' Failure to Make the Section 7.19(d) "Initial Deposit" is Not a Payment Default That Entitles SHS to Assess Default Interest.

42. The only default HarborOne cited to support the imposition of default interest retroactively to March 1, 2017, was the Debtors' failure to pay the Initial Deposit. The Construction Loan Agreement specifically denominates this as a non-monetary default. The Decision correctly states that SHS failed to provide any evidence that in March of 2017 HarborOne provided notice of this default pursuant to section 9.1(b) of the Construction Loan Agreement, which is a precondition to the occurrence of an Event of Default. *See* Decision at 6-7.

43. Moreover, neither the failure to pay the Initial Deposit under section 7.1(d) nor any other type of non-monetary Event of Default under section 9.1(b) of the Loan Agreement was a type of default that triggered the payment of interest at the Default Rate. Even if the section 7.1(d) breach ripened into an Event of Default at some later date, it did not cause interest at the Default Rate to accrue because it is not the type of payment default that could trigger the payment of interest at the Default Rate under section 5(a) of the Note.

44. Using a default interest rate of eighteen percent (18%), and the dates for the acceleration of the Construction Loan (December 22, 2020) and the notice of the maturity date of the Term Loan (August 2, 2019) set forth in the Decision, SHS' claim as of July 31, 2022, would be $14,837,468.[3] A schedule showing the calculation of SHS' claim using these assumptions is attached as Exhibit A.

[3] This claim amount is subject to all of the Debtors other rights, claims and defenses.

**C. <u>The Default Interest Rate is an Unenforceable Penalty</u>.**

45. Regardless of when the Loans were accelerated, the Default Interest rate set forth in the Notes is an unenforceable penalty.

46. The Notes define the "Default Rate" of interest as follows:

> "Default Rate" means the annual interest rate equal to the greater of (a) the Published Base Rate in effect at the time of calculation of the Default Rate, plus four percent (4%), and (b) eighteen percent (18%); provided, however, that at no time shall the Default Rate exceed the maximum rate permitted under applicable Legal Requirements.

47. The Notes define "Published Base Rate" to mean "a rate per annum equal to the rate of interest determined or announced from time to time by Lender as its 'Base Rate.'" The Published Base Rate is not necessarily the lowest rate of interest charged by Lender on loans or other credit relationships." During the course of the Loans, HarborOne's non-default rate of interest, which was the 30-day LIBOR rate plus 3.5%, on average ranged from 4.0% to 5.72%, and maxed out at approximately 6.0%. On December 22, 2020, the alleged date of the assignment to SHS, the 30-day LIBOR rate was 0.14%, meaning the non-default rate of interest was just 3.64%.

48. HarborOne sent Ice and Swim documents titled "Current Loan Information" dated December 31, 2020, reflecting interest rates of 3.644% (Construction Loan) and $3.625% (Term Loan).

49. The dramatic disparity between the rates of Default Rate (not less than 18%) and the non-default rate under the Notes (3.64% as of December 22, 2020) demonstrates that the Default Rate was not a reasonable forecast of damages, and is, instead, an unenforceable penalty. *See, e.g.*, *In re Charles Street African Methodist Episcopal Church of Boston*, 481 B.R. 1, 12-13 (Bankr. D. Mass. 2012) *aff'd OneUnited Bank v. Charles St. Afr. Methodist Episcopal Church of Bos.*, 501 B.R. 1 (D. Mass. 2013).

50. The Notes themselves indicate what HarborOne considered to be a reasonable forecast of damages. The Notes at section 5(b) provide for a late charge, which "is intended to help defray the expenses incurred by Lender in handling and processing delinquent payments and to compensate Lender for the loss of the use of the funds constituting the delinquent payment." The Notes define the term "Late Charge" to mean "five percent (5%) of any amounts due under this Note or the other Loan Documents and not paid within fifteen (15) consecutive calendar days of the date when due."

51. The increased costs incurred when a loan goes into default and the types of expenses incurred by lenders in handling and processing delinquent payments include demands on in-house staff, which are part of the bank's overhead and not otherwise separately chargeable to the borrower. By the terms of the Notes, it is these costs, and the loss of the use of funds, that are redressed by the five percent (5%) Late Charge on the amounts not paid when due. The damages flowing from a breach of the Notes were not difficult for HarborOne to ascertain. HarborOne could have reasonably predicted, on average, costs associated with a loan in default based on its own experience.

52. The payment of "all fees, charges, costs and expenses" and "reasonable attorneys' fees" are separately recoverable under the Notes and should not be factored into any anticipated damages addressed through the imposition of Late Charges or Default Interest.

53. Neither HarborOne nor SHS have provided any justification for increasing the anticipated damages amount from the five percent (5%) embodied in the Late Charge to the Default Interest rate of eighteen percent (18%).

54. In context, given the aggregate principal balance of the Notes ($11,244,035.40), the Default Interest rate of eighteen percent (18%) would result in damages of approximately

$2,023,926 per year. There is no plausible scenario under which HarborOne would sustain damages of over $2,000,000 per year based on a breach of the Notes, particularly since all of HarborOne's post-default fees, charges, costs and expenses are ostensibly separately recoverable.

55. The Court should, accordingly, limit SHS' default interest to the contract rate under the Notes plus five percent (5%).

56. Using a default interest rate of the contract rate plus five percent (5%), and the dates for the acceleration of the Construction Loan (December 22, 2020) and the notice of the maturity date of the Term Loan (August 2, 2019) set forth in the Decision, SHS' claim as of July 31, 2022, would be $12,889,151.[4] A schedule showing the calculation of SHS' claim using these assumptions is attached as Exhibit B.

**D. SHS' Attorneys' Fee Claim Should be Estimated at Not More Than $375,000.**

57. SHS has estimated that its attorneys' fees, through the date of the hearing on confirmation of the Plan, will be $750,000. For the reasons set forth below, the Court should estimate the amount of SHS' attorney's fees in the amount of not more than $375,000.

58. SHS purchased the Loans for the purpose of acquiring the Debtors' real properties. Since that time it has engaged in vexatious and inequitable conduct designed to seize the Debtors' real properties. Among other things, SHS has improperly inflated the amount of its claims by claiming to be owed default interest retroactively to March 1, 2017, which it knew, or should have known, was not permitted under the Loan Agreements. Conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for purposes of Massachusetts General Laws chapter 93A.

---

[4] This claim amount is subject to all of the Debtors other rights, claims and defenses.

59. Since the Petition Date, SHS has objected to virtually every pleading filed by the Debtors and has engaged in vexatious, scorched earth litigation tactics with the primary purpose of obtaining control and ownership of the Debtors' properties, rather than exercising reasonable efforts to collect its indebtedness. Proof of SHS' vexatious conduct can be seen in SHS' estimated professional fees, $750,000, which are $150,000 more than Debtors' counsel's estimate, $600,000, for handling all aspects of the Debtors chapter 11 cases. Two recent pleadings filed by SHS demonstrate the improper tactics it has employed in these cases. First, SHS recently filed a motion to dismiss the amended complaint in the SHS Litigation that seeks dismissal of the entire amended complaint, including counts in the amended complaint as to which the Court, in the Decision, held stated sufficient claims to survive a motion to dismiss. Second, SHS recently objected to the extension of the debtor-in-possession loan provided by SP on the grounds, among other things, that it permitted the Debtor, in lieu of borrowing funds from SP, to use cash collateral to make the required adequate protection payments to SHS.

60. SHS' actions are not those of a creditor seeking to recover payment of a debt, but those of a party who bought the HarborOne Loans for the purpose of acquiring the Debtors' real properties, and who is making every effort to frustrate the Debtors' reorganization to achieve that purpose. The Debtors and their creditors have suffered, and continue to suffer, injury as a result of SHS's actions in the form of, among other things, the uncertainty, costs and attorneys' fees associated with these bankruptcy proceedings and the negative impact on the Rink's operations, planning.

61. The Court should, accordingly, estimate the amount of SHS' attorneys' fees at not more than $375,000.

**WHEREFORE**, the Proponents request that, for the purposes of voting on and determining the confirmability of the Plan, the Court enter an order: (a) in accordance with the Decision, limiting SHS' claim for default interest to periods after August 2, 2019, for the Term Loan, and December 22, 2022, for the Construction Loan, (b) limiting the default rate of interest assessable by SHS at the contract rate plus five percent (5%), (c) estimating estimate SHS' attorneys' fee claim at not more than $375,000, and (d) providing the Proponents with such other relief as may be just.

Respectfully Submitted,

NESV Ice, LLC, NESV Swim, LLC,
NESV Tennis, LLC, NESV Land East,
LLC, NESV Field, LLC, NESV Hotel,
LLC, and NESV Land, LLC,
By their counsel,

/s/ *Joseph M. Downes*
Joseph M. Downes III, Esq.
William S. McMahon, Esq.
Downes McMahon LLP
215 Lewis Wharf
Boston, MA 02110
Telephone: (617) 600-8693
Email: jdownes@dmlawllp.com

Shubh Patel, LLC,
By its counsel,

/s/ *D. Ethan Jeffery*
D. Ethan Jeffery (BBO #631941)
Murphy& King, Professional Corporation
28 State Street, Suite 3101
Boston, MA 02109
D. Ethan Jeffery, Esq.
Telephone: (617) 423-0400
Email: EJeffery@murphyking.com

Ashcroft Sullivan Sports Village Lender,
LLC,
By its counsel,

/s/ *Gary M. Hogan*
Gary M. Hogan, Esq.
Baker, Braverman & Barbadoro, P.C.
300 Crown Colony Drive, Suite 500
Quincy, MA 02169-0904
Telephone: (781) 848-9610
Email: garyh@bbb-lawfirm.com

Dated: May 6, 2022

**IN RE: NESV ICE, LLC, *ET AL.***
**BANKRUPTCY NO. 21-11226-CJP**
**(JOINTLY ADMINISTERED)**

**EXHIBIT A TO**

**MOTION BY DEBTORS, ASHCROFT SULLIVAN SPORTS VILLAGE LENDER, LLC, AND SHUBH PATEL, LLC TO ESTIMATE SHS ACK, LLC CLAIM FOR PURPOSE OF VOTING ON AND DETERMINING CONFIRMABILITY OF PLAN**

NESV SHS Claim Calculation (as of July 31, 2022)

**Assumptions**

1. Default interest under the Term Loan commences August 2, 2019.

2. Default interest under the Construction Loan commences December 22, 2020.

3. The Debtors pay SHS $56,766 monthly through July 1, 2022, which is credited against the Construction Loan.

4. The $1,715 credit due to the Debtors is applied against the Term Loan.

5. The $64,836 swept by HarborOne on December 31, 2019, is applied against the Term Loan.

6. Does not include SHS' attorneys' fees claim of $750,000.

NESV SHS Claim Calculation (as of July 31, 2022)
Using default interest equal to eighteen percent (18%)

| | Principal | Interest | Late Fees/Costs | Total |
|---|---|---|---|---|
| Construction Loan | $ 9,284,035 | $ 2,587,747 | $ 13,837 | $ 11,885,619 |
| Term Loan | $ 1,960,000 | $ 991,849 | $ - | $ 2,951,849 |
| Total Both Loans | $ 11,244,035 | $ 3,579,596 | $ 13,837 | $ 14,837,468 |

Construction Loan

| Principal Balance | Date | Interest Rate | Interest | Late Fees |
|---|---|---|---|---|
| $ 9,284,035 | Mar-20 | 5.02% | $ 38,801 | $ 1,940 |
| $ 9,284,035 | Apr-20 | 4.49% | $ 34,760 | $ 1,746 |
| $ 9,284,035 | May-20 | 3.83% | $ 29,629 | $ 1,494 |
| $ 9,284,035 | Jun-20 | 3.68% | $ 28,490 | $ 1,441 |
| $ 9,284,035 | Jul-20 | 3.66% | $ 28,334 | $ 1,438 |
| $ 9,284,035 | Aug-20 | 3.65% | $ 28,277 | $ 1,440 |
| $ 9,284,035 | Sep-20 | 3.66% | $ 28,291 | $ 1,445 |
| $ 9,284,035 | Oct-20 | 3.65% | $ 28,225 | $ 1,446 |
| $ 9,284,035 | Nov-20 | 3.64% | $ 28,164 | $ 1,448 |
| $ 9,284,035 | 12/1 - 12/21 | 3.65% | $ 19,767 | $ - |
| $ 9,284,035 | 12/22 - 12/31 | 18.00% | $ 46,420 | $ - |
| $ 9,284,035 | Jan-21 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | Feb-21 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | Mar-21 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | Apr-21 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | May-21 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | Jun-21 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | Jul-21 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | Aug-21 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | Sep-21 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | Oct-21 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | Nov-21 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | Dec-21 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | Jan-22 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | Feb-22 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | Mar-22 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | Apr-22 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | May-22 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | Jun-22 | 18.00% | $ 139,261 | $ - |
| $ 9,284,035 | Jul-22 | 18.00% | $ 139,261 | $ - |
| Less post-petition interest payments | | | $ (397,362) | |
| Total July 2022 | | | $ 2,587,747 | $ 13,837 |

NESV SHS Claim Calculation (as of July 31, 2022)
Using default interest equal to eighteen percent (18%)

Term Loan

| Principal Balance | | Date | Interest Rate | | Interest | | Late Fees |
|---|---|---|---|---|---|---|---|
| $ | 1,960,000 | Aug-19 | 18.00% | $ | 29,400 | | |
| $ | 1,960,000 | Sep-19 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Oct-19 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Nov-19 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Dec-19 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Jan-20 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Feb-20 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Mar-20 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Apr-20 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | May-20 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Jun-20 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Jul-20 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Aug-20 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Sep-20 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Oct-20 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Nov-20 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | 20-Dec | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Jan-21 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Feb-21 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Mar-21 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Apr-21 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | May-21 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Jun-21 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Jul-21 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Aug-21 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Sep-21 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Oct-21 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Nov-21 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Dec-21 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Jan-22 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Feb-22 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Mar-22 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Apr-22 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | May-22 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Jun-22 | 18.00% | $ | 29,400 | $ | - |
| $ | 1,960,000 | Jul-22 | 18.00% | $ | 29,400 | $ | - |
| Credit per SHS Proof of Claim | | | | $ | (1,715) | | |
| Funds swept by HarborOne 12/31/19 | | | | $ | (64,836) | | |
| Total July 2022 | | | | $ | 991,849 | | |

**IN RE: NESV ICE, LLC, *ET AL.***
**BANKRUPTCY NO. 21-11226-CJP**
**(JOINTLY ADMINISTERED)**

**EXHIBIT B TO**

**MOTION BY DEBTORS, ASHCROFT SULLIVAN SPORTS VILLAGE LENDER, LLC, AND SHUBH PATEL, LLC TO ESTIMATE SHS ACK, LLC CLAIM FOR PURPOSE OF VOTING ON AND DETERMINING CONFIRMABILITY OF PLAN**

NESV SHS Claim Calculation (as of July 31, 2022)

**Assumptions**

1. Default interest under the Term Loan commences August 2, 2019.

2. Default interest under the Construction Loan commences December 22, 2020.

3. The Debtors pay SHS $56,766 monthly through July 1, 2022, which is credited against the Construction Loan.

4. The $1,715 credit due to the Debtors is applied against the Term Loan.

5. The $64,836 swept by HarborOne on December 31, 2019, is applied against the Term Loan.

6. Does not include SHS' attorneys' fees claim of $750,000.

NESV SHS Claim Calculation (as of July 31, 2022)
Using default interest equal to the contract rate + five percent (5%)

| | Principal | Interest | Late Fees/Costs | Total |
|---|---|---|---|---|
| Construction Loan | $ 9,284,035 | $ 1,189,210 | $ 13,837 | $ 10,487,082 |
| Term Loan | $ 1,960,000 | $ 442,069 | $ - | $ 2,402,069 |
| Total Both Loans | $ 11,244,035 | $ 1,631,279 | $ 13,837 | $ 12,889,151 |

Construction Loan

| Principal Balance | Date | Interest Rate | Interest | Late Fees |
|---|---|---|---|---|
| $ 9,284,035 | Mar-20 | 5.02% | $ 38,801 | $ 1,940 |
| $ 9,284,035 | Apr-20 | 4.49% | $ 34,760 | $ 1,746 |
| $ 9,284,035 | May-20 | 3.83% | $ 29,629 | $ 1,494 |
| $ 9,284,035 | Jun-20 | 3.68% | $ 28,490 | $ 1,441 |
| $ 9,284,035 | Jul-20 | 3.66% | $ 28,334 | $ 1,438 |
| $ 9,284,035 | Aug-20 | 3.65% | $ 28,277 | $ 1,440 |
| $ 9,284,035 | Sep-20 | 3.66% | $ 28,291 | $ 1,445 |
| $ 9,284,035 | Oct-20 | 3.65% | $ 28,225 | $ 1,446 |
| $ 9,284,035 | Nov-20 | 3.64% | $ 28,164 | $ 1,448 |
| $ 9,284,035 | 12/1 - 12/21 | 3.65% | $ 19,767 | $ - |
| $ 9,284,035 | 12/22 - 12/31 | 8.65% | $ 22,307 | $ - |
| $ 9,284,035 | Jan-21 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | Feb-21 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | Mar-21 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | Apr-21 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | May-21 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | Jun-21 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | Jul-21 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | Aug-21 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | Sep-21 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | Oct-21 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | Nov-21 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | Dec-21 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | Jan-22 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | Feb-22 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | Mar-22 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | Apr-22 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | May-22 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | Jun-22 | 8.65% | $ 66,922 | $ - |
| $ 9,284,035 | Jul-22 | 8.65% | $ 66,922 | $ - |
| Less post-petition interest payments | | | $ (397,362) | |
| Total July 2022 | | | $ 1,189,210 | $ 13,837 |

NESV SHS Claim Calculation (as of July 31, 2022)
Using default interest equal to the contract rate + five percent (5%)

Term Loan

| Principal Balance | | Date | Interest Rate | | Interest | | Late Fees |
|---|---|---|---|---|---|---|---|
| $ | 1,960,000 | Aug-19 | 8.65% | $ | 14,128 | | |
| $ | 1,960,000 | Sep-19 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Oct-19 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Nov-19 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Dec-19 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Jan-20 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Feb-20 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Mar-20 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Apr-20 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | May-20 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Jun-20 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Jul-20 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Aug-20 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Sep-20 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Oct-20 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Nov-20 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | 20-Dec | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Jan-21 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Feb-21 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Mar-21 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Apr-21 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | May-21 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Jun-21 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Jul-21 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Aug-21 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Sep-21 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Oct-21 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Nov-21 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Dec-21 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Jan-22 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Feb-22 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Mar-22 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Apr-22 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | May-22 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Jun-22 | 8.65% | $ | 14,128 | $ | - |
| $ | 1,960,000 | Jul-22 | 8.65% | $ | 14,128 | $ | - |
| Credit per SHS Proof of Claim | | | | $ | (1,715) | | |
| Funds swept by HarborOne 12/31/19 | | | | $ | (64,836) | | |
| Total July 2022 | | | | $ | 442,069 | | |