# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### (EASTERN DIVISION)

| | |
|---|---|
| In re:<br><br>**NESV ICE, LLC,** *et al.,*[1]<br><br>Debtors. | **Chapter 11**<br>**Case No. 21-11226-CJP**<br>**(Jointly Administered)** |

**OBJECTION OF CONSTRUCTION SOURCE MANAGEMENT, LLC
TO CONFIRMATION OF SECOND AMENDED JOINT PLAN OF REORGANIZATION
OF NESV ICE, LLC, NESV SWIM, LLC, NESV TENNIS, LLC, NESV LAND EAST,
LLC, NESV FIELD, LLC, NESV HOTEL, LLC, NESV LAND, LLC, ASHCROFT
SULLIVAN SPORTS VILLAGE LENDER, LLC,
<u>AND SHUBH PATEL, LLC</u>**

To the Honorable Christopher J. Panos, Chief United States Bankruptcy Judge:

NOW COMES Construction Source Management, LLC ("CSM"), a secured creditor of the Debtor, NESV Ice, LLC ("Ice"), and hereby objects (the "Objection") to confirmation of the *Second Amended Joint Plan of Reorganization of NESV Ice, LLC, NESV Swim, LLC, NESV Tennis, LLC, NESV Land East, LLC, NESV Field, LLC, NESV Hotel, LLC, NESV Land, LLC, Ashcroft Sullivan Sports Village Lender, LLC, and Shubh Patel, LLC* dated April 18, 2022 [Dkt. No. 345] (the "Plan").[2]

## I.   <u>BACKGROUND.</u>

### A.   <u>Relevant Background.</u>

1.   CSM was hired by Ice to serve as general contractor for the overall construction of the ice rink.  The contemplated job was immensely challenging.  The site was almost entirely ledge with steep elevation changes.

---

[1]   The debtors in these Chapter 11 cases, along with the last four digits of each debtor's tax identification number, are as follows:  NESV Ice, LLC (1262), NESV Swim, LLC (5919), NESV Tennis, LLC (6937), NESV Land East, LLC (4138), NESV Field, LLC (5539), NESV Hotel, LLC (9151), and NESV Land, LLC (2353).

[2]   Capitalized terms used but not defined in this Objection shall have the meanings ascribed to them in the Plan.

2.      CSM's and Ice's contract was based upon architectural drawings for the site work which were extremely rudimentary.  In fact, the drawings were only 3% complete.  Accordingly, at the time the contract was entered into the actual scope of the work was largely unknown, and because of the rudimentary nature of the drawings the parties understood that changes to the contract were inevitable.

3.      Notwithstanding the difficulties of the project, in light of Ice's desire to have the project completed early, CSM finished the building work in just nine (9) months, ahead of schedule.  As expected there were many changes and redesigns to the contract documented and accepted throughout the project.  Ice promised CSM it would take care of the outstanding Change Orders at the conclusion of the project, but it failed to do so.

4.      CSM completed all of the work requested of it.  In addition, CSM paid all subcontractors in full as evidenced by there being no other creditors of Ice asserting mechanic's liens on the project.  Now Ice refuses to pay CSM for the work it completed.

5.      CSM asserts a perfected mechanic's lien on Ice's real property under M.G.L. c. 254, §§ 2, 5, 8, and 11.  Specifically, CSM recorded a Notice of Contract with the Bristol County Registry of Deeds against Ice on November 23, 2016, recorded a Statement of Account on November 23, 2016 and January 17, 2017, and commenced a civil action by filing a complaint in the Bristol Superior Court on January 25, 2017.

6.      CSM's mechanic's lien was perfected after the recording of a mortgage now held by SHS ACK, LLC ("SHS"), and before the filing of a mortgage in favor of Ashcroft Sullivan Sports Village Lender, LLC ("ASVL").[3]

---

[3]      CSM does not concede the validity, priority, or amount of the claims and security interests asserted by SHS and ASVL, and specifically reserves all of its rights and remedies with respect thereto.

7.      CSM's proof of claim filed in the Debtors' cases evidences a secured claim against Ice in an amount in excess of $14 million.  See Claim No. 5-1.

**B.      Summary of Plan.**

8.      The Plan Proponents consist of the Debtors, ASVL, and Shubh Patel, LLC ("SP").

9.      The Plan provides for the restructuring of the Debtors' debts.  The Plan will be funded by: (a) a loan of approximately $12 million by SP to the Reorganized Debtors (i.e., the Plan Loan); (b) an additional contribution by SP of approximately $1.225 million; and (c) the Reorganized Debtors' continued operations.  In addition, under the Plan, ASVL will waive its liens on the Debtors' assets and convert its claims into equity interests in a new holding company that will own the Reorganized Debtors.  The DIP Loan made by SP to the Debtors will also be converted to equity interests in the new holding company.

**C.      Estimation of CSM's Claims.**

10.     The Plan provides for this Court to estimate CSM's claims for the purpose of deciding whether or not to confirm the Plan.  Confirmation of the Plan requires the estimation of CSM's claims because the amount of CSM's "allowed claims" will be determined after the hearing on confirmation of the Plan, in the state court litigation between Ice and CSM (among others).

11.      In the *Plan Proponents' Motion to Estimate Construction Source Management, LLC's Claim* [Dkt. No. 387] (the "Claims Estimation Motion"), the Plan Proponents argue that CSM's claims are overstated and subject to setoff and further reduction and should be estimated at $157,850.

12.     CSM filed an *Objection to the Claims Estimation Motion* [Dkt. No. 408] (the "Claims Estimation Objection").  In the Claims Estimation Objection, CSM disputes the Plan

Proponents' allegations seeking to reduce or setoff CSM's claims and requests that the Court

estimate CSM's claims for confirmation purposes in the amount of not less than $10,806,276.53,

comprised of a mechanic's lien claim of $5,825,486 and simple interest on its claim of

$4,980,790.53.

13.     In addition, the retainage portion of CSM's mechanic's lien claim is not less than

$376,505.  CSM believes that it preserved the priority of its retainage claim in accordance with

M.G.L. c. 254, §§ 7(b) and 32.  Accordingly, CSM's retainage claim is entitled to priority senior

to SHS' secured claims against the assets of Ice.

**D.    <u>Plan Treatment of CSM's Claims</u>.**

14.     The Plan separately classifies CSM's secured claims against Ice in Class 3.

15.     CSM is impaired under the Plan.

16.     Specifically, the Plan proposes the following treatment of CSM's secured claims:

(c) <u>Claim Treatment</u>.  In full and final satisfaction, settlement, discharge and
release of the Allowed CSM Secured Claim against Ice, the holder of the Allowed
CSM Secured Claim shall receive payment in full of such Claim from the
Reorganized Debtors, at the sole election of the Proponents, by one of the
following methods:

(i)     (A) From the Effective Date until the determination of the Allowed
CSM Secured Claim, monthly payments of interest only on an
amount equal to the Estimated CSM Secured Claim, calculated
based on the Plan Interest Rate, with such interest only payments
commencing on the first day of the first full month following the
Effective Date,

(B) Through monthly payments, commencing on the first day of
the first full month following the determination of the Allowed
CSM Secured Claim, consisting of (I) principal computed on the
basis of an amortization schedule of twenty (20) years from such
determination, and (II) interest calculated based on the Plan Interest
Rate, or such other rate determined by Final Order, with the unpaid
balance of such Claim due on the tenth (10th) anniversary of the
Effective Date, and

(C) Through the granting of a Lien, junior to SHS' Liens and the Liens securing the Plan Loan, on the real property owned by Swim, Tennis, Land East, Field, Hotel and Land;

(ii)  Within ten (10) Business Days of the determination of the Allowed CSM Secured Claim, in cash equal to the amount of the Allowed CSM Secured Claim, minus all amounts paid to CSM between the Petition Date and the date the Allowed CSM Secured Claim is determined;[4] or

(iii)  By such treatment as is agreed upon in writing between the Proponents and the holder of the Allowed CSM Secured Claim.

Plan, Art. 4.3(c).

17.  The Plan further provides that any deficiency claim held by CSM will be treated as a Class 6 general unsecured claim.  Plan, Art. 4.3(e).

18.  CSM has voted to reject the Plan and therefore Class 3 is a non-accepting impaired class.[5]

19.  The Court has scheduled hearings to consider confirmation of the Plan (and related valuation and claims estimation issues) for July 25, July 26, July 27, and July 28, 2022.

## II.  <u>OBJECTIONS TO CONFIRMATION OF THE PLAN.</u>

20.  As discussed below, the Plan is fundamentally flawed and unconfirmable.  Among other flaws, the Plan cannot be confirmed because (a) even applying a "per plan" approach, no impaired, non-insider class will accept the Plan, (b) the Plan discriminates unfairly between CSM and other secured creditors; (c) the Plan cannot be found to be in the best interests of creditors; (d) the Plan is not fair and equitable with respect to CSM; and (e) the Plan is not feasible.

---

[4]  As stated in Article 4.3(c)(i)(B), the Plan provides that CSM's "Allowed Secured Claim" under the Plan will include the principal amount of CSM's mechanic's lien claim plus interest.  Accordingly, any interest payments made to CSM post-confirmation should not be "credited" against the principal amount of CSM's mechanic's lien claim.

[5]  CSM also submitted a Class 6 ballot rejecting the Plan related to any unsecured claims.

A. **The Plan Does Not Satisfy the Requirements of Bankruptcy Code § 1129(a)(10).**

21.      The Plan does not satisfy the requirements of Bankruptcy Code § 1129(a)(10).

Bankruptcy Code § 1129(a)(10) provides that "[i]f a class of claims is impaired under the plan, at

least one class of claims that is impaired under the plan has accepted the plan, determined

without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).

22.      The Plan Proponents assert that, with respect to a multi-debtor plan like the Plan,

§ 1129(a)(10) requires only one impaired, accepting class per plan.  See *Plan Proponents'*

*Memorandum of Law in Support of Confirmation of Plan* [Dkt. No. 335].

23.      The Plan Proponents believe that the Plan satisfies § 1129(a)(10) because Class 4

(ASVL Secured Claims) is impaired under the Plan and, as a non-insider and co-proponent of the

Plan, ASVL will vote in favor of the Plan.  ASVL asserts claims against all Debtors other than

Land East.

i. ***SHS Controls ASVL's Plan Voting Rights and Will Vote to Reject the Plan.***

24.      Significantly, SHS holds the right to vote ASVL's claims related to the acceptance

or rejection of the Plan pursuant to the express terms of a certain Subordination and Standstill

Agreement (the "Subordination Agreement") entered into pre-petition by the Debtors and ASVL

in favor of SHS' predecessor in interest HarborOne Bank ("HarborOne").  A copy of the

Subordination Agreement is attached as **Exhibit A**.[6]

25.      Bankruptcy Code § 510(a) provides that "[a] subordination agreement is

enforceable in a case under this title to the same extent that such agreement is enforceable under

---

[6]      The Subordination Agreement attached hereto was previously filed with this Court as an exhibit to *SHS' Omnibus Reply to ASVL's and the Debtors' Oppositions to SHS' Claim Objection and Motions to Strike* [Dkt. No. 362].

applicable nonbankruptcy law." 11 U.S.C. § 510(a).

26.    Paragraph 4 of the Subordination Agreement provides:

> The Subordinate Lender [ASVL] irrevocably authorizes and directs the
> Senior Lender [HarborOne] and any trustee in bankruptcy, receiver or
> assignee for the benefit of creditors of any of the Borrowers or Ajax,
> whether in voluntary or involuntary liquidation, dissolution or
> reorganization proceedings, on the Subordinate Lender's behalf, to take
> such action as may be reasonably necessary or appropriate to effect the
> subordination provisions and other rights and/or remedies granted to the
> Senior Lender in the Agreement (including, without limitation, in the case
> of the Senior Lender, to file a proof of claim and **to vote upon matters**
> **with respect to which the Subordinate Lender may be able to vote in**
> **connection with any bankruptcy proceedings related to any of the**
> **Borrowers** or Ajax) and irrevocably appoints the Senior Lender and any
> such trustee, receiver or assignee as its attorney-or-attorneys-in-fact for
> such purposes with full powers of substitution and re-substitution.  The
> power of attorney conferred on the Senior Lender and any such trustee
> receiver and assignee by the provisions of this Paragraph 4, being coupled
> with an interest, shall be irrevocable until the Senior Debt is fully satisfied
> and shall not be affected by the disability or incapacity of the Subordinate
> Lender and shall survive the same.  Such power of attorney is provided
> solely to protect the interests of the Senior Lender and any such trustee,
> receiver and assignee and shall not impose any duty on the Senior Lender
> nor any such trustee, receiver or assignee to exercise any such power and
> neither the Senior Lender nor any such trustee, receiver or assignee shall
> be liable for any act, omission, error in judgment or mistake of law, except
> as the same may result from its gross negligence or willful misconduct.

Subordination Agreement, ¶ 4 (emphasis added).

27.    In sum, pursuant to the Subordination Agreement, ASVL irrevocably assigned to

HarborOne (SHS' predecessor in interest) its rights to vote to accept or reject the Plan.

28.    CSM anticipates that SHS will submit a Class 4 ballot that rejects the Plan with

respect to ASVL's secured claims.  Based upon the Subordination Agreement, the Court should

disregard any ballot submitted by ASVL.

29.    Courts have enforced provisions like the one in the Subordination Agreement,

granting the senior creditor the right to vote the subordinate creditor's claim for or against plan

confirmation.  See, e.g., In re MPM Silicones, LLC, 596 B.R. 416, 431-32 (S.D.N.Y. 2019) (in

dicta); In re Avondale Gateway Ctr. Entitlement, LLC, 2011 WL 1376997, at *4 (D. Ariz. 2011);

In re Coastal Broad Sys., Inc., 2012 WL 2803745, at *7-8 (Bankr. D.N.J. 2012), aff'd 2013 WL

3285936, at *5-6 (D.N.J. 2013), aff'd 570 F. App'x 188, 192 (3d Cir. 2014).  But see In re SW

Boston Hotel Venture, LLC, 460 B.R. 38, 52 (Bankr. D. Mass. 2011).  This Court should also

enforce the terms of the Subordination Agreement, which were negotiated by sophisticated,

commercial non-debtor parties.

30.    Assuming that SHS votes ASVL's claims and rejects the Plan, the Plan

Proponents will no longer have an impaired, accepting class. [7]  Accordingly, the Plan does not

meet the requirements of § 1129(a)(10) and confirmation of the Plan must be denied.

> ii.    *Even if the Court Determines that Class 4 is an Impaired, Accepting Class, the Plan is Not Confirmable Because No Impaired Class of Land East's Creditors Will Accept the Plan.*

31.    CSM adopts the arguments put forth by SHS in its *Objection to Disclosure

Statement* [Dkt. No. 311] ("SHS DS Objection") and its *Objection to the Amended Disclosure

Statement* [Dkt. No. 334] ("SHS Amended DS Objection") and asserts that the Court should

employ the "per debtor" approach to § 1129(a)(10).  See SHS DS Objection, Sec. III(B), pp. 20-

22 and SHS Amended DS Objection, Sec. III, pp. 23-25.

32.    CSM acknowledges that there is a split among courts regarding how the impaired,

accepting class rule of § 1129(a)(10) should be applied in multi-debtor cases.  The "per plan"

approach provides that a joint plan need only garner the acceptance of a single impaired creditor

class in order to be confirmed.  See In re Consol. Land Holdings, LLC, 2021 Bankr. LEXIS

2270, at *12 n.67 (Bankr. M.D. Fla. Aug. 20, 2021) (collecting cases).  In contrast, the "per

---

[7]    To the extent that the Court declines to enforce the Subordination Agreement, ASVL's vote in favor of the Plan cannot be counted for the purposes of § 1129(a)(10) because ASVL is a non-statutory insider of the Debtors.

debtor" approach requires that an impaired, accepting class must be present for each debtor.  Id.;

In re Tribune Co., 464 B.R. 126, 180-83 (Bankr. D. Del. 2011).

33.     While CSM has not identified any First Circuit precedent deciding this issue, the

"per debtor" approach is the better approach on these facts.  Specifically, ASVL is a Plan

Proponent and will receive preferential treatment under the Plan despite the fact that its asserted

liens against assets of Ice are junior in interest to both SHS and CSM.

34.     In this case, even if the Court determines that ASVL, rather than SHS, controls its

Class 4 vote, ASVL does not have claims against Land East.  The only impaired creditor of Land

East is SHS.

35.     Based on the foregoing, the Court should apply the "per debtor" approach, and

find that, without the acceptance of SHS, the Plan does not satisfy § 1129(a)(10).

**B.      The Plan Discriminates Unfairly Between CSM and Other Secured
         Creditors.**

36.     Under Bankruptcy Code § 1129(b)(1), the Plan must "not discriminate unfairly"

with respect to each impaired, non-accepting class.  The Plan, however, proposes unfairly

disparate treatment between CSM and other secured creditors and, therefore, is unconfirmable.

37.     Under the first "method" of treatment of CSM's secured claim in Class 3, from

the Effective Date until the amount of CSM's secured claim is determined through post-

confirmation litigation in the state court, the Plan provides for monthly payments of interest only

calculated based on the estimated amount of CSM's secured claim.  Plan, Art. 4.3(c)(i)(A).  The

applicable rate of interest is 4.25% per annum (unless the Court imposes an alternative rate of

interest).

38.     Once CSM's secured claim is determined, the Plan contemplates a ten-year term

to pay CSM's secured claim with a twenty-year amortization rate.  Plan, Art. 4.3(c)(i)(B).

### i.        *The Plan Affords Preferential Treatment to ASVL.*

39.        Clearly, the Plan affords ASVL preferential treatment at the expense of CSM.

See, e.g., In re Tribune Co., 972 F.3d 228, 244 (3d Cir. 2020) (discussing that a rebuttable

presumption of unfair discrimination exists when there is (a) a dissenting class; (b) another class

of the same priority; and (c) a difference in the plan's treatment of the two classes that results in

either (i) a materially lower percentage recovery for the dissenting class (measured in terms of

the net present value of all payments), or (ii) regardless of percentage recovery, an allocation

under the plan of materially greater risk to the dissenting class in connection with its proposed

distribution).

40.        The Plan provides that ASVL will receive a seventeen percent (17%) equity

interest in the Reorganized Debtors, guaranteed dividends of $367,237.63 per year,[8] and a release

of avoidance actions from the estates.  See Plan, Art. 4.4(c).

41.        Essentially, the Plan Proponents propose to grant ASVL an ownership interest in

an enterprise that purportedly owns $40 million in real estate and further to pay ASVL a sizable

annual return in exchange for ASVL to support the Plan.  In contrast, the Plan proposes to pay

senior secured creditors out over a ten (10) year period at a lower interest rate.

42.        Significantly, ASVL's lien is junior to CSM's lien against Ice's assets.

Notwithstanding CSM's senior position, the Plan affords ASVL with far better treatment.  The

Plan Proponents propose to pay CSM, a senior secured creditor, interest over the next ten (10)

years at a rate of 4.25%, less than that being provided to ASVL under the Plan (i.e., 4.75%).[9]

---

[8]        The Plan provides that ASVL will be entitled to an "internal rate of return of four and three-quarters percent
(4.75%) on its Secured Claims[.]"  Plan, Art. 4.4(c).  Therefore, it appears that the Plan proposes to pay ASVL
an annual guaranteed dividend in the amount of 4.75% on its secured claims.  This equates to an annual return of
$367,237.63 on ASVL's $7,731,318.49 claim.  The proposed "internal rate of return" adopts the interest rate
that ASVL received from Ajax pre-petition.

[9]        Unlike ASVL, the Plan provides CSM with no right to share in the equity of the Reorganized Debtors.

43.     While ASVL will receive an equity stake in the Reorganized Debtors and guaranteed dividends each year commencing on the Effective Date, CSM must litigate its claims after confirmation and wait ten (10) years for its claims to be paid.  In addition, the Plan proposes to pay CSM from highly speculative and unsubstantiated business revenues and establishes no reserve of cash to fund payments to creditors with claims in dispute.  In fact, it appears that the Plan depends on the Debtors, who have <u>never</u> been profitable,[10] attaining immediate profitability upon confirmation.  As such, the Plan will cause CSM to bear an undue proportion of risk under the Plan.

44.     For all those reasons, the Plan unfairly discriminates between CSM and ASVL.

*ii.*      ***The Plan Affords Preferential Treatment to SHS.***

45.     The Plan also affords unfairly preferential treatment to SHS.

46.     The Plan Proponents dispute the amount of SHS' and CSM's secured claims and seek to have such claims estimated for confirmation purposes.  Notwithstanding these similarities, SHS will receive a significant payment of not less than $11.5 million on the Effective Date.  CSM, however, will receive only interest payments on its estimated claims for potentially several years post-confirmation while its claims are litigated.

47.     Significantly, CSM's retainage portion of its mechanic's lien claim is not less than $376,505 (the "Retainage Claim").

48.     Under Massachusetts law, in certain circumstances, the retainage owed to a mechanic's lien creditor is afforded priority over a mortgage lien recorded prior to the recording of the mechanic's lien creditor's notice of contract.  <u>See</u> M.G.L. c. 254, §§ 7(b) and 32.

---

[10]    Ice's most recent Monthly Operating Report for May 2022 [Dkt. No. 452] shows that the Debtors are still not operating profitably.

49.     CSM believes that it preserved the priority of its Retainage Claim in accordance

with M.G.L. c. 254, §§ 7(b) and 32.  See **Exhibit B**.[11]  Accordingly, the Retainage Claim is

senior in interest to SHS' mortgage and should be paid in full on the Effective Date.[12]

50.     Unless the Plan provides for the full payment of the Retainage Claim on the

Effective Date, the Plan discriminates unfairly between CSM and SHS and should not be

confirmed.

51.     In sum, the Plan discriminates unfairly among classes of secured creditors.

Therefore, the Plan fails to satisfy the requirements of Bankruptcy Code § 1129(b)(1).

### C.     The Plan Cannot be Deemed in the Best Interests of Creditors as Required by Bankruptcy Code § 1129(a)(7).

52.     Bankruptcy Code § 1129(a)(7)(A)(ii) requires that each non-accepting holder in

each impaired class of claims or interests:

> will receive or retain under the plan on account of such claim or interest
> property of a value, as of the effective date of the plan, that is not less than
> the amount that such holder would so receive or retain if the debtor were
> liquidated under chapter 7 of this title on such date[.]

11 U.S.C. § 1129(a)(7)(A)(ii).

53.     To establish that the Plan should be confirmed, the Plan Proponents bear the

burden of satisfying the best interests of creditors test codified in § 1129(a)(7).  See, e.g., In re

Draiman, 450 B.R. 777, 789 (Bankr. N.D. Ill. 2011); In re Global Ocean Carriers Ltd., 251 B.R.

31, 46 (Bankr. D. Del. 2000).

---

[11]    In the Disclosure Statement, the Plan Proponents incorrectly state that CSM's claims are likely substantially
under-secured or wholly unsecured and suggests that the entirety of CSM's secured claims are junior in priority
to SHS's secured claims against the assets of Ice.  See Disclosure Statement, Arts. 4.2(F) and 8.1.

[12]    Upon information and belief, SHS does not dispute that CSM holds a retainage claim in some amount that is
senior in interest to SHS' lien.

54.     In order to meet this burden, the Plan Proponents must present plausible, complete evidence as to the liquidation value of assets and the amount of the recovery to creditors in a hypothetical Chapter 7 case.  See In re SW Boston Hotel Venture LLC, 460 B.R. 38, 65-66 (Bankr. D. Mass. 2011); In re Rusty Jones, Inc., 110 B.R. 362, 373-74 (Bankr. N.D. Ill. 1990).

55.     The Plan Proponents must also show that under the Plan, each non-accepting creditor will receive property under the Plan that has a present value at least equal to the amount that such creditor would receive in a Chapter 7 liquidation.  See, e.g., SW Boston Hotel Venture, 460 B.R. at 65-66; see also ACC Bondholder Grp. v. Adelphia Commc'ns. Corp., 361 B.R. 337, 364 (S.D.N.Y. 2007); In re Crwothers McCall Pattern, Inc., 120 B.R. 279, 292 (Bankr. S.D.N.Y. 1990).

### *i.    SHS' and CSM's Secured Claims and Debtors' Appraisals.*

56.     SHS asserts a secured claim of approximately $18.9 million.  SHS' secured claim is secured by mortgages on all of the Debtors' real properties and liens on the Debtors' personal property.

57.     CSM asserts a secured mechanic's lien claim of approximately $5.825 million. CSM's mechanic's lien claim is secured by a lien on only Ice's real estate and on no other collateral.  As noted above, except for CSM's Retainage Claim, it appears that the SHS' secured claim is senior in priority to CSM's mechanic's lien claim.

58.     The Plan Proponents' appraisals of the Debtors' real properties dated April 24, 2022 show: (a) a fair market value for Ice's real property of $18,500,000 and (b) an aggregate fair market value for the other Debtors' real properties of $19,300,000.[13]  Based on those appraisals, the Debtors' real properties have a collective fair market value of $37,800,000.

---

[13]    CSM reserves all rights to present competing appraisals or otherwise challenge the Debtors' valuation assertions at a later time.

## ii.    *The Plan Proponents' Hypothetical Liquidation Analysis.*

59.     The Plan fails to satisfy the "best interests" of creditors test because the Plan

Proponents provide no liquidation analysis and instead conclude based on conjecture that

"[c]onfirmation of the Plan will . . . result in a substantially more certain and greater return to all

unsecured creditors than might be realized if the Bankruptcy Cases were converted to cases under

chapter 7 of the Bankruptcy Code."  Disclosure Statement, Art. 8.2.

60.     The Plan Proponents submit that: (a) upon conversion, SHS would be granted

relief from the automatic stay to foreclose its liens on the Debtors' properties; (b) SHS would

either credit bid its claim at the foreclosure sale or make claim to all of the proceeds of the

foreclosure sale; (c) no other creditors, other than taxing authorities, would receive anything; and

(d) a Chapter 7 trustee is not likely to litigate the amount of SHS' claims, as there would be no

unencumbered funds to prosecute the litigation, and the primary beneficiaries of the litigation

would be CSM and ASVL as junior lienholders.  Disclosure Statement, Art. 8.2.

61.     This cursory and unsupported summary of the "likely" outcome of a hypothetical

liquidation is wholly inadequate to satisfy "best interests" requirements.

## iii.    **The Plan Proponents' Liquidation Analysis Fails to Account for CSM's Valid Marshaling Claims.**

62.     The Plan Proponents assert that in a hypothetical liquidation case CSM's

mechanic's lien claim is likely to be substantially under-secured or wholly unsecured.  See

Disclosure Statement, Arts. 4.2(F) and 8.1.  The Plan Proponents further argue that "in a

liquidation SHS' Allowed Claims are . . . likely to be allocated to Ice" because "[s]ubstantially

all of SHS' loans to the Debtors . . . were used in the construction of Ice's rink[.]"  See

Disclosure Statement, Art. 8.2.

63.     CSM submits that, under the equitable doctrine of marshaling, it would be inequitable and unjust to CSM to allow SHS to liquidate assets of Ice first (i.e., CSM's only collateral) in order to pay the entirety of SHS' secured claim.  Instead, after conversion to a case under Chapter 7, CSM would raise marshaling claims in either the Bankruptcy Court (if the Chapter 7 trustee was to sell the Debtors' real properties pursuant to § 363) or in state court (if SHS were to foreclose on the Debtors' real properties after obtaining relief from the stay) to ensure that SHS would be required to first pursue the assets of the non-Ice Debtors in order to satisfy its claims.  See In re Szwyd, 394 B.R. 230, 236 (Bankr. D. Mass. 2008) ("It is beyond refutation that bankruptcy courts have the equitable power to order the marshaling of assets in a bankruptcy case or proceeding").

64.     "The equitable doctrine of marshaling exists for the benefit of junior creditors." In re Pray, 242 B.R. 205, 209 (Bankr. D. Mass. 1999).  Marshaling "may be invoked when a senior and a junior creditor are both secured by a common asset, but where the senior creditor is also secured by some other asset, or assets, of a common debtor."  In re Sunset Hollow Props., 359 B.R. 366, 378-79 (Bankr. D. Mass. 2007).  "Under the doctrine of marshaling, the senior creditor is required to look first to the non-shared collateral to satisfy its claim, thereby providing the junior creditor with the opportunity to reach equity for its claim in the shared collateral." Id. at 379; see Szwyd, 394 B.R. at 236 (noting that "the marshaling doctrine requires that a senior lienholder resort first to assets unavailable to the junior lienholder to prevent [resulting inequities]").

65.     "Marshaling is generally understood by reference to state law since the rights of lienholders typically arise in a non-bankruptcy venue." Szwyd, 394 B.R. at 236 (citing In re Dig It, Inc., 129 B.R. 65, 67 (Bankr. D.S.C. 1991)).

66.     Massachusetts law requires that a junior lienor seeking to apply the marshaling

doctrine must demonstrate that three conditions are met: "(1) a common debtor; (2) two separate

funds, one of which is a common fund available to both creditors and one of which is available

only to the senior creditor; and (3) no detriment or prejudice to the senior creditor if he is

required to pursue the fund to which he alone can look." In re T.H.B. Corp., 85 B.R. 192, 196

(Bankr. D. Mass. 1988); see Szwyd, 394 B.R. at 236-37.

67.     The first condition is met here.  Both SHS' and CSM's secured claims are secured

by the assets of Ice.  Therefore, SHS and CSM share a "common debtor."

68.     The second condition is also met here.  In addition to Ice's real property which is

both SHS' and CSM's collateral, SHS' collateral consists of (a) Ice's personal property and

(b) the non-Ice Debtors' real properties.

69.     Therefore, there are separate "non-shared" assets (primarily, the real properties

owned by the non-Ice Debtors) available to SHS in order to satisfy SHS' secured claims.

70.     Further, the Plan provides for consolidation of the Debtors in order to implement

the Plan and to satisfy Allowed Claims.  See Plan, Art. 5.9.  Specifically, the Plan provides in

Article 5.9 (Plan Consolidation), in relevant part and without limitation, that "[o]n the Effective

Date . . . , the Debtors shall be consolidated such that:

> (a) all assets (and all proceeds thereof) and liabilities of each Debtor shall be
> deemed merged or treated as though they were merged into and with the assets
> and liabilities of all other Debtors; [and]

> (c) all guarantees of any Debtor of the obligations of any other Debtor shall be
> deemed eliminated and extinguished so that any Claim against any Debtor and any
> guarantee thereof executed by the other and any joint and several liability of any
> Debtor shall be deemed to be one obligation of the Reorganized Debtors[.]

Art. 5.9.

71.      In light of the consolidation of the Debtors under the Plan, all of the Debtors are

treated as common debtors for marshaling purposes.  CSM has recourse only to the assets of Ice,

while SHS has recourse to the assets of Ice and the assets of the other six consolidated Debtors,

valued at more than $19 million.

72.      The third condition is also met here.  SHS will not be prejudiced if marshaling is

applied – it will be fully secured whether or not marshaling is applied.  See Pray, 242 B.R. at

209-10 ("Because marshaling is fundamentally an equitable doctrine, imposition of the

marshaling order may not cause prejudice to third parties of equal or superior equity position").

Notably, there is sufficient value in the non-Ice Debtors' real properties alone ($19.3 million) to

satisfy SHS' secured claim in full.

73.      In stark contrast, CSM's rights are dramatically and inequitably affected by the

proposed treatment under the Plan.  It would be unfair for this Court to permit the consolidation

of the Debtors for the purposes of implementing the Plan (an equitable remedy sought by the

Plan Proponents to, among other things, allow the Plan Proponents to confirm the Plan over the

objections of CSM and SHS) while simultaneously allowing the Plan Proponents to defeat

CSM's mechanic's lien rights and diminish CSM's recovery against Ice's real estate.[14]  See, e.g.,

In re Concepts America, Inc., 2018 WL 2085615, at *3 (Bankr. N.D. Ill. 2018); In re Dehon, Inc.,

2004 WL 2181669, at *3-4 (Bankr. D. Mass. 2004) (discussing substantive consolidation

generally and noting that it is an extraordinary equitable remedy).

---

[14]      Courts have adopted certain exceptions to "common debtor" requirements in situations where the non-shared
collateral is owned by a guarantor as opposed to the debtor.  See, e.g., In re Borges, 184 B.R. 874, 879 n.3
(Bankr. D. Conn. 1995).  But see Sunset Hollow, 359 B.R. at 382 (declining to apply marshaling where non-
shared collateral was owned by related corporate debtors).  CSM asserts that such exceptions are not relevant
here due to consolidation of the Debtors' assets and liabilities under the Plan.  Nevertheless, CSM believes that
it meets the exceptions.

74.     The original joint plan filed by the Plan Proponents on February 1, 2022 [Dkt. No. 257] did not provide for substantive consolidation of the Debtors.  That equitable remedy was added to this Plan in an attempt to remedy the Debtors' lack of an accepting, impaired class for each Debtor.  The Debtors are attempting to use one equitable remedy (substantive consolidation) and should not be allowed to ignore another equitable remedy (marshaling) to defeat CSM's rights.

75.     Because CSM would prevail in bringing marshaling claims, the Plan Proponents' liquidation analysis is fundamentally flawed.  The Plan Proponents incorrectly presume that CSM would receive little to no distribution on account of its mechanic's lien claim from the proceeds of the liquidation of Ice's assets.  As noted above, however, there is sufficient value in the non-Ice Debtors' real properties alone to satisfy SHS' secured claim in full.  Therefore, CSM asserts that it is fully secured and would be paid in full in the Debtors' Chapter 7 case.  At a minimum, the Plan Proponents should be required to submit a liquidation analysis that accounts for CSM being fully secured and paid in full.

      ***iv.***     ***The Plan Proponents Have Not Met Their Burden of Showing that the Net Present Value of Plan Distributions to CSM is Equal to or Greater Than the Amount CSM Would Receive in a Hypothetical Chapter 7 Case.***

76.     For the purposes of § 1129(a)(7), it is the Plan Proponents' burden to show that the present value of plan distributions to CSM is equal to or greater than the amount of the hypothetical litigation recovery.  The Plan Proponents have not met their burden with respect to CSM.

77.     The Plan contemplates paying CSM's secured claims in full over ten (10) years once CSM's claims are determined.  Initially, while state court litigation concerning CSM's

claims is ongoing, the Plan Proponents will make interest only payments to CSM calculated

based on the Plan Interest Rate of 4.25%.

78.     In order to determine the value of plan payments to CSM as of the Effective Date,

the Court must discount them to their net present value as of the Effective Date.  See Till v. SCS

Credit Corp., 542 U.S. 465, 474 & n. 10 (2004) ("[T]he Bankruptcy Code includes numerous

provisions that … require a court to discount[t] … [a] stream of deferred payments back to the[ir]

present dollar value[,]" including § 1129(a)(7)); see also In re Hockenberry, 457 B.R. 646, 653

(Bankr. S.D. Ohio 2011) (citing several cases).

79.     The Plan Proponents have presented no evidence to show that the present value of

deferred payments over ten (10) years with 4.25% interest is equal to or greater than what CSM

would receive in a Chapter 7 case.

80.     For the foregoing reasons, the Court must find that the Plan fails to satisfy

§ 1129(a)(7).

**D.      The Plan is Not Fair and Equitable With Respect to CSM.**

81.     CSM's secured claims (i.e., Class 3 claims) are impaired under the Plan, and CSM

has voted to reject the Plan.  Therefore, the Plan must satisfy the "fair and equitable"

requirements of Bankruptcy Code § 1129(b).

82.     The Plan is not "fair and equitable" with respect to CSM.  Significantly,

Bankruptcy Code § 1129(b)(2) mandates that with respect to an impaired, dissenting class of

secured claims, the plan must provide:

> (i) (I)  that the holders of such claims retain the liens securing such claims,
> whether the property subject to such liens is retained by the debtor or
> transferred to another entity, to the extent of the allowed amount of such
> claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A).

83.     In addition to meeting all of the technical requirements of § 1129(b)(2), a plan proponent must convince the court that the terms of a "cram-down" plan are fair and equitable to any dissenting class and do not unduly shift the risk of the reorganization to creditors.  See In re Cottonwood Corners Phase V, LLC, 2012 WL 566426, at *22 (Bankr. D.N.M. 2012) (noting that to determine whether a plan is fair and equitable, a court may consider several factors in addition to the specific requirements found in § 1129(b)(2)(A), including whether the risks are unduly shifted to the creditor); In re Montgomery Court Apartments, 141 B.R. 324 (Bankr. S.D. Ohio 1992).

84.     Similar to the Plan Proponents' failures under § 1129(a)(7), the Plan Proponents have not shown that CSM will receive payments under the Plan having a present value, as of the Effective Date, equal to at least the value of CSM's secured claim.  See § 1129(b)(2)(A)(i)(I) and (II).

85.     As discussed above, CSM asserts that its mechanic's lien claim is fully secured in part because the equitable doctrine of marshaling should apply to ensure that SHS' secured claims are allocated to the assets of the non-Ice Debtors.

86.     In addition, given the undue risk placed on CSM under the Plan and the lengthy

Plan term, CSM disputes that the Plan Interest Rate is adequate to provide CSM with the present

value of its claim as of the Effective Date.[15]  The Plan Proponents' projections are highly

speculative, and CSM bears the risk that revenues will be insufficient to make required plan

payments to CSM.

87.     In addition, under the first "method" of Plan treatment, from the Effective Date

until the determination of the amount of CSM's secured claims through post-confirmation

litigation, the Plan provides for monthly payments of *interest only* calculated based on the

estimated amount of CSM's secured claim.  Plan, Art. 4.3(c)(i).

88.     The Plan Proponents offer no explanation regarding the proposed treatment of

CSM nor provide evidence that the proposed treatment meets "cram-down" requirements.

89.     In addition, the Plan contemplates a ten-year term to pay CSM's secured claims

with a twenty-year amortization rate.  Both the length of this term and the amortization rate are

unreasonable.

90.     The Plan contemplates paying CSM over time from business revenues and

establishes no reserve of cash to fund payments to creditors with claims in dispute.  As noted

above, the Debtors' other secured creditors (i.e., SHS and ASVL) will receive more favorable

treatment under the Plan (with SHS receiving not less than $11.5 million in cash on the Effective

Date and with ASVL receiving an equity stake and guaranteed annual dividends).  In contrast,

CSM will be paid interest only while it litigates with the Debtors.  As such, the Plan will cause

---

[15]     CSM reserves all rights to request that the Bankruptcy Court impose a higher rate of interest in order to provide
CSM with the indubitable equivalent of its claims.

CSM to bear an undue proportion of risk under the Plan.[16]  See Cottonwood Corners, 2012 WL

566426, at *25.

**E.    The Plan is Not Feasible.**

91.    The so-called "feasibility" requirement set forth in Bankruptcy Code

§ 1129(a)(11) provides that:

> The court shall confirm a plan only if . . . [c]onfirmation of the plan is not
> likely to be followed by the liquidation, or the need for further financial
> reorganization, of the debtor or any successor to the debtor under the
> plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

92.    The plan proponent bears the burden to show that the Plan is feasible.  See

Cottonwood Corners, 2012 WL 566426, at *26.

93.    "When determining whether a plan is feasible, courts often consider a debtor's

cash flow projections showing its ability to simultaneously make plan payments and fund

projected operations.  The projections must be based upon evidence of financial progress and

must not be speculative, conjectural, or unrealistic."  Investment Co. of the Southwest, Inc., 341

B.R. 298, 310 (10th Cir. B.A.P. 2006) (citing In re Trevarrow Lanes, Inc., 183 B.R. 475, 482

(Bankr. E.D. Mich. 1995)).

94.    The Reorganized Debtors' projections ("Exhibit C" to the Disclosure Statement)

provide only a condensed summary and fail to provide material details regarding post-

confirmation Plan payments to CSM and other parties, legal fees and other expenses incurred

through post-confirmation litigation, and possible impediments.  In fact, it appears that the

---

[16]    CSM's litigation with Ice and others post-confirmation will likely take many months and possibly years to
conclude.  While the litigation is ongoing, CSM will receive interest-only payments on its Estimated Secured
Claim.  During that time the value of Ice's real estate will undoubtedly appreciate.  Therefore, it would be
inequitable for this Court to cap CSM's Estimated Secured Claim at the amount of the current equity in Ice's
real estate (above the amount of SHS' secured claim).

projections fail to provide for any payments being made to CSM on account of its secured claim,

despite the fact that the Plan requires at a minimum interest payments to CSM calculated based

on CSM's Estimated Secured Claim.

95.     Significantly, the Debtors dismiss and provide no contingencies for negative

litigation outcomes – particularly with respect to the claims of CSM and SHS.  For the Plan to be

confirmed, the Plan Proponents must show that the Plan is feasible notwithstanding litigation

risks.

96.     In addition, the Court should look to the Debtors' performance during the

pendency of these cases to determine whether the Plan is feasible.  See In re Agawam Creative

Mktg. Assocs., Inc., 63 B.R. 612, 620 (Bankr. D. Mass. 1986) (stating that where operational

revenues are being used to fund a plan, the debtor's financial record during the Chapter 11 is

probative of feasibility").

97.     The Plan Proponents provide no credible support for their belief that revenues will

increase significantly once the Plan is confirmed.  The Plan Proponents' projections estimate

significant revenue increases as a result of efforts to reorganize Ice's scheduling and

programming for the rink, including approximately $370,000 from increased rink usage,

approximately $107,400 from floor sports, and approximately $40,000 from sponsorship

opportunities, as well as increased net income of approximately $304,000 from the re-opening of

Ice's restaurant, the opening of its café and from catering.  Disclosure Statement, Art. 8.1.

98.     The Debtors, however, have struggled to operate profitably since prior to the

Petition Date and prior to the onset of the COVID-19 pandemic, and have shown no ability

during the Chapter 11 cases to pay creditors and operate profitably.  Indeed, at the end of last

year, SHS had obtained conditional relief from the automatic stay to foreclose on non-Ice real

properties, which precipitated SP's initial funding of post-petition loans.

99.     According to the most recent Monthly Operating Report filed by Ice, the only

operating entity, losses continue to pile up despite making no payments to CSM or ASVL.  To

expect a dramatic turnaround in the Debtors' profitability is mere wishful thinking.

100.     CSM further adopts the arguments put forth by SHS in the SHS DS Objection and

SHS Amended DS Objection related to the Plan's lack of feasibility, including without limitation

the following:

a.     The Debtors' cash flow projections are inherently unreliable;

b.     The Reorganized Debtors will be undercapitalized and unable to
meet cash needs and payment obligations within months of the
Effective Date;

c.     Projected revenues are overstated, and expenses are understated;
and

d.     Rink revenues are insufficient to fund post-confirmation
obligations.

See SHS DS Objection, Sec. III(A), pp. 17-20; SHS Amended DS Objection, Sec. II(A), pp. 14-

18.

101.     Based on the foregoing, the Plan Proponents cannot demonstrate that the Plan is

feasible.  As a result, confirmation of the Plan must be denied.

## III.     JOINDER IN OTHER OBJECTIONS AND RESERVATION OF RIGHTS.

102.     CSM hereby joins in the objections of other parties to confirmation of the Plan, to

the extent that such objections supplement and are not otherwise inconsistent with this Objection.

CSM reserves the right to supplement this Objection as may be necessary or appropriate.

## IV.    **CONCLUSION**.

For all of the foregoing reasons, CSM respectfully requests that the Court enter an order

(i) sustaining this Objection, (ii) denying confirmation of the Plan, and (iii) granting to CSM such

other and further relief as the Court deems just and proper.

Respectfully submitted,

**CONSTRUCTION SOURCE MANAGEMENT, LLC**

By its counsel,

_____/s/ Kate P. Foley_____
Paul W. Carey, BBO #566865
Kate P. Foley, BBO #682548
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608
Phone: 508.791.8500
Fax:    508.791.8502
Email: pcarey@mirickoconnell.com
Email: kfoley@mirickoconnell.com

-and-

Michael L. Mahoney, BBO #557562
Michael L. Mahoney PC
45 Braintree Hill Office Park
Suite 202
Braintree, MA 02184
Phone: 781.843.2354
Dated:  June 24, 2022        Email: michael@mlmesq.com

# EXHIBIT A

## SUBORDINATION AND STANDSTILL AGREEMENT

This SUBORDINATION AND STANDSTILL AGREEMENT (this "Agreement") is made as of the ____ day of _____, 2016 by and among ASHCROFT SULLIVAN SPORTS VILLAGE LENDER, LLC, a Delaware limited liability company, having an address of c/o the Ashcroft Sullivan New England Economic Development Center, LLC, 200 State Street, 7th Floor, Boston, MA 02109 (the "Subordinate Lender"), AJAX 5CAP NESV, LLC, a Delaware limited liability company, having an address of c/o Five Capital Management LLC, 521 Mount Hope Street, North Attleboro, MA 02760 ("Ajax"), and HARBORONE BANK, a Massachusetts cooperative bank, having an address of 770 Oak Street, Brockton, MA 02303 (together with its successors and assigns, the "Senior Lender").

WHEREAS, the Senior Lender has extended to NESV ICE, LLC, a Delaware limited liability company (the "Construction Borrower"), a construction loan in the original principal amount of Nine Million Five Hundred Six Thousand and No/100 Dollars ($9,506,000.00) (hereinafter referred to as the "Senior Construction Loan"), pursuant to the terms of a Construction Loan Agreement (as the same may be amended, restated, modified, substituted or extended from time to time, the "Senior Construction Loan Agreement") dated June 24, 2016 by and among, Ajax, the Construction Borrower, the Senior Lender, NESV SWIM, LLC, NESV FIELD, LLC, NESV HOTEL, LLC, NESV TENNIS, LLC, and NESV LAND, LLC, each a Delaware limited liability company (collectively, the "Term Borrowers" and, together with the Construction Borrower, the "Borrowers"), having a principal address c/o Five Capital Management LLC, 521 Mount Hope Street, North Attleboro, Massachusetts 02760, and STUART SILBERBERG, individually ("Silberberg"), having a principal address of 28 Marjory Lane, Scarsdale, New York 10583, as well as a Promissory Note dated June 24, 2016 by the Construction Borrower payable to the order of the Senior Lender in the original principal amount of Nine Million Five Hundred Six Thousand and No/100 Dollars ($9,506,000.00) (as the same may be amended, restated, modified, substituted or extended from time to time, the "Construction Note"); and

WHEREAS, the Senior Lender has extended to the Term Borrowers a term loan in the original principal amount of One Million Nine Hundred Sixty Thousand and No/100 Dollars ($1,960,000.00) (hereinafter referred to as the "Senior Term Loan" and, together with the Senior Construction Loan, the "Senior Loans"), pursuant to the terms of a Loan Agreement (as the same may be amended, restated, modified, substituted or extended from time to time, the "Senior Term Loan Agreement" and, together with the Senior Construction Loan Agreement, the "Senior Loan Agreements") dated June 24, 2016 by and among, Ajax, the Term Borrowers, the Senior Lender, the Construction Borrower and Silberberg, as well as a Promissory Note dated June 24, 2016 by the Term Borrowers payable to the order of the Senior Lender in the original principal amount of One Million Nine Hundred Sixty Thousand and No/100 Dollars ($1,960,000.00) (as the same may be amended, restated, modified, substituted or extended from time to time, the "Term Note" and, collectively with the Construction Note, the "Senior Notes"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Senior Loan Agreements; and

WHEREAS, Ajax has agreed to guarantee the obligations of the Borrowers under the Senior Loans by virtue of (i) a Payment Guaranty from Ajax, the Term Borrowers and Silberberg in favor of the Senior Lender, dated June 24, 2016 (as the same may be amended, restated, modified, substituted or extended from time to time, the "Senior Construction Payment Guaranty"), (ii) a Completion Guaranty from Ajax, the Term Borrowers and Silberberg in favor of the Senior Lender, dated June 24, 2016 (as the same may be amended, restated, modified, substituted or extended from time to time, the "Senior Construction Completion Guaranty"), and (iii) a Payment Guaranty from Ajax, the Construction Borrower and Silberberg in favor of the Senior Lender, dated June 24, 2016 (as the same may be amended, restated, modified, substituted or extended from title to time, the "Senior Term Payment Guaranty" and, together with the Senior Construction Payment Guaranty and the Senior Construction Completion Guaranty, the "Senior Guaranties"); and

WHEREAS, the Borrowers' obligations under the Senior Notes, the Senior Loan Agreements and the other Loan Documents (as defined and determined by each of the Senior Loan Agreements) are secured, in part, by (i) a Mortgage, Financing Statement and Security Agreement (as the same may be amended, restated, modified, substituted or extended from time to time, the "Senior Construction Mortgage") from the Construction Borrower in favor of the Senior Lender, dated June 24, 2016, encumbering the Mortgaged Property (as defined in the Senior Construction Mortgage), and recorded with the Bristol North District Registry of Deeds (the "Registry") in Book 20364, Page 289, (ii) an Assignment of Leases and Rents (as the same may be amended, restated, modified, substituted or extended from time to time, the "Senior Construction Assignment of Leases") from the Construction Borrower in favor of the Senior Lender, dated June 24, 2016, encumbering the Mortgaged Property, as defined in the Senior Construction Mortgage, and recorded with the Registry in Book 20364, Page 315, (iii) a Mortgage, Financing Statement and Security Agreement (as the same may be amended, restated, modified, substituted or extended from time to time (the "Senior Term Mortgage" and, together with the Senior Construction Mortgage, the "Senior Mortgages") from the Term Borrowers in favor of the Senior Lender, dated June 24, 2016, encumbering the Mortgaged Property (as defined in the Senior Term Mortgage), and recorded with the Registry in Book 20365, Page 1, and filed with the Registered Land Section of the Bristol North District Registry of Deeds (the "Registered Land Section") as Document No. 104738 and (iv) an Assignment of Leases and Rents (as the same may be amended, restated, modified, substituted or extended from time to time, the "Senior Term Assignment of Leases" and, together with the Senior Construction Assignment of Leases, the "Senior Assignment of Leases") from the Term Borrowers in favor of the Senior Lender, dated June 24, 2016, encumbering the Mortgaged Property, as defined in the Senior Term Mortgage, and recorded with the Registry in Book 20365, Page 31 and filed with the Registered Land Section as Document No. 104739; and

WHEREAS, the Senior Notes, the Senior Loan Agreements, the Senior Mortgages, the Senior Assignment of Leases, the Senior Guaranties and all other instruments and documents now or hereafter evidencing and/or securing the repayment of, or otherwise pertaining to and executed and delivered in connection with, the Senior Loans evidenced by the Senior Notes, are hereinafter collectively referred to as the "Senior Loan Documents"; and

WHEREAS, Ajax has executed and delivered to the Subordinate Lender a certain Promissory Note (the "Subordinated Note"), dated of even date herewith, in the original principal amount of Twenty Million and No/100ths Dollars ($20,000,000.00) made by Ajax to the order of the Subordinate Lender; and

WHEREAS, payment of the indebtedness evidenced by the Subordinated Note is secured by a Pledge Agreement (the "Subordinated Pledge Agreement"), by and between Ajax and the Subordinate Lender, dated of even date herewith, pursuant to which Ajax grants to the Subordinate Lender the "Pledged Collateral," as such term is defined in the Subordinated Pledge Agreement; and

WHEREAS, Ajax and the Subordinate Lender have executed and delivered a certain Loan Agreement (the "Subordinated Loan Agreement"), by and between Ajax and the Subordinate Lender, dated of even date herewith; and

WHEREAS, the Subordinated Note, the Subordinated Pledge Agreement and the Subordinated Loan Agreement (collectively, the "Subordinated Loan Documents") shall be the only instruments or documents evidencing the repayment of the Subordinated Debt (as hereinafter defined); and

WHEREAS, in the absence of this Agreement the Senior Lender would not consent to Ajax entering into the Subordinated Pledge Agreement; and

WHEREAS, the Senior Lender requires that the Subordinate Lender, the Borrowers, and Ajax enter into this Agreement as a condition precedent to the Senior Lender consenting to Ajax entering into the Subordinated Pledge Agreement;

NOW, THEREFORE, for Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the mutual covenants set forth herein, the parties act and agree as follows:

1.      The Subordinate Lender agree that the payment of principal, interest and all other charges or payments with respect to the Subordinated Debt is expressly subordinated, in the manner hereinafter set forth, in right of payment to the prior payment and satisfaction in full of the Senior Debt (as hereinafter defined).  As used herein, (a) "Senior Debt" means the principal, interest and all other sums payable and all other obligations to be performed from time to time under the Senior Loan Documents and any and all other indebtedness or liability of the Borrowers and/or Ajax to the Senior Lender, whether direct or indirect, absolute or contingent, secured or unsecured, and (b) "Subordinated Debt" means the principal, interest and all other sums payable and all obligations to be performed from time to time under the Subordinated Note and any and all other indebtedness or liability of Ajax to the Subordinate Lender, whether direct or indirect, absolute or contingent, secured or unsecured.

2.      As long as any part of the Senior Debt shall remain unsatisfied, no payment of principal or interest or any other sum shall be made by Ajax or accepted by the Subordinate Lender, at any time, with respect to the Subordinated Debt, without the prior written consent of the Senior Lender, in each instance, provided, however that; so long as no Event of Default

exists, Ajax may make and the Subordinate Lender may accept payments of accrued interest on the Subordinated Debt, without the prior written consent of the Senior Lender. The Subordinate Lender agrees that, except as may otherwise be expressly permitted by the terms of this Paragraph 2, without the prior written consent of the Senior Lender, in each instance, the Subordinate Lender will not demand, ask, bring suit for, accept or receive any payment with respect to the Subordinated Debt. The Senior Lender shall be under no obligation to grant any consent referred to in this Paragraph 2 as long as any part of the Senior Debt shall remain unsatisfied.

3.     In the event of an acceleration of the Senior Debt pursuant to the terms of any of the Senior Loan Documents, or in the event of a distribution of the assets, dissolution, winding-up, liquidation or reorganization of the Borrowers or Ajax (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or otherwise), the Senior Debt shall be paid and satisfied in full before the Subordinate Lender is entitled to receive any payment whatsoever on account of the Subordinated Debt, and any payment or distribution (of any kind or nature whatsoever) to which the holder of the Subordinated Debt would otherwise be entitled, but for the subordination provisions of this Agreement, shall be paid directly to the Senior Lender (to be applied toward the Senior Debt) until the Senior Debt shall have been paid and satisfied in full. Subject to the foregoing and the provisions of Paragraph 4, the Subordinate Lender shall have the right to file a claim or proof of claim, be a member of a creditors' committee, vote on a plan and otherwise act to preserve and protect its claims and interests as the holder of the Subordinated Debt.

4.     The Subordinate Lender irrevocably authorizes and directs the Senior Lender and any trustee in bankruptcy, receiver or assignee for the benefit of creditors of any of the Borrowers or Ajax, whether in voluntary or involuntary liquidation, dissolution or reorganization proceedings, on the Subordinate Lender's behalf, to take such action as may be reasonably necessary or appropriate to effect the subordination provisions and other rights and/or remedies granted to the Senior Lender in this Agreement (including, without limitation, in the case of the Senior Lender, to file a proof of claim and to vote upon matters with respect to which the Subordinate Lender may be able to vote in connection with any bankruptcy proceedings relating to any of the Borrowers or Ajax) and irrevocably appoints the Senior Lender and any such trustee, receiver or assignee as its attorney-or-attorneys-in-fact for such purposes with full powers of substitution and re-substitution. The power of attorney conferred on the Senior Lender and any such trustee receiver and assignee by the provisions of this Paragraph 4, being coupled with an interest, shall be irrevocable until the Senior Debt is fully satisfied and shall not be affected by the disability or incapacity of the Subordinate Lender and shall survive the same. Such power of attorney is provided solely to protect the interests of the Senior Lender and any such trustee, receiver and assignee and shall not impose any duty on the Senior Lender nor any such trustee, receiver or assignee to exercise any such power and neither the Senior Lender nor any such trustee, receiver or assignee shall be liable for any act, omission, error in judgment or mistake of law, except as the same may result from its gross negligence or willful misconduct.

5.     The terms of this Agreement, the subordination effected hereby and the respective rights, remedies and obligations of the Senior Lender and the Subordinate Lender shall not be affected by (a) any amendment or restatement of, or addition or supplement to, any of the Senior

-4-

Loan Documents, (b) any exercise or non-exercise of any right, power or remedy under any of the Senior Loan Documents or any instrument or agreement relating thereto, or securing or guaranteeing any of same or (c) any waiver, consent, release, indulgence, extension, renewal, modification, delay or other action, inaction or omission pertaining to the Senior Debt or any instrument or agreement relating thereto, or securing or guaranteeing any of same, all whether or not the Subordinate Lender shall have had notice and/or knowledge of any of the foregoing.

6.     As long as any portion of the Senior Debt shall remain outstanding:

(a)     the Subordinate Lender irrevocably waives any right to require marshalling of the assets of any of the Borrowers and/or Ajax and agrees that the Senior Lender shall have no obligation to seek satisfaction of the Senior Debt through recourse to collateral, if any, other than the applicable Mortgaged Property, prior to the exercise of the Senior Lender's rights with respect to the applicable Mortgaged Property;

(b)     none of the Subordinated Loan Documents shall be amended, cancelled, forgiven or terminated, without the prior written consent of the Senior Lender, in each instance, which consent may be withheld in the Senior Lender's sole and absolute discretion;

(c)     the Subordinate Lender shall not grant or consent to any further or additional subordination of the Subordinated Debt in whole or in part in favor of any Person other than the Senior Lender, without the prior written consent of the Senior Lender, in each instance, which consent may be withheld in the Senior Lender's sole and absolute discretion;

(d)     the Subordinate Lender will not file, cause to be filed or join in the filing of, any petition under the Bankruptcy Code, or any similar petition or pleading under any state law, against any of the Borrowers or Ajax or seeking any relief with respect to any of the Borrowers or Ajax (including, without limitation, the appointment of a receiver, trustee or other similar official for it or any part of its business or properties) under any such law, without the prior written consent of the Senior Lender, in each instance, which consent may be withheld in the Senior Lender's solo and absolute discretion;

(e)     except for the Pledged Collateral, the Subordinate Lender will not demand or accept as security for the Subordinated Debt any collateral owned, wholly or in part, by the Borrowers or Ajax (including, without limitation, the Mortgaged Property) without the prior written consent of the Senior Lender, in each instance, which consent may be withheld in the Senior Lender's sole and absolute discretion;

(f)     the Subordinate Lender will not exercise any rights or remedies with respect to the Pledged Collateral; and

(g)     the Subordinate Lender will not enter into any other promissory notes with any of the Borrowers and/or Ajax without the prior written consent of the Senior Lender, in each instance, which consent may be withheld in the Senior Lender's sole and absolute discretion.

7.    The Subordinate Lender shall be entitled to the right of subrogation with respect to payments to the Senior Lender made hereunder, but only if the Senior Debt shall have been first paid in full and discharged.

8.    The Subordinate Lender agrees not to assign or transfer any interest in the Subordinated Debt to any Person without the prior written consent of the Senior Lender, in each instance, which consent the Senior Lender may withhold in its sole and absolute discretion, unless prior to or simultaneous with any such assignment or transfer, the applicable assignee or transferee acknowledges and agrees to be bound by the terms and conditions of this Agreement and executes and delivers to the Senior Lender an agreement, in form and substance reasonably acceptable to the Senior Lender, affirming and confirming such agreement to be bound.

9.    If the Subordinate Lender, the Borrowers and/or Ajax, contrary to this Agreement, makes or receives any payment, attempts to or threatens to make or receive any payment not expressly permitted by the terms of this Agreement, takes any other action contrary to this Agreement or fails to take any action required by this Agreement or, with respect to such Subordinate Lender, commences or participates in any action or proceeding against the Borrowers, Ajax, the Mortgaged Property and/or the Pledged Collateral to enforce the payment of the Subordinated Debt or to realize upon the Pledged Collateral, then, the Senior Lender may obtain relief by injunction, specific performance and/or other appropriate equitable relief; it being understood and agreed that (a) the Senior Lender's damages from the Subordinate Lender's, the Borrowers' and/or Ajax's actions may at that time be difficult to ascertain and may be irreparable, and (b) the Subordinate Lender, the Borrowers and Ajax waive any defense or claim that the Senior Lender cannot demonstrate any damage and/or can be made whole by the awarding of damages.

10.    The Subordinate Lender agrees to indemnify and to hold the Senior Lender harmless from and against any and all reasonable costs and expenses (including, without limitation, reasonable attorney's fees and expenses) relating to (a) any actions of the Subordinate Lender taken contrary to this Agreement and (b) the enforcement of this Agreement in the event of any breach or default by the Subordinate Lender hereunder. Each of the Borrowers and Ajax each agree to indemnify and hold the Senior Lender harmless from and against any and all reasonable costs and expenses (including, without limitation, reasonable attorneys' fee and expenses) relating to (y) any actions of any of the Borrowers and/or Ajax taken contrary to this Agreement and (z) the enforcement of this Agreement in the event of any breach or default by it hereunder.

11.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

12.    If any provision of this Agreement or the application thereof to any Person or circumstance, for any reason and to any extent, shall be held to be invalid or unenforceable, neither the remainder of this Agreement nor the application of such provision to any other Person or circumstance shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by law. Notwithstanding the foregoing, it is the intention of the parties hereto that if any provision hereof is capable of two (2) constructions, one of which would render the

-6-

provision void and the other of which would render the provision valid, then such provision shall be construed in accordance with the construction which renders such provision valid.

13.   The Subordinated Note and any subsequent notes evidencing any portion of the Subordinated Debt shall be marked with the following legend:

> "Payment of this note is subject to the terms and conditions of a Subordination and Standstill Agreement dated as of _____, 2016, among the payee, the borrower and HarborOne Bank. A copy of said Subordination and Standstill Agreement may be obtained upon written request of any holder of this note from HarborOne Bank, 770 Oak Street, Brockton, MA 02303."

14.   Nothing contained in this Agreement or otherwise will in any event be deemed to constitute the Senior Lender to be the agent of the Subordinate Lender for any purpose nor to create any fiduciary relationship between the Senior Lender and the Subordinate Lender. No action or inaction with respect to any collateral for the Senior Debt; nor any amendment to any of the Senior Loan Documents; nor any exercise or non-exercise of any right, power or remedy under or in respect of any of the Senior Debt or any instrument or agreement relating to, securing or guaranteeing any of the Senior Debt; nor any waiver, consent, release, indulgence, extension, renewal, modification, delay or other action, inaction or omission in respect of any of the Senior Debt or any instrument or agreement relating to, securing or guaranteeing any of the Senior Debt will in any event give rise to any claim by the Subordinate Lender against the Senior Lender or any officer, director, employee or agent of the Senior Lender.

15.   This Agreement shall be governed by and construed in accordance with the laws of The Commonwealth of Massachusetts.

16.   To the maximum extent permitted by applicable law, the Subordinate Lender, the Borrowers and Ajax hereby submit to the jurisdiction of the courts of The Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts, as well as to the jurisdiction of all courts from which an appeal may be taken from the aforesaid courts, for the purpose of any suit, action or other proceeding arising out of, or with respect to this Agreement and expressly waive any and all objections they may have as to venue in any of such courts.

17.   Any notice, request, demand, statement or consent made hereunder shall be in writing and shall be deemed duly given if personally delivered, sent by certified mail, return receipt requested, or sent by a nationally recognized commercial overnight delivery service with provisions for a receipt, postage or delivery charges prepaid, and shall be deemed given (a) three (3) days after postmarked, if sent by certified mail, or (b) when received, if personally delivered or sent by such an overnight delivery service and addressed to the applicable party at such party's address set forth in the introductory paragraph of this Agreement or at such other place as any of the parties hereto may from time to time hereafter designate to the other in writing. Any

notice given to the Subordinate Lender, the Borrowers or Ajax by the Senior Lender at any time shall not imply that such notice or any further or similar notice was or is required.

18.    This Agreement shall remain in full force and effect so long as the Senior Debt remains undischarged or unsatisfied in any respect. The Subordinate Lender, the Borrowers and Ajax agree that an affidavit, certificate, letter or statement of any officer, agent or attorney of the Senior Lender indicating that any part of the Senior Debt remains outstanding shall be deemed prima facie evidence of the validity, effectiveness and continuing force of this Agreement and any Person is hereby authorized to rely thereon. Upon the complete payment and performance of the Senior Debt and the recording of a full and complete discharge of mortgage, assignment of leases and rents and security agreement discharging the Senior Mortgages and the Senior Assignment of Leases, this Agreement shall be deemed terminated without further action.

19.    In no event shall the Senior Lender ever be liable to the Subordinate Lender for any indirect or consequential damages suffered by the Subordinate Lender from any cause whatsoever.

20.    Reference in this Agreement to "herein", "hereof" shall be deemed to refer to this Agreement and shall not be limited to the particular text or section in which such words appear. The use of any gender shall include all genders and the singular number shall include the plural and vice versa as the context may require.

21.    Reference in this Agreement to the Mortgaged Property shall be deemed to include references to all of the Mortgaged Property, as the case may be and as defined and described in the Senior Mortgages, as applicable, and references to any portion thereof. References in this Agreement to the Subordinated Debt shall be deemed to include references to any of the Subordinated Debt and any portion thereof. References in this Agreement to the Senior Debt shall be deemed to include references to all of the Senior Debt and any portion thereof. References in this Agreement to the Senior Loan Documents shall include, without limitation, all renewals, replacements, amendments, extensions, substitutions, revisions, consolidations and modifications of the Senior Loan Documents.

22.    As used herein, the term "Person" shall include all individuals and all entities of every kind and nature, including, without limitation, corporations, general and limited partnerships stock companies or associations, joint ventures, unincorporated associations, companies, trusts, banks, trust companies, land trustee, business trusts, and agencies, authorities, bodies, boards, commissions, courts, instrumentalities, legislatures, or offices of any nature whatsoever for any government unit or political subdivision, whether federal, state, county, district, municipal, city or otherwise, and whether now or hereafter in existence.

23.    As used herein, the term "including", when following any general statement, will not be construed to limit such statement to the specific items or matters as provided immediately following the term "including" (whether or not non-limiting language such as "without limitation" or "but not limited to" or words of similar import are also used), but rather will be deemed to refer to all items or matters that could reasonably fail within the broader scope of the general statement.

-8-

24.     This Agreement may be executed in one or more counterparts, each of which taken together shall constitute an original and all of which shall constitute one and the same instrument.

25.     Time is of the essence of this Agreement.

[END OF TEXT; SIGNATURE PAGE(S) TO FOLLOW]

EXECUTED as an instrument under seal as of the date and year first above written.

**WITNESS:**

**SENIOR LENDER:**

HARBORONE BANK.

By: _____
Name: _____

Mathew J. Insana, Vice President

**WITNESS:**

**SUBORDINATE LENDER:**

ASHCROFT SULLIVAN SPORTS VILLAGE
LENDER, LLC

By: _Michael A.S._____
Name: Michelle Reilly

Name: MICHAEL SULLIVAN
Title: PRINCIPAL

**WITNESSES:**

**BORROWERS:**

NESV ICE, LLC, a Delaware limited liability
company

Name: Jason Miller

By: _____
Stuart Silberberg, Manager

NESV SWIM, LLC, a Delaware limited liability
company

Name: Jason Miller

By: _____
Stuart Silberberg, Manager

-10-

NESV FIELD, LLC, a Delaware limited liability company

Name: _Jason Miller_

By: _____
Stuart Silberberg, Manager

NESV HOTEL, LLC, a Delaware limited liability company

Name: _Jason Miller_

By: _____
Stuart Silberberg, Manager

NESV TENNIS, LLC, a Delaware limited liability company

Name: _Jason Miller_

By: _____
Stuart Silberberg, Manager

NESV LAND, LLC, a Delaware limited liability company

Name: _Jason Miller_

By: _____
Stuart Silberberg, Manager

**WITNESS:**

**AJAX:**

AJAX 5CAP NESV, LLC, a
Delaware limited liability company

Name: _Jason Miller_

By: _____
Stuart Silberberg, Manager

3453549.3

-11-

# EXHIBIT B

## PARTIAL WAIVER AND SUBORDINATION OF LIEN
### Mass. G. L. c. 254, Section 32

COMMONWEALTH OF MASSACHUSETTS                    Date 12/22/2016

Bristol    COUNTY                              Application for Payment No.: 8R

OWNER:                    NESV Ice, LLC
CONTRACTOR:               Construction Source Management
LENDER/MORTGAGEE:         _____

| | | | |
|---|---|---|---|
| 1. | Original Contract Amount: | $ | 13,707,855.00 |
| 2. | Approved Change Orders: | $ | - 2,638,369.00 |
| 3. | Adjusted Contract Amount:<br>(line 1 plus line 2) | $ | 11,069,486.00 |
| 4. | Completed to Date: | $ | 10,720,526.00 |
| 5. | Less Retainage: | $ | 376,505.00 |
| 6. | Total Payable to Date:<br>(line 4 less line 5) | $ | 10,344.021.00 |
| 7. | Less Previous Payments: | $ | 9,766,129.95 |
| 8. | Current Amount Due:<br>(line 6 less line 7) | $ | **577,891.05** |
| 9. | Pending Change Orders: | $ | 3,509,139.00 |
| 10. | Disputed Claims: | $ | 206,944.00 |

The undersigned who has a contract with **NESV Ice LLC** for furnishing labor or materials or

both labor and materials or rental equipment, appliances or tools for the erection, alteration,

repair or removal of a building or structure or other improvement of real property known and

identified as **Rink-1395A Commerce Way** located in Attleboro, MA  (city or town),  Bristol

County, Commonwealth of Massachusetts and owned by  **NESV Ice, LLC** , upon receipt of

**Five Hundred Seventy Seven Thousand, Eight Hundred Ninety One and 05/100**

**($577,891.05)** in payment of an invoice/requisition/application for payment dated 11/30/2016

does hereby:

(a)   waive any and all liens and right of lien on such real property for labor or materials, or

both labor and materials, or rental equipment, appliances or tools, performed or furnished

through the following date:11/30/2016 (payment period), except for retainage, unpaid

agreed or pending change orders, and disputed claims as stated above; and

(b)   subordinate any and all liens and right of lien to secure payment for such unpaid, agreed

or pending change orders and disputed claims, and such further labor or materials, or both

labor and materials, or rental equipment, appliances or tools, except for retainage,

performed or furnished at any time through the twenty-fifth (25th) day after the end of the

above payment period, to the extent of the amount actually advanced by the above

lender/mortgagee through such twenty-fifth (25th) day.

[END OF TEXT; SIGNATURE PAGE(S) TO FOLLOW]

2

Signed under the penalties of perjury this _____ day of _____, 2016.


By: _____

Name: John C. Kelly
Title: Managing Member


## COMMONWEALTH OF MASSACHUSETTS

Plymouth , ss

On this 22th day of December 2016, before me, the undersigned notary public, personally appeared John C. Kelly, proved to me through satisfactory evidence of identification, which was personally known, to be the person whose name is signed on the foregoing document, and acknowledged to me that he (he/she) signed it voluntarily for its stated purpose. as Managing Member of Construction Source, LLC, as the voluntary act of Construction Source Management, LLC


_____

Notary Public
My Commission Expires: June 27, 2019
Print Name:  Lisa Anne Lizotte

3146021.1

3

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**(EASTERN DIVISION)**

|  |  |
|---|---|
| **In re:**<br><br>**NESV ICE, LLC,** *et al.*,<br><br>     **Debtors.** | **Chapter 11**<br>**Case No. 21-11226-CJP**<br>**(Jointly Administered)** |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 24, 2022, the foregoing document, ***Objection of Construction Source Management, LLC to Confirmation of Second Amended Joint Plan of Reorganization of NESV Ice, LLC, NESV Swim, LLC, NESV Tennis, LLC, NESV Land East, LLC, NESV Field, LLC, NESV Hotel, LLC, NESV Land, LLC, Ashcroft Sullivan Sports Village Lender, LLC, and Shubh Patel, LLC***, was filed with the United States Bankruptcy Court – District of Massachusetts and served upon all parties entitled to receive notice of filings in the above-captioned proceeding via the Bankruptcy Court's Electronic Case Filing (ECF) system, including the following:

- John Fitzgerald (U.S. Trustee), USTPRegion01.BO.ECF@USDOJ.GOV

- Paula R.C. Bachtell, Esq. (Counsel for U.S. Trustee), paula.bachtell@usdoj.gov

- Joseph M. Downes III, Esq. (Counsel for Debtors), jdownes@dmlawllp.com

- William S. McMahon, Esq. (Counsel for Debtors), wmcmahon@dmlawllp.com

- D. Ethan Jeffery, Esq. (Counsel for Shubh Patel, LLC), ejeffery@murphyking.com

- Gary M. Hogan, Esq. (Counsel for Ashcroft Sullivan Sports Village Lender, LLC), garyh@bbb-lawfirm.com

- Thomas H. Curran, Esq. (Counsel for SHS ACK, LLC), tcurran@curranantonelli.com

- Christopher Marks, Esq. (Counsel for SHS ACK, LLC), cmarks@curranantonelli.com

**[SIGNATURE PAGE FOLLOWS]**

By:    /s/ Kate P. Foley
        Paul W. Carey, BBO #566865
        Kate P. Foley, BBO #682548
        Mirick, O'Connell, DeMallie & Lougee, LLP
        100 Front Street
        Worcester, MA 01608
        Phone:   508.791.8500
        Fax:     508.791.8502
        Email:   pcarey@mirickoconnell.com
        Email:   kfoley@mirickoconnell.com

Dated:  June 24, 2022

2