**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case No. 21-11226-CJP |
| NESV ICE, LLC, *et al.*,[1] | ) |  |
|  | ) | Jointly Administered |
| Debtors | ) |  |
|  | ) |  |

**AMENDED[2] ORDER REGARDING ESTIMATION OF CLAIMS, VALUATION, AND TENTATIVE RULINGS ON CERTAIN OBJECTIONS TO CONFIRMATION**

The Court having held the first phase of a bifurcated evidentiary confirmation hearing on the *Second Amended Joint Plan of Reorganization of NESV Ice, LLC, NESV Swim, LLC, NESV Tennis, LLC, NESV Land East, LLC, NESV Field, LLC, NESV Hotel, LLC, NESV Land, LLC, Ashcroft Sullivan Sports Village Lender, LLC, and Shubh Patel, LLC* [Dkt. No. 345] (the "Plan") filed by the Debtors, Ashcroft Sullivan Sports Village Lender, LLC ("Ashcroft"), and Shubh Patel, LLC ("SP," together with the Debtors and Ashcroft, the "Proponents") regarding valuation and estimation of the claims of SHS ACK, LLC ("SHS"), Construction Source Management, LLC ("CSM"), and Ashcroft pursuant to the *Plan Proponents' Motion to Estimate Construction Source Management, LLC's Claim* [Dkt. No. 387], the *Motion by Debtors, Ashcroft Sullivan Sports Village Lender, LLC, and Shubh Patel, LLC to Estimate SHS ACK, LLC Claim for*

---

[1] The debtors in the jointly administered chapter 11 cases, along with the last four digits of each debtor's tax identification number, are as follows: NESV Ice, LLC (1262), NESV Swim, LLC (5919), NESV Tennis, LLC (6937), NESV Land East, LLC (4138), NESV Field, LLC (5539), NESV Hotel, LLC (9151), and NESV Land, LLC (2353) (collectively referred to as the "Debtors").

[2] The Court hereby amends its order entered at Dkt. No. 673 on February 24, 2023 (the "Prior Order") to correct certain typographical errors, add additional citations to the record, and clarify certain language to ensure that the Court's intention in deciding the matters related to Phase I of the confirmation hearing is properly reflected. This Amended Order supersedes the Prior Order for all purposes. The fourteen (14) day deadlines reflected in both orders shall run from the date of this Amended Order.

*Purpose of Voting on and Determining Confirmability of Plan* [Dkt. No. 388], the *Memorandum*

*in Support of Validation of Mortgage and Claim of Ashcroft Sullivan Sports Village Lender, LLC*

[Dkt. No. 400], *Debtors' and Shubh Patel, LLC'S Motion in Support of Proposed Compromise of*

*Ashcroft Sullivan Sports Village Lender, LLC's Mortgage and Claims Under the Plan* [Dkt. No.

403] (collectively, the "Motions"), and all related oppositions thereto filed by SHS [Dkt. No.

406] and CSM [Dkt. No. 408]; upon consideration of the Motions, the objections to the Motions,

the Plan, the objections to confirmation filed by SHS [Dkt. No. 462] and CSM [Dkt. No. 463],

the response to the confirmation objections filed by the Proponents [Dkt. No. 480], and the

evidence presented at the four-day, Phase I portion of the confirmation hearing on the Plan,

along with the arguments of counsel and posttrial briefs, I make the following rulings and orders:

I.      **Estimation of Claims**

    A.      **Standard**

A bankruptcy court's authority to estimate claims arises from § 502(c)[3] or Rule 3018 of

the Federal Rules of Bankruptcy Procedure (the "Rules"), the policy interests underlying those

provisions, and the Court's equitable powers under § 105.  Section 502(c) provides, in relevant

part, that:

> There shall be estimated for purpose of allowance under this section–
>
> (1) any contingent or unliquidated claim, the fixing or liquidation of which, as
> the case may be, would unduly delay the administration of the estate.

11 U.S.C. § 502(c).  Despite the "allowance" reference in § 502(c), that provision has been

construed as a basis for estimating for temporary purposes and not only for allowance.  *See, e.g.,*

*In re Chemtura Corp.*, 448 B.R. 635, 649 (Bankr. S.D.N.Y. 2011) (concluding that "[c]laims

---

[3] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C.
§§ 101 *et seq.*, as amended (the "Bankruptcy Code" or "Code").

estimation under Section 502(c)(1), . . . can be used for a variety of purposes, including determining voting rights on a reorganization plan, gauging plan feasibility, determining the likely aggregate amount of a related series of claims, setting claim distribution reserves, or (though this is less commonly wise) allowing claims"); *In re Pac. Gas & Elec. Co.*, 295 B.R. 635, 642 (Bankr. N.D. Cal. 2003) (determining that "[a]n estimation under section 502(c) may be for broad or narrow purposes . . . the court may estimate a claim solely for the purpose of determining a creditor's ability to vote on a plan of reorganization or solely for the purpose of determining feasibility of a plan"); *In re Adelphia Bus. Sols., Inc.*, 341 B.R. 415, 423 (Bankr. S.D.N.Y. 2003) (estimating administrative expense claims temporarily for feasibility purposes under section 502(c)); *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996) (citing both Rule 3018 and "the statutory predicate to Rule 3018(a)," §502(c), as the basis for estimation of a claim and its temporary allowance for plan purposes and concluding that the court's findings of fact will not have any preclusive effect upon the ultimate disposition of the claim).  Rule 3018 allows claim estimation "for the purpose of accepting or rejecting a plan" where "[n]otwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper." Fed. R. Bankr. P. 3018(a).

Neither § 502(c) nor Rule 3018(a) prescribe any method for temporary allowance and claim estimation and courts have broad discretion in deciding whether to temporarily allow a claim for voting purposes and how to estimate the claim. *See, e.g.*, *In re Chemtura Corp.*, 448 B.R. at 648 (acknowledging "neither the Code nor the Federal Rules of Bankruptcy Procedure provides any procedures or guidelines for estimation, and a bankruptcy court has wide discretion in accomplishing it"); *In re Pac. Gas & Elec. Co.*, 295 B.R. at 642; *In re Trident Shipworks, Inc.*,

3

247 B.R. 513, 514 (Bankr. M.D. Fla. 2000).  "For both procedure and analytical methodology,

bankruptcy courts may use whatever method is best suited to the contingencies of the case."  *In*

*re Chemtura Corp.*, 448 B.R. at 649.

Claim estimation for purposes of voting and plan confirmation does not determine the

final amount of the claim but only provides "limited voting authority to a creditor" so as to not

unduly delay the chapter 11 case.  *See, e.g., Armstrong v. Rushton (In re Armstrong)*, 292 B.R.

344, 354 (B.A.P. 10th Cir. 2003).  As a result, claim estimation for these purposes does not

"entail consideration on the merits of all the issues in dispute respecting that claim," but only

addresses the issues affecting the amount of the claim.  *In re Ralph Lauren Womenswear, Inc.*,

197 B.R. at 775.  Courts are also "bound by the legal rules which may govern the ultimate value

of the claim." *Id.* (citation omitted).

In estimating the claims for voting and confirmation purposes, some courts have chosen

to assess the probabilities of success on the merits and then discount the claims accordingly.  *See,*

*e.g.*, *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. at 775; *In re Frascella Enters.*, 360 B.R.

435, 458–59 (Bankr. E.D. Pa. 2007). In *In re Ralph Lauren Womenswear, Inc.*, the Bankruptcy

Court for the Southern District of New York adopted the following standard:

> "A trier of fact first determines which version [of the facts] is most probable and
> proceeds from there to determine an award in a fixed amount. An estimator of claims
> must take into account the likelihood that each party's version might or might not be
> accepted by a trier of fact. The estimated value of a claim is then the amount of the
> claim diminished by [the] probability that it may be sustainable only in part or not at
> all."

197 B.R. at 775 (quoting *In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 521 (Bankr.

E.D.N.Y. 1994)).  Based on this approach, the court made no "definitive findings of fact, but

instead [assessed] the probabilities of the various contentions made by the parties passing muster

upon [the court's] final adjudication of the claim."  *Id.*  The court further emphasized that the

4

parties' legal arguments "must be evaluated not for the probability that they have merit, but rather for their correctness as a matter of governing law." *Id.*

Other courts have adopted the "all or nothing approach" by estimating a claim at $0 after finding the claimant "would not succeed on the merits" under Rule 3018(a) and § 502(c). *See, e.g.*, *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 136–39 (3d Cir. 1982) (evaluating the claims at $0 by evaluating the "ultimate merits" of the claims in question, after the court found that the claimant's "counterclaim in the state action lacked legal merit" and that the possibility that the state court would find otherwise was remote); *In re Kaplan*, 186 B.R. 871, 874 (Bankr. D.N.J. 1995) (ruling that estimating of a claim at zero was appropriate when the bankruptcy court found that "the claim [was] contingent" and "the party probably would not succeed on the merits in a state court action."); *In re Innovasystems, Inc.*, No.: 11–36228–ABA, 2014 WL 7235527, at *8 (Bankr. D.N.J. Dec. 18, 2014) (estimating the claim at $0 under Rule 3018(a) after recognizing the claimant's ultimately prevailing on the claims was "uncertain at best" especially in light of "its lack of success at the appellate level.").

For each claim estimation, I have evaluated many of the discrete issues presented by such claim, assessed the strengths and weaknesses of each party's position and what I perceive as risks, considered the evidence presented at the Phase I confirmation hearing, and attempted to estimate a result within the range of likely results. I make no findings of fact or determination of claims in these summary proceedings other than to estimate the claims for purposes of voting and consideration of confirmation of the Plan.

### B.  SHS Claim Estimation

On or about June 24, 2016, HarborOne Bank ("HarborOne"), SHS's predecessor in interest, made loans to certain of the Debtors, including a construction loan in original principal

amount of $9,506,000 (the "Construction Loan") and a term loan in the principal amount of

$1,960,000 (the "Term Loan," together with the Construction Loan, the "Loans").  With respect

to the Construction Loan, NESV Ice, LLC ("Ice") was the principal obligor and the remainder of

the Debtors, NESV Swim, LLC, NESV Tennis, LLC, NESV Field, LLC, NESV Hotel, LLC, and

NESV Land, LLC (initially excluding NESV Land East, LLC ("Land East")), were guarantors.

The Debtors, other than Ice and Land East, were the principal obligors under the Term Loan and

Ice was a guarantor.  Given the summary nature of this estimation ruling, I will not detail the full

structure of the loans that are the basis for the SHS claims or much of the background of the

dispute, some of which is recited in the *Memorandum of Decision and Order* granting in part and

denying SHS's motion to dismiss the Debtors' complaint in Adversary Proceeding No. 21-1093

("Dismissal Opinion").[4]  *See NESV Ice, LLC v. SHS ACK LLC (In re NESV Ice, LLC)*, No. 21-

11226-CJP, 2022 WL 586136, at *1 (Bankr. D. Mass. Feb. 25, 2022).

On or about December 22, 2020, SHS purchased the Loans.  The Debtors commenced

their chapter 11 cases on August 26, 2021 (the "Petition Date") and the cases are jointly

administered.  SHS filed a claim against the Debtors in the amount of $18,928,809.92 regarding

the Loans (the "SHS Claim").  The SHS Claim includes interest calculated at the default rate on

and after March 1, 2017 through the Petition Date.

---

[4]  The Dismissal Opinion addressed SHS's request to dismiss the original five count complaint (the "Complaint") commencing the adversary proceeding through which the Debtors sought (i) entry of a declaratory judgment that the default rate of interest of 18% per annum provided for by the loans and notes held by SHS, is unenforceable and/or may not be collected from March 1, 2017 ("Count I"); (ii) equitable subordination of the debt the Debtors owe to SHS ("Count II"); and (iii) avoidance and recovery of certain transfers made by Land East to SHS's predecessor in interest, HarborOne Bank, pursuant to Mass. Gen. Laws. ch. 109A, §§ 5, 6 and 11 U.S.C. § 548 ("Counts III–V").  The Court dismissed the usury portion of Count I and the entirety of Counts III–V, with leave to amend.  SHS has also sought to dismiss the Debtors' amended complaint, which matter remains pending.

The Plan Proponents have objected to the SHS Claim for a number of reasons, including

that SHS is not entitled to recover interest at the default rate before April 21, 2021, because

neither SHS or its predecessor had sent a notice of acceleration on the Construction Loan before

that date or made a demand for payment on the Term Loan prior to April 21, 2021.  The Plan

Proponents have moved to estimate the SHS Claim for purposes of confirmation of the Plan,

specifically with respect to their objection to SHS's entitlement to default interest relating to the

Loans.  The Court directed SHS and the Plan Proponents to address the following in their

posttrial briefing:  (1) the "Automatic Acceleration" provisions of each of the Notes addressed in

the Dismissal Opinion; and (2) if the Court rules that each of the Loans had not been accelerated,

the specific provisions of the Loan Documents that would provide for default interest after a

nonmonetary default.  Ord. [Dkt. No. 531].

SHS argues that the occurrence of an Event of Default[5] triggered acceleration of all

amounts due under the promissory notes related to the Loans (the "Construction Note" and

"Term Note," respectively) and, as such, default interest would accrue on all outstanding

amounts under those promissory notes.  The evidence demonstrates that an Event of Default did

not occur until 30 days after notices of non-monetary default were sent on April 9 and 10, 2019.

Exs. 10 and 11.[6]  While an email was sent on March 8, 2017 at the request of Stuart Silberberg

providing details of defaults that were being discussed at that time, this email did not constitute

---

[5] Terms not defined in this SHS Claim Estimation section shall have the meanings given to them in the
Dismissal Opinion.

[6] There were two separate lists of exhibits admitted during Phase I of the confirmation hearing.  One list
related primarily to the SHS and Ashcroft claim estimations and valuation, consisting of 40 exhibits.  If
an exhibit is cited from that list, it will be referred to herein as "Exhibit."  The other list related to the
CSM claim estimation and consists of 50 numbered exhibits.  If an exhibit is cited from the CSM exhibit
list, it will be referred to as "CSM Exhibit."

notice of default as contemplated by the loan documents that would trigger cure periods provided

therein.  Ex. 37.  Also supporting this ruling, the internal records of HarborOne do not reflect

that notice of default was given prior to April of 2019, *see, e.g.*, reference in Letter dated

December 22, 2020 (Ex. 13) to "Initial Default Letter" dated as of April 9, 2019, and the email

did not comply with the notice requirements of the Loans, *see, e.g.,* Constr. Loan Agreement, §

11.11.[7]

Moreover, I do not read the terms of the Construction Note to "automatically" accelerate

the payment obligations under that note upon an Event of Default.  Section 6 of the Construction

Note provides that the "entire unpaid Principal balance of this Note and all accrued and unpaid

interest thereon and all other fees, charges, costs and expenses hereunder shall become

immediately due and payable, without demand, at the sole option of Lender, upon the earlier of

(a) the Maturity Date, or (b) the occurrence of any one or more of the Events of Default set forth

in the Loan Agreement." Constr. Note § 6. The language of § 6 of the Construction Note requires

an act by the Lender to exercise its option to accelerate all indebtedness upon the occurrence of

an Event of Default.  *See Perry v. Wolaver*, 506 F.3d 48, 53–54 (1st Cir. 2007) (applying Maine

law and rejecting creditor's assertion that late payment automatically accelerated note without

notice as being expressly contradicted by the note at issue, which made acceleration an option

---

[7] The Notice provision specifically provides:

> Whenever Borrower, Guarantor or Lender shall desire to give or serve any notice,
> demand, request or other communication with respect to this Agreement or any of the
> other Loan Documents (including, without limitation, a notice of default pursuant to
> this Agreement), each such notice, demand, request or other communication shall be
> in writing and shall be deemed to have been duly given if sent addressed to the notice
> addresses for such parties set forth below by hand delivery, by Federal Express or
> other reputable overnight courier, or by certified mail, postage prepaid, return receipt
> requested.

Constr. Loan Agreement, § 11.11.

creditor could affirmatively exercise in the event of a default and that creditor's conduct in

sending a notice letter that only sought default rate interest and late fees made clear that creditor

did not accelerate the note or reflect a belief by the creditor that the note had been automatically

accelerated); *Beal Bank S.S.B. v. Krock*, 201 F.3d 426, 2000 WL 18959, *2 (1st Cir. 2000)

(unpublished table decision) (stating that "[a]n event of default triggers acceleration, at the

holder's option, but both the note and Massachusetts law require written notice first") (citation

omitted)); *Clark v. Trumble*, 692 N.E.2d 74, 79 (Mass. App. Ct. 1998) (contrasting self-

executing acceleration clause, providing as an example, "[f]ailure to pay any instalment as the

same becomes due shall render the entire obligation then due and payable," with acceleration

clause including language that it is at "the *option* of the holder, which interjects the right of an

election by the holder. This language generally requires the holder to take some action to

accelerate maturity, such as making demand for payment or filing suit" (emphasis in original)

(citations and internal quotations omitted)); *Butter v. Melrose Sav. Bank*, 435 N.E.2d 1057, 1057

(Mass. App. Ct. 1982) (determining that "[a]cceleration requires a positive act, but the act may

consist of an unequivocal declaration by a  mortgagee to a mortgagor that he is exercising the

option") (citations omitted). While inconsistent with the language that the obligations under the

note will "become immediately due and payable, without demand," the discretion reserved to

SHS requires it to have exercised its "option."  Constr. Note, Ex. 2, § 6.

The evidence does not demonstrate that the Lender provided notice of any acceleration of

the Construction Note until it sent a letter dated April 21, 2021.  Ex. 15.  I recognize that

HarborOne did send a letter dated December 22, 2020 referencing a monetary default under the

Construction Note, but that letter did not demand payment of the Construction Note in full – it

demanded payment of additional interest at the default rate notwithstanding the accommodation

made in the "Initial Default Letter." Ex. 13.    Since that demand for payment of default interest

was retroactive to March 1, 2017 and was expressly based on the non-monetary default identified

in the Initial Default Letter, it appears to be an improper demand and a demand for payment of a

default interest amount rather than an acceleration.[8]    The evidence supports the inference that

SHS required HarborOne to send the December 22, 2020 letter as a condition to closing the sale

of the Loans; SHS expressly stated in an email dated November 2, 2020 that it was "not

requesting the Bank send acceleration letters. We just want default letters to include all of the

amounts due under the Notes."  Ex. 38; Partial Tr. (Testimony of Tristan Pierce Only) [Dkt. No.

526] ("Pierce Tr."), 40:6–11; 42:17–43:23; and 44:7–15.  Further, there was no credible evidence

presented or argument made regarding any failure to make specific monthly payments under

Construction Note § 4(a) and the accrual of default interest specifically with respect to any

amounts not paid when due that would support default interest accruing before April 21, 2021

with respect to any such amounts.  A monetary default occurred under the Construction Note as

of April 21, 2021, and default interest began to accrue five days after that date on April 26, 2021.

Constr. Note, Ex. 2, § 5(a).  SHS declined the opportunity to brief whether the Construction Note

provided for the accrual of default interest after a non-monetary event of default.  I conclude it

does not.

The Term Note matured on June 24, 2019.  Ex. 3.  While the evidence does not

demonstrate that HarborOne demanded payment of the matured obligations until April 21, 2021

---

[8] Moreover, the December 20, 2020 letter simply references that "as of December 11, 2020, the following
amounts were due and owing on the Loan."  Ex. 13.  Even with a most generous reading, absent language
stating that this was a calculation as of that date and a statement that the Loan was being accelerated, this
states the position that somehow the Loan had been accelerated prior to the December 20, 2020 letter.
Contrast that language with the acceleration language in the April 21, 2021 letter; "as of April 21, 2021,
the following amounts are immediately due and payable on the Loan, the entire amount owing thereunder
having been accelerated pursuant to Section 9.3 of the Loan Agreement."  Ex. 15.

(Ex. 16), it did not have to make demand.  As provided in the Term Note, upon the maturity date the entire outstanding balance of the promissory note was due and payable if the obligations were not accelerated prior to that date.  Term Note, Ex. 6, § 4(a).  As such, default interest began to accrue with respect to outstanding obligations under the Term Note five days after the maturity date (June 29, 2019) when the Term Loan was not paid in full.  As part of this estimation, I will not assess the Debtors' estoppel arguments arising from the fact that HarborOne continued to accept monthly payments and did not make demand for payment in full of the Term Note at maturity.  Ex. 12.  This argument and other defenses will be addressed when the claim is finally determined.

While not dispositive, it is worth noting that HarborOne's records appear to consistently reflect the loan balances as the outstanding principal plus interest at the non-default rate. HarborOne sent periodic statements to Ice reflecting the accrual of interest at the non-default rate.  Pierce Tr. 31:14–32:7; 33:12–14 and 24; and 34:9–19.  After the sale to SHS closed, HarborOne sent an audit confirmation letter to Ice requesting Ice confirm that as of September 30, 2020, the balance due on the Construction Loan was $9,284,035.40 and the interest rate on the Construction Loan was 3.65575%.  Ex. 39; Pierce Tr. 44:18 and 47:1.

For all of the reasons above and the reasons set out in the Dismissal Opinion and the briefs of the Plan Proponents, I estimate the claim of SHS in the amount set forth in the proof of claim filed by SHS reduced by (i) any interest at the default rate claimed with respect to the Construction Note accruing before April 26, 2021 and (ii) any interest at the default rate claimed with respect to the Term Note accruing before June 29, 2019.  The parties shall file a stipulation within fourteen (14) days calculating the amount of the estimated claim based on my estimation or shall request a conference if they are unable to agree on the figure.  For purposes of

estimation, I have not considered other defenses and objections asserted to the SHS claim, such as waiver, estoppel, and unenforceable penalty defenses raised by the Plan Proponents, all of which are reserved for final adjudication of the claim.

In addition, counsel to SHS filed a Notice of Estimation of Section 506(b) Claim [Dkt. No. 476], reflecting an estimated claim of attorneys' fees, costs and charges allowable under § 506 in the amount of $671,351.00 as of July 25, 2022 (the "§ 506 Fees"), and reserving the right to supplement the notice if necessary. Given the litigation positions of SHS contemplated in estimating SHS's secured claim and that SHS was pursuing its strategy when it was significantly over-secured, I anticipate that the § 506 Fees will draw an objection. In estimating these fees, even without the benefit of an objection, I have estimated $400,000 for SHS's counsel's postpetition attorneys' fees, costs and charges. After considering that fees and expenses for an over-secured lender would normally be substantially less than asserted and the litigation positions taken by SHS with respect to default interest that are estimated to have been unsuccessful, I have adjusted the § 506 Fees claim downward. It may be that these fees will ultimately be allowed in a lesser or greater amount, but the adjusted amount appears reasonable as an estimate for confirmation purposes.

### C.   CSM Claim Estimation

CSM and Ice have been involved in construction related litigation since 2017. The estimation process for the CSM claim and consideration of the multiple issues presented has been particularly difficult and has likely taken more time than may have been useful in the context of efficiently advancing the confirmation process through estimation. The claim dispute arises from alleged oral modifications to a construction agreement and alleged approvals of change orders by silence and course of dealing outside the procedures contemplated by the

contract between the parties.  These disputes have implicated disputed interpretations of the

Massachusetts mechanic's lien statute, Mass. Gen. Laws ch. 254, § 1 *et seq.*, and Prompt

Payment Act, Mass. Gen. Laws ch. 149, § 29E, the effect of a lien waiver, and disputes over the

quality of work.  It is clear that construction of the ice-skating rink in connection with what is

known as the New England Sports Village (the "Project") was a difficult undertaking with tight

timing requirements that resulted in a complete breakdown of the relationship between CSM, as

general contractor, and Ice, as owner.

CSM asserts a mechanic's lien on Ice's real property (the "Rink") in the amount of

$5,825,492.70, *see* CSM Ex. 28, which includes $5.1 million of unsigned change orders issued

after it left the Project.  CSM's proof of claim, CSM Ex. 29, reflects a secured claim of

$14,106,762.75, but CSM has acknowledged for estimation and voting purposes that: (i) it is

asserting that $5,825,486 of its claim is secured and (ii) $4,980,790 of contractual interest, plus

any deficiency claim, should be treated as a general unsecured claim.  The Plan Proponents

dispute approximately $4.6 million of the charges included in CSM's asserted secured claim,

consisting of approximately $3 million for additional site work, $349,086 for delay damages,

$753,938 for additional HVAC, plumbing, and refrigeration charges, and approximately

$500,000 in other charges.  The Plan Proponents do not dispute charges totaling $1,276,071, but

assert setoffs/counterclaims and credits of $1,108,200.  *See* Declaration of Stuart Silberberg in

Support of Motion to Estimate [CSM's] Claim [Dkt. No. 504] (the "Silberberg CSM Aff."), ¶¶

7–8, Declaration of Paul Brooks in Support of Motion to Estimate [CSM's] Claim [Dkt. No. 506]

(the "Brooks Aff."), ¶¶ 29–34.

In my estimation process, I have viewed the evidence and legal issues presented by each

of the significant areas of dispute to estimate the likelihood that these components of CSM's

secured claim would ultimately be allowed.  For the reasons below, I estimate the secured claim

of CMS to be $3,393,009, which is $1,276,071 (the undisputed amount), plus $2,116,938 (the

disputed $4.6 million amount with certain downward adjustments upon consideration of various

defenses, credits, and counterclaims).[9]

      1.   <u>Assessment of Dissolution of Mechanic's Lien, Prompt Pay Act, and Estoppel</u>

On May 25, 2016, Ice entered into a written contract (the "Agreement") with CSM for

the construction of an ice-skating facility with a guaranteed maximum price ("GMP") of

$13,707,855.  CSM Ex. 1.  The Agreement provides that except for "additions and deductions by

Change Order as provided in the Contract Documents," costs which cause the GMP "to be

exceeded shall be paid by [CSM] without reimbursement by [Ice]." *Id.*, at Art. 5, § 5.2.1 (Bates

No. 00004).  The Agreement further provides that it is a fully integrated agreement comprised of

the "Contract Documents" that may only be amended in writing.  *See id*. at Art. 1, §§ 1.1.1–1.1.2

(Bates No. 00030).  The "Contract Documents" are defined in the Agreement as the "Agreement,

Conditions of the Contract (General, Supplementary and other Conditions), Drawings,

Specifications, Addenda  issued prior to execution of the Contract, other documents listed in the

Agreement and Modifications issued after execution of the Contract."   *Id*. at Art. 1, § 1.1.1.

Modifications are further defined as "(1) a written amendment to the Contract signed by both

parties, (2) a Change Order, (3) a Construction Change Directive, or (4) a written order for a

minor change in the Work issued by the Architect."  *Id*.

---

[9] I refer to "secured claim" throughout without making any determination of the validity or priority of
CSM's lien or considering application of the valuation set out in these rulings or marshalling arguments
made by CSM.  In addition, it does not appear to be necessary for confirmation purposes to estimate
CSM's unsecured claim, which would require an assessment of any deficiency claim remaining after
consideration of the Rink value and SHS's estimated claim and any amount of a CSM contract or
quantum meruit claim that might be asserted against Ice or other Debtors that would not be secured by a
mechanic's lien.

CSM asserts that its claim is secured by a perfected mechanic's lien on Ice's real property under Mass. Gen. Laws ch. 254, §§ 2, 5, 8, and 11 based on a Notice of Contract recorded on November 23, 2016 (CSM Ex. 2), Statements of Account recorded on November 23, 2016 and January 17, 2017 (CSM Ex. 28), and a civil action commenced in the Bristol Superior Court on January 26, 2017 (the "State Court Action") (CSM Ex. 27).  The Plan Proponents argue that CSM failed to give a "just and true account of the amount due or to become due [it], with all just credits," as required by the mechanic's lien statute and that CSM "willfully and knowingly" overstated the amount due to it under the written Agreement.  Consequently, the Plan Proponents assert that the mechanic's lien should be dissolved, leaving any claim of CSM unsecured.

A mechanic's lien is valid despite any inaccuracies in the amount shown due in the statement of account "for labor or material or professional services unless it is shown that the person filing the statement has willfully and knowingly claimed more than is due."  Mass. Gen. Laws ch. 254, § 11; *see also Vickery v. Richardson*, 189 Mass. 53, 75 N.E. 136 (1905); *Massachusetts Gas & Elec. Light Supply Co. v. Rugo Const*. Co., 321 Mass. 20 (1947).  "A mechanic's lien will not be deemed invalid under law because the amount owed that is stated in the sworn statement is not completely accurate unless it is proven that the claimant 'willfully and knowingly claimed more than is due him." *Nat'l Lumber Co. v. M.G. Murphy Const. Co*., 1996 Mass. App. Div. 35, 1996 WL 111875, *3 (1996) (citations and quotations omitted); *see also Value of and limitation on lien amounts*, 57 Mass. Prac., Mass. Construction Law § 11:7.  On the other hand, CSM cannot assert a mechanic's lien for labor or services performed pursuant to separate written or oral agreements beyond the scope of the Agreement.  *Lampasona v. Capriotti*, 296 Mass. 34, 40 (1936) (finding no lien exists for "extra work beyond what was comprehended in the original [written] agreement").  As will be discussed further, significant

evidentiary issues exist as to whether the parties orally agreed to change the scope of the Agreement and what was contemplated to be the original scope of the Agreement.

Based on the evidence presented, I do not conclude that the Plan Proponents are likely to prevail in proving that CSM willfully and knowingly claimed more than could have been asserted in good faith to have been due so as to result in the dissolution of the mechanic's lien.  I do accept, however, that there is an issue as to whether unsigned change orders for services expressly outside the scope of the Agreement (where those charges and related change orders were not yet "deemed accepted" at the time of perfection of the mechanics lien) could constitute services or other charges furnished by virtue of a written contract as required by Mass. Gen. Laws ch. 254, § 2, but will discuss that issue in the context of evaluating the claim as it relates to site work.

CSM asserts that the contested change orders would be subject to the Prompt Payment Act and each would be "deemed accepted" by Ice.  Evidence at the estimation hearing would support a finding that change orders 9R (CSM Ex. 17.2), 10R (CSM Ex. 18.2), 11 (CSM Ex. 19), 12 (CSM Ex. 20) and 13 (CSM Ex. 21) were first submitted to Ice together with payment requisition 10R (CSM Ex. 16), which CSM signed on January 23, 2017.  *See* Brooks Aff., ¶¶ 21–22.  John C. Kelly, CSM's managing member, testified CSM sent those change orders to Ice on January 11, 2017, *see* Affidavit of John C. Kelly [Dkt. No. 510] (the "Kelly Affidavit"), ¶¶ 43–47, which is the date Kelly signed those change orders, but CSM offered no persuasive documentary evidence of transmission or receipt of those change orders on that date.  Assessing the evidence in this summary proceeding, assuming that CSM will have the burden of proof on this issue, it appeared more likely than not that the change orders were delivered on or about

January 23, 2017 with payment requisition 10R.  The date may have significance in evaluating

compliance with the Prompt Payment Act.

The Massachusetts Prompt Payment Act addresses the submission and payment of

change orders in certain construction contracts, providing:

> (d) Every contract for construction shall provide a reasonable time period
> within which a written request submitted by a person seeking an increase in the
> contract price shall be approved or rejected, whether in whole or in part. The
> time period shall not exceed 30 days after the later of commencement of the
> performance of the work on which the request is based or submission of the
> written request; provided, however, that the time period, as applicable to
> approval or rejection by the person at each tier of contract below the owner of
> the project, may be extended by 7 days more than the time period applicable to
> the person at the tier of contract above the person. A request which is neither
> approved nor rejected within such time period shall be deemed to be approved
> and may be submitted for payment within the next application for a periodic
> progress payment, unless it is rejected before the date payment is due. A
> rejection of a request, whether in whole or in part, shall be made in writing,
> shall include an explanation of the factual and contractual basis for the
> rejection and shall be certified as made in good faith. A rejection of a request
> shall be subject to the applicable dispute resolution procedure. A provision in
> the contract which requires a party to delay commencement of the procedure
> until a date later than 60 days after the rejection shall be void and
> unenforceable.

Mass. Gen. Laws ch. 149, § 29E(d).

The Prompt Payment Act was "[d]esigned to ensure the prompt payment of, or resolution

of disputes about, invoices for periodic payment made by contractors during the course of work

on [certain projects where the with an original contract price with the project owner is $3 million

or more] . . . ." *Tocci Bldg. Corp. v. IRIV Partners, LLC*, 101 Mass. App. Ct. 133, 134, 190

N.E.3d 1077, 1079, *review denied*, 490 Mass. 1106, 195 N.E.3d 908 (2022).  Notably, CSM filed

suit against Ice on January 26, 2017, before the time periods for rejection under the Agreement

and statute had expired.  CSM submitted payment request number 10R on or about January 23,

2017, and filed suit three days later, on January 26, 2017.  CSM Ex. 1, § 15.2.8 (Bates No.

00059).  Additionally, § 29E(d) of ch. 149 contemplates that a change order be submitted in

advance of a request for payment and then may be included in a subsequent request for payment

if not paid within the time for rejection of that change order.  It does not appear from the briefing

that Massachusetts courts have addressed the consequence of a contractor not strictly adhering to

the timing contemplated by that section or whether a suit prior to the time allowed for rejection

affects the "deemed to be approved" consequence of that provision.

CSM has some risk that, in a final determination of its claim, I would find that the

contested change orders were submitted on January 23, 2017, after CSM left the project and

interpret the Prompt Pay Act as not operating to deem the contested change orders approved by

operation of ch. 149, § 29E(d) because suit had been commenced shortly after submission of the

change orders to collect amounts included in those change orders—effectively electing a judicial

process for rejection and determination of the disputed claims.  There is also some question as to

the effectiveness of the change orders to initiate the rejection process contemplated by ch. 149, §

29E(d) if I were to find that the disputed change orders were first submitted on or about January

23, 2017 with payment requisition 10R.  Conversely, the Plan Proponents have some risk that the

Prompt Pay Act might be determined to apply to deem the change orders "accepted," even if I

assess that risk to be less than the alternative.

The Plan Proponents assert CSM's payment requisitions show that as of December 31,

2016, and after CSM certified that 100% of the work was complete and all change orders were

accounted for, total change orders remained negative $2,638,369.  *See* CSM Ex. 10 (Requisition

7, negative $2,638,369 through October 31, 2016), CSM Ex. 11 (Requisition 8R, negative

$2,638,369 through November 30, 2016); CSM Ex. 15 (Requisition 10, negative $2,638,369

through December 31, 2016).  The Plan Proponents allege CSM certified that it performed just

$348,961 in work between November 30, 2016 (the date through which it had waived lien rights) and December 31, 2016. *See* CSM Exs. 13 and 15 (Requisitions 9R and 10). The Rink partially opened in November 2016. The Plan Proponents further assert that CSM's requisitions do not show $3,509,139 in "Pending Change Orders" as of November 31, 2016, the date through which CSM waived its mechanic's lien, but this amount is reflected as pending in the calculation of the lien release waiver regarding payment requisition 8R through November 2016. *See* CSM Ex. 11. The Plan Proponents contend that CSM's requisitions show that as of December 31, 2016, when CSM certified that the work was 100% complete, the total contract price, including change orders, was $11,069,486. *See* CSM Ex. 15. This is the same amount as the "Adjusted Contract" price in the Statement of Account. *Compare* CSM Ex. 15 *with* CSM Ex. 28. CSM acknowledges in the Statement of Account, CSM Ex. 15, and in Attachment I to its proof of claim, CSM Ex. 29, that it was paid $10,344,021.30. Deducting that amount from the total contract price of $11,069,486 leaves a remaining contract balance of $725,464.70—which is the amount stated in the Statement of Account.

The Plan Proponents argue that payment requisition 10R dated January 24, 2017, pursuant to which CSM asserts a right to payment in the amount of $5,198,936.00, including $5,100,021 in change orders, is contradicted by CSM's own certified requisitions, each of which, like requisition 10R, was certified by Kelly. The Plan Proponents assert that CSM should be estopped from claiming a right to payment of any amounts reflected in requisition 10R. CSM argues that the evidence shows that CSM was "working with" Ice following its direction for additional work and invoicing as requested by Ice to accommodate Ice and its relationship with its lender and investors. There is sufficient evidence in the record that Brooks was aware of substantial additional services being performed by CSM and references to pending change orders

in the lien release waiver.  Further, the record does not reflect any prejudice to Ice or specific

reliance by Ice on the certifications.

Ultimately, I did not apply any risk of a determination of estoppel in connection with my

estimation.  It is not that I assess there to be no risk, but the evidence is conflicting, and I have

considered that there is risk that inconsistent statements may impact the credibility of parties.

   2.   <u>Additional Site Work</u>

Notably, the Agreement provides that CSM's proposal is based on "[w]ork specially

related to the construction of the RINK Building ONLY" and that any work other than the

construction of the Rink is "NOT included (i.e. Aquatics Center, Access Road, Field House,

Hotel, etc.)."  CSM Ex. 1, Ex. F at §3(c) (Bates No. 00077).   As previously mentioned, the

Agreement provides that except for Change Orders "as provided in the Contract Documents,"

costs which cause the GMP "to be exceeded shall be paid by [CSM] without reimbursement by

[Ice]."  *Id.*, at Art. 5, § 5.2 (Bates No. 00004).  The Agreement further provides that it is a fully

integrated agreement that may only be amended in writing.  *See id*. at, Art. 1, §§ 1.1.1-1.1.2

(Bates No. 00030).  CSM asserts that there was an oral agreement to amend the Agreement to

have approximately $3 million of site work originally contemplated to have been performed

under contracts with other Debtors shifted to the Agreement and become an obligation of Ice.

Kelly testified in person and by affidavit to a course of dealings where: "the [change orders]

were the result of directives and acceptances by Ice, documented in meeting minutes and emails.

The parties adopted a process not memorialized in the contract documents whereby scope

increases, or decreases, were: (i) requested by Ice; (ii) discussed in project meetings; and (iii)

approved during those meetings and/or through written or verbal communications." CSM's

Posttrial Brief [Dkt. No. 556], ¶ 48; Kelly Aff., ¶ 39.  Kelly explained that the sitework was

moved to the Agreement at the request of Ice to satisfy certain objectives with Ice's lenders.

The testimony of Paul Brooks, Ice's representative on the Rink construction as part of the

Project, established that he was on site most work days and never issued an order to stop any of

the work outlined in the change estimates, but Brooks denies approving any change orders or

additional work in relation to those change orders.  The evidence establishes that Ice did pay or

does not dispute certain charges reflected in change orders 9–14 and received significant credits

for work eliminated from the scope of work contemplated by the Agreement, notwithstanding

that change orders were not signed by Ice.  *See, e.g.*, Tr. Day 1 of Trial, July 25, 2022 [Dkt. No.

558] ("Tr. Day 1"), Silberberg Test., 176–186.  While the principal of the Debtors testified that

these charges may have been approved in some other form, he would not concede that Ice did not

strictly adhere to the Agreement and the requirement that change orders be approved in writing.

CSM will have the burden of proof on the issue of whether there was an oral modification

of the Agreement that would allow CSM to include the site work charges within the written

Agreement that is the basis for the asserted mechanic's lien.  This position is not without risk.

Ultimately, it may be determined that the site work was the subject of other contracts and could

not have been included in the mechanic's lien because they were not the subject of a written

contract with Ice.  Kelly candidly testified during the hearing and in deposition testimony that he

understood that the additional site work was to be paid "outside" the Agreement.  Tr. Day 2 of

Trial, July 26, 2022 [Dkt. No. 559] ("Tr. Day 2"), Kelly Test., 31: 44–46 and 149–153.

Ultimately, he stated that he believed that CSM would be paid for that work under the

Agreement, but his testimony referenced "outside the contract," understanding that Ice desired to

keep change orders under $50,000 to avoid the scrutiny of its lender's approval process, and

being paid from different "buckets" of available funds.  Tr. Day 2, Kelly Test., 151:5–152:17;
Kelly Aff., ¶¶ 32–33.  While CSM appears to have been attempting to "work with" Ice, the
informality of re-assigning site work to the Agreement presents significant risk that that work
will not be found to have been work provided for by that Agreement and properly subject to the
mechanic's lien.  Conversely, the Plan Proponents have some risk that ultimately a finder of fact
will draw inferences from the record favorable to CSM because Ice may appear to have taken
advantage of CSM in the process of administering the Agreement and related contracts for site
work.

Assuming that CSM clears that hurdle and the $3 million additional site work claim is
determined to be the subject of change orders under the Agreement, CSM asserts that the
contested change orders would be subject to the Prompt Payment Act and each would be
"deemed accepted" by Ice as discussed above.

If CSM meets its burden to demonstrate that the parties orally modified the Agreement to
include the site work and the approval process for change orders, even if the Prompt Pay Act is
determined not to apply to the disputed change orders, CSM asserts that Ice should be found to
have approved the disputed change orders through acquiescence and course of dealings.  There
was no evidence that before Ice received payment requisition 10R, Ice had expressly approved
any of the services reflected in the disputed change orders in writing.  Each change order form
submitted by CSM says "Not Valid Until Signed by the Contractor and the Owner."  CSM Exs.
17.1–22.  Each change order also says that it does not include "charges authorized . . . but not
agreed upon by both the Owner and Contractor."  CSM asserts that by attending regular meetings
and reviewing work plans, Ice, through its agent, was aware of the work that is the subject of the
disputed change orders.  This is somewhat incongruous with Kelly's testimony that CSM did not

provide Ice with quotes before submitting charges in a change order/requisition 10R.  The Plan

Proponents assert that it is impossible to have a meeting of the minds on a price that was never

shared with Ice and/or allegedly approved by Ice's silence.  *See Petrucelli Constr. Co. v. Barrios*,

2011 Mass. App. Civ. 47, 2011 WL 579232, *1–2 (2011) (determining that the owner never

having agreed on the price, there was no meeting of the minds, and "there was no contract,

written or otherwise, between the parties"; however, there was an acknowledgment of the trial

court's determination that while "there was never a real meeting of the minds between the parties

but that [the contractor was] entitled to be fairly compensated for work actually done").

Both Silberberg and Brooks testified that there were various portions of payment

requisitions that were accepted verbally and by actions of the parties.  This could support a

finding of oral modification or modification through course of dealings. CSM argues that the law

is well established that oral modification can amend a contract, even when that is not

contemplated by the contract.  *See J.P. Smith Co. Inc. v. Wexler Constr. Co., Inc.*, 353 Mass.

551, 555 (1968); *M.L. Shalloo, Inc. v. Ricciardi & Sons Constr., Inc.*, 348 Mass. 682, 684–685

(1965) (finding waiver of provision that "[n]o extra work . . .  under this contract will be

recognized or paid for, unless agreed to in writing before the work is done."); *Zarthar v. Saliba*,

282 Mass. 558, 560 (1933) (finding waiver of provision that "no charge for extra work will be

honored and paid unless owner shall order same by a writing directed to the contractor stating the

nature of the work to be performed and the sum to be paid therefor."); *see also Gen. Elec. Co. v.

Brady Elec. Co. Inc.*, 2 Mass. App. Ct. 522, 528, (1974) (noting that contract requirement that

"permitted payment for extra work only when authorized by written  change order" may be

waived); *Certified Power Sys., Inc. v. Dominion Energy Brayton Point, LLC*, No. BRCV2008-

01114, 2012 WL 384600, at *61 (Mass. Super. Jan. 3, 2012) (acknowledging that, generally,

"parties to a contract may waive compliance with a provision in a written construction contract requiring a written order form for additional work, and may orally agree for work to be performed outside the written contract").

Despite having claimed that Ice approved every disputed charge, albeit orally, Kelly also acknowledged during his testimony that his sworn interrogatory answers alleged that Ice approved a number of charges through its silence, including the charges in change estimate 50 (additional site work - $693,464) and change estimate 35 (HVAC, plumbing, refrigeration - $753,938). Tr. Day 2, Kelly Test., 74:18–78:21. Kelly also stated that he would have preferred that everything be under the Agreement. Although Kelly also claimed that "Ice" orally told him at some unspecified date to incorporate the additional $3 million in alleged site work into the Agreement (which David Boucher, part of the team involved in the construction of the Rink on behalf of Ice, denied), Kelly identified no written authorization to do so. Kelly testified that he relied on a spreadsheet Boucher prepared that described site work as support for the $900,000 charge in change estimate 57. CSM Ex. 19 (Bates No. 00743-44). Boucher denied that he authorized CSM (through the spreadsheet or otherwise) to perform any additional site work, or to charge Ice more than the $2.08M for site work contemplated under the Contract. *See* Declaration of David Boucher [Dkt. No. 507] (the "Boucher Aff."), ¶ 5; CSM Ex. 1 (Bates No. 00072).

For the $1 million "processing materials" charge, Kelly testified that he never gave Brooks a quote. He also acknowledged that processing materials was within the scope of work for the four site contracts with Ajax 5Cap NESV, LLC ("Ajax") that preceded the Agreement. Tr. Day 2, Kelly Test., 31–41; CSM Exs. 24–26 at subsection i, (Bates Nos. 00868, 00882, 00895); CSM Ex. 23, (Bates No. 00859) ($380k crushing line item). Brooks disputed the charge and denied ever directing Kelly to process materials. Brooks Aff., ¶ 27(e)(iii).

Finally, CSM has risk that any claim it might have relating to site work reflected in the disputed change orders is not secured by any mechanic's lien because that protection was expressly waived by CSM at least as to a substantial portion of the site work claim.  CSM's Partial Waiver and Subordination of Lien dated November 11, 2016 provided that, upon payment of $1,298,496, CSM "waive[d] any and all liens and right of lien" for labor and materials through October 31, 2016.  CSM Ex. 10, (Bates No. 00182-184). There does not seem to be any dispute that CSM received that payment, and Kelly testified that the disputed site work was performed between November 2015 and November 2016.  Tr. Day 2, Kelly Test., 82:12–83:7; 84:25–85:3.

The Plan Proponents assert that by including in its mechanic's lien claim these site work amounts for which they assert that CSM's lien rights had been waived, CSM failed to give a "just and true account of the amount due or to become due [it], with all just credits" as required, and "willfully and knowingly" claimed more than was due to it, such that the entire mechanic's lien should be dissolved.

I have not credited that argument with respect to other components of the CSM claim in considering estimation, but have considered the risk that the waiver executed by CSM would render unsecured any claim for site work reflected in the disputed change orders.  CSM argues that "[a]ny claim by the Plan Proponents that CSM submitted falsified lien waivers is untrue, improper, and was dismissed in the pending State Court Action between Ice and CSM (among others) via summary judgment and should not be relitigated in this Court. Moreover, the allegations involving lien waivers inured to the benefit of Ice and, as the Superior Court ruled, Ice has suffered no damages based on lien waivers." CSM Obj.to Estimation Mot. [Dkt. No. 408], ¶ 6(g).  As I have stated, I have not given weight to the estoppel argument made by the

Plan Proponents, but I have considered the inconsistent statements made by CSM in considering Kelly's testimony and associated risks that his explanations and assertions of an oral modification or modification by course of dealing may not be credited.

After considering all of these factors and risks, I determine that the portion of the secured claim asserted by CSM for approximately $3 million in additional site work should be reduced to $1.6 million. I recognize that ultimately, if not settled, this portion of the claim will likely be allowed in full or disallowed, but the estimated amount reflects my assessment of the risks based on the abbreviated estimation process and burdens of proof. I have not assessed whether CSM would have unsecured contract or quantum meruit claims against Ice or other Debtors for these site work charges.

3.   Delay Damages

CSM has claimed $349,086 for delay damages as reflected in change order No. 13. Ex 21. On cross-examination, Kelly addressed the calculation and his claim for "delay damages" when the project was completed within the original time allotted. Tr. Day 2, Kelly Test., 210:8–214:24. The Agreement required Ice to provide permanent power to the job by a certain date to allow CSM to perform services. Ice did not meet that condition. Kelly described that, to stay on the timeline contemplated by the Agreement, CSM worked "7 days a week" and brought in additional manpower and superintendents to compensate for the delay and stay on track for project completion. *Id*. at 141:22–145:25; 213:1–2.

CSM Exhibit 21 contains a copy of change estimate 58, which calculates the $349,086 claim for delay damages. It does not specify additional costs, but rather calculates a "per day rate" of $2,994 and multiplies it by 106 days (the number of days between the date that Ice was required to provide permanent power and project completion). Calculation of the per day rate

includes General Conditions, Insurance, Project management, and overhead. Kelly testified that CSM "tried to keep [the calculation] very simple." Tr. Day 2, Kelly Test., 144:2–19. His theory was that by multiplying what he calculated to be CSM's "burn rate" and applying it to the number of days of delay to which he asserts CSM would have been entitled because of the power delay. *See id*. Section 8.3 of the General Conditions of the Agreement provides that the period for completion shall be extended for a time period as the architect may determine. It also provides that any claims relating to time shall be made in accordance with Article 15 of the General Provisions. While CSM Exhibit 21 contains a copy of a November 28, 2016 notice of a delay claim, that notice does not appear to have been delivered within the time required by Article 15 and the claim process does not appear to have been followed, but the focus of the claim objection was the fact that there was no actual delay or added time.

No evidence was presented regarding calculation of any actual additional expenses incurred by CSM to complete the project within the timeline as a result of Ice's failure to timely provide permanent power, but Kelly's testimony was credible that Ice's representatives endorsed that approach and that there were additional costs. CSM has risk that the "per day" methodology may not be accepted as the true measure of delay damages, but CSM would be allowed to put on evidence supporting alternative damages models. Since the components of that claim are less than clear, I have applied a discount. Under Massachusetts law, it does appear that project management and additional equipment and labor costs would be appropriately included in a mechanic's lien. I have also factored in the risks associated with oral contact amendments and the Prompt Pay Act. After considering all of those factors and assuming that the per day calculation has some value as a proxy for actual damages and could be accepted as a valid

amount that would have been incurred by Ice had the completion date been extended 106 days if proven, I estimate the delay damages component of CSM's secured claim at $280,000.

    4.    <u>Additional HVAC, Plumbing, and Refrigeration Charges</u>

CSM has asserted a secured claim for $753,938 for additional HVAC, plumbing, and refrigeration charges that are included in change order No. 10.  Ex 18.1.  Kelly testified that CSM relied on November 10, 2015 architectural drawings referenced in the "Contract Document Log" incorporated in the Agreement to make its bid and in executing the Agreement.  CSM Ex. 1, Ex. D (Bates No.00073).  The Agreement was not amended to update those bid drawings, but updated drawings "for bid set and construction" dated May 24, 2016 were provided to CSM before the execution date of the Agreement on May 25, 2016.  Tr. Day 2, Kelly Test., 90:2–93:15.  On cross-examination, Kelly testified that he had stated to a representative of Ice's lender that he was expecting updated drawings in February of 2016 and that he received the updated plumbing drawings in April. *See id.* at 92–93, 159.  I infer from the testimony and related exhibits that the updated drawings were reviewed by Kelly prior to signing the Agreement.

The Plan Proponents dispute CSM's position that it relied on the drawings attached to the Agreement and should be entitled to additional amounts for changes from those drawings, which are agreed to have been only 10% complete.  Kelly testified that he did rely on those drawings in establishing the CSM bid and the price reflected in the Agreement.  *See id.* at 87:9–90:9.  He testified as to some of the differences in the HVAC and plumbing specifications that resulted in the charges reflected in change order No. 10.  For example, he testified that the number of floor drains increased from 28 in the original drawings to more than 90 on the updated drawings.  *See id*. at 159:10–160:5.  He also testified how the drawings and design for the HVAC system completely changed from the drawings attached to the Agreement to those ultimately provided

by Wozny Barbar.  Kelly testified that ultimately Ice terminated Wozny Barbar and approved a

design build plan from ESI that would be similar to a system in use at Endicott College.  *See id*.

at 161:12–162:8.

Ice's construction representative, Paul Brooks, testified that, in his experience, CSM

would not have relied on the original documents and that Kelly had the updated documents in his

possession and would have relied on those.  Tr. Day 3 of Trial, July 27, 2022 [Dkt. No. 560]

("Tr. Day 3"), Brooks Test., 192:7–195:18, 202:15–204:13.  He testified that Kelly participated

in meetings with the architect at which updates to the plans were discussed.  *See id*. at 194:18–

195:2.  Brooks also testified that the HVAC design was different from the original drawings and

was installed properly and that he was on site nearly every day and never stopped the HVAC

work.  Brooks further stated that the updated drawings "absolutely" should have been referenced

in the Agreement or Kelly should have "not executed [the Agreement] with all the documents

that were out there."  Tr. Day 3, Brooks Test., 210:2–8.  He testified that he could not imagine

how CSM could have solicited bids from subcontractors based on the original drawings that were

appended to the Agreement.  *See id.* at 211:20–22.

While I understand that CSM may have signed the Agreement on the assumption that it

would effectively re-price this work based on the new plans that had been provided to it, in this

estimation proceeding, I give CSM the benefit of the Agreement as executed and assign the risk

of enforcement of that Agreement, which referenced the original bid documents, to Ice.  Based

on the evidence, I estimate that this portion of CSM's secured claim will not be reduced given

that the Agreement reflects a negotiated price based on the attached original drawings and that

there is substantial evidence that Ice and its representatives instructed CSM to install systems and

construct according to designs that were materially different from the original drawings.  Clearly,

there was a breakdown in the contracting process and the change order procedures contemplated

by the Agreement, but the record is clear that Ice approved additional costs outside the change

order process on certain undisputed items, and the evidence presented on the interaction between

the parties and evolution of the construction relating to these charges appears likely to support

the claim. While CSM has some risk that it will not be able to prove an oral agreement and

meeting of the minds on estimated costs for these charges, I have not attempted to quantify it in

this estimation proceeding and have instead accepted the full amount of this portion of the claim

as asserted. As such, I estimate the amount of this component of the CSM claim at $753,938.

> 5.    Asserted Credits

The Plan Proponents assert that CSM "failed to perform or improperly performed"

certain work required under the Agreement that is itemized in Paragraph 32–34 of the trial

affidavit of Brooks. Brooks Aff., ¶¶ 32–34. Brooks estimated the cost to correct or perform the

work that he identified would be $518,200, "based on current industry standards and labor costs,

and my experience in the construction industry." *Id*. at ¶ 33. On cross-examination, Brooks

testified that the items and estimates reflected his assessment of work that had not been

performed, had been rejected, or had to get reinstalled or corrected when he did an account

ledger for management of Ice. Tr. Day 3, Brooks Test., 181:17–182:13. He stated that he

estimated the amount in 2016 or 2017 and that it was "very rough." *Id*. at 182:18–23. The

estimates were not based on bids provided by subcontractors, and Brooks testified that Ice has

not yet incurred any expense to perform the repairs or work identified in his affidavit other than

some plumbing repairs and paving. *See id*. at 183, 200. It also appeared that Brooks did not

consider a number of credits reflected in change estimate 57 and paving. CSM Ex. 19; Tr. Day

3, Brooks Test., 184–189. The rough estimates of Brooks based on a walk through

approximately five years earlier and certain credits not considered by Brooks do not support an

assessment that the secured claim should be significantly reduced by these asserted credits for

estimation purposes.  Consequently, I estimate the credits for this work to be $250,000.  The Plan

Proponents offered largely uncontroverted evidence of $117,000 charges for work not performed

as stated in paragraph 27 of the Brooks affidavit.  Adding these amounts together, I estimate total

credits for to be offset against the secured claim of CSM to be $367,000.

      6.   <u>The Culvert</u>

      The Plan Proponents assert that any claim asserted by CSM should be offset by

counterclaims possessed by Ice for defective construction of a culvert.  I have considered certain

other credits identified in estimating other claims.  The Plan Proponents introduced evidence that

Ice paid $200,000 for the installation of the culvert and that it will cost at least $300,000 to

rebuild the culvert.  Brooks Aff., ¶ 31.  Evidence of the cost to repair was based on an estimation

by Brooks, without having obtained actual estimates from contractors.  Kelly testified that CSM

worked closely with the City of Attleboro Conservation Commission and that he received praise

for the construction of the culvert.  He characterized the dispute as whether CSM was to have

installed a second sidewalk adjacent to the roadway above the culvert.  Tr. Day 2,  Kelly Test.,

171:22–172:24.  Brooks testified extensively as to how he asserted the culvert was built

incorrectly so that the tapered block construction would not have the required width of 30 feet

plus one sidewalk at the top of the culvert.  Tr. Day 3, Brooks Test., 122–143, 167–171.

      The evidence presented regarding the culvert was contradictory.  Brooks asserted that the

culvert would have to be rebuilt to meet the specifications and support a two-lane road with a

sidewalk.  He stated that the engineer rejected the culvert, but the testimony was unclear as to the

distinction between the civil engineer and structural engineer and whether there was an actual

rejection.  Expert testimony would be required to determine this issue.  I found Brooks to be specific and credible regarding his understanding of width issue supporting his contention that the culvert was built incorrectly, but did not find substantial support for his assessment regarding the amount that would be required to be spent to correct that issue and achieve a two lane road and sidewalk.  Consequently, I estimate the value of this claim/credit at $150,000.

       7.     <u>Calculation of Estimated CSM Secured Claim</u>

For the reasons above, I estimate the CSM secured claim to be $3,393,009, which is $1,276,071 (the undisputed amount), plus $2,116,938 ($1,600,000 (site work), plus $280,000 (delay damages), plus $753,938 (additional HVAC, Plumbing, and Refrigeration Charges), minus $367,000 (credits), minus $150,000 (culvert)).

### D.    Ashcroft Claim Compromise/Estimation

Ashcroft filed a proof of claim (the "Ashcroft Claim") asserting $7,731,318.49 due with respect to a mortgage granted on or about December 13, 2019 by all Debtors, except for Land East, over their real property securing a $7.5 million debt owed by their parent company, Ajax , to Ashcroft.  None of the Debtors are obligors or guarantors of the original mortgage made by Ashcroft to Ajax.  A compromise of the Ashcroft Claim is embodied in the Plan whereby any claim of Ashcroft will effectively be subordinated and converted to equity.  While SHS objected to the Ashcroft Claim, the claim objection was stricken without prejudice given the proposed compromise and the fact that the Plan Proponents would need to demonstrate that Ashcroft has a claim to compromise and that the proposed compromise is in the best interests of the estate in the context of confirmation.  The Court directed the Proponents to file a motion for an order finding that there is a good-faith basis for the assertion that the Ashcroft Claim is supported by sufficient consideration from the Debtors to warrant considering the compromise of that Claim embodied

in the Plan, including for purposes of Plan voting.  For purposes of estimation, the Proponents

were required to demonstrate that a benefit flowed from Ashcroft to the Debtors from the loan to

Ajax that could form a basis for the Ashcroft Claim.  *See Ord. Regarding Discovery Schedule*

*and ESI Protocol* [Dkt. No. 440].

Evidence on the Ashcroft Claim was presented through the declaration of Stuart

Silberberg, the sole manager of the Debtors, declaration of Jason Hebert, who provided

bookkeeping and accounting services to the Debtors and Ajax, and the affidavit of Michael

Sullivan, the manager of Ashcroft (Dkt. Nos. 503, 505, and 508, respectively) and their

examination at trial.  The evidence established that Ashcroft was formed by Ashcroft Sullivan

New England Development Center, LLC as a single-purpose entity qualified as a regional center

authorized to accept capital investments from foreign investors to invest in the development of

the Project undertaken by the Debtors in Attleboro.  Sullivan Aff., ¶ 3.  Ashcroft, thereafter,

solicited and received capital investments from various individual foreign investors, each

investing $500,000 for the purpose of funding the development of the Project. Sullivan Aff., ¶¶

3–5. In estimating the Ashcroft claim, I have not given any weight to the potential of a successful

objection to the claim based on SHS's theory that Ashcroft is not the holder of the debt

obligation underlying the Ashcroft claim.  Although the loan documents from the November

2016 transaction between Ashcroft and Ajax do not appear to have been entered into the

evidentiary record, the Ashcroft loan to Ajax is corroborated by, among other things, a

Subordination and Standstill Agreement (the "Subordination Agreement") entered into between

HarborOne, SHS's predecessor in interest, and Ashcroft and a promissory note made by Ajax in

favor of Ashcroft.  A copy of the Subordination Agreement was attached to SHS's reply to the

request to strike and responses to its Objection to Ashcroft's Claim (the "Reply"), *see* Dkt. No.

362, and to CSM's confirmation objection, *see* Dkt. No. 463; and a copy of the *Form of Promissory Note* was attached to SHS's Reply.  The version of the Subordination Agreement filed on the docket is unsigned by HarborOne, but no party has raised that as an issue. Further, the mortgage to Ashcroft from the Debtors dated November 21, 2019, referencing the loan documents is attached to the Ashcroft proof of claim and is consistent with Ashcroft being the holder of the promissory note.

The credible evidence presented demonstrated that Ashcroft loaned at least $7.5 million to Ajax, of which $5,598,951 was intended for and used for the benefit of the Debtors and their Project.  Hebert Aff., ¶ 3;  Tr. Day 3, Hebert Test., 148:4–14.  Each disbursement request was accompanied by a statement of intended use of the funds and provided that the advances were to be used solely for construction, utilities, taxes, and costs related to development of the Project and the respective properties owned by the Debtors.  Hebert Aff.  Of that amount, Hebert testified at trial that the total amount of direct "value" allocated to the non-Ice Debtors from Ashcroft loan proceeds was $784,390.32.  *See* Hebert Aff., ¶ 48.  Further, the total amount of loan proceeds that directly benefitted the non-Ice Debtors advanced after those Debtors (other than Land East) granted the mortgage to Ashcroft was $405,701.33 in total.  *See id.*  Each of the Debtors, other than Land East, is liable to Ashcroft on a non-recourse basis pursuant to respective mortgage securing all outstanding amounts owed by Ajax. *See* Ashcroft Proof of Claim, Mortgage dated Nov. 21, 2019.  I estimate that Ashcroft will have an allowed secured claim in some amount against each of the Debtors (other than Land East) that could be as much as $5.598 million and would be at least $4.814 million as against Ice.  Certain of the Debtors may have fraudulent conveyance claims or other defenses that could reduce amounts secured by respective mortgages, but in each case I estimate that Ashcroft would have more than a nominal

secured claim against each of the Debtors, other than Land East. I will use the estimated claims

and consider evidence introduced during the Phase I evidentiary hearing in evaluating the

reasonableness of the settlement proposed by the Plan Proponents with respect to the Ashcroft

claim as part of the plan of reorganization. Given the values established, as will be discussed, for

the Rink and the largely undeveloped land owned by the other Debtors (the "Land"), it does not

appear that it is necessary to estimate a specific amount of Ashcroft's secured claim against each

Debtor.

## II.    Valuation

The Plan Proponents offered two expert witnesses to establish the value of the Rink and

Land: Joseph M. Miller, who prepared appraisals of the properties and testified as to valuation,

and Craig Jalbert, who testified as to the reasonableness of the operating projections of the Rink.

I have considered the appraisals, affidavit, and testimony of Miller, and the affidavit and

testimony of Jalbert.

In formulating his opinion of the fair market value of the Rink, Miller relied on operating

revenue projections prepared by management of ICE and reviewed by Jalbert. Jalbert testified

that he believed that the projections were reasonable based on expected conditions and

considering historic performance. Miller estimated the fair market value of the Rink at $18.5

million and the Land at $19.3 million as of February 22, 2022. He estimated the liquidation

value of the Rink at $9.3 million and the liquidation value of the Land at $13.5 – $15.29 million

as of February 22, 2022.

No interested party offered expert testimony contradicting the opinions of Miller or

Jalbert. SHS cross-examined the experts and submitted a posthearing brief, as directed by the

Court, in which SHS does not contest the fair market value opinion of Miller for either the Rink

or Land.  SHS also does not contest the liquidation value opinion of Miller as to the Land, but

SHS argues the liquidation value of the Rink and its improvements should be between $11.1 and

$12.9 million, applying a 30%–40% liquidation discount.

Miller had applied a 50% discount to arrive at the $9.3 million liquidation value in his

appraisal.  In his report, Miller stated that "[i]n discussions with local market participants, it was

determined that a liquidation value is difficult to assess due to the special use nature of the

subject property, but generally between 60% and 70% was the opinion."  Notice of Proponents'

Appraisals, Dkt. No. 365, Ex. A, at 77.  The liquidation discount survey in the report noted a

discount of 60%–70% from a "disposition director," 65%–75% from a "REO director," and

"[n]o less than 50%" from a "capital markets director."  *Id*.  On cross-examination, Miller

reiterated the difficulty in determining the value of a special purpose asset and testified that

determining the liquidation value depends on operations and the pool of ultimate buyers during a

presumed liquidation market period of three (3) months or less.  In response to questioning as to

why he applied a 50% discount given the other discounts in his survey, Miller stated a belief that

disposition of a special use property within a three month period at 30%–40% of its value is

"pretty punitive," which is one of the reasons he chose to use 50%.  He also testified that he

brought the discount down from 60%–70% because Ice's operations were turning around, which

bode well for a sale.  In later testimony, he appeared to confirm that 60%–70% was the

liquidation value, instead of the discount gleaned from the market participants.  Accordingly,

there appears to be a discrepancy in the report and during Miller's testimony as to the opinions of

certain of the confidential participants and how that played into his assessment of a discount to

be applied to the Rink.  While Miller concluded that a 50% discount was more appropriate and

used a 50% discount in his liquidation valuation for that property, the support for that particular

conclusion is not entirely persuasive, both because of the confusion as to the discount and the

application of a three-month marketing period.  There has been no contrary expert testimony

provided, however.

After considering the record, the qualifications of each expert, and the bases for each of

their opinions, I find that the estimated the fair market (reorganization) value of the Rink is $18.5

million and the fair market (reorganization) value of the Land is $19.3 million.  I find that the

liquidation value of the Land is $14.3 million.  I further find that the liquidation value of the ICE

property is $11.1 million.  While I did not have the benefit of expert testimony establishing that a

lower discount rate would be more appropriate for the Rink and Miller's testimony was

somewhat confusing regarding local market participant input and his conclusions, he did

ultimately testify that discount rates of 30% and 40% were recommended to him by persons

familiar with the local market and that he considered and did not accept those recommendations.

I accept his assessment that the specialized nature of the Rink supports a higher discount being

applied, but a 50% discount appears too high given the options that Miller considered and that

the marketing period seemed arbitrary.  The liquidation value of $11.1 million applies a 40%

discount to the fair market value of the Rink.

The values established during Phase I of the confirmation hearing discussed in this

section reflect real estate market conditions at the time of the valuation by Miller.  I do not have

evidence of the current market, but the market may have changed due to increased interest rates

and other economic factors.  I will use the valuations found herein, unless a party in interest files

a motion within fourteen (14) days requesting that additional valuation evidence be presented at

the Phase II confirmation hearing.

### III.    Tentative Rulings on Voting and Application of § 1129(a)(10) - Acceptance by Impaired Class as to "Per Debtor" or "Per Plan"?

SHS and CMS have each objected to confirmation on the basis that the Plan Proponents cannot demonstrate that, at least as to Land East, the requirements of § 1129(a)(10) have been met. Section 1129(a)(10) provides that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). There is a split of authority on how the impaired, accepting class provision of § 1129(a)(10) should be applied in multi-debtor cases where a joint plan is proposed. While not initially framed as a Phase I confirmation issue, whether this objection should be sustained is a legal question of how I construe the requirements of § 1129(a)(10). Resolution of this issue will help guide the parties with respect to confirmation of the Plan.

As acknowledged by the parties, there is no controlling law in the First Circuit and a split of authority among courts that have addressed this question. When applied to plans proposed by multiple debtors, courts have interpreted the requirement of § 1129(a)(10) in two different ways.[10] Some courts have held that, where cases are jointly administered, but not substantively consolidated, § 1129(a)(10) requires an impaired but consenting class for each debtor (known as the "per debtor" approach) included in the plan. *See, e.g., In re Tribune Co.*, 464 B.R. 126, at 180–83 (Bankr. D. Del. 2011), *on reconsideration in part*, 464 B.R. 208 (Bankr. D. Del. 2011), *aff'd sub nom. In re Tribune Media Co.*, 587 B.R. 606 (D. Del. 2018), *aff'd sub nom. In re Tribune Co.*, 972 F.3d 228 (3d Cir. 2020). The contrary view is that § 1129(a)(10) requires only

---

[10] As an aside, with no bearing on the determination of this issue in this case, the American Bankruptcy Institute Commission to Study the Reform of Chapter 11 recommends the elimination of § 1129(a)(10) and the requirement of an accepting impaired class for confirmation. American Bankruptcy Institute Commission to Study the Reform of Chapter 11: 2012–2014 Final Report and Recommendations, 23 Am. Bankr. Inst. L. Rev. 1, 280–284 (2015) (weighing policy goals and limitations of § 1129(a)(10)).

that one class of impaired claims accept the plan, even if that class asserts claims against only

one of the debtors (known as the "per plan" approach).  *See, e.g., JPMCC 2007-C1 Grasslawn*

*Lodging, LLC v. Transwest Resort Props. Inc. (In the Matter of Transwest Resorts Props., Inc.)*,

881 F.3d. 724, 730 (9th Cir. 2018).   Applying a "per plan" approach, the Plan Proponents assert

that the Plan satisfies § 1129(a)(10) because Class 4 ("[Ashcroft] Secured Claims") is impaired

under the Plan and, as a non-insider and Proponent of the Plan, Ashcroft will vote in favor of the

Plan.  Ashcroft asserts claims against all Debtors other than Land East.  If a "per debtor"

impaired, accepting class rule is applied, as advocated by SHS and CSM, the Plan cannot be

confirmed.

Courts adopting a "per plan" approach have focused on the plain language of the statute

and whether that provision is a technical requirement rather than a substantive right for objecting

creditors.  *See In the matter of Transwest Resort Props. Inc.*, 881 F.3d. at 730 (concluding that

plain language of statute permitted "per plan" approach as it references only one impaired class

is needed "under the plan" to approve "the plan," application of statutory construction under §

102(7)  "effectively amends section 1129(a)(10) to read: 'at least one class of claims that is

impaired under the plans has accepted the plans[,]'" and creditors had not objected to

consolidation provisions of the plan); *JPMorgan Chase Bank, N.A. as Administrative Agent v.*

*Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 419 B.R. 221, 266

(Bankr. S.D.N.Y. 2009) (applying the "per plan" approach because the business of the joint

debtors was managed on an integrated basis, which made it "reasonable and administratively

convenient to propose a joint plan"); *In re Pac. Links US. Holdings, Inc.*, No. 21-00094, 2022

Bankr. LEXIS 1377, at *19 (Bankr. D. Haw. May 13, 2022) (holding that in a jointly

administered proceeding without substantive consolidation, § 1129(a)(10) was satisfied because

at least one impaired class of claims had accepted the joint plan); *In re Station Casinos, Inc.*, No. BK-09-52477, 2010 Bankr. LEXIS 5380, at *82–83 (Bankr. D. Nev. Aug. 27, 2010) (finding "the plain language and inherent fundamental policy behind Section 1129(a)(10) supports the view that the affirmative vote of one impaired class under the joint plan of multiple debtors is sufficient to satisfy Section 1129(a)(10)"); *In re SGPA, Inc.*, No. 1-01-026092, 2001 WL 34750646 (Bankr. M.D. Pa. Sept. 28, 2001) (acknowledging that "[a]n overly broad reading of [§ 1129(a)(10)]—arguably barred and certainly not supported by its plain language—would inappropriately complicate multi-debtor cases by exalting form over substance and would, in some cases, potentially make a negotiated plan unworkable").

Courts that have adopted the "per debtor" approach have distinguished cases where the debtors have been substantively consolidated and have held that the meaning of the statute is not as "plain" as suggested by other courts in that circumstance. *Compare Tribune*, 464 B.R. at 180–83 (concluding other "per plan" precedent inapplicable because, arguably, the § 1129(a)(10) issue was not central to the issue before those courts); *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, at 302–03 (Bankr. D. Del. 2011) (determining that although the debtors collectively have a number of assets and many creditors, one of the debtors has only one creditor and one asset, such that, in the absence of substantive consolidation, that debtor cannot confirm a plan over creditor's objection because it could get no accepting class and, therefore that debtor "does not have any chance of confirming a plan); *In re Consol. Land Holdings, LLC*, No. 6:19-bk-04760-KSJ, 2021 WL 3701799, at *6 (Bankr. M.D. Fla. 2021) (adopting "per debtor" approach and concluding that, absent substantive consolidation, the subsections of § 1129(a) must be satisfied by each debtor; since at least one joint debtor did not have an impaired accepting class, the joint plan was not confirmable).

In *Tribune*, the court reasoned that the statutory reference to "plan" in § 1129(a)(10) was not a sufficient basis, alone, in multiple debtor cases, to "conclude that only one debtor—or any number fewer than all debtors—must satisfy [the] standard" under § 1129(a)(10) because Bankruptcy Code rules of construction under § 102(7) state that "the singular includes the plural." *See Tribune*, 464 B.R. at 182.  The court concluded that "plan" could be and should be read to consist of "plans" in conjunction with other subsections of § 1129 where plan was also referenced in the singular, but understood to apply to all debtors in a multiple debtor case, *e.g.,* § 1129(a)(1) (compliance with applicable provisions of the Bankruptcy Code) and § 1129(a)(3) (good faith requirement).  *See id.* at 183.  The court also commented that the "best interest of creditors" treatment under § 1129(a)(7) applied to every impaired class of creditors for each joint debtor which was compatible with the "per debtor" application.  *See id*.  The *Tribune* court also emphasized that "[i]n the absence of substantive consolidation, entity separateness [was] fundamental."  *See id.* at 182 (citation omitted).  The court acknowledged that large multiple-debtor cases are often jointly administered for convenience and joint plans may be filed for convenience possibly because a single distribution scheme is proposed, but that convenience alone where creditors have objected is not a sufficient reason to disturb creditors' rights with respect to a debtor not meeting confirmation standards and would undermine entity separateness recognized by corporate law.  *See id*. at 183.

The approach in *Tribune* has been criticized by the Ninth Circuit Court of Appeals in *Transwest*, which concluded that "the plain language of section 1129(a)(10) indicates that Congress intended a 'per plan' approach."  881 F.3d at 730.  Contrary to *Tribune's* theory of textual uniformity among each § 1129(a) subsection, the *Transwest* court stated that nothing in the plain text of these subsections suggested the "per debtor" basis and rejected the argument that

all subsections must uniformly adopt the "per debtor" basis, especially when the Bankruptcy

Code phrases each subsection differently. *See id.*  Application of the rule of construction in §

102(7) to § 1129(a)(10) to read "at least one class of claims that is impaired under the plans has

accepted the plans" did not change the court's analysis, concluding the "per plan" approach was

consistent with that reading. *See id.* at 729–30.  The Ninth Circuit did not address substantive

consolidation's bearing on the § 1129(a)(10) analysis because the creditor did not appeal on that

basis. *See id.*

The Plan proposed by the Proponents in this case has a consolidation provision that is

similar to what has been characterized in other cases as "'deemed' substantive consolidation or

substantive consolidation 'light' . . . [b]ecause it is substantive consolidation that is being

implemented *for plan-purposes only* (i.e., voting and treatment purposes).  Post-reorganization,

the reorganized Debtors may or may not keep their existing structure of . . .  separate legal

entities." *In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 91 (Bankr. N.D. Tex. 2017) (emphasis

in original).  Here, Section 5.9 of the Plan provides that "the Reorganized Debtors shall continue

to maintain their separate corporate existence for all purposes other than the payment of Claims

as expressly provided for in the Plan."  Plan § 5.9.  Among other things, that provision provides

that the assets and liabilities of each Debtor will be "merged" with the assets and liabilities of

each other debtor "for the purposes of implementing the Plan and satisfying Allowed Claims as

provided for in the Plan." *Id.*

SHS and CSM have objected to confirmation of the Plan, among other things, because

there is no impaired accepting class of creditors of Land East because Ashcroft, which is

impaired under Class 4 of the Plan and has voted to accept the Plan, is the only accepting class,

but has no claim against that Debtor.[11]  Each objects to the substantive consolidation provision, stating that the requirements for substantive consolidation have not been met.  Notably, CSM does not assert any claim against Land East, and would objectively benefit from the consolidation proposed in the plan because payment of any allowed claim that it may have would be made from assets of all of the Debtors rather than just ICE.  CSM argues, among other things, that it would also be inequitably affected as a result of the consolidation of the Debtors for purposes of implementing the Plan, without taking into account its marshalling claims.  If allowed, SHS would possess a fully secured claim against all Debtors and retain its mortgages covering each of the Debtor's properties.  It would arguably not benefit from the proposed consolidation, but would not be adversely affected in terms of payment of its claim under the Plan.  SHS argues that consolidation and application of the per plan interpretation of § 1129(a)(10) would deprive it of what it perceives as the protections afforded by that provision by not requiring acceptance of an impaired class of Land East creditors.

Section 1123(a)(5)(C) permits a consolidation or merger as a means for the Plan's implementation.  Section 105 also provides authority for the Court to approve substantive consolidation within or outside a plan.

> When courts have exercised their authority to order substantive consolidation pursuant to section 1123(a)(5)(C) of the Bankruptcy Code, most have tended to look to some of the many equitable or balancing factors [applied by courts considering substantive consolidation]  (many of which were applied outside of the context of a chapter 11 plan) to determine whether or not substantive consolidation is appropriate.  However, arguably, to the extent the court is determining whether substantive consolidation in a plan is appropriate,

---

[11] SHS and CSM also assert Ashcroft's claim should not be counted because it is a "non-statutory insider" of the Debtors that is not entitled to vote under § 1129(a)(10).  Subject to evidence to be presented at Phase II of the confirmation hearing, I tentatively rule that the fact that Ashcroft has reached agreement with the Debtors and others and is a plan proponent does not, *per se*, make Ashcroft an "insider" for voting purposes.

> pursuant to section 1123(a)(5)(C), the only "real requirement" for exercising
> such authority should be that section 1129 of the Bankruptcy Code is complied
> with in that: (1) classes of impaired creditors have accepted the plan's proposed
> consolidation, or (2) the "best interest test" and "absolute priority rule"
> protection granted to dissenting creditors has been met by the plan proponent.

*In re ADPT DFW Holdings, LLC*, 574 B.R. at 92–93 (citations omitted).

If the Plan Proponents present evidence that substantive consolidation is appropriate under applicable law, this would permit confirmation of the Plan under either view of § 1129(a)(10). *See, e.g., In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 775–76, 778 (Bankr. D. Del. 2018). If the evidence at confirmation does not support a finding that substantive consolidation would be appropriate under applicable law outside of the confirmation process, with some reservation and subject to the evidence presented, I will apply the "per plan" approach to evaluate compliance with § 1129(a)(10). While I have carefully considered the reasoning of the *Tribune* line of cases, I interpret § 1129(a)(10) to permit confirmation of a joint plan of reorganization where at least one class of impaired creditors of one debtor has accepted the plan under certain discrete circumstances where limited consolidation is proposed as a good faith means of implementing the plan. The Plan must nevertheless meet all other requirements for confirmation, including the best interests of creditors test in § 1129(a)(7) and the good faith requirements of § 1129(a)(3). I am cognizant that applying the "per plan" approach may allow for greater attempts at chicanery by plan proponents, but creditors are protected by judicial scrutiny of the business reasons for proposing a joint plan, the relationship of the debtors, and the importance of "entity separateness," the benefit to creditors of each estate, and whether any objecting party is prejudiced by the proposed limited consolidation other than a claim of prejudice because one or more of the debtors failed to obtain acceptance from a class of impaired creditors. In this case, it appears unlikely that it would be found that SHS or CSM are materially

44

prejudiced by limited consolidation and application of the "per plan" rule as it relates to Land East.

At Phase II of the confirmation hearing, the parties will present evidence of good faith and will present argument and evidence regarding whether approval of Section 5.9 of the Plan is appropriate.  The parties may also present evidence supporting substantive consolidation under applicable law or may seek confirmation where the record only supports limited consolidation as a means to effectuate the plan as discussed above.

Finally, both SHS and CSM argue that SHS is entitled to vote Ashcroft's claim because of the prepetition Subordination Agreement entered into between HarborOne, SHS's predecessor in interest, and Ashcroft, asserting that Ashcroft assigned its right to vote its claim in these cases to HarborOne or its assignee, SHS, pursuant to that agreement.  Paragraph 4 of the Subordination Agreement provides in relevant part:

> The Subordinate Lender [Ashcroft] irrevocably authorizes and directs the Senior Lender [HarborOne] and any trustee in bankruptcy, receiver or assignee for the benefit of creditors of any of the Borrowers or Ajax, whether in voluntary or involuntary liquidation, dissolution or reorganization proceedings, on the Subordinate Lender's behalf, *to take such action as may be reasonably necessary or appropriate to effect the subordination provisions and other rights and/or remedies granted to the Senior Lender in the Agreement (including, without limitation, in the case of the Senior Lender,* to file a proof of claim and *to vote upon matters with respect to which the Subordinate Lender may be able to vote in connection with any bankruptcy proceedings related to any of the Borrowers or Ajax)* . . . ."

Subordination Agreement ¶ 4 (emphasis added).  A copy of the Subordination Agreement was attached to SHS's Reply, *see* Dkt. No. 362, and to CSM's confirmation objection, *see* Dkt. No. 463.  The version in the record is unsigned by HarborOne, but no party has raised that as an issue.

If the Ashcroft claim is subject to defenses and other claims and is being compromised as part of the Plan and no payments will be made to Ashcroft on account of its proposed equity interest under the Plan before SHS is paid in full on account of its over-secured claim, it appears that SHS voting Ashcroft's claim is not "reasonably necessary or appropriate to effect the subordination provisions and other rights and/or remedies" under the terms of the Subordination Agreement.   I do not reach whether distribution of equity interests under the Plan may be subject to provisions of the Subordination Agreement.

Additionally,  I have further discretion to decline to enforce the intercreditor voting agreement embodied in the Subordination Agreement.  Section 510(a) of the Bankruptcy Code provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a).  However, provisions in such an agreement cannot invalidate applicable provisions of the Bankruptcy Code, and I would likely find the voting provision to be unenforceable, adopting the reasoning of the court in *In re SW Boston Hotel Venture, LLC*, 460 B.R. 38 (Bankr. D. Mass. 2011), which, in turn, adopted the analysis of the court in *Bank of Amer. v. N. LaSalle Street Ltd. P'ship (In re 203 N. LaSalle Street P'ship)*, 246 B.R. 325 (Bankr. N.D. Ill. 2000).  *See In re SW Bos. Hotel Venture, LLC*, 460 B.R. at 52, *vacated on other grounds sub nom.*, *The Prudential Ins. Co. of America v. SW Bos. Hotel Venture, LLC*, No. BAP 11-087, 2012 WL 4513869 (B.A.P. 1st Cir. Oct. 1, 2012), *vacated*, 748 F.3d 393 (1st Cir. 2014) (rejecting assignment of voting right in subordination agreement with respect to plan confirmation because "[t]o the extent a provision in a subordination agreement purports to alter substantive rights under the Bankruptcy Code, it is invalid."); *In re N. LaSalle Street P'ship*, 246 B.R. at 330–31 (determining that "[w]hile the language of the subordination agreements governs the outcome of

46

the Bank's right to repayment of any deficiency claim, the language of the Bankruptcy Code

governs the determination of voting rights in the case [. . . ; u]nless there is some basis for

deviating from the plain language of § 1126(a), [the Bank] should therefore be allowed to vote

its claim in the confirmation process); *but see In re Fencepost Prods., Inc.*, 629 B.R. 289, 290

(Bankr. D. Kan. 2021) (determining that subordination agreements are enforceable to the extent

that the parties agreed that senior lender's claim would be paid in full before any payments are

made to the subordinated lender, but are ineffective to deprive the subordinated lenders their

status of creditors for purposes of Chapter 11; concluding, "[n]evertheless, because the amount

of [the senior creditor's] unsecured claim and Debtors' financial circumstances establish that the

[subordinated lender] under all conceivable scenarios will not receive any distribution from

Debtors in this Chapter 11 proceeding, or if the cases are converted to Chapter 7, the Court finds

that the [subordinated lender] lacks prudential standing to participate in the confirmation

process"); *Blue Ridge Investors, II, LP v. Wachovia Bank, N.A. (In re Aerosol Packaging, LLC)*,

362 B.R. 43, 47 (Bankr. N.D. Ga. 2006) (finding that because of the express terms of the

subordination agreement, senior lender was entitled to vote the claim of the subordinated lender

because, while § 1126(a) grants a right to vote to a holder of a claim, it "does not expressly or

implicitly prevent that right from being delegated or bargained away by such holder" and

"Federal Rules of Bankruptcy Procedure 3018 and 9010 explicitly permit agents and other

representatives to take actions, including voting, on behalf of parties").

My rulings on these issues are tentative and are intended to provide guidance to the

parties to assist them in preparing arguments and considering evidence to be presented at Phase

II of the confirmation hearing.

**IV.   Conclusion**

The Court will schedule a further evidentiary hearing on confirmation after

conducting a case management conference with parties in interest.

By the Court,

Dated: February 28, 2023

_____
Christopher J. Panos
United States Bankruptcy Judge