# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case No. 21-11226-CJP |
| NESV ICE, LLC, et al.,[1] | ) |  |
|  | ) |  |
| Debtors | ) | Jointly Administered |
|  | ) |  |

## <u>MEMORANDUM OF DECISION ON CONTESTED CONFIRMATION OF MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION</u>

NESV Ice, LLC ("Ice"), NESV Swim, LLC ("Swim"), NESV Tennis, LLC ("Tennis"), NESV Land East, LLC ("Land East"), NESV Field, LLC ("Field"), NESV Hotel, LLC ("Hotel"), and NESV Land, LLC ("Land," collectively with Swim, Tennis, Land East, Field, and Hotel, the "Land Debtors," and the Land Debtors together with Ice, the "Debtors"), Ashcroft Sullivan Sports Village Lender, LLC ("Ashcroft") and Shubh Patel, LLC ("SP" and, collectively with the Debtors and Ashcroft, the "Plan Proponents") seek confirmation of the *Modified Second Amended Joint Plan of Reorganization of NESV Ice, LLC, NESV Swim, LLC, NESV Tennis, LLC, NESV Land East, LLC, NESV Field, LLC, NESV Hotel, LLC, NESV Land, LLC, Ashcroft Sullivan Sports Village Lender, LLC, and Shubh Patel, LLC* (the "Plan") [Dkt. No. 770].[2]  SHS ACK, LLC ("SHS") and Construction Source Management, LLC ("CSM") object to confirmation of the Plan (collectively, with prior pleadings referenced therein, the "Objections").  Confirmation of the Plan has been bifurcated into two phases.  Because consideration of confirmation required estimation of certain claims and determination of preliminary issues, I conducted Phase I of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: NESV Ice, LLC (1262), NESV Swim, LLC (5919), NESV Tennis, LLC (6937), NESV Land East, LLC (4138), NESV Field, LLC (5539), NESV Hotel, LLC (9151), and NESV Land, LLC (2353).

[2] All capitalized terms used herein shall have the same meaning as used in the Plan unless otherwise defined.

confirmation hearing at which eight witnesses testified and forty documents were admitted into

evidence.  Subsequently, I issued an *Order Regarding Estimation of Claims, Valuation, and*

*Tentative Rulings on Certain Objections to Confirmation*, as amended [Dkt. No. 677], *In re*

*NESV Ice, LLC*, No. 21-11226-CJP, 2023 WL 2278603, at *1 (Bankr. D. Mass. Feb. 28, 2023)

("Phase I Order").  After an eight-day Phase II evidentiary hearing at which fourteen witnesses

testified and 240 documents were admitted into evidence,[3] the parties filed post-trial briefs,

replies, and proposed findings of fact and rulings of law.[4]  The docket reflects numerous

additional briefs, oppositions, replies, affidavits, statements of expert witnesses, and other

documents filed on various dates in connection with both phases of confirmation that were

considered in entering these findings and rulings regarding the confirmation of the Plan.

The Plan Proponents must prove by a preponderance of the evidence that the Plan

satisfies each requirement of § 1129(a).[5]  *See, e.g.*, *In re Mullins*, 633 B.R. 1, 3 (Bankr. D. Mass.

2021); 7 *Collier on Bankruptcy* ("Collier") ¶ 1129.02 (Alan N. Resnick & Henry J. Sommer eds.,

16th ed. rev.).  The Court has an independent obligation to ensure that the plan satisfies the §

1129 requirements.  *See, e.g., In re Mullins*, 633 B.R. at 3; *In re Charles St. African Methodist*

*Episcopal Church of Bos.*, 578 B.R. 56, 94–95 (Bankr. D. Mass. 2017).

---

[3] Citations to exhibits admitted into evidence at the Phase II hearings shall be to "Ex. __." Citations to exhibits admitted into evidence at the Phase I hearings shall be to "Phase I Ex. __." Citations to the trial transcript shall reference the trial day and relevant page number(s) of testimony.  Citations to items on the docket shall be to "Dkt. No. __."

[4] *Construction Source Management, LLC's Post-Trial Brief with Respect to [Plan] of [Plan Proponents] and Requests for Findings of Fact and Rulings of Law* [Dkt. No. 910] ("CSM Post-Trial Brief"); *Plan Proponents' Phase II Post-Trial Memorandum* and *Plan Proponents' Phase II Proposed Findings of Fact and Conclusions of Law* [Dkt. No. 911] ("Proponents' Post-Trial Brief"); *SHS ACK, LLC's Post-Trial Brief on Confirmation* [Dkt. No. 912] ("SHS Post-Trial Brief"); *Reply of Construction Source Management, LLC to Plan Proponents' Phase II Post-Trial Memorandum* [Dkt. No. 915]; *Plan Proponents' Reply to SHS ACK, LLC and Construction Source Management, LLC's Phase II Post Trial Briefs*, *Plan Proponents' Response to SHS ACK, LLC'S Proposed Findings of Fact*, and *Plan Proponents' Response to Construction Source Management, LLC's Alleged Facts* [Dkt. No. 916] ("Proponents' Reply").

[5] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "Bankruptcy Code" or "Code").

Based on the evidentiary record at trial and the entire record in this case, I will overrule the Objections to confirmation and enter an order confirming the Plan provided that the Plan Proponents modify the Plan as described in this memorandum. I find that each of the requirements of § 1129 will have been met by a preponderance of the evidence if the Plan is modified. Some of the confirmation requirements were not contested or evidence proffered in support of those requirements was not rebutted. I will address below the requirements of § 1129 that were the subject of the Objections filed by SHS and CSM. In my findings of fact and rulings of law that follow,[6] I have adopted portions of proposed findings, rulings, and legal argument submitted by the parties.

As will be discussed in detail below, I have determined that: Ashcroft is not an insider and may vote to accept the Plan, notwithstanding an existing subordination agreement; acceptance by one impaired class under this joint Plan satisfies § 1129(a)(10); the doctrine of marshaling will not be applied to require SHS to first seek satisfaction from collateral of guarantor Debtors not obligated to CSM; to be fair and equitable with respect to the secured claim of CSM as required by § 1129(b), the Plan must value CSM's lien after allocating a portion of the senior SHS term loan to the Debtors other than Ice that are the primary obligors of that loan; the Plan Rate required to be paid to satisfy § 1129(b) with respect to deferred payments under the Plan to SHS and CSM is the prime rate, plus 2%; and the Plan must be modified to provide that Ashcroft may not be paid any amounts on account of the equity interest to be issued under the Plan and any such equity interest must be held in trust for SHS until SHS's claims are paid in full.

---

[6] Any findings of fact that are, in whole or part, rulings of law shall be considered as such and vice versa. While I may cite to specific supporting evidence in the record, my findings are often supported by additional evidence in the record that I have considered, and I do not intend to limit support for my findings to the cited portion of the record.

## I.   BACKGROUND

### A.  The Parties

The Debtors each filed a voluntary chapter 11 petition on August 26, 2021 (the "Petition Date").  The Debtors were organized in contemplation of the development, construction, and operation of the New England Sports Village, a planned athletic, entertainment, and hospitality complex in Attleboro, Massachusetts (the "Project").  *Affidavit of Stuart Silberberg*, Ex. 163 ("Silberberg Affidavit"),[7] ¶ 5.  Each Debtor owns a parcel of real estate.  *Id.*  Ice is the only Debtor that has significantly developed and improved its property with the construction of an ice-skating rink (the "Rink") and is operating a business.  *Id.*  HarborOne Bank ("HarborOne") provided senior financing consisting of term debt loaned to the Land Debtors and construction financing loaned to Ice for the Rink.  Each Debtor is obligated on the indebtedness to HarborOne either as a borrower or guarantor.  SHS is the current holder of the claims arising from the HarborOne loans.

The sole member of each of the Debtors is Ajax 5Cap NESV, LLC ("Ajax 5Cap").  *Id.*  Ajax 5Cap's sole manager is Stuart Silberberg.  *Id.* at ¶ 1.  Ajax 5Cap has two classes of members—Class A and Class B.  Five Capital Management, LLC ("Capital Management") is a Class A member of Ajax 5Cap, holding less than fifteen percent of the Class A membership interests.  Tr. Day 6 of Trial, Sept. 15, 2023 [Dkt. No. 877] ("Tr. Day 6"), Boucher Test., at 16:4-13.  The initial majority members of Capital Management were David Boucher and Joseph Fitzpatrick.  *Agreement and Settlement Agreement Effective Feb. 9, 2018*, Ex. 228 ("Feb. 9, 2018 Agreement"); Tr. Day 6, Boucher Test., 101; Tr. Day 6, Fitzpatrick Test., 193.  In addition to its less than fifteen percent Class A membership interest in Ajax 5Cap, Capital Management possessed a forty-nine percent interest in the Ashcroft Sullivan New England Regional

---

[7] The Silberberg Affidavit was admitted into evidence as his direct testimony except as to the first sentence of ¶ 20 and ¶ 55.

Development Center (the "NEDC"). Tr. Day 6, Boucher Test., 16, 23–24, 101; Tr. Day 6, Fitzpatrick Test., 122, 174, 195; Feb. 9, 2018 Agreement.

SP is a Class B member of Ajax 5Cap, having invested approximately $500,000 in late 2016. Tr. Day 3 of Trial, Aug. 1, 2023 [Dkt. No. 889] ("Tr. Day 3"), Patel Test., 50–52, 105, 157. Dharmesh Patel and his wife are the sole members of SP. *Id.* at 79–80. Dharmesh Patel is also the manager of SP. SP was not a creditor of the Debtors and held no interest in the Debtors at the time of the Debtors' Chapter 11 filings, other than indirectly as a Class B member of Ajax 5Cap. *Id.* at 50–52, 105, 157. SP became a creditor of the Debtors after the commencement of the bankruptcy cases when it provided debtor-in-possession ("DIP") financing to the Debtors. *Id.*; Silberberg Aff., ¶¶ 15–16. SP was the initial DIP financing lender in the case and the Debtors, and SP sought authority pursuant to a motion filed on or about February 7, 2023 to assign SP NESV, LLC the rights and liens granted to SP pursuant to the Court's prior orders authorizing DIP loans. The Debtors and SP represented that SP NESV, LLC is an affiliate of SP and that Dharmesh Patel is the principal of both SP and SP NESV, LLC, as replacement DIP lender. Mot. Dkt. No. 662; Ord. [Dkt. No. 674] (approving the proposed assignment to the replacement DIP lender). As of July 24, 2023, the Debtors owed $1,213,993 on account of their DIP borrowing, excluding interest. Silberberg Aff., ¶ 16.

SHS, as assignee of HarborOne, is a creditor possessing a mortgage covering the properties owned by each Debtor to secure its claim. SHS filed a proof of claim totaling $18,928,809.92. Claim No. 11. The Debtors objected to that claim. Dkt. No. 270. For purposes of plan confirmation, SHS's claim has been estimated in the amount of $13,148,497.68 as of the Petition Date. *Stipulation Regarding Estimated Claim of SHS ACK, LLC* [Dkt. No. 687] ("SHS Estimated Claim Stipulation"); Phase I Ord., 2023 WL 2278603, at *5–6. This amount consists of $10,493,951.14 attributable to the construction loan and $2,645,546.53 attributable to the term

5

loan.  SHS Estimated Claim Stipulation, Ex. A.  The claim of SHS has also been estimated to

include an additional $400,000 in attorneys' fees, costs, and charges allowable under § 506(b).

Phase I Ord., 2023 WL 2278603, at *6.

CSM asserts a statutory mechanic's lien covering the real property and improvements

owned by Ice.  CSM filed Claim No. 5, reflecting a claim totaling $14,106,762.75.  The Debtors

objected to that claim.  Dkt. No. 514.  CSM acknowledged for estimation purposes that: (i)

$5,825,486 of its claim is secured and (ii) $4,980,790 of contractual interest, plus any deficiency

claim, should be treated as a general unsecured claim.  Phase I Ord., 2023 WL 2278603, at *6.

The claim of CSM has been estimated in the amount of $3,393,009, comprised of $1,276,071

(the undisputed portion of the secured claim), plus $2,116,938 (a reduction from the remaining

disputed portion of CSM's secured claim of $4.6 million, after consideration of various defenses,

credits, and counterclaims).  Phase I Ord., 2023 WL 2278603, at *6.

Ashcroft is a secured creditor that possesses mortgages covering all the properties owned

by all of the Debtors, except for Land East.  The Ashcroft mortgages were recorded after the

mortgages in favor of SHS and the notice of contract recorded by CSM.  Ashcroft has asserted

that its mortgages secured indebtedness of approximately $7,500,000, plus interest, as of the

Petition Date.  Silberberg Aff., ¶ 15; Claim No. 6.

**B.  Valuation Findings**

The Ice parcel consists of approximately 12.39 acres and is improved by the Rink.

*Notice of Proponents' Appraisal*, Ex. A, Keystone Consulting Group's Rink Appraisal dated as

of Apr. 28, 2023, with an Apr. 11, 2023 effective date [Dkt. No. 772] ("Keystone Rink

Appraisal"), at 13, 30, and *Affidavit of Stephen M. Dylag in Connection with Submission of his

Appraisals* [Dkt. No. 822] ("Dylag Affidavit"), ¶ 9, Ex. 161.[8]  The "as is" market value of Ice's

---

[8] The Court notes that the index of admitted trial exhibits accurately describes Ex. 161 as the "Affidavit of Stephen

Rink is $12,900,000.  Keystone Rink Appraisal, at 73; Dylag Aff., ¶ 8.  The Plan Proponents'

expert estimated that the Ice property would be expected to sell within a marketing and exposure

time of 6 months.  Keystone Rink Appraisal, at 29.  The "as is" liquidation value of Ice is

$9,600,000.  Keystone Rink Appraisal, at 73–74; Dylag Aff., ¶ 9.  The Plan Proponents' expert

estimated that in a liquidation the fair market value of the Ice property would be discounted

because the owner would be under an extreme compulsion to sell  and a sale would be

consummated quickly.  Keystone Rink Appraisal, at 73.  The expert applied its established

capitalization rate to year one estimated net income to determine the discounted liquidation

value.  *Id.*  I find that the methodologies to determine the values are reasonable and based on

established standards.  SHS and CSM did not rebut the valuation testimony of the Plan

Proponents with their own expert as to any of parcels of the Debtors.

The "as is" market value of the Land Debtors' collective parcels, totaling approximately

128.36 acres and exclusive of the Ice parcel, is $19,300,000, equaling an indicative, per acre

rounded value of $150,000.  *JLL Valuation Advisory Appraisal of the Attleboro Land* [Dkt. No.

365] ("JLL Land Debtors Appraisal"), Ex. B, [Tr.] Ex. 160, at 145, 150, 204, 216.  The market

value of 70.53 acres of the land if rezoned for multi-family use is $12,300,000, with an indicative

value per acre of $175,000.  *Id.* at 145, 150, 211, 216, 218.  The market value of the 57.83 acres

of the land if rezoned for commercial and industrial use is $9,540,000, with an indicative value

per acre of $165,000.  *Id.* at 145, 150, 215–16, 218.  The total hypothetical value of the land "if

rezoned" as described would be approximately $21.84 million.  *See id.* at 215–16.

The "as is" liquidation value of the land—the market value discounted by thirty

percent—is $13,500,000.  *Id.* at 217.  The liquidation value of the land if rezoned for multi-

---

Dylag of Keystone Consulting and Appraisal of Rink [ECF No. 822, 772]."  However, in the electronic exhibit
binder of admitted trial exhibits submitted to the Court, the electronic binder is missing the copy of the Keystone
Rink Appraisal.

family use—the market value as rezoned for multi-family use discounted by thirty percent—is $8,610,000. *Id.* at 218. If rezoned for commercial or industrial use and applying the same thirty percent discount, the liquidation value is $6,680,000. *Id.* The liquidation period assumed by the Plan Proponents' valuation was three months or less. *Id.* at 217. The expert applied a thirty percent liquidation discount, which was not credibly rebutted and is within the range of reasonableness because of the nature of these properties even if the liquidation period were eight months.

Each of the Land Debtors owns a portion of 128.36 acres. Each of the valuations that follow for the Land Debtors is the "as is" value. The real property owned by Field consists of 19.6 acres. *Id.* at 181. Field's real property has a market value of $2,940,000 based upon 19.6 acres times $150,000 per acre. *Id.* at 181, 204. Field's real property has a liquidation value of $2,058,000 based on 19.6 acres times $105,000 ($150,000 discounted by thirty percent).[9] *Id.* at 181, 204, 217.

The real property owned by Hotel consists of 9.2 acres. *Id.* at 181. Hotel's real property has a market value of $1,380,000 based on 9.2 acres times $150,000 per acre. *Id.* at 181, 204. Hotel's real property has a liquidation value of $966,000 based on 9.2 acres times $105,000 per acre. *Id.* at 181, 204, 217.

The real property owned by Land consists of 34.6 acres. *Id.* at 181. Land's real property has a market value of $5,190,000 based on 34.6 acres times $150,000 per acre. *Id.* at 181, 204. Land's real property has a liquidation value of $3,633,000 based on 34.6 acres times $105,000. *Id.* at 181, 204, 217.

The real property owned by Swim consists of 7.1 acres. *Id.* at 181. Swim's real property has a market value of $1,065,000 based on 7.1 acres times $150,000 per acre. *Id.* at 181, 204.

---

[9] The remaining liquidation value determinations apply the same calculation of $150,000 discounted by thirty percent, resulting in a per acre value of $105,000.

Swim's real property has a liquidation value of $745,000 based on 7.1 acres times $105,000 per acre. *Id.* at 181, 204, 217.

The real property of Tennis consists of 21.5 acres. *Id.* at 181, 204, 217. Tennis's real property has a market value of $3,225,000 based on 21.5 acres times $150,000 per acre. *Id.* at 181, 204. Tennis's real property has a liquidation value of $2,257,500 based on 21.50 acres times $105,000 per acre. *Id.* at 181, 204, 217.

The real property of Land East consists of 36.36 acres. *Id.* at 181. Land East's real property has a market value of $5,454,000 based on 36.36 acres times $150,000 per acre. *Id.* at 181, 204. Land East's real property has a liquidation value of $3,817,800 based on 36.36 acres times $105,000 per acre. *Id.* at 181, 204, 217.

## II.    OVERVIEW OF THE PLAN AND OBJECTIONS

The Plan classifies claims into eight classes:

| Class | Designation |
|---|---|
| 1 | Secured Real Estate Tax Claims Against All Debtors |
| 2 | SHS Claim Against All Debtors |
| 3 | CSM Secured Claim Against Ice |
| 4 | Ashcroft Secured Claims Against All Debtors Except Land East |
| 5 | Priority Claims Against All Debtors |
| 6 | General Unsecured Claims Against Ice |
| 7 | Subordinated SHS Claims Against All Debtors |
| 8 | Equity Interests In All Debtors |

Plan, §§ 3.1, 4.1–4.8.

SHS's claim is treated in Class 2 and the Plan proposes the following treatment:

In full and final satisfaction, settlement, discharge and release of the Allowed SHS Claim, the holder of the Allowed SHS Claim shall receive payment in full of such Claim from the Reorganized Debtors, at the sole election of the Proponents, by one of the following methods:

(i)   (A) Within five (5) Business Days of the Effective Date, a payment of not less than $11,500,000.00 On Account,

(B) From the Effective Date until the determination of the Allowed SHS Claim, monthly payments of interest only, On Account, on an amount equal to the Estimated SHS Claim, calculated based on the Plan Interest Rate, with such interest only payments commencing on the first day of the first full month following the Effective Date, and

(C) Upon the determination of the Allowed SHS Claim, payment of the Net Allowed SHS Claim through monthly payments, commencing on the first day of the first full month following such determination, consisting of (I) principal computed on the basis of an amortization schedule of twenty (20) years from such determination, and (II) interest calculated based on the Plan Interest Rate, with the unpaid balance of such Claim due on (1) the later of the third anniversary of the Effective Date or the first anniversary of the determination of the Allowed SHS Claim, or (2) as agreed between the Proponents and the holder of the Allowed SHS Claim, provided that the Allowed SHS Claim may be pre-paid at any time without any penalty or charge;

(ii)   (A) Within five (5) Business Days of the Effective Date, a payment of not less than $11,500,000.00 On Account,

(B) From the Effective Date until the determination of the Allowed SHS Claim, monthly payments of interest only, On Account, on an amount equal to the Estimated SHS Claim, calculated based on the Plan Interest Rate, with such interest only payments commencing on the first day of the first full month following the Effective Date, and

(C) Within ten (10) Business Days of the determination of the Allowed SHS Claim, payment in cash equal to the Net Allowed SHS Claim; or

(iii)   By such treatment as is agreed upon in writing between the Proponents and the holder of the allowed SHS Claim.

Plan, § 4.2.  There is no deficiency component of SHS's claim and it is treated entirely in Class

2.  *See id.*

The Plan separately classifies CSM's secured claim against Ice in Class 3 and proposes

the following treatment of CSM's secured claim:

In full and final satisfaction, settlement, discharge and release of the Allowed CSM Secured Claim against Ice, the holder of the Allowed CSM Secured Claim shall receive payment in full of such Claim from the Reorganized Debtors, at the sole election of the Proponents, by one of the following methods:

(i)    (A) From the Effective Date until the determination of the Allowed CSM Secured Claim, monthly payments of interest only on an amount equal to the Estimated CSM Secured Claim, calculated based on the Plan Interest Rate, with such interest only payments commencing on the first day of the first full month following the Effective Date,

(B) Through monthly payments, commencing on the first day of the first full month following the determination of the Allowed CSM Secured Claim, consisting of (I) principal computed on the basis of an amortization schedule of twenty (20) years from such determination, and (II) interest calculated based on the Plan Interest Rate, with the unpaid balance of such Claim due on the third (3rd) anniversary of the Effective Date or the first anniversary of the Allowed CSM Secured Claim; or (2) as agreed between the Proponents and the holder of the Allowed CSM Secured Claim, provided that the Allowed CSM Secured Claim may be pre-paid at any time without any penalty or charge, and

(C) Through the granting of a Lien, junior to SHS' Liens and the Liens securing the Plan Loan, on the real property owned by Tennis, Field and Land;

(ii)    Within ten (10) Business Days of the determination of the Allowed CSM Secured Claim, in cash equal to the amount of the Allowed CSM Secured Claim, minus all amounts paid to CSM between the Petition Date and the date the Allowed CSM Secured Claim is determined; or

(iii)    By such treatment as is agreed upon in writing between the Proponents and the holder of the Allowed CSM Secured Claim.

Plan, § 4.3(c)(i)–(iii). The Plan further provides that any deficiency claim held by CSM will be treated as a Class 6 general unsecured claim. *See id.* at § 4.3(d).

The Plan provides that SP will make a plan loan "in an amount equal to all Allowed Secured Real Estate Tax Claims and the payment to SHS set forth in section 4.2(c)(i)(A) of the Plan" (the "Plan Loan") and a Plan Contribution, as defined in section 1.58 of the Plan. *Id.* at §§ 1.58(b), 1.60, 5.1(b), 5.1(c). The Plan Loan will be in the approximate amount of $12,000,000 and will be used to pay approximately $460,000 to the City of Attleboro for the full amount of prepetition real estate taxes due from the Debtors and to pay not less than $11,500,000 to SHS on

account of its disputed claim. *Id.* at §§ 1.60, 4.1, 4.2(c)(i)(A), 5.1(b). The Plan Loan will be secured by a first mortgage on the properties owned by Swim, Land East, and Hotel, and a second mortgage, subject to the mortgage held by SHS, on the properties owned by the other Debtors, Ice, Tennis, Field, and Land. *Id.* at § 5.1(b). In addition to the Plan Loan, SP will provide the Plan Contribution in an amount sufficient to satisfy the allowed claims of the Debtors' professionals, the dividend to Ice's unsecured creditors, and $500,000 in working capital for the Reorganized Debtors. *Id.* at §§ 1.58, 5.1(c). Further, in addition to the Plan Loan and the Plan Contribution, SP[10] will convert its DIP Loans of more than $1.2 million, excluding interest, to an equity interest in NESV Holding, the parent of the Reorganized Debtors. *Id.* at §§ 1.27, 1.49, 5.1(d).

Ashcroft has joined with SP and the Debtors as a Plan Proponent. *Id.* at 2, 6 § 1.57. Ashcroft has agreed that, in full and complete settlement of its secured claim, it will release and discharge its junior mortgages in exchange for seventeen percent of the membership interests in NESV Holding. *Id.* at § 4.4(c). Ajax 5Cap's membership in the Debtors will be extinguished pursuant to the Plan, and it will receive nothing on account of its interest. Plan, § 4.8(f). The Debtors propose to fund their operations and additional plan payments from cash flow and potential disposition of real property. *Id.* at §§ 5.1(a), 5.2.

SHS and CSM have voted to reject the Plan and object to confirmation. CSM objects on the bases that "(a) . . . no impaired, non-insider class will accept [the Plan], (b) [the Plan] discriminates unfairly between CSM and other secured creditors; (c) [the Plan] cannot be found to be in the best interests of creditors; (d) [the Plan] is not fair and equitable with respect to CSM; and (e) [the Plan] is not feasible." CSM Post-Trial Br., at 4–5. SHS asserts that the Plan

---

[10] Pursuant to the Plan, "DIP Loans" mean, collectively, all post-petition debtor-in-possession loans made by SP to the Debtors. Plan, § 1.27. As noted previously, SP and the Debtors obtained authority to replace the DIP lender to an affiliate of SP. The Court would determine that this change would constitute a non-material modification.

may not be confirmed because the Plan (a) is not feasible; (b) has not been accepted by at least

one impaired, non-insider class in each case of the administratively consolidated Debtors; (c)

does not treat the claim of SHS fairly and equitably; (d) fails the best interests of creditors test

because SHS asserts it (and the unsecured creditors) will receive less under the Plan than in a

liquidation; and (e) was not proposed in good faith.  SHS Post-Tr. Br. at 3–4.  I will describe the

objections more fully when addressing them below.

### III.    ANALYSIS AND ADDITIONAL FINDINGS

#### A.  Section 1129(a)(10) and the Vote of Ashcroft

SHS and CSM each assert that the Plan may not be confirmed because the Plan

Proponents have not demonstrated that the requirements of § 1129(a) have been satisfied.

Section 1129(a)(10) requires that "[i]f a class of claims is impaired under the plan, at least one

class of claims that is impaired under the plan has accepted the plan, determined without

including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  The only

impaired class that has voted to accept the Plan is Class 4 containing the Ashcroft claims.  SHS

and CSM contend that Ashcroft is a non-statutory insider and that it is not a creditor of Land East

such that, even if Ashcroft is not a non-statutory insider, no class of non-insider claims of Land

East has accepted the Plan in violation of § 1129(a)(10).  SHS and CSM further contend that

Ashcroft's vote should be disregarded because SHS holds the right to vote Ashcroft's claims

related to the acceptance or rejection of the Plan pursuant to the terms of a certain prepetition

Subordination and Standstill Agreement, Ex. 214 (the "Subordination Agreement"), between the

Debtors, Ashcroft, and SHS's predecessor in interest, HarborOne.  SHS has submitted a Class 4

ballot that rejects the Plan with respect to Ashcroft's secured claims. *Notice of Plan Voting* [Dkt.

No. 574].

i.   <u>Ashcroft's Right to Vote</u>

As to Ashcroft's right to vote its claim after consideration of the terms of the

Subordination Agreement, I adopt the tentative rulings and reasoning set out in the Phase I

Order.  Phase I Order, 2023 WL 2278603, at *19–21.  The prepetition Subordination Agreement

between HarborOne, SHS's predecessor in interest, and Ashcroft provides that HarborOne, now

SHS, may:

> take such action as may be reasonably necessary or appropriate to effect the
> subordination provisions and other rights and/or remedies granted to the Senior
> Lender [HarborOne] in the Agreement (including, without limitation, in the case
> of the Senior Lender, to file a proof of claim and to vote upon matters with
> respect to which the Subordinate Lender [Ashcroft] may be able to vote in
> connection with any bankruptcy proceedings related to any of the Borrowers or
> Ajax [5Cap]) . . . .

Subordination Agreement, ¶ 4.  Because of the proposed treatment of the SHS claim under the

Plan, it is not reasonably necessary or appropriate for SHS to vote the Ashcroft claim to effect its

rights under the Subordination Agreement.  With the clarifications that will be discussed later in

this memorandum, SHS's rights with respect to the senior debt that constitutes the SHS claim are

not impaired by any act of Ashcroft in compromising objections to its claim and voting to accept

the Plan, which implements those compromises.  The SHS claim will be substantially paid down

on the effective date of the Plan and its remaining debt will be secured by collateral with a

liquidation value far exceeding the amount of the remaining debt.  The Plan provides for the full

payment of the SHS debt with interest and, subject to certain conditions that I will discuss below,

will in no way provide for payment of the subordinated Ashcroft debt before SHS is paid in full.

The terms of the Subordination Agreement quoted above make clear that the right to vote

Ashcroft's claim is only a *means* to enforce other rights under the Subordination Agreement and

*not* a right or remedy in and of itself.  As will be discussed, the subordination provisions and

other material terms of that agreement will be enforced and do not entitle SHS to vote Ashcroft's

claim.

Additionally, even if SHS could exercise the right to vote Ashcroft's claim, such an exercise would be solely to effect a litigation strategy with respect to the SHS claim and, therefore, could be held to be a vote not made in good faith as part of the Court's considerable discretion to designate votes.  *See In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 56–57 (Bankr. S.D.N.Y. 2006) (in the context of a motion to disqualify votes, describing "seeking to advance interests apart from recovery under the Plan, or seeking to extract plan treatment that is not available for others in the same class" as examples of "highly egregious conduct" that would warrant disqualification of a vote not made in good faith); *see also In re DBSD N. Am., Inc.*, 421 B.R. 133, 138 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 CIV. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part*, 627 F.3d 496 (2d Cir. 2010) (determining that "'badges of bad faith' which may justify disqualification . . . include efforts to: (1) assume control of the debtor; (2) put the debtor out of business or otherwise gain a competitive advantage; (3) destroy the debtor out of pure malice; or (4) obtain benefits available under a private agreement with a third party which depends on the debtor's failure to reorganize").  SHS has aggressively pursued a claim for default interest to which this Court has determined in the context of the estimation of SHS's claim it is not entitled.  Phase I Ord., 2023 WL 2278603, at *3–6.  Evidence presented supports an inference that that SHS required HarborOne to send a December 22, 2020 letter claiming certain default interest as a condition to closing the sale of the loans to SHS when HarborOne had not previously demanded payment of that interest or accrued that interest in statements or its internal records.  Partial Tr. of Phase I Confirmation Hr'g, July 25, 2022 [Dkt. No. 526] ("Phase I Pierce Tr."), Pierce Test., at 31:14–32:7, 33:12-14, 24, 34:9-19, 40:6-11, 42:17–43:23, 44:7-15.  Additionally, to the extent that SHS's rights and remedies under its loan documents are impaired under the Plan, it is not because of any violation of the Subordination Agreement, but rather by operation of the Bankruptcy Code.  For SHS to vote the

Ashcroft claim for reasons other than to ensure the priority of payment of its claim vis-a-vis Ashcroft's claim would constitute a vote in bad faith. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 359 B.R. at 60.

Moreover, while § 510(a) of the Bankruptcy Code provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law," 11 U.S.C. § 510(a), provisions in such an agreement cannot invalidate other applicable provisions of the Bankruptcy Code. Section 1126(a) grants a right to vote to the holder of a claim. Further, § 1129(b)(1) states that a nonconsensual plan may be confirmed "[n]otwithstanding section 510(a) . . . if the plan does not discriminate unfairly, and is fair and equitable," with respect to impaired classes that have not accepted the plan. 11 U.S.C. § 1129(b)(1); *see In re Tribune Co.*, 972 F.3d 228, 237–38 (3d Cir. 2020) (observing that § 1129(b)(1) "tests, among other things, whether involuntary reallocations of subordinated sums under a plan unfairly discriminate against the dissenting class" and "attempts to ensure that debtors and courts do not have *carte blanche* to disregard pre-bankruptcy contractual arrangements, while leaving play in the joints").

Even if I interpreted the Subordination Agreement to permit SHS to vote the claim of Ashcroft, under the facts and circumstances of this case, I hold that exercising those rights under this intercreditor voting agreement would subvert and invalidate provisions of the Bankruptcy Code. As tentatively determined in the Phase I Order, I adopt the reasoning of the court in *In re SW Boston Hotel Venture, LLC*, 460 B.R. 38 (Bankr. D. Mass. 2011), which, in turn, adopted the analysis of the court in *Bank of America v. North LaSalle St. Ltd. P'ship (In re 203 North LaSalle St. Ltd. P'ship)*, 246 B.R. 325 (Bankr. N.D. Ill. 2000). *See* Phase I Ord., 2023 WL 2278603, at *20–21; *In re SW Boston Hotel Venture, LLC*, 460 B.R. at 52, *vacated on other grounds sub nom. The Prudential Ins. Co. of Am. v. SW Bos. Hotel Venture, LLC*, No. BAP 11-

087, 2012 WL 4513869 (B.A.P. 1st Cir. Oct. 1, 2012), *vacated*, 748 F.3d 393 (1st Cir. 2014)

(rejecting assignment of voting right in subordination agreement with respect to plan

confirmation because "[t]o the extent a provision in a subordination agreement purports to alter

substantive rights under the Bankruptcy Code, it is invalid"); *In re 203 North LaSalle St. Ltd.*

*P'ship*, 246 B.R. at 330–31 (determining that "[w]hile the language of the subordination

agreements governs the outcome of the Bank's right to repayment of any deficiency claim, the

language of the Bankruptcy Code governs the determination of voting rights in" the case,

"[u]nless there is some basis for deviating from the plain language of § 1126(a), [the Bank]

should therefore be allowed to vote its claim in the confirmation process"); *but see In re*

*Fencepost Prods., Inc.*, 629 B.R. 289, 290 (Bankr. D. Kan. 2021) (determining that

subordination agreements are enforceable to the extent that the parties agreed that senior lender's

claim would be paid in full before any payments are made to the subordinated lender, but are

ineffective to deprive the subordinated lenders their status of creditors for purposes of Chapter

11; concluding, "[n]evertheless, because the amount of [the senior creditor's] unsecured claim

and Debtors' financial circumstances establish that the [subordinated lender] under all

conceivable scenarios will not receive any distribution from Debtors in this Chapter 11

proceeding, or if the cases are converted to Chapter 7, the Court finds that the [subordinated

lender] lacks prudential standing to participate in the confirmation process"); *Blue Ridge Invs.,*

*II, LP v. Wachovia Bank, N.A. (In re Aerosol Packaging, LLC)*, 362 B.R. 43, 47 (Bankr. N.D.

Ga. 2006) (finding that because of the express terms of the subordination agreement, senior

lender was entitled to vote the claim of the subordinated lender because, while § 1126(a) grants a

right to vote to a holder of a claim, it "does not expressly or implicitly prevent that right from

being delegated or bargained away by such holder" and "Federal Rules of Bankruptcy Procedure

3018 and 9010 explicitly permit agents and other representatives to take actions, including

voting, on behalf of parties").

    ii.   <u>Acceptance Determined Per Plan or Per Debtor</u>

    After considering the split of authority on how the impaired, accepting class provision of

§ 1129(a)(10) should be applied in multi-debtor cases where a joint plan is proposed,[11] and with

some reservation, as discussed in greater detail in the Phase I Order, I interpret § 1129(a)(10) to

permit confirmation of a joint plan of reorganization where at least one class of impaired

creditors of one debtor has accepted the plan under certain discrete circumstances and where

limited consolidation is proposed as a good faith means of implementing the plan.  Here,

evidence has not been proffered to support substantive consolidation of the Debtors for all

purposes, and the Plan Proponents have only proposed consolidation for limited purposes under

the Plan.  As will be discussed below, the Plan must meet all other requirements for

confirmation, including the best interests of creditors test in § 1129(a)(7) and the good faith

requirements of § 1129(a)(3).  As stated in the Phase I Order, "I am cognizant that applying the

'per plan' approach may allow for greater attempts at chicanery by plan proponents, but creditors

are protected by judicial scrutiny of the business reasons for proposing a joint plan, the

relationship of the debtors, the importance of 'entity separateness,' the benefit to creditors of

---

[11] In describing the split of authority in the Phase I Order, I stated:

> As acknowledged by the parties, there is no controlling law in the First Circuit and a split of
> authority among courts that have addressed this question. When applied to plans proposed by
> multiple debtors, courts have interpreted the requirement of § 1129(a)(10) in two different
> ways. Some courts have held that, where cases are jointly administered, but not substantively
> consolidated, § 1129(a)(10) requires an impaired but consenting class for each debtor (known
> as the "per debtor" approach) included in the plan. *See, e.g., In re Tribune Co.*, 464 B.R. 126,
> at 180–83 (Bankr. D. Del. 2011), *on reconsideration in part*, 464 B.R. 208 (Bankr. D. Del.
> 2011), *aff'd sub nom. In re Tribune Media Co.*, 587 B.R. 606 (D. Del. 2018), *aff'd sub nom. In
> re Tribune Co.*, 972 F.3d 228 (3d Cir. 2020). The contrary view is that § 1129(a)(10) requires
> only that one class of impaired claims accept the plan, even if that class asserts claims against
> only one of the debtors (known as the "per plan" approach). *See, e.g., JPMCC 2007-C1
> Grasslawn Lodging, LLC v. Transwest Resort Props. Inc. (In the Matter of Transwest Resorts
> Props., Inc.)*, 881 F.3d. 724, 730 (9th Cir. 2018).

Phase I Ord., 2023 WL 2278603, at *16.

each estate, and whether any objecting party is prejudiced by the proposed limited

consolidation[,] other than a claim of prejudice because one or more of the debtors failed to

obtain acceptance from a class of impaired creditors." Phase I Ord., 2023 WL 2278603, at *19.

This case illustrates a circumstance where acceptance by one impaired class satisfies not

only the text of § 1129(a)(10), but also the policies represented by that section. SHS is the only

significant creditor of Land East and the only creditor of Land East that objects to confirmation.

Notably, as will be discussed when considering good faith under § 1129(a)(3), the Plan

effectively provides for the substantial $11.5 million paydown of the SHS claim in exchange for

a release of the SHS mortgage covering the Land East property and other collateral. SHS will be

paid on the effective date considerably more than the value of the Land East parcel. This is not a

case where a debtor seeks to propose a joint plan with related debtors to obtain acceptance of a

class of claims because the primary debtor cannot do so in its own case. Here, the Plan

Proponents are not grafting a marginally-related debtor on to the Plan to obtain confirmation of a

cramdown plan to restructure the debt of the primary debtor. Here, the Plan Proponents would

have the acceptance of a class in Ice and every other Debtor other than Land East. The only

prejudice to SHS is that SHS is otherwise unable to block confirmation of the Plan because it is

in effect the only creditor of Land East—notwithstanding that SHS will be paid more than the

fair market value of its Land East mortgage on the effective date. Here, the Plan Loan to be

secured in part by the Land East property is integral to that paydown and implementation of the

Plan. If the tail were to wag the dog, a joint plan would raise substantial good faith issues. As

stated above, I adopt this interpretation of § 1129(a)(10) with some reservation, but I am

persuaded by the text of the provision and the reasoning of courts adopting a similar position as

detailed in the Phase I Order.[12]

---

[12] While having no bearing on my decision, I observe that, after acknowledging the split of authority on this issue

### iii.    Is Ashcroft a Non-Statutory Insider?

SHS and CSM assert that, notwithstanding my ruling that adopts the "per plan"

interpretation of § 1129(a)(10), Ashcroft is the sole impaired class of creditors that has accepted

the Plan and Ashcroft's acceptance does not satisfy § 1129(a)(10) because Ashcroft is a non-

statutory insider. [13]

#### a.   The Test for Determination of Non-Statutory Insider Status

Section 101(31) of the Bankruptcy Code defines which entities are "insiders" of various

types of debtors.  11 U.S.C. § 101(31).  "The term 'insider' *includes* . . . (B) if the debtor is a

corporation—(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the

debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor;

or (vi) relative of a general partner, director, officer, or person in control of the debtor[.]"  *Id.* at §

101(31)(B) (emphasis added).  "Because Congress used the term 'includes' in § 101(31), a

number of courts have identified a category of creditors, called 'non-statutory insiders,' who fall

within the definition, but outside of any of the five categories specified."  *Riley v. Tencara, LLC*

*(In re Wolverine, Proctor & Schwartz, LLC)*, 447 B.R. 1, 30 (Bankr. D. Mass. 2011) (collecting

cases) (examining insider status for purposes of determining whether debt should be

recharacterized as equity); *see also Grossman v. Charmoy (In re Craig Sys. Corp.)*, 244 B.R.

529, 539 (Bankr. D. Mass. 2000) (analyzing whether a transferee qualified as an "insider" for

preference purposes and concluding that "[b]ecause the list of 'insiders' is non-exhaustive, courts

---

and considering the policy goals of Chapter 11 and current practice, the American Bankruptcy Institute's
Commission to Study the Reform of Chapter 11 recommended that § 1129(a)(10) be eliminated in its entirety
because "the potential delay, cost, gamesmanship, and value destruction attendant to section 1129(a)(10) in all cases
significantly outweighed its presumptive gating role."  *American Bankruptcy Institute Commission to Study the
Reform of Chapter 11: 2012–2014 Final Report and Recommendations*, 23 Am. Bankr. Inst. L. Rev. 1, 284 (2015).

[13] To the extent the Plan Proponents suggest that the burden of proof on the insider status of Ashcroft shifts to SHS
and CSM by including the statement in their post-trial brief that the objecting parties have a "'heavy burden' to
sustain their objection" which they have failed to meet, Proponents' Post Trial Brief, at 14, there is no burden
shifting on § 1129(a)(10) requirements.

have held that an insider may be any person or entity whose relationship with the debtor is

sufficiently close so as to subject the relationship to careful scrutiny") (internal quotations

omitted)).  As the United States Supreme Court has recognized, the Bankruptcy Code

> enumerates certain insiders, but courts have added to that number. According to
> the Code's definitional section, an insider of a corporate Debtor "includes" any
> director, officer, or "person in control" of the entity. §§ 101(31)(B)(i)–(iii).
> Because of the word "includes" in that section, courts have long viewed its list of
> insiders as non-exhaustive. See §102(3) (stating as one of the Code's "[r]ules of
> construction" that "'includes' and 'including' are not limiting"); 2 A. Resnick &
> H. Sommer, Collier on Bankruptcy ¶ 101.31, p. 101–142 (16th ed. 2016)
> (discussing cases). Accordingly, courts have devised tests for identifying other,
> so-called "non-statutory" insiders. The decisions are not entirely uniform, but
> many focus, in whole or in part, on whether a person's "transaction of business
> with the debtor is not at arm's length." *Ibid*. (quoting *In re U.S. Medical, Inc.*, 531
> F.3d 1272, 1280 ([10th Cir.] 2008)).

*U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 390 (2018) (examining the

standard of review regarding determination of a non-statutory insider status in a case involving

confirmation of a cramdown plan, but declining to reach correctness of legal test applied in

granting certiorari on standard of review question).  Generally, "insider status is determined by a

factual inquiry into the debtor's relationship with the alleged insider, including whether the

debtor and the alleged insider dealt at arms[-]length with the debtor." *In re Craig Sys. Corp.*,

244 B.R. at 539.

Disqualification of insiders in determining whether an impaired class has accepted a plan

under § 1129(a)(10) is intended to safeguard the integrity and fairness of the plan approval

process. *U.S. Bank, N.A. v. Vill. at Lakeridge, LLC (In re Vill. at Lakeridge, LLC)*, 814 F.3d 993,

1000 (9th Cir. 2015), *aff'd sub nom. U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 583 U.S.

387 (2018).  The First Circuit Court of Appeals has not established a test for determining who

may be a non-statutory insider in the context of § 1129(a)(10).  Cases in the First Circuit

addressing whether parties are non-statutory insiders generally have done so in the context of

avoidance actions and debt recharacterization.  *See, e.g., Braunstein v. Crawford (In re*

*Crawford)*, 454 B.R. 262, 275 (Bankr. D. Mass. 2011) (preference avoidance context); *In re*

*Wolverine, Proctor & Schwartz, LLC*, 447 B.R. at 30 (recharacterization of debt to equity

context); *In re Craig Sys. Corp.*, 244 B.R. at 538–39 (preference avoidance context); *Barnhill v.*

*Vaudreuil (In re Busconi)*, 177 B.R. 153, 158 (Bankr. D. Mass. 1995) (preference avoidance

context).  Courts in other jurisdictions evaluating whether a particular person or entity is a non-

statutory insider in the context of § 1129(a)(10) have considered, among other things, the

relationship between the debtor and the creditor, whether the relationship disadvantaged other

creditors, and whether the transaction in question was arm's length.  *See, e.g.*, *In re Gilbert*, 104

B.R. 206, 209–10 (Bankr. W.D. Mo. 1989).

Citing *Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.)*, SHS advocates that I

should apply a "totality of the circumstances" test to determine whether Ashcroft is a non-

statutory insider.  SHS Post-Trial Brief, at 30–31 (citing 531 F.3d 1272, 1280 (10th Cir. 2008)).

Courts applying that test have noted that "control" over the debtor is not a requirement for

finding that a creditor is a non-statutory insider where the debtor and creditor have engaged in

transactions that were not at arm's length.  *See United States v. State St. Bank & Trust Co.*, 520

B.R. 29, 81 (Bankr. D. Del. 2014) ("A party may also be considered a 'non-statutory insider,'

even without actual control of the debtor, when there is a close relationship between debtor and

creditor and when transactions between them were not conducted at arm's length."); *Bruno*

*Mach. Corp. v. Troy Die Cutting Co. (In re Bruno Mach. Corp.)*, 435 B.R. 819, 836 (Bankr.

N.D.N.Y. 2010) ("Here, unlike in *U.S. Medical*, the court finds that the parties engaged in less

than-arm's-length transactions.  Therefore, the court need not reach the alternative element of

control."); *Schubert v. Lucent Techs. Inc (In re Winstar Commc'ns., Inc.*), 554 F.3d 382, 396–97

(3d Cir. 2009) ("However, a finding of such control is not necessary for an entity to be a non-

statutory insider."); *Hirsch v. Tarricone (In re A. Tarricone, Inc.)*, 286 B.R. 256, 264–65 (Bankr.

S.D.N.Y. 2002) ("Congress did not make control necessary for either statutory or non-statutory

insider status.") (explaining rationale).

"[I]nsider status must be determined on a [case-by-case] basis through examination of the

totality of the circumstances and the creditor's degree of involvement in the debtor's affairs."

*Lugo-Mender v. Gov't Commc'ns. Inc. (In re El Comandante Mgmt. Co.)*, 404 B.R. 47, 56

(D.P.R. 2008); *see also In re Missionary Baptist Found. of Am., Inc.*, 712 F.2d 206, 210 (5th Cir.

1983) (determination of insider status is a question of fact); *Wiscovitch Rentas v. Olavarria (In

re Editorial Flash, Inc.)*, No. 13-08014-BKT, 2016 WL 3638471, at *3 (Bankr. D.P.R. June 29,

2016) (citing *In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992)) (insider status determined on

case-by-case basis); *In re Craig Sys. Corp.*, 244 B.R. at 537 (same); *In re Rexford Props., LLC*,

557 B.R. 788, 797 (Bankr. C.D. Cal. 2016) ("Determination of non-statutory insider status is a

two-step process and made on a case-by-case basis, from the totality of the circumstances."). In

making its determination, a court is required to "conduct a fact-intensive analysis . . . ." *In re

Vill. at Lakeridge, LLC,* 814 F.3d at 1001. No one fact or combination of facts is necessarily

determinative. *Id.* at 1003 (citing *Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman)*, 126

B.R. 63, 67 (B.A.P. 9th Cir. 1991)) (reviewing relationship of debtor and alleged non-statutory

insider in detail). Further, the weight accorded to any particular factor or combination of factors

varies, depending on the context in which a court considers the status of the person or entity and

the right affected. *In re Friedman*, 126 B.R. at 70 ("[N]ot every creditor-debtor relationship

attended by a degree of personal interaction between the parties rises to a level of an insider

relationship.").

I must determine Ashcroft's status at the time it voted to accept the Plan. *See In re

Rexford Props., LLC*, 557 B.R. at 795–96 (noting there is "abundant persuasive authority . . .

expressly holding that insider status should be determined at the time of voting, not at the time

the debt arose" and collecting cases (citing *In re 455 CPW Associates*, No. 99-508, 2000 WL 1340569, at \*5 (2nd Cir. Sept. 14, 2000); *In re Neogenix Oncology, Inc*., 508 B.R. 345, 355 (Bankr. D. Md. 2014); *In re Locke Mill Partners*, 78 B.R. 697, 702 (Bankr. M.D.N.C. 1995); *In re MCorp. Fin. Inc.*, 137 B.R. 219, 232 (Bankr. S.D. Tex. 1992); *In re Gilbert*, 104 B.R. at 210– 11; *In re Featherworks Corp.*, 25 B.R. 634, 640 (Bankr. E.D.N.Y. 1982), *aff'd*, 36 B.R. 460 (E.D.N.Y. 1984))); *see also In re Tara Retail Grp., LLC,* 614 B.R. 215, 229 (Bankr. N.D.W.V. 2020) (declining to designate creditor as insider, noting that critical conduct complained of occurred prior to the date when the creditor cast its ballot, citing to *In re Rexford Props., LLC*). In doing so, I will consider the history between the Debtors and Ashcroft, including evidence presented regarding the formation of Ashcroft, the relationships of insiders of the Debtors to insiders of Ashcroft, the origination of the Ashcroft loan to the Debtors, in assessing the nature of the relationship and whether undue influences or other factors inconsistent with the objectives of § 1129(a)(10) were present at the time Ashcroft exercised its right to vote. *Lakeridge*, 583 U.S. at 394 ("[A] bankruptcy court evaluating insider status must make findings of what we have called 'basic' or 'historical' fact—addressing questions of who did what, when or where, how or why."). Those factors would include whether any such undue influence or the nature of the relationship between Ashcroft and the Debtors resulted in detriment to the other creditors when Ashcroft accepted the Plan. *In re Gilbert*, 104 B.R. at 210.

As will be discussed in the context of findings below, Ashcroft and the Debtors had a unique history because of relationships maintained by insiders of each that affected the origination and administration of the Ashcroft loan that is the basis for the Ashcroft claim. The ultimate question is whether, under the facts and circumstances of this case, Ashcroft, as a creditor, should be found to have had, or be subject to, a degree of control or influence over (or possibly by) the Debtors or to have engaged in transactions not at arm's length to the detriment

of other creditors sufficient to deem Ashcroft an insider at the time it voted in favor of the Plan.

b. *Relevant Facts and Analysis*

The NEDC was formed in 2014 or 2015 to participate in the EB-5 Visa Program (the "EB-5 Program") administered by the United States Citizenship and Immigration Services ("USCIS") and to loan funds to the Project. Tr. Day 4 of Trial, Aug. 2, 2023 [Dkt. No. 871] ("Tr. Day 4"), Sullivan Test., 149–52; Tr. Day 7 of Trial, Sept. 18, 2023 [Dkt. No. 879] ("Tr. Day 7"), Klis Test., 111, 118. The EB-5 Program allows foreign citizens to invest in projects in the United States and provides a path for qualified investors to become permanent residents. Tr. Day 7, Klis Test., 111, 124, 158–59. The EB-5 Program facilitates foreign investment in domestic businesses through regional development centers ("Regional Development Centers" or "Regional Centers") to create jobs in the United States. *Id.* at 113–14. Regional Development Centers are responsible for processing the necessary applications and obtaining the required approvals to qualify an identified project for participation in the EB-5 Program. Tr. Day 3, Patel Test., 43–45, 96, 98–99; Tr. Day 4, Sullivan Test., 177. Upon the qualification of a project, a Regional Development Center would establish a lending entity to make a loan to the identified project. EB-5 investors' funds would be invested in that lending entity which, in turn, would use those funds to make a loan to the identified project. Tr. Day 7, Klis Test., 124; Tr. Day 4, Sullivan Test., 149–50, 157. NEDC was one such Regional Development Center. Deborah Klis, an attorney who represented the NEDC and Ashcroft, testified that she had substantial experience establishing Regional Development Centers in EB-5 lending and that, although every EB-5 deal is different, typically there is a return paid to EB-5 investors and payment to the "migration agent" who helps find investors. Tr. Day 7, Klis Test., 122–24.

Joseph Fitzpatrick was familiar with EB-5 investments from foreign investors under the EB-5 Program, and he gained this knowledge through the process of creating the NEDC. Tr.

Day 6, Fitzpatrick Test., at 121:2-9. Fitzpatrick gained knowledge of EB-5 investments by going overseas, identifying investors, and lending money to projects, including the Project in this case. *Id.* at 121:9-20. Fitzpatrick researched the requirements to establish a Regional Center. *Id.* at 121:21-24. Fitzpatrick presented the idea of the NEDC to Michael Sullivan, who would become the manager of NEDC. Fitzpatrick presented that the platform "would have the ability to fund any project that qualified or had qualified characteristics, an agnostic platform." *Id.* at 122:3-9. At the time Fitzpatrick brought the idea of developing a Regional Development Center to Sullivan, Fitzpatrick had an equity interest in the Project through Capital Management. *Id.* at 122:10-15. He viewed EB-5 financing as a way to obtain "super cheap" capital, the cost of which would be less than even would be received from "equity groups in the United States." *Id.* at 121, 133–35.

Sullivan is and was, at all relevant times, the manager of the NEDC. Tr. Day 4, Sullivan Test., 137–38; Tr. Day 6, Fitzpatrick Test., 126; Tr. Day 6, Boucher Test., 100. Sullivan is a former U.S. Attorney who served in various elected and appointed government positions during his career as a lawyer. Tr. Day 4, Sullivan Test., 133–35. At relevant times, Sullivan served as a director of HarborOne[14] and acted as litigation counsel for Ice, Ajax 5Cap, Silberberg, and Fitzpatrick in the dispute with CSM. Tr. Day 1 of Trial, July 27, 2023 [Dkt. No. 884] ("Tr. Day 1"), Silberberg Test., 29–30, 90–91; Tr. Day 5 of Trial, Aug. 16, 2023 [Dkt. No. 872] ("Tr. Day 5"), Sullivan Test., 22–27, 87–89. He currently practices law with the firm of "Ashcroft Sullivan." Tr. Day 4, Sullivan Test., 133–35.

The Ashcroft Group, Fitzpatrick, and Double Eagle, LLC, an entity owned by Sullivan, are the members of the NEDC. Fitzpatrick formed the NEDC as a platform for EB-5 lending, and the first development project pursued by Fitzpatrick was in Baltimore, Maryland. Tr. Day 6,

[14] As a director of HarborOne, Sullivan "recused" himself from involvement with the loans involving the Debtors because he was involved in "raising capital" for the Debtors' project. Tr. Day 5, Sullivan Test., 22–24, 26.

Boucher Test., 19, 109.  Prior to February 9, 2018, Capital Management owned the forty-nine

percent membership interest in the NEDC that is currently owned by Fitzpatrick.  Tr. Day 6,

Boucher Test., 23–24; Tr. Day 6, Fitzpatrick Test., 174; Ex. 228, at 21, 24.  Capital Management

owns less than fifteen percent of the Class A membership interests of Ajax 5Cap.  Tr. Day 6,

Boucher Test., 16.

At all relevant times prior to February 9, 2018, Fitzpatrick and Boucher were the

managers and members of Capital Management.  Ex. 228, at 2; Tr. Day 6, Boucher Test., 101;

Tr. Day 6, Fitzpatrick Test., 193.  On February 9, 2018, Boucher and Fitzpatrick had a business

separation through which Capital Management divested itself of its ownership interest in the

NEDC, which interest was transferred to Fitzpatrick.  At that time, Fitzpatrick divested himself

of his ownership interest in Capital Management.  Ex. 228, at 2; Tr. Day 6, Boucher Test., 23–

24; Tr. Day 6, Fitzpatrick Test., 122, 195.  Boucher has not spoken to Fitzpatrick since April or

May of 2017.  Tr. Day 6, Boucher Test., 70.  Boucher received no payments, commissions, or

distributions from the NEDC or Ashcroft.  Id. at 25, 109.  In March 2018, Boucher's day-to-day

involvement with the Debtors changed when he started to work for a payroll company, after

which his involvement was largely confined to responding to questions asking about historical

information about the project.  Id. at 25.

The NEDC solicited foreign investors to invest in the Project.  Tr. Day 3, Patel Test., 43–

45, 96, 98–99; Tr. Day 4, Sullivan Test., 177.  The NEDC worked with Enterprise Service

Management System ("ESMSYS") in a "strategic alliance" to solicit investors in India to invest

in the Project. *EB5 AS12 Ashcroft Sullivan LR Exemplar*, Ex. 183 (the "NEDC Brochure"); Tr.

Day 3, Patel Test., 94–95.  The investors provided their funds to Ashcroft, which is a wholly

owned subsidiary of the NEDC.  Tr. Day 4, Sullivan Test., 141; Tr. Day 6, Fitzpatrick Test., 195.

Ashcroft was established by the NEDC to be the lending platform to make a loan to Ajax 5Cap,

the parent of the Debtors. *[Ashcroft] Loan Agreement, Note and Mortgage*, Phase I Ex. 21, ¶ D. The investors in Ashcroft had no ownership interest in Ajax 5Cap or the Debtors. The investors were unrelated third parties who participated in a qualified EB-5 transaction. In return for their investment, the foreign investors received visas and annual distributions that followed from Ajax 5Cap's payment of interest on the Ashcroft loan. Phase I Ex. 21; Tr. Day 7, Klis Test., 113, 123–24, 158.

In 2016, Ashcroft and Ajax 5Cap had entered into a loan agreement (the "Ashcroft Loan Agreement") pursuant to which Ashcroft agreed to make periodic advances in an aggregate of up to $20 million to Ajax 5Cap in connection with the development of the Project. Phase I Ex. 21. The advances were to be made over time as funds were raised and requisitions presented. *Id.* Fitzpatrick was involved in assisting Sullivan in analyzing requests for funding of the Project and other projects. Tr. Day 6, Fitzpatrick Test., at 124:7-10. The 4.75% interest rate under the Ashcroft Loan Agreement was higher than the non-default rate of interest under the HarborOne loans. Phase I Exs. 2, 6, 21; Tr. Day 7, Klis Test., 134–35. Klis testified that the Ashcroft Loan Agreement was a market rate for EB-5 loans, which often provide interest rates lower than in a similar commercial loan from an institutional lender. Tr. Day 7, Klis Test., 134–35. The Ashcroft Loan Agreement was secured by a pledge of Ajax 5Cap's potential distributions from the Debtors. Phase I Ex. 21; Tr. Day 6, Fitzpatrick Test., 125, 184, 187. Sullivan and Fitzpatrick testified that they initially believed the pledge was sufficient collateral for the Ashcroft Loan Agreement. Tr. Day 6, Fitzpatrick Test., 187–88, 197–98; Tr. Day 5, Sullivan Test., 27–32. None of the Debtors were borrowers or guarantors of the Ashcroft Loan Agreement.

SHS and CSM emphasize a number of facts in the record to support their assertion that, at least at the time of the Ashcroft Loan Agreement, the transactions between Ajax 5Cap and Ashcroft were not arm's length. For example, the Ashcroft Loan Agreement was purportedly

based upon cash flow projections which were neither committed to writing, nor contained in an underwriting file. Tr. Day 5, Sullivan Test., at 143:15-25. Ashcroft did not know the amount that was outstanding on the HarborOne loan when it provided the Ashcroft Loan Agreement to the Debtors. *Id.* at 144:1-5. At the time that Ashcroft made the loan, it did not maintain any written loan policies that established appropriate limits and standards for extension of credit and did not have a loan committee that reviewed the application for the loan. *Id.* at 123:14-22. Ajax 5Cap did not make a written loan application with Ashcroft. *Id.* at 123:23–124:3. Furthermore, Ashcroft did not obtain a personal financial statement from Silberberg, a credit application from Silberberg, or a credit report of the borrower. *Id.* at 124:11-13. Ashcroft did not use a credit score formula prior to underwriting the loan, *Id.* at 124:4-23, and did not maintain loan administration policies regarding default notices being provided to borrower. *Id.* at 128:17-20. SHS and CSM argue that Ashcroft controlled the Debtors' operations as its "general partner" or "joint venturer." SHS Post-Trial Br., at 30, 34; CSM Post-Trial Br., at 8, 17; s*ee also* Proponents' Reply, at 37, ¶ 111 and n.63.[15]

Klis testified that it was not uncommon for EB-5 loans to be secured by a pledge agreement rather than a real estate mortgage because first lienholders generally oppose EB-5 lenders having a subordinate mortgage interest on a project's real estate. Tr. Day 7, Klis Test., at 167:15-18 ("Ninety-nine percent of EB-5 loans were secured that way because the senior lenders . . . did not permit EB-5 lenders to have a subordinate interest on the land."). Ashcroft and Ajax 5Cap were represented by separate and independent counsel in the drafting and negotiation of the

---

[15] The evidentiary support for this argument is the NEDC Brochure, which appears to be a marketing brochure directed to potential EB-5 investors. In a table, Ashcroft highlights why investment through one of its two its Regional Development Centers would be advantageous. There was no testimony from which I infer that Ashcroft actually provided operation or project oversight and I do not draw that inference from the NEDC Brochure, which suggests, where the investment is structured as a loan, Ashcroft would administer the loan by overseeing the project and operations of its borrower. Notably, the brochure references two projects, the Project and a project in Maryland. Ex. 183. The table does not distinguish between the two projects and appears to offer EB-5 investment opportunities in both.

Ashcroft Loan Agreement.  Tr. Day 5, Sullivan Test., at 161:21–162:13, 192:17-22.  Klis and

Claudia Grime represented Ashcroft, and Steve Charlip and James Saya represented Ajax 5Cap

in connection with the Ashcroft Loan Agreement.  Tr. Day 5, Sullivan Test., at 161:21–162:13,

192:17-22; Tr. Day 7, Klis Test., at 128:1-8; Tr. Day 1, Silberberg Test., at 157:21–158:5; Ex.

232.

Sullivan testified that, between November 2016 and July 2019, the Ashcroft Loan

Agreement generally performed according to its terms.  Tr. Day 5, Sullivan Test., 163.  There

was evidence that on February 1, 2018, Ashcroft sent Ajax 5Cap a notice of default arising from

the failure to pay interest and origination fees.  Ex. 175; Tr. Day 4, Sullivan Test., 202.

Moreover, the Ashcroft Loan Agreement provided for annual payments of interest, so it is

unclear how much Ajax 5Cap had to do to perform under the terms of that loan.  Tr. Day 5,

Sullivan Test., 114.  In 2019, the Debtors were experiencing financial issues and their senior

lender, HarborOne, had issued a notice of default.  Tr. Day 1, Silberberg Test., 174; Phase I Exs.

10 and 11..  Ashcroft became concerned about HarborOne's intentions with respect to its senior

loans, and Fitzpatrick told Silberberg that Ashcroft would not fund into a foreclosure.  Tr. Day 1,

Silberberg Test., at 174:11-14; Exs. 177, 215.  In December of 2019, Ashcroft made an

additional $1.5 million advance after receiving assurances that Ajax 5Cap would obtain a

forbearance from HarborOne and the Debtors would grant additional collateral to Ashcroft.  Tr.

Day 1, Silberberg Test., 174; Tr. Day 4, Sullivan Test., 191; Phase I Ex. 21, at 36.  Ashcroft

demanded additional collateral for its $7.5 million loan in the form of a mortgage against the real

property owned by the Debtors' (other than Land East).  Tr. Day 6, Fitzpatrick Test., at 187:24–

188:14; Tr. Day 1, Silberberg Test., 143, 145; Tr. Day 4, Sullivan Test., 191; Phase I Ex. 21, at

36.  Ashcroft did not employ a loan committee to assist in making the decision to loan the

borrower more money while in default.  Tr. Day 5, Sullivan Test., at 134:10-20.  Ashcroft did

not complete an appraisal of the real estate it accepted as security for the promissory note. *Id.* at 142:11-19.  Again, during relevant periods while the Ashcroft Loan Agreement was outstanding, Sullivan and his law firm acted as counsel to Ice and other parties in the litigation with CSM, he was a director of HarborOne, and he had recused himself from matters involving the HarborOne loan to the Debtors because Sullivan was raising money for the Project.  Tr. Day 1, Silberberg Test., 29–30, 90–91; Tr. Day 5, Sullivan Test., 22–27, 87–89.

Sullivan testified that, under the circumstances, Ashcroft believed it had a duty to get increased security.  Tr. Day 4, Sullivan Test., 191.  After a delay, the Debtors, except for Land East, granted Ashcroft junior mortgages on their real properties (the "Ashcroft Mortgage").  Phase I Ex. 21, 36–43.  The Debtors (other than Land East) signed the Ashcroft Mortgage in December 2019, and the mortgage was recorded in February 2020.  *Id.*  Sullivan testified that the delay in recording the mortgage was due to title issues that needed to be resolved in the Massachusetts Land Court.  Tr. Day 4, Sullivan Test., 204–05.  As of the Petition Date, the Ashcroft  loan balance was approximately $7,500,000 plus interest.  Claim No. 6; Tr. Day 4, Sullivan Test., 135; Ex.  215.

SP and Patel have never been members or officers of Ashcroft or the NEDC.  Tr. Day 3, Patel Test., 50, 84–85; Tr. Day 5, Sullivan Test., 161; Tr. Day 6, Fitzpatrick Test., 156.  Patel was never an investor in Ashcroft or the NEDC.  Tr. Day 3, Patel Test., 85.  ESMSYS is not, and has never been, a member of or investor in Ashcroft or the NEDC.  Tr. Day 5, Sullivan Test., 160; Tr. Day 3, Patel Test., 44, 48.

ESMSYS is primarily an IT company and provides services and products in various industries.  Tr. Day 3, Patel Test., 41–42.  Although Patel is ESMSYS's Chief Operating Officer, he is not a director or owner.  *Id.* at 41, 79.  Contrary to statements made in the Disclosure Statement, Dkt. No. 379, at 37, SP had no relationship to ESMSYS relating to the Debtors or

otherwise at any time relevant to this case. Patel, however, testified that SP intends to eventually become a subsidiary of ESMSYS in connection with further development of the Debtors. Tr. Day 3, Patel Test., 49. ESMSYS helped the NEDC identify investors and to facilitate and complete immigration paperwork and "I-526 forms." *Id.* at 43–45, 96, 98–99; Tr. Day 4, Sullivan Test., 177. ESMSYS also helped ensure the Indian EB-5 lenders' investments complied with India's anti-money laundering laws. Tr. Day 3, Patel Test., 44. Patel "advocated" for individual EB-5 investors identified through ESMSYS in India and facilitated communications between the investors and the NEDC. *Id.* at 45; Tr. Day 4, Sullivan Test., 177–78. Patel introduced ten of the fifteen Indian investors to the NEDC who eventually invested in the Project. Tr. Day 3, Patel Test., 104. ESMSYS received a commission on fees earned by the NEDC, which was the only form of compensation Patel or ESMSYS received from any of the Ashcroft entities. Tr. Day 5, Sullivan Test., 160–61.

Between 2016 and 2019, SP's involvement in the Project was minimal. Tr. Day 3, Patel Test., 52. Patel had no contact with Silberberg or Debtors between 2016 and mid-2019. Tr. Day 4, Patel Test., 87. Patel was introduced to Silberberg on July 23, 2019 after the Boucher and Fitzpatrick separation agreement was signed. Tr. Day 3, Patel Test., 54, 113; Exs. 184, 228. His involvement with the Debtors would increase significantly after that date. Patel had concerns about issues with HarborOne, which had sent default notices in April 2019, and the project's finances and performance. Tr. Day 3, Patel Test., 54, 115, 122–23; Tr. Day 4, Patel Test., 88–90. Thereafter, Patel sought information from Silberberg and provided opinions about operations to help get the Project back on track and obtain additional funding. Tr. Day 3, Patel Test., 120–21, 123–26, 150–51; Tr. Day 4, Patel Test., 114; Exs. 185, 189, 190, 193.

Patel and Silberberg discussed a possible Class C investment in the Project relating to the development of a hotel, which never materialized. Tr. Day 3, Patel Test., 132–140, 143, 155; Tr.

Day 4, Patel Test., 89–92; Exs. 187, 188, 191.  Patel communicated with Silberberg and

conducted due diligence, which stopped because of the COVID pandemic.  Tr. Day 3, Patel

Test., 53–55; Tr. Day 4, Patel Test., 92.  Patel and SP were not sharing the due diligence he

received with Ashcroft.  Tr. Day 3, Patel Test., 55–56.  Patel requested and received financial

information from Silberberg, including information relating to projections, available funds, and

expenses.  Ex. 193.  At times, Patel had trouble getting financial and other information from the

Debtors.  Tr. Day 3, Patel Test., 57, 163; Tr. Day 4, Patel Test., 109–11.

Patel had no discussions at all with Silberberg for approximately five to six months, and

ultimately SP made no further investment in the Project until after the bankruptcy filing.  Tr. Day

3, Patel Test., 55.  In 2019, SP and ESMSYS offered operational and management assistance to

Ice including free IT support.  Tr. Day 3, Patel Test., 56–57, 166; Ex. 189.  Those services were

not provided at the request of Ashcroft, and the persons providing those services were not

communicating with Ashcroft.  Tr. Day 3, Patel Test., 57–58.  In 2020, Plenary Shah was

deployed by Patel to work and provide assistance on the Project and day-to-day operations.  Tr.

Day 3, Patel Test., 63–64, 153; Exs. 191–92.  At that time, Silberberg was looking for help that

the Debtors needed.  Tr. Day 3, Patel Test., 64; Tr. Day 4, Patel Test., 95–96; Exs. 169, 193.

Shah was compensated by ESMSYS.  Tr. Day 3, Patel Test., 160–61.  Vibhakar Ravat, employed

by SP and ESMSYS, also provided assistance to the Debtors with operations.  Tr. Day 3, Patel

Test., 63–64, 152.  Ravat was not providing information to Ashcroft.  Tr. Day 3, Patel Test., 65.

In 2021, after learning about the SHS foreclosure notice, Patel was actively engaged in

communications to track the status of the Project.  Tr. Day 3, Patel Test., 56; Tr. Day 4, Patel

Test., 93–94, 99–100.

On February 26, 2021, Silberberg sent Patel and Chaitu Parikh, a close friend of Patel

who provided Patel limited assistance at the time, an email titled "NESV Restructure" that

outlined major terms that Silberberg indicated were necessary to give control of the Project to

ESMSYS or an affiliate, including management fees and incentives, acknowledgement of

guarantor's indemnity rights, and a $1.5 million escrow account as security for the personal

guaranty—which proposal was rejected.  Ex. 194; Tr. Day 4, Patel Test., 20–21.  Silberberg's

February 26, 2021 email and related talks with Patel came after SHS threatened to foreclose on

the Debtors' properties.  Tr. Day 3, Patel Test., 175; Ex. 194.  Silberberg kept Patel, Sullivan,

and Fitzpatrick informed about the possibility of a bankruptcy filing by the Project that would

stop SHS from foreclosing on the property.  Tr. Day 3, Patel Test., 180–82; Exs. 194–97.

    Patel had no involvement in the Debtors' decision to file for bankruptcy.  Tr. Day 3, Patel

Test., 111–12.  Patel testified that, during the bankruptcy, SP was getting limited information

from the Debtors until it filed its motion to appoint a chapter 11 trustee.  *Id.* at 59.  SP had no

role in the bankruptcy until it became a DIP lender.  *Id.* at 60.

    None of the original EB-5 investors in the NEDC became an investor in SP to finance the

DIP lending.  *Id.* at 61.  SP has committed to provide up to $20 million in funding for the project.

*Id.* at 66.  Although two original EB-5 investors expressed interest to SP, as of now none of the

up to $20 million in financing comes from original EB-5 lenders.  *Id.* at 67.  In pre- and post-

bankruptcy negotiations concerning possible restructurings or agreements with the Debtors,

Sullivan and Fitzpatrick represented Ashcroft and the Regional Center, while Patel represented

himself and SP.  *Id.* at 62–63; Tr. Day 4, Patel Test., 98; Exs. 171–72, 195, 199–206.  During the

time after SP became a DIP lender, Patel and his agents took on an active role at Ice, giving

directions to staff and making decisions.  Tr. Day 8 of Trial, Sept. 19, 2023 [Dkt. No. 881] ("Tr.

Day 8"), Reilly Test., 25–27, 29–40, 45–47; Exs. 238–40.  SP was unwilling to provide funding

for certain requested expenditures and improvements at the Rink that were requested by Robert

Reilly, the general manager of the Rink at that time.  Tr. Day 8, Reilly Test., 14, 37–38, 46–47,

50–52; Tr. Day 2 of Trial, July 31, 2023 [Dkt. No. 887] ("Tr. Day 2"), Jalbert Test., 105.  During

the bankruptcy, Reilly understood there were orders with respect to the use of cash collateral,

and that Ravat reviewed Ice's compliance with the budget.  *Id.* at 93, 95–96.  Although Reilly

observed Patel and Fitzpatrick having meetings at the Rink in 2022, he did not attend the

meetings and did not know what they discussed.  *Id.* at 63–70.  Fitzpatrick told Reilly that he and

Patel met with investors at the Rink.  *Id.* at 68–69.

      The Plan Proponents negotiated material terms of a plan that could allow the Debtors to

emerge from bankruptcy.  Exs. 171–72, 198–201, 203–06, 213, 219 (various email chains

originating from Silberberg or Patel); *see also* Tr. Day 3, Patel Test., 59, 62–63, 65–66; Tr. Day

4, Patel Test., 17, 20, 22–29, 34–36, 42–44, 102–09; Tr. Day 1, Silberberg Test., at 30:25–31:22;

Silberberg Aff., ¶¶ 37–41.  Terms were proposed by the Debtors but not accepted by the other

Plan Proponents, such as indemnification of Ajax 5Cap and Silberberg against SHS's civil

actions.  Exs. 201, 219; *see also* Ex. 194.  During those negotiations, on December 15, 2021, SP

moved for the appointment of a chapter 11 trustee.  Dkt. No. 175; Tr. Day 3, Patel Test., 59.

Negotiations subsequently continued, including among counsel.  SP ultimately agreed to provide

DIP financing as a bridge to a plan of reorganization, Dkt. Nos. 202, 261, and withdrew the

trustee motion, Dkt. No. 253.  Until it became a DIP lender, SP was not a creditor of the Debtors.

Silberberg Aff., ¶¶ 15–16.  The Debtors separately negotiated with Ashcroft about a possible DIP

loan.  *E.g.* Ex. 233.  The Debtors informed Ashcroft that they intended to seek to set aside the

Ashcroft Mortgage.  Ex. 198; Tr. Day 4, Patel Test., 104 (recalling dispute over Ashcroft

Mortgage).  Ashcroft voiced its opposition to that effort.  Exs. 205, 233.  Ashcroft also objected

to the terms of SP's initial DIP loan to the extent that it sought to prime Ashcroft's secured

position.  Dkt. No. 210.  Moreover, four days before the original plan was filed, Ashcroft still

had not been offered an equity interest in the Reorganized Debtors.  Ex. 205.  Ultimately,

Ashcroft agreed to participate as a plan proponent with SP and the Debtors, convert its claim to equity, and discharge the Ashcroft Mortgage pursuant to the Plan.  Dkt. No. 257.

SHS and CSM assert that the relationships and interactions among the Debtors, Ashcroft, SP, and their principals and agents, together with the nature of the transactions, support a finding that Ashcroft is a non-statutory insider of the Debtors.  In addition to the relationships described above, there is evidence in the record that the Ashcroft Loan Agreement was not administered in a manner that might normally be expected in a commercial loan.  Klis, counsel to Ashcroft, while responding to inquiries from Saya, counsel to Ajax 5Cap, stated in an email on January 31, 2016 regarding the Ashcroft Loan Agreement that (1) the qualifying investment in the form of a loan to the borrower "is not an arm's length loan," (2) Debtors will not be responsible for EB-5 lenders' or the Regional Center's costs "as would be in an arm's length deal," and (3) "regarding the note, it shall be simpler that a true arm's length note . . . ."  Ex. 232.  Nearly a year later on December 7, 2016, Klis reiterated the point to Boucher, the co-owner through Capital Management of both Ashcroft and Ajax 5Cap, that the Ashcroft Loan Agreement was not an arm's length transaction.  *See* Ex. 237.  Klis testified that, when she commented in emails exchanged during the negotiation of the Ashcroft Loan Agreement that it was not "arm's length," she meant that the loan was unlike situations where there was "no acquaintanceship" among the parties.  Tr. Day 7, Klis Test., 129, 137.  She testified that, in situations where the parties to a loan are not familiar with one another, an EB-5 lender may require a high origination fee, may demand a reserve account for interest payments, and may ask for an expense deposit up front.  *Id.* at 129–30.  Klis did not foresee Ashcroft assessing as many fees and expenses as would be typical in less friendly deals, which are also more costly to draft.  *Id.* at 138, 140.  In fact, the Ashcroft loan did not have many of the features or fees that Klis testified would likely be found in less "friendly" deals.  *Id.* at 138.

Klis testified that she had experience representing other EB-5 lenders who would give more favorable, "friendlier" terms because the lender "knew" the borrower. *Id.* at 132–33. She testified that there was no less expectation of repayment or security in the transaction between Ashcroft and Ajax 5Cap. *Id.* at 131. She emphasized that Ashcroft could sue for repayment and would be required to act consistent with the fiduciary duty that "the principals behind the lender in the [NEDC]" owe to the EB-5 investors. *Id.* at 131. Klis emphasized that Sullivan and his team did "everything by the book." *Id.* at 140. She described him as "just [not] trying to soak this project out of every cost . . . where a lot of lenders are not as compassionate." *Id.*

"Compassionate" and "friendly" are not typically terms associated with a commercial loan. In the context of this transaction, where Fitzpatrick and Sullivan sought to raise funds to develop the Project, the relationships among the parties changed over time and influenced the loan and its administration. On many occasions, Ashcroft gave great latitude to Ajax 5Cap and the Debtors in administering the loan. For example, Silberberg and Sullivan had communications where Silberberg explained that he was not going to use funds advanced by Ashcroft in a manner directly in line with the EB-5 sources and uses request. Tr. Day 1, Silberberg Test., at 99:6. Silberberg testified credibly that he meant funds advanced on a request that detailed construction-related expenses would be used to effectively reimburse the Project for expenses incurred prior to the funding so that the funds advanced could be used for other non-qualified purposes. *Id.* at 79:9, 101:15. He further testified that this practice was "allowed . . . under the rules." *Id.* at 99:23. Because Ashcroft was the only funding source for the Project at relevant times, I draw the inference that funds advanced by Ashcroft were used to pay Sullivan's legal fees, Ex. 166, and to fund the settlement payments between Fitzpatrick and Boucher regarding the breakup of their Capital Management partnership, Ex. 176. I do not make any findings as to whether the EB-5 rules permitted the sources and uses accounting practices that

appear to have been agreed to by Sullivan and Silberberg. There were other examples in the

record of the relationship between borrower and lender that appear to have been more

accommodating than one might expect in a commercial lending relationship. As recited above,

the evidence shows that Ashcroft continued its funding under its loan notwithstanding the fact

that the senior mortgage from HarborOne was in default, no forbearance with HarborOne was

ever executed by the Debtors, and granting of a requested junior mortgage was delayed. Ex.

177; Tr. Day 1, Silberberg Test., 174; Tr. Day 4, Sullivan Test., 191; Phase I Ex. 21, at 36.

### c. Ashcroft Is Not a Non-Statutory Insider

After considering the entire record and the findings above, I do not find Ashcroft to be a

non-statutory insider. First, I find that at no time did Patel or SP act as an agent of Ashcroft in

connection with the Ashcroft Loan Agreement to Ajax 5Cap and the Debtors or the Project, and I

do not attribute Patel's acts or the acts of his agents or agents of ESMSYS to Ashcroft other than

as a "strategic partner" recruiting foreign investors to fund the EB-5 loan. Certainly, Patel

aggressively attempted to or did insert himself and his agents (or the agents of ESMSYS) into the

Debtors' situation prior to and after the bankruptcy filing. I find that he did so in an effort to

protect his Class B investment, the DIP Loans, and the investments of the EB-5 investors in the

Project through the Ashcroft Loan Agreement. I draw an inference that he attempted to

influence the Debtors' restructuring and business issues not only because of his investment, but

also to avoid adverse consequences for the foreign investors that he and ESMSYS recruited. At

times, he certainly attempted to coordinate with Ashcroft, but at other times he or ESMSYS were

adverse to Ashcroft or acting alone. While the interests of Patel, SP, the individual EB-5

investors, and Ashcroft were often aligned, I find no credible evidence that Sullivan or Ashcroft

acted through Patel or his agents. I find that Patel was often acting alone, at times with

acquiescence of Ashcroft or the Debtors, and, after the DIP financing, cloaked with the position

of the critical DIP lender.

Next, examining the relationship and transactions between Ashcroft and the Debtors at the time that Ashcroft voted to accept the Plan and informed by the record prior to that time, there is no question that the relationship of the principals and between Ashcroft and the Debtors and their affiliates was "friendly" and often aligned in purpose.  The Ashcroft Loan Agreement reflected this in both its terms and administration.  As suggested by Klis, this is somewhat understandable because of the nature of EB-5 mezzanine-like financing between acquainted parties.  Klis was a knowledgeable and experienced witness on the subject of EB-5 lending.  At times her explanations for using loose phraseology and portrayal of the actions of Sullivan and Ashcroft in a favorable light were strained, but she was credible when testifying about the fiduciary obligations of Sullivan in relation to the NEDC and by inference how that would impact his decisions on behalf of Ashcroft.  Fitzpatrick had divested his equity interest in the Project through Capital Management long before the bankruptcy and Ashcroft's vote to accept the Plan.  Sullivan, who was the ultimate decision-maker for Ashcroft, testified that he was not personally in the business of lending money, had no real experience or training as a commercial lender, and only had experience underwriting and administering one other loan made through the NEDC.  Tr. Day 5, Sullivan Test., 119–23.  He credibly testified that he understood his responsibilities to the EB-5 investors and acted on behalf of Ashcroft in what he believed would be the best interest of those investors.  At times, the interests of Ashcroft appear to have aligned with the Debtors, but not at all times.  The Debtors sought to avoid the Ashcroft mortgages, Ashcroft opposed the initial terms of the SP DIP Loan, and the evidence demonstrates that Ashcroft negotiated for acceptable terms to agree to exchange its debt for equity and become a plan proponent.

While the history of the transactions and relationships between Ashcroft and the Debtors,

and their respective affiliates, informs my assessment and certainly required scrutiny, ultimately, I find that Ashcroft acted in its own interest and at arm's length in voting to accept the Plan. The evidence shows that it is more likely than not that Ashcroft acted as an independent economic actor in accepting the Plan in a manner that it deemed to maximize its opportunity for recovery on its claim and to provide a return to the EB-5 investors. While Ashcroft's interests (including its interest to avoid a failed investment and the related consequences to its EB-5 investors) ultimately aligned with the Debtors, there was no credible evidence of undue influence or a less than arm's length transaction at the time Ashcroft voted its claim. SHS argues that Ashcroft accepted the Plan because its primary goal was to support the success of the Project as a partner or joint venturer and not to pursue the independent interests of Ashcroft and the EB-5 investors. Chapter 11 cases often make for strange bedfellows of case constituents. In this case, the Debtors and Ashcroft were well known to each other and had many ties, much more so than is commonly seen in Chapter 11 cases involving loans of the size of the Ashcroft loan. In this case, the fiduciary obligations of Sullivan are clear, and the actions of Ashcroft in accepting the Plan are consistent with those obligations where he has made a determination that supporting the Plan is in the best interests of Ashcroft and the EB-5 investors. The fact that those interests align with the interests of the Debtors and other Plan Proponents does not render Ashcroft a statutory insider.

### B. Section 1129(a)(7) – Best Interests Test

"Section 1129(a)(7)(A)(ii) permits a plan to be confirmed, despite rejection by an impaired class, if each holder 'will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.'" *In re Mullins*, No. 19-11574-CJP, 2021 WL 2946099, at *2 (Bankr. D.

Mass. July 13, 2021) (quoting 11 U.S.C. § 1129(a)(7)(A)(ii)); *see also In re SW Bos. Hotel Venture, LLC*, 460 B.R. at 65–66; *ACC Bondholder Grp. v. Adelphia Commc'ns. Corp. (In re Adelphia Commc'ns Corp.),* 361 B.R. 337, 364 (S.D.N.Y. 2007). The Court is obligated to make an independent determination of whether § 1129(a)(7) is satisfied. *See, e.g.*, *In re Charles St. African Methodist Episcopal Church of Bos.*, 578 B.R. at 102.

SHS argues that the Plan does not satisfy the best interests of creditors test because the Plan proposes to: (i) pay SHS's claim over a three-year period with interest that does not provide SHS the indubitable equivalent of its claim; and (ii) pays unsecured claims "at most five (5) cents on the dollar." SHS Post-Trial Br., at 65. As determined below, *see infra* Part III(C)(i)(b), the Plan does provide SHS the indubitable equivalent of its claim. Moreover, based on the evidence presented, I have found that SHS is fully secured. SHS filed a proof of claim totaling $18,928,809.92. The Debtor objected to that claim. For purposes of plan confirmation, SHS's claim has been estimated in the amount of $13,148,497.68 as of the Petition Date. This amount consists of $10,493,951.14 attributable to the construction loan and $2,645,546.53 attributable to the term loan. The claim of SHS has also been estimated to include an additional $400,000 in attorneys' fees. I have found that the "as is" liquidation value of Ice is $9,600,000 and the "as is" liquidation value of the land owned by the remaining Debtors is $13,500,000. In applying the "best interests" test, liquidation value is the appropriate valuation standard. I will discuss the marshaling argument asserted by CSM below, but even if I allocated a portion of the term loan held by SHS to the other Debtors on the basis that the term loan refinanced the acquisition cost for the land of all of the Debtors,[16] the liquidation value of the assets of Ice, even without

---

[16] There was no argument made by CSM for re-allocation of only the SHS term loan (as opposed to CSM's broad marshaling argument), but I can determine a re-allocation based on the loan documents in evidence and the valuation evidence that provided acreage for the real property owned by each Debtor and making an inference that the term debt refinanced financing relating to all of the land in an undeveloped state. Of the 140.75 acres owned by all of the Debtors, the parcel owned by Ice is 12.39 acres (8.8% of the total). I infer that approximately $2,412,738 (91.2%) of the balance of the funds advanced on the term loan could be attributable to the acquisition of real

considering senior tax liens securing outstanding real estate taxes, is less than the SHS secured

claim asserted against Ice. SHS will receive more under the Plan than it would in a hypothetical

liquidation. As such, the Plan meets the best interests test as to SHS.

SHS appears to argue that the Court should not adopt the liquidation value supported by

the Plan Proponents' expert evidence and should instead use a fair market value. SHS argues

that a chapter 7 trustee would never permit SHS to obtain relief from the automatic stay and

foreclose on the properties owned by the Debtors. This assertion is not supported by any

evidence in the record and does not address the assumption made by the Plan Proponents'

valuation expert that does not assume a foreclosure. The liquidation period assumed by the Plan

Proponents' valuation expert was a sale occurring in three months or less for properties owned

by the Land Debtors. JLL Land Debtors Appraisal, at 217. The expert applied a thirty percent

liquidation discount to the fair market value determined for the assets of each of the Debtors,

which was not credibly rebutted, and I found this within the range of reasonableness because of

the nature of these properties even if the liquidation period were eight months. Neither SHS nor

CSM introduced expert valuation testimony. I also note that, even if the liquidation discount

were adjusted to twenty-five percent because of an assumed period of the hypothetical

liquidation that is longer than considered by the expert, the result would not be material to

application of the "best interests" test in this case. Similarly, neither SHS nor CSM introduced

evidence of an alternative liquidation scenario for the Ice assets or any possibility that a

hypothetical chapter 7 Trustee would seek authority to operate the business and whether that

would undermine the liquidation assumptions of the Plan Proponents' expert.

---

property by Debtors other than Ice. This supports an inference that in a liquidation that amount of the estimated
claim for the term loan would be attributed to and paid by those other Debtors, leaving an SHS secured claim of
$10,726,759 (plus a portion of the $400,000 of estimated legal fees), consisting of $10,493,951 attributable to the
construction loan (100% of the construction loan) and $232,808 attributable to the term loan (8.8% of the term loan).
In addition, the City of Attleboro has asserted a tax claim and statutory lien for the Ice real estate in the amount of
$289,781.

CSM also asserts that the Plan Proponent's liquidation analysis is fundamentally flawed in treating its claim as substantially under-secured or wholly unsecured because:

> under the equitable doctrine of marshaling, it would be inequitable and unjust to CSM to allow SHS to liquidate assets of Ice first (i.e., CSM's only collateral) in order to pay the entirety of SHS'[s] secured claim.  Instead, after conversion to a case under Chapter 7, CSM would raise marshaling claims in either the Bankruptcy Court (if the [c]hapter 7 trustee was to sell the Debtors' real properties pursuant to § 363) or in state court (if SHS were to foreclose on the Debtors' real properties after obtaining relief from the stay) to ensure that SHS would be required to first pursue the assets of the non-Ice Debtors in order to satisfy its claims.

CSM Post-Trial Br., at 19.  It argues that in this case, notwithstanding that CSM only has a claim against Ice, the necessary elements of marshaling are satisfied and that it would be inequitable for the Court not to require that SHS's claim be paid first from proceeds of collateral from Debtors other than Ice so that CSM's claim would be secured rather than unsecured in a hypothetical liquidation.

When senior and junior lienholders are both secured by a common asset, but the senior lienholder is also secured by some other asset, or assets, of a common debtor, application of the equitable doctrine of marshaling results in the senior lienholder "look[ing] first to the non-shared collateral to satisfy its claim, thereby providing the junior creditor with the opportunity to reach equity for its claim in the shared collateral."  *Sunset Hollow Props., LLC v. Bank of W. Mass. (In re Sunset Hollow Props., LLC)*, 359 B.R. 366, 378–79 (Bankr. D. Mass. 2007).  Both CSM and the Plan Proponents look to principles of marshaling under state law in support of their positions. Massachusetts law requires all of the following three elements as prerequisites to marshaling asserted by a junior creditor: "(1) a common debtor, (2) two separate funds, one of which is a common fund available to both creditors and one of which is available only to the senior creditor; and (3) no detriment or prejudice to the senior creditor if he is required to pursue the fund to which he alone can look."  *Houghton v. United States (In re Szwyd)*, 394 B.R. 230, 236–37 (Bankr. D. Mass. 2008), *aff'd*, 408 B.R. 547 (D. Mass. 2009) (citation and quotations

omitted).

The Plan Proponents argue that CSM's marshaling argument fails the second requirement because the assets are owned by the Land Debtors and not the "common debtor," Ice.  *See id.*  Typically, the marshaling doctrine mandates that a single "common" debtor own the assets being marshaled.  *See id.*; *but see In re Sunset Hollow Props., LLC*, 359 B.R. at 379 (describing certain exceptions to "common debtor" requirement discussed *infra*).  Courts have generally held that marshaling may not be invoked to compel the senior creditor to seek to satisfy its debt from separate legal entities.  *See, e.g.*, *In re Sunset Hollow Props., LLC*, 359 B.R. at 382 (concluding that "there is no evidence that Massachusetts courts would apply the controversial Wisconsin Exception [deeming assets pledged by a guarantor-principal of a corporate debtor to be a capital contribution to the debtor and applying marshaling to require the senior creditor to proceed first against the collateral provided by the guarantor-principal's personal assets], much less expand it to include guarantors who are not guarantor-principals, but are instead related corporate bankruptcy debtors. . . .  [T]here is nothing before this Court to suggest that creditors were misled into believing that the Related Debtors were, in fact, one single entity."); *Whitlock v. Max Goodman & Sons Realty, Inc. (In re Goodman Indus., Inc.)*, 21 B.R. 512, 523 (Bankr. D. Mass. 1982) (stating "[w]hile there is a conflict as to the treatment of guarantors the prevailing view is that the sine qua non of marshalling is that the senior creditor have access to two funds of a single debtor when only one fund is subject to the claim of a junior creditor"); *Broadway Nat'l Bank of Chelsea v. Hayward*, 189 N.E. 199, 202 (Mass. 1934) (declining to order the marshaling of assets of a guarantor and stating "as a general rule at any rate, [marshaling] is not to be applied where the two funds to which the creditors or sets of creditors may resort are not derived from a common source, or are not in the hands of a common debtor." (citation and quotations omitted)).  As stated by one court,

[t]he requirement that both funds be in the hands of a common debtor is not
merely a formal or technical requirement; rather, it limits marshaling to cases for
which the marshaling doctrine purports to provide the rule of decision. . . . When
guarantors and other debtors are added to the picture, then new questions arise.
The marshaling doctrine simply does not purport to provide a rule for deciding
whether a junior mortgagee can require the senior mortgagee to satisfy its claim
out of the assets of a second debtor.

*DuPage Lumber & Home Improvement Ctr. Co. v. Georgia-Pac. Corp.*, 34 B.R. 737, 740–41

(N.D. Ill. 1983).  Courts have determined there are certain exceptions to the "common debtor"

requirement: "(1) where the nondebtor (typically a corporate debtor's controlling shareholder

who has guaranteed the debt and secured the guaranty with his or her own property) is the alter

ego of the debtor; (2) where the nondebtor's property should equitably be deemed a capital

contribution to the debtor; and (3) where the nondebtor has engaged in inequitable conduct."

*In re Sunset Hollow Props., LLC*, 359 B.R. at 379.

CSM does not suggest that a traditional common debtor exception applies but asserts that

Article 5.9 of the Plan effects a substantive consolidation and, therefore, the second requirement

for marshaling is met because all the Debtors should be treated as "common debtors" for

marshaling purposes.  In a hypothetical liquidation, however, the Plan would not be effective and

CSM would not have "plan consolidation" to support a claim for marshaling.  No party has

argued that a basis exists for substantive consolidation of the Debtors' estates other than the

limited purpose consolidation proposed to effect the Plan.  In fact, the Plan Proponents and the

objecting parties appear to agree that there would be no independent basis for substantive

consolidation.

As stated by the court in *In re Szwyd*,

[t]he burden for demonstrating the propriety of marshaling in a particular case is
upon whomever seeks the benefit therefrom, . . . and courts traditionally require
that the doctrine be applied only when it can be equitably employed as to all
parties with an interest in the property. . . . Here, that would include the Debtor[s].

394 B.R. at 237 (citing *Johnson v. Wilson*, 261 P. 102, 103 (Wash. 1927), *Meyer v. United States*, 375 U.S. 233, 237 (1963), and *In re United Retail Corp.*, 33 B.R. 150, 153 (Bankr. D. Haw. 1983)).  Here, I will not apply the doctrine of marshaling to require SHS to first look to collateral granted by Debtors other than Ice.  CSM has not demonstrated that there is a basis to require SHS to first liquidate the collateral of Debtors against which CSM has no claim for the benefit of CSM's recovery against Ice.  Ice is the only debtor common to both SHS and CSM. While CSM argues that this Court could apply marshaling, notwithstanding the usual requirements of the doctrine, *see* CSM Post-Trial Br., at 25–26, none of the exceptions cited persuade me that they are applicable or should compel a different result.  Further, even if CSM were to satisfy that hurdle, it would not be equitable to apply marshaling where approximately $10,726,758 of SHS's claim, plus attorneys' fees, is attributable to Ice—not the other Debtors. CSM has not met its burden to invoke the doctrine of marshaling.  I will discuss below consideration of allocation of a portion of the SHS term debt in the context of determining whether the treatment of CSM under the Plan is fair and equitable under § 1129(a)(8).

No holders of unsecured claims against Ice or other Debtors have objected to confirmation of the Plan except CSM, which holds only a disputed mechanic's lien claim and possible unsecured deficiency claim against Ice.  For the reasons discussed above, in a liquidation, no distribution would likely be realized by CSM or Class 6 unsecured creditors greater than what is proposed under the Plan.  Consequently, the Plan Proponents have met their burden to satisfy the best interests test under § 1129(a)(7).

### C.  Section 1129(b) – Cramdown: A Plan Must Not Discriminate Unfairly and Must Be Fair and Equitable to Each Dissenting Class

Because not every impaired class has accepted the Plan as contemplated by § 1129(a)(8), the Plan Proponents must meet the requirements for "cramdown" set out in in § 1129(b)(1) that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each

dissenting class.  SHS and CSM each assert that the Plan does not satisfy either of those requirements.

### i.  SHS's Objection

SHS contends that the Plan does not comply with § 1129(b)(1) because it: (i) proposes to pay SHS's secured claim over a period of three years with interest at prime, plus 1%, which is not the indubitable equivalent of its claim; (ii) shifts the risks of reorganization onto SHS; and (iii) allows the Reorganized Debtors to sell the non-Ice Debtors' real property and strip SHS's liens thereon without those liens attaching to the sale proceeds, as required by the Bankruptcy Code.  SHS also asserts that the Plan provides for distributions to Ashcroft that are prohibited by the Subordination Agreement.

### a.  *Terms of Repayment and Interest Rate*

SHS objects to both the repayment terms for its secured claim provided by the Plan and the rate of interest proposed under the Plan.  The Plan provides for a payment of $11.5 million on account of the SHS secured claim within five days of the effective date of the Plan.  Plan, § 4.2(c).  The balance of its claim would be paid in three years with interest.  Depending on when the SHS claim is finally determined, the Plan provides for payment of a small amount of principal on a twenty-year amortization schedule.  Based on the claim estimation, the remaining balance of the SHS claim would be approximately $1.6 million.  If the proof of claim filed by SHS were to be allowed in full, the remaining balance of SHS's secured claim would exceed $7.42 million.  The Plan provides that SHS will maintain a mortgage on the real properties of Ice, Land, Field, and Tennis to secure the remaining balance of its claim.  As such, the balance of SHS's claim will be secured by first mortgages on real property and other assets having an "as is" market value of $24,255,000 and an "as is" liquidation value of $17,548,500, consisting of the following:

| Debtor | As Is Market | As Is Liquidation |
|--------|:------------:|:-----------------:|
| Ice | $12,900,000 | $9,600,000 |
| Tennis | $3,225,000 | $2,257,500 |
| Field | $2,940,000 | $2,058,000 |
| Land | $5,190,000 | $3,633,000 |
| **TOTAL** | **$24,255,000** | **$17,548,500** |

While SHS asserts that a five-year amortization schedule would be more appropriate and that the contemplated balloon payment after three years unfairly shifts the risk of the reorganization to creditors, I disagree.  Considering the substantial immediate paydown, three-year payoff, payment of interest, and security provided by the plan, the proposed term of repayment and balloon payment are fair and equitable and do not prejudicially shift the risk of the reorganization to SHS.

Further, SHS contends that the interest rate of prime, plus 1%, to be paid under the Plan on account of the unpaid balance of its secured claim is inadequate because it does not provide SHS with deferred cash payments equaling the amount of its claim or the indubitable equivalent of that amount.  Payment of the value of the secured creditor's claim as of the effective date of the plan requires the Court to determine the amount of post-confirmation interest that will compensate the secured creditor for the risk attendant to the restructured loan.  *See In re SW Bos. Hotel Venture, LLC*, 460 B.R. at 53.  In the absence of an efficient market to establish an interest rate for the cramdown that is proposed, I must use a formula approach based on a risk-free loan, subject to adjustment for risk factors.  *Till v. SCS Credit Corp.,* 541 U.S. 465, 479, (2004).  No party has suggested that there is an efficient market for the financing package provided under the Plan.  In considering application of *Till*, the Eighth Circuit Court of Appeals recently recognized, as did the Supreme Court in *Till*, that the prime rate reflected some risk as a starting point.  *See Farm Credit Servs. of Am., FLCA v. Topp (In re Topp)*, 75 F.4th 959, 962 (8th Cir. 2023)

(concluding that the bankruptcy court did not err in using the twenty-year treasury bond rate as the appropriate starting point for formula approach required by *Till* because (i) the court rationally analyzed its preference for starting with the bond rate and (ii) *Till* does not require using a particular starting rate, but rather requires selection of a risk-free rate and adjustment for risk from that base rate depending on what, if any, risk is already accounted for in starting rate).

SHS offered the expert testimony of Richard J. George on the issue of interest rate. George has a Bachelor of Arts and a Master of Business Administration from University of California, Berkeley. Tr. Day 8, George Test., 125. He worked in various commercial lending capacities with Citibank for thirty years both in the United States and internationally. *Id.* at 125–30. After he retired from Citibank, he was the president of a community bank, provided services as a consultant and testifying expert, and has taught at Georgetown University and UC Berkeley. *Id.*

Jason Bonarrigo testified as an expert for the Plan Proponents. Bonarrigo has approximately twenty-two years of banking and residential mortgage lending experience, primarily as a loan officer. Tr. Day 2, Bonarrigo Test., 144. He has no commercial lending experience. *Id.* at 152. Bonarrigo testified that he had been discussing possible financing options with Patel and Patel engaged him to give an opinion on the interest rate proposed under the Plan. *Id.* at 145.

Both experts identified the risk to be assessed as risk of the secured creditor not being able to recover the amount of its indebtedness. Tr. Day 8, George Test., 142. Bonarrigo opined that the Plan's proposed cramdown interest rate of the prime rate, plus 1%, was an appropriate rate particularly given the substantial amount by which the value of the collateral that would secure SHS's indebtedness would exceed the amount of that indebtedness. Tr. Day 2, Bonarrigo Test., 149. In arriving at his opinion, Bonarrigo testified that he considered all of the various *Till*

risk factors, but that the amount by which the value of the collateral exceeded the indebtedness was the dominant factor. *Id.* at 148–50.

George was more methodical in his approach. He observed that, in his long career, prime, plus 1%, was a rate that "connotes a borrower that has a very unblemished track record of repayment" and has a strong credit rating. Tr. Day 8, George Test., 133. He opined that an appropriate cramdown interest rate would be prime, plus 5%. *Id.* at 140. George started at the prime rate and identified seven factors that he considered in forming his opinion on the appropriate cramdown rate. He identified collateral coverage and guarantees as negative risk factors and liquidity cash flow, refinance ability, plan failure, and the economy as positive risk factors. *Id.* at 136−39. George acknowledged that a significant factor in a secured creditor's ability to recover its indebtedness is the value of its collateral in relationship to the indebtedness. *Id.* at 142. He also acknowledged that in this case even if there were a "severe reduction" in the value of the collateral securing SHS's post-confirmation debt, there would be significant coverage, mitigating risk of loss. *Id.* Having identified the significant collateral coverage of not less than two-to-one, George ascribed a negative one (-1)% risk factor to the cramdown rate. *Id.* at 149–50. George identified liquidity as a risk factor of plus one (+1%). He defined the liquidity risk as the value the secured creditor could obtain from a foreclosure or forced sale of the real estate. In assessing this risk, George acknowledged that his definition of "liquidity" was the functional equivalent to liquidation value. *Id.* Notwithstanding that George ascribed a negative risk assessment of one percent (-1%) based upon the collateral coverage that considered liquidation values of the SHS collateral, he offset that by plus one percent (+1%) for essentially the same risk factor assumed in the liquidation value itself. *Compare id.* at 135−49 *with id.* at 149−50.

George also ascribed an enhanced risk factor of plus 2.5% based upon "cash flow" or operating condition of the properties.  George's opinion was based on historical performance, and he did not account for the substantial projected increase in revenues resulting from improved operations and increased ice rental contracts.  *Id.* at 150−54, 162.  Also, George's enhanced cash flow risk factor accounted for the provisions in the Plan which provided for the Plan Loan, Plan contribution, working capital infusion of $500,000, or the Plan's provision for sale of properties to reduce the SHS debt.  *Id.* at 150−52.  George acknowledged that in looking at the historical numbers, he reviewed summaries prepared by others that were based on profit and loss and not cash flows.  George recognized that the profit and loss prepared on an accrual basis included historical debt, whereas the projections that were offered in evidence in support of confirmation were prepared on a cash basis for post confirmation performance and assumed that the prepetition debt was discharged.  *Id.* at 150, 152.  Enhanced risk based on cash flow is mitigated by the liquidation value of the collateral and the ability of SHS to realize sufficient proceeds from liquidation of the collateral to satisfy its debt.  *Id.* at 142.

George applied an enhanced risk factor of plus one percent based on the "ability to refinance."  *Id.* at 157.  He considered whether there were institutional investors willing to refinance the SHS debt and his conclusion that an institutional lender would be unwilling to do so.  *Id.* at 157−58.  However, George recognized that the current lender, SP, is not an institutional lender and that it has a real incentive to protect its position should there be a need for refinancing.  "With all the money these investors already have in these projects, they are going to be extremely concerned and probably uniquely inclined to support the project further."  *Id*. at 158.  George also applied an enhanced risk factor of plus 1.5% based on the potential for a "plan failure."  He based that risk upon the sponsors withdrawing their support from the Debtors, even though he acknowledged that the sponsors have shown commitment to the Debtors, both

through the DIP funding and the financial commitments provided for in the Plan.  *Id.* at 162, 163.

It is unclear why "plan failure" is an additional risk factor after considering cash flow and

operational risk and refinancing risk.  George applied a negative risk factor of 0.5% based on the

existence of a personal guaranty in favor of SHS.  *Id.* at 138.  He offset this by an enhanced risk

factor of 0.5% based on general economic uncertainty.  *Id.* at 139.

Notwithstanding George's significant experience and impressive credentials, I find that

he did not apply appropriate weight to the value of SHS's collateral in relation to the amount of

its remaining claim after the payment of $11.5 million.  While his carefully considered approach

of seven factors was appreciated, several factors appeared to overlap and, in addition to his

negative adjustment for collateral value being too small, he offset that adjustment by liquidity

risk that he described to include many of the factors that would have been considered in

establishing the liquidation value of the collateral.  While Bonarrigo's experience as a residential

mortgage lender significantly lessens the weight of his opinion for these commercial

transactions, he identified the substantial debt to collateral value as a primary factor in assessing

the risk to SHS.  In *Till*, the Supreme Court observed that bankruptcy courts "have generally

approved" risk adjustments of between one to three percent.  *Till*, 541 U.S. at 465.  The Supreme

Court did not limit adjustments to that range but described the factors to be considered in

establishing a cramdown rate.  After considering all of the evidence presented, including the

opinions of all of the experts, I find that the interest rate required to be paid on the unpaid

balance of the SHS claim under *Till* is prime, plus 2%.  For the Plan to be confirmed, the Plan

Rate must be modified to that rate.

       *b.  Section 1129(b)(2) – Release Prices, Lien Stripping, and Credit Bidding*

SHS also asserts that Plan is not fair and equitable because it provides for release prices

with respect to collateral designated to secure the remaining claim of SHS and discharges certain

mortgages currently held by SHS to secure its claim.  To be fair and equitable to a class of

secured claims, a plan must at least meet one of the requirements of § 1129(b)(2):

> Section 1129(b)(2) prescribes in general terms the minimum treatment that the
> holder of a secured claim must receive in order for a chapter 11 plan to be
> confirmed over the creditor's dissenting vote. In general, the plan must treat the
> creditor's secured claim in accordance with one of three alternative standards: (i)
> if the debtor proposes to retain the collateral, the plan must provide that the
> creditor retain its lien on the collateral and receive cash payments equal to the
> present value of the allowed amount of the secured claim, or (ii) if the property is
> to be sold, the creditor must retain its right to credit bid at the sale, and the
> creditor's lien must attach to the proceeds of the collateral and be treated in a way
> that preserves the value of the creditor's interest, or (iii) the secured creditor must
> otherwise be provided with the "indubitable equivalent" of its secured claim. The
> phrase "indubitable equivalent" is a term of art. It means, in essence, that the
> treatment afforded the secured creditor must be adequate to both compensate the
> secured creditor for the value of its secured claim, and also insure the integrity of
> the creditor's collateral position. . . .

4 *Collier* ¶ 506.03[7][d][i].

The Plan does not allow a "straight" application of § 1129(b)(2)(i) because it provides

that certain liens securing SHS's claim will be deemed discharged.  Plan, § 4.3(g).  The Plan also

provides that certain other parcels may be sold at specified release prices, which implicates §

1129(b)(2)(ii).  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 647

(2012) (holding that, where a plan proposes to sell collateral after the effective date and provide

the indubitable equivalent of an undersecured creditor's secured claim by payment of proceeds,

the plan must meet the requirements of § 1129(b)(2)(A)(ii), which allows a secured creditor to

credit bid if permitted by § 362(k)).  Setting aside whether SHS must be permitted to credit bid

with respect to future sales of its post-confirmation collateral, the Plan Proponents may also

demonstrate that the Plan provides for the realization by SHS of the indubitable equivalent of its

secured claim under § 1129(b)(2)(A)(iii).  *See RadLAX Gateway Hotel, LLC*, 566 U.S. at 645

(requiring compliance with credit bidding requirements where providing a mortgagee with

indubitable equivalent).

"The common thread through . . . cases evaluating whether the objecting secured creditor

has been provided the indubitable equivalent of its claim is certainty of payment beyond a

reasonable doubt and adequate plan protections." *In re Pearl Res.*, 622 B.R. 236, 274 (Bankr.

S.D. Tex. 2020) (confirming a Subchapter V plan where secured creditors whose total claims, if

undisputed, totaled $1.2 million were stripped of their prepetition, statutory liens held on all

assets valued at $35 million, except for one piece of property valued at $7.4 million based on a

finding that, although the plan reduced the over-secured creditors' "29 to 1 value-to-debt equity

cushion" to "6 to 1," the remaining collateral "provide[d] virtual certainty that Allowed Claims

[would] be paid in full").  Collier explains that "[a]s applied, most courts recognize that the test

of indubitable equivalence has two requirements: (1) that the secured creditor receive the present

value of its secured claim; and (2) that the Plan ensures the safety of the secured creditor's

principal."  4 *Collier* ¶ 506.03[7][d][i] n.247 (internal citations and quotations omitted).  Courts

have found indubitable equivalence in "dirt-for-debt" plans or plans that substitute collateral.

*See, e.g.*, *In re River E. Plaza, LLC*, 669 F.3d 826, 831 (7th Cir. 2012) ("Banning substitution of

collateral indeed makes good sense when as in the present case the creditor is undersecured,

unlike a case in which he's oversecured, in which case the involuntary shift of his lien to

substitute collateral is proper as long as it doesn't increase the risk of his becoming undersecured

in the future.");  *In re Pac. Lumber Co.*, 584 F.3d 229, 247 (5th Cir. 2009) ("The Bankruptcy

Code, however, does not protect a secured creditor's upside potential; it protects the 'allowed

secured claim.' If a creditor were over-secured, it could not demand to keep its collateral rather

than be paid in full simply to protect the 'upside potential.'");  *In re May*, 174 B.R. 832, 837

(Bankr. S.D. Ga. 1994) (concluding that "proposal to surrender only a portion of the collateral to

an oversecured creditor in full satisfaction of its claim . . . provide[s] an oversecured creditor

with the 'indubitable equivalent' of its claim");  *see also In re James Wilson Assocs.*, 965 F.2d

160, 171–72 (7th Cir. 1992) ("[A secured creditor] has no right to fence off the entire collateral

in which it has an interest so that no other creditor can get at it. Its only entitlement is to the

adequate protection of its interest. . . . He may not paralyze the debtor and gratuitously thwart the

other creditors by demanding superfluous security. . . . [T]he principle that liens pass through

bankruptcy unaffected cannot be taken literally, as we have seen; and it is the law that, provided

the plan of reorganization gives the secured creditor the 'indubitable equivalent' of his secured

interest, the bankruptcy judge can force the creditor to accept the exchange.").

SHS cites to *F.H. Partners, L.P. v. Inv. Co. of the SW, Inc. (In re Inv. Co. of the SW, Inc.)*

("*Investment Co.*") as an example of a case where a court did not confirm a cramdown plan that

included collateral release prices that were less than the value of the underlying collateral and the

secured creditors' claim because it failed to provide the indubitable equivalent of a secured

creditor's claim.  341 B.R. 298, 324 (B.A.P. 10th Cir. 2006).  However, *Investment Co.* is not

binding on this Court and, even if it were, is distinguishable from this case.  In *Investment Co.*,

the plan spanned seven years, and on each anniversary of the effective date, the debtor was to

pay one-seventh of the secured creditor's claim, plus interest, that was to be funded by the

release prices of assets that debtor planned to liquidate through the life of the plan.  *See id.* at

305.  If the release price was insufficient, the debtor was bound to "make an additional principal

payment."  *Id.*  The secured creditor retained a first-priority lien on "bundle of assets"

(developed land) and junior lien on another group of lesser-valued assets (undeveloped land).  *Id.*

at 322.  The plan provided for payments to the secured creditor only from the release prices

obtained from sales of its collateral, "use[d] [the leftover] proceeds to pay other creditors under

the Plan, [and] the remaining property left to secure [secured creditor's] claim [w]ould become

increasingly less valuable."  *Id.*

The secured creditor in *Investment Co.* presented "a detailed hypothetical example showing

that if Debtor sells assets in a certain order, the Confirmed Plan can theoretically take [secured creditor]

from its position as a generously secured first lienholder to a junior lienholder," *id.* at 322, and in one

example "leaving [it] with a remaining claim of 'nearly $500,000' to be paid, and no remaining

assets on which [it] would then hold a senior lien" *id.*, n.79.  The record in that case did not

support a finding that "under no set of events could [secured creditor] have any risk of not

ultimately being paid." *Id.* at 323.

Notably, after reviewing decisions that involved confirmation of plans involving release

prices or the substitution or discharge of collateral, the *Investment Co.* court observed:

> This Court agrees, in principle, that a debtor may be able to tap at least some
> portion of the equity that has built up in collateral to fund a plan by establishing
> values by which a secured creditor's lien may be released—without violating the
> indubitable equivalent requirement. Otherwise, no real estate developer, by
> definition, could likely ever reorganize. That said, if release prices are going to be
> used, their application cannot result in any reasonable possibility that a creditor
> will not be fully protected at all times until its claim is satisfied.

*Id.* at 325.

In this case, as found above, the Plan provides for a payment of $11.5 million on account

of the SHS secured claim within five days of the effective date of the Plan.  Plan, § 4.2(c).  Based

on the claim estimation, the remaining balance of the SHS claim would be approximately $1.6

million.  If the proof of claim filed by SHS were to be allowed in full, the remaining balance of

SHS's secured claim would be approximately $7.42 million.  The Plan provides that SHS will

maintain a first-priority lien on all assets of Ice and first-priority liens on the real property owned

by each of Land, Field, and Tennis to secure the remaining balance of its claim.  *Id.*  As such, the

balance of SHS's claim will be secured by first mortgages on real property and other assets

having an as is Market Value of $24,255,000 and an as is Liquidation Value of $17,548,500.

The release prices established for each of the mortgages for Land, Field, and Tennis equals or

exceeds the fair market value of those respective properties.  Plan, § 1.69.  The release price for

the Ice liens is the "the sum of the Estimated SHS claim and the Estimated CSM Secured Claim,

unless either of those Claims has been Allowed at the time of the sale or refinance of [Ice]'s real

property, in which case the Allowed Claim shall apply." Plan, § 1.71.[17]

In contrast to *Investment Co.* where the secured creditor demonstrated a reasonable possibility that its claim would be left unpaid with no security, SHS will retain a collateral value to claim of at least 2.3-to-1 using the full amount of the SHS claim and the liquidation value of its collateral. SHS argues that "by selling off the individual parcels, both the individual and the total value of the parcels will likely be diminished since the sum value of the parcels sold together could reasonably be much higher, reflecting the added value of the contiguous land acquisitions." SHS Post-Trial Br., at 63. SHS cites no credible evidence in the record that the sale of parcels on which it will retain a lien at the release prices established by the Plan or the sale of other parcels with respect to which the Plan provides for discharge of its present liens will adversely affect the value of the remaining parcels subject to its liens. Even with the potential for some market fluctuation, the collateral coverage provided under the Plan effectively eliminates any reasonable possibility of risk that SHS will not be paid the full amount of its allowed secured claim and provides the indubitable equivalent required under § 1129(b)(2)(A)(iii). Even though SHS will not have the collateral coverage it possessed prepetition, its collateral coverage will substantially exceed 200%.

The Plan Proponents have met their burden to demonstrate that the Plan's provisions for substantial paydown of the SHS claim, payment of the real estate taxes, and the remaining collateral value, after taking into consideration the release price provisions and the requirement that certain liens securing the SHS claim be discharged, provide for the realization of the indubitable equivalent of SHS's secured claims.[18] I also find for many of the same reasons, and

---

[17] While this may provide the indubitable equivalent, to ensure the value of the remaining liens securing the SHS claim, the Plan must be modified to provide that the minimum release price for the Ice assets will be the full amount of the unpaid claim as asserted by SHS, whether allowed at the time of a sale or not. If the SHS claim is not allowed at the time of a sale, proceeds must be reserved.

[18] Some courts have held or suggested that plan proponents have a burden of demonstrating indubitable equivalence

for the reasons discussed below in assessing the feasibility of the Plan, that the Plan does not

improperly shift the risk of reorganization to SHS and does not unfairly discriminate with respect

to the claim of SHS.  Further, turning to SHS's assertion that the Plan must permit it to credit bid

with respect to any sales of assets subject to its post-effective date liens, I find that cause exists

under § 362(k) to limit SHS's credit bid rights for all of the reasons stated above supporting my

indubitable equivalence determination.  *See* 11 U.S.C. § 363(k); *RadLAX*, 566 U.S. at 644 n.3

("[Section] 363(k) —and by extension clause [§ 1129(b)(2)(A)(ii)]—provides an exception to the

credit-bidding requirement if 'the court for cause orders otherwise.'").  The purpose of the credit

bidding right is to "protect a creditor against the risk that its collateral will be sold at a depressed

price." *RadLAX*, 56 U.S. at 644 n.2.  The release prices established under the Plan mitigate the

risk that those properties will be sold at a depressed price.  In addition, participation by SHS in a

sale process would be thwarted initially because SHS does not hold an allowed claim, could chill

any sale process, *see, e.g.*, *In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 60 (Bankr. D.

Del. 2014), and may restrict development of the overall project by the Reorganized Debtors

through selection of compatible development partners.

### c.   *"Distribution" to Ashcroft*

Finally, while not expressly phrased as an objection based on whether the Plan is fair and

---

in order to cram-down a claim under ¶ 1129(b)(1) by a "clear and convincing" standard, rather than the
preponderance of evidence standard applicable to other requirements of § 1129.  *See, e.g.*, *In re Agawam Creative
Mktg. Assocs. Inc.*, 63 B.R. 612, 618–19 (Bankr. D. Mass. 1986) ("The plan proponents have the burden of proving
satisfaction of each of the requirements of section 1129(a) . . . and the burden of proving that the plan meets the fair
and equitable standards of section 1129(b)(1) by clear and convincing evidence." (citing *In re Stoffel*, 41 B.R. 390,
392 (Bankr. D. Minn. 1984) and *In re Nat'l Awards Mfg., Inc.*, 35 B.R. 691, 693 (Bankr. S.D. Ohio 1983))).  I
disagree a "clear and convincing" standard applies.  *See In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1165 n.26
(5th Cir. 1993) ("[T]he debtor must show that the creditor will receive the indubitable equivalent of its claims by a
preponderance of the evidence. The level of proof to show indubitability is not raised merely by the use of the word
'indubitable'. 'Indubitable' modifies 'equivalent' not 'provides'."); *In re Ponce de Leon, 1403, Inc.*, 523 B.R. 349,
371, 395 (Bankr. D.P.R. 2014) (Although "[creditor] argues that the bar for finding the indubitable equivalence is
exceedingly high and as such the Debtor must prove the indubitable equivalence akin to a clear and convincing
standard," the court concluded that "plan proponent has the burden of proving by a preponderance of the evidence
that the plan satisfies the applicable requirements.").  Given the record established, however, even if it did apply, I
would find that the Plan Proponents have met that standard as well on indubitable equivalence.

equitable, SHS objects to the Plan on the basis that it provides for a "distribution" to Ashcroft

and certain payments of a minimum return to Ashcroft in contravention of the Subordination

Agreement. Section 1129(b) allows confirmation of a plan "[n]otwithstanding section 510(a)" if

certain conditions set out there are met. 11 U.S.C. § 1129(b)(1). I have found that the Plan's

treatment of the SHS claim is fair and equitable and does not discriminate unfairly. The Plan

provides for the realization of the indubitable equivalent of such claims by SHS through the

substantial paydown, payments with interest, significant collateral coverage of the remaining

balance of the SHS claim. The Plan proponents have also stated on the record that an order

confirming the Plan may provide that the Reorganized Debtors may not make any distributions

to Ashcroft on account of its membership interest to be distributed under Article 4.4 of the Plan.

To be fair and equitable, the confirmation order must also provide that the equity interest will be

held in trust by Ashcroft for the benefit of SHS until the Allowed Claim of SHS is paid in full

Plan, and any distributions or consideration received on account of that equity interest shall be

paid to SHS until the Allowed Claim of SHS is paid in full.

     ii.   <u>CSM's Objection – Doctrine of Marshaling</u>

CSM asserts that the Plan is not fair and equitable because it does not provide that CSM

will receive payments under the Plan having a present value equal to the value of CSM's secured

claim. As set out above, the Plan provides that the allowed amount of the CSM secured claim

will be paid in full with interest in a similar manner to the SHS claim. *See* Plan, § 4.3. To secure

payment of the CSM claim, the Plan provides that CSM will retain its mechanic's lien on the

property owned by Ice (subject to the Plan Loan used to pay real estate taxes and to reduce the

SHS claim) and grants second mortgage liens on the properties owned by Tennis, Field, and

Land. Subject to certain conditions that follow, I adopt the reasoning above and find that the

terms of payment of the CSM claim are fair and equitable, provided that the Plan Rate is

modified to be prime, plus 2%.

CSM filed Claim No. 5 asserting a secured claim of $14,106,762.75, but CSM

acknowledged for estimation and voting purposes that: (i) $5,825,486 of its claim is secured and

(ii) $4,980,790 of contractual interest, plus any deficiency claim, should be treated as a general

unsecured claim.  The claim of CSM has been estimated in the amount of $3,393,009.  Phase I

Order, 2023 WL 2278603, at *6.  The Plan provides that CSM shall have a secured claim to the

extent of the value of CSM's lien as determined by this Court pursuant to § 506(a).  *See* Plan, §§

1.73, 4.3.  "Such value shall be determined in light of the purpose of the valuation and of the

proposed disposition or use of such property, and in conjunction with any hearing on such

disposition or use or on a plan affecting such creditor's interest."  11 U.S.C. § 506(a).  Because

the Plan Proponents propose that the Reorganized Debtors will retain and operate, develop, or

sell the Ice property and related assets, the market value of $12.9 million is the appropriate value

to use in determining the value of the CSM lien.  *See In re SW Bos. Hotel Venture, LLC*, 460

B.R. at 31–33.

CSM contends that I should apply the doctrine of marshaling to require that SHS look

first to collateral provided by the Land Debtors, so that CSM's claim will be fully secured.  I

rejected that argument in the context of the "best interests test" analysis above.  *See supra* Part

III(B).  However, for purposes of evaluating whether the Plan meets the "fair and equitable"

requirements of § 1129(b), it is appropriate to consider allocation of that portion of the SHS

claim that could be attributable to Debtors other than Ice in determining the amount of the SHS

lien that is senior to the CSM lien on the assets of Ice and the value of the CSM lien.  *See* 11

U.S.C. § 1129(b)(2) ("the condition that a plan be fair and equitable with respect to a class

includes the following requirements. . . ." (emphasis added); *In re Mullins*, 633 B.R. at 11–16. It

would not be appropriate or equitable to apply the doctrine of marshaling for the benefit of CSM

to require that SHS's claim against Ice arising from the construction financing provided to Ice be satisfied from collateral granted by the other Debtors that executed guaranties and against which CSM has no claims. *See supra* Part III(B). Similarly, here, it would not be fair or equitable in the context of 11 U.S.C. § 1129(b)(2) to value the lien of CSM in a manner that contemplates that collateral granted by Ice to secure a guaranty to SHS would be looked to first to pay the term loan where the other Debtors were primary obligors.

Generally under state law, SHS has the right to proceed to enforce liens granted by a guarantor without looking first to the assets of a primary obligor. *See, e.g.*, *In re LightSquared, Inc.*, Case No. 12-12080, 2014 WL 5488413, at *7 (Bankr. S.D.N.Y. Oct. 30, 2014) ("Long-standing principles of commercial law would be overturned if . . . a secured creditor with a contractual right to seek payment from multiple sources could be precluded from seeking recovery from a co-obligor merely because of allegation that it is oversecured by the collateral of another co-obligor."); *see also HSBC Realty Credit Corp. (USA) v. O'Neill*, 745 F.3d 564, 577 (1st Cir. 2014) (determining that clause of guaranty limiting primary obligor's liability to $8.1 million of a $15.9 million loan did not render obligor responsible only for the loan's final $8.1 million and observing that appellant "spotlight[ed] a lawyer's comment in an article that '[w]hen dealing with a guarantee limited to an amount,' a lender '[g]enerally' intends 'that the last 'x' dollars be guaranteed' and that the guarantor 'may . . . make the argument that his guarantee doesn't kick in until the lender has liquidated its collateral from its primary obligor.' But he cites us no case showing that Massachusetts buys into any of this" (internal citation omitted)). As the court in *In re LightSquared* determined, "each [lender] continues to hold a claim against every [g]uarantor . . . for any amount that is unpaid when due, and each of the [lender's] claims continues to exist until the [debt] is paid, in full." 2014 WL 5488413, at *6. But issues of subrogation would arise if a guarantor fully paid the debt of a primary obligor. 11 U.S.C. §

509(a); Restatement (Third) of Suretyship & Guaranty § 27 cmt. a (1996) ("Subrogation is often called an equitable assignment or an assignment by operation of law."); *see also In re Morrison*, 555 B.R. 92, 94–95 (Bankr. D. Mass. 2016) (determining that "[t]here is disagreement among the courts over the interrelationship between equitable subrogation under state law and subrogation under Bankruptcy Code § 509, specifically 'as to whether § 509 preempts any other form of subrogation theory, or whether equitable subrogation criteria are the test under § 509, or whether equitable subrogation is an alternative method to § 509.' Obviously, to the extent a subrogation claim satisfies both federal and state criteria it is not necessary to blaze a trail down any one of these specific paths. That is the situation here" (internal citations and quotations omitted)). Generally, a subrogated guarantor is entitled to an assignment of loan documents and rights to collateral. *See* Restatement (Third) of Suretyship & Guaranty §§ 27–31 (1996); Restatement (Third) of Property: Mortgages § 7.6 (1997); *see also In re LTC Holdings, Inc.*, 10 F.4th 177, 185–86 (3d Cir. 2021). The possibility of a subrogation claim by Ice and other equitable reasons support consideration of reallocation of a portion of the SHS term debt when determining whether the treatment of CSM is fair and equitable under the Plan.

Of course, until the SHS claim becomes an allowed claim, it is not possible to determine the value of CSM's lien. As discussed above at note 16, I infer from evidence in the record that at least 91.2% of the balance of the portion of the SHS claim on account of the <u>term</u> loan may be attributed to Debtors other than Ice. Notably, the term loan was made to Debtors other than Ice to refinance what appears to be acquisition financing. Phase I Ex. 5, at 2. Ice and Ajax 5Cap executed guaranties of the term loan. Phase I Exs. 5, 7. When the SHS claim is finally determined, the CSM lien will have a value of $12.9 million (market value of Ice assets), less $289,781.18 of undisputed senior real estate tax liens, less the total amount of the allowed SHS secured claim, plus 91.2% of any amount of that claim attributable to the term loan. As an

illustration only (and assuming that the estimated legal fees would be divided equally between the term loan and construction loan), if the estimated value of the SHS claim were to be the final allowed amount of the that claim, the value of the CSM lien would be $1,456,860, calculated as follows: $12.9 million, less $289,781 (real estate tax lien claim), less $13,548,497 (the total amount of the estimated SHS secured claim), less $200,000 (one-half of the SHS estimated attorneys' fees), plus $2,595,138 (91.2% of the estimated claim attributable to the term loan, in the amount of $2,645,546). After payment of the real estate taxes, the junior liens retained and granted under the Plan more than fully secure CSM's estimated secured claim of approximately $1.45 million. Provided that the secured claim of CSM is calculated in this manner, the Plan is fair and equitable with respect to the secured claim of CSM.

I also find that the Plan does not unfairly discriminate with respect to the secured claim of CSM. CSM argues that its treatment is not as advantageous as the treatment of the secured claim of Ashcroft. The Plan does not discriminate unfairly because, to the extent that CSM and Ashcroft are each secured creditors, they are not similarly situated. *See In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) ("Unlike unsecured creditors, every secured claim is different. Secured claims usually are secured by different collateral and usually have different priorities even if secured by the same collateral."). CSM has not alleged any unfair discrimination with respect to the extent it has an unsecured claim because there is only one class of unsecured claims. Even if CSM were similarly situated with Ashcroft, the differences in the treatment afforded them is not unfair discrimination and there is a reasonable basis for reconsideration. *See id*. CSM will receive, on account of any secured claim, a stream of payments with interest at the same rate as SHS that will pay its claim in full. CSM presented no expert testimony or other persuasive evidence to differentiate its risk from the risk associated with the SHS claim and, therefore, I conclude that 2% adjustment is appropriate for the CSM

claim as well.  In addition to retaining its lien on Ice's property, it will receive additional liens on

the properties owned by Tennis, Field, and Land to provide it with additional security to ensure

the payment in full of its allowed secured claim.  Plan, § 4.3(f).  Ashcroft's second mortgages, on

the other hand, are being cancelled entirely in exchange for a minority equity position in the

Reorganized Debtors behind all other creditors.  While CSM contends that this treatment may

ultimately have great value, Ashcroft's treatment involves the settlement of claims and comes

with the inherent risk of a minority equity investment.

Finally, for the reasons discussed in assessing feasibility of the Plan below and

considering the additional collateral provided to CSM under the Plan, the Plan does not place

undue risk on CSM.

### D.  Section 1129(a)(11) – Feasibility

Section 1129(a)(11) of the Bankruptcy Code provides that a plan may only be confirmed

if confirmation is not likely to be followed by liquidation or the need for further financial

reorganization.[19]  *In re SW Bos. Hotel Venture, LLC*, 460 B.R. at 58 (citing 11 U.S.C. §

1129(a)(11)).  To demonstrate that the Plan is feasible, the Plan Proponents must show a

reasonable assurance of viability, not a guarantee of success.  *See id.* (describing "[t]he purpose

of the feasibility test is to determine whether there is a reasonable probability that creditors will

receive the payments provided for in the plan" (citation and quotations omitted)); *In re Chicago

Invs., LLC*, 470 B.R. 32, 107 (Bankr. D. Mass. 2012) (concluding that "[a] plan proponent need

not guarantee the success of the plan, but rather must introduce evidence that its plan is

---

[19] (a) The court shall confirm a plan only if all of the following requirements are met:

. . .

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further
financial reorganization, of the debtor or any successor to the debtor under the plan, unless such
liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

realistic").  The purpose of § 1129(a)(11) is

> to prevent confirmation of visionary schemes which promise creditors and equity
> security holders more under a proposed plan than the debtor can possibly attain
> after confirmation, . . . to prevent an abuse of the reorganization process by the
> confirmation of a plan of a debtor likely to return to bankruptcy, . . . [and] to
> promote the willingness of those who deal with post-confirmation debtors to
> extend the credit that such companies frequently need.

*In re Agawam Creative Mktg. Assocs., Inc.*, 63 B.R. at 619 (internal citations and quotations

omitted).  "In determining whether [a plan] is feasible, the bankruptcy court has an obligation to

scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and

is workable."  *Id.* (quoting *In re Monnier Bros.*, 755 F.2d 1336, 1341 (8th Cir. 1985)).  Courts

generally consider the following factors to assess feasibility:

> (1) the adequacy of the capital structure; (2) the earning power of the business; (3)
> economic conditions; (4) the ability of management; (5) the probability of the
> continuation of the same management; and (6) any other related matter which
> determines the prospects of a sufficiently successful operation to enable
> performance of the provisions of the plan.

*In re SW Bos. Hotel Venture, LLC*, 460 B.R. at 58 (quoting *In re Trenton Ridge Invs., LLC*, 461

B.R. 440, 478 (Bankr. S.D. Ohio 2011)).  "Where a debtor proposes to fund a plan out of

operating revenue, its financial record during the pendency of the Chapter 11 is probative of

feasibility and 'income projections indicating financial progress must be based on concrete

evidence of financial progress, and must not be speculative, conjectural or unrealistic

predictions.'"  *In re Agawam Creative Mktg. Assocs., Inc.*, 63 B.R. at 619 (quoting *In re

Merrimack Valley Oil Co., Inc.*, 32 B.R. 485, 488 (Bankr. D. Mass. 1983)).  "Feasibility, [] must

be based on objective facts rather than wishful thinking."  *In re Claar Cellars LLC*, 623 B.R.

578, 595 n.30 (Bankr. E.D. Wash. 2021) (quoting *In re Howard*, 212 B.R. 864, 879 (Bankr. E.D.

Tenn. 1997)).

SHS and CSM forcefully argue that the financial projections provided by the Plan

Proponents are unrealistic, wholly unsupported by past performance, and based on wishful

thinking or conjecture.  These creditors are certainly correct that historic operations do not

obviously support the projections offered into evidence by the Plan Proponents.  SHS asserts that

in the approximately two-year period between the Petition Date and shortly before the Phase II

confirmation hearing, the Rink's operations alone lost a total of $2,574,273.00.  *Ice Monthly*

*Operating Report Aug. 2023* [Dkt. No. 901], at 2.  SHS and CSM assert that the Plan

Proponents' proposed capital infusion will be inadequate because the operating projections are

not realistic.

They also contend that, based on prior projections, the Plan Proponents cannot be found

to be competent to prepare reliable projections.  The Plan Proponents project that during the first

year of the plan the Reorganized Debtor will decrease payroll-related expenses by a total of

$223,125.00 when compared to those actual expenses during 2022.  *See Substitution of Exhibit to*

*Modified Second Amended Disclosure Statement* [Dkt. No. 771] (the "Projections"), Ex. 158, at

7.  Further, the Plan Proponents estimate that the Reorganized Debtors will reduce their

"program expenses" by a total of $53,661.00 during the first year of the plan when compared to

their actual program expenses during 2022.  *Id.*  SHS contends that the Plan Proponents' failure

to explain how the Reorganized Debtor will decrease the expenses related to its "programs"

while also increasing the revenue generated by those programs is a mystery, and therefore the

projected cost savings should be given no weight.  The Reorganized Debtors are also obligated to

pay quarterly fees to the United States Trustee's office following confirmation.  While the

projections assume an administrative closing of the Chapter 11 case six months after the

effective date, SHS asserts that the projections should account for the approximately $12.5

million in disbursements being made on the effective date.  The amounts due to the United States

Trustee's office on account of these disbursements alone would be approximately $100,000.00

(0.8% of the amount of Plan disbursements).  This amount would become due within a few

months of the effective date and could further and significantly decrease any cash reserve that

the Reorganized Debtors have at that time.

Finally, SHS and CSM contend that the projections should include payments on account

of allowed secured claims at a higher rate and in the full amount asserted rather than estimated.

It is true that I have ruled that, to be confirmed, the Plan must provide for interest at a rate of

prime, plus 2%, rather than prime, plus 1%, but the amount of the secured claims for purposes of

considering confirmation has been established in the Phase I Order.  They also question the

feasibility of the Reorganized Debtors to refinance in order to make the balloon payments

contemplated to be made in three years to SHS and CSM and funding of the Plan Loan by SP.

On their face, the projections introduced by the Plan Proponents demonstrate sufficient

cash flow for the Reorganized Debtors to meet all of their obligations under the Plan, even if the

interest rate to be paid on account of the SHS and CSM claims is adjusted as provided in this

memorandum.  The modified projections project ending cash balances after payment of all

expenses, taxes and interest as follows:

| | | |
|---|---|---|
| (a) | 12 months ending July 2024 | $654,481 |
| (b) | 12 months ending July 2025 | $339,097 |
| (c) | 12 months ending July 2026 | $457,007 |

Projections, at 8.  Craig Jalbert of Verdolino & Lowey was retained by the Plan Proponents as an

expert to opine on the reasonableness of the plan projections set forth in the Projections.

Projections; Tr. Day 2, Jalbert Test., 56–57.  Jalbert has extensive experience in the area of

insolvency, accounting, and taxation.  Tr. Day 2, Jalbert Test., 54.  He is a Certified Insolvency

and Restructuring Advisor.  *Id*.  For the past thirty years, the focus of his practice has been on

underperforming businesses, insolvency, and bankruptcy.  *Id*.  He has been involved in

approximately 500 Chapter 11 cases and numerous state and federal receiverships.  *Id*.  Jalbert

has been qualified as an expert in other bankruptcy cases on the issue of feasibility of a plan of

reorganization.  *See id.*, at 55.

Prior to forming an opinion as to the reasonableness of the Projections, Jalbert conducted

due diligence regarding the assumptions and support for the Projections.  *Id.* at 64.  Jalbert was

assisted in his due diligence by Donald Swanson, who has over forty years of accounting

experience. *Id.* The due diligence conducted by Jalbert and Swanson included numerous

meetings with members of Ice's management team, Paul Cokinos and Michael Balzarini, in

addition to Patel and Ravat. *Id.* at 64, 72, 86–87, 104, 113. During these meetings, Jalbert and

Swanson reviewed and discussed the Projections with Ice's management, or the DIP lender,

considered and questioned the underlying assumptions, and made suggestions as to changes in

the Projections. *Id.* at 64, 131. As part of their due diligence Jalbert and Swanson examined

numerous contracts and e-mails reflecting agreements for ice rentals at the Rink. They also

examined tenant leases, invoices, profits and losses for that year, and cash receipts and

disbursements. *Id.* at 64–65.

In late 2022, Cokinos replaced Reilly as the Rink's manager. *Id.* at 89, 105. Jalbert's

assessment was that Cokinos was able to better use Athlete Trax software to schedule various

customers' ice times. *Id.* at 67, 114–15. This affected, among other things, "energy costs, the

quality of the ice, the edging of the ice, and the cutting of the ice." *Id.* at 115. According to

Jalbert, Cokinos changed the dynamic of the efficiency and effectiveness of running the facility,

maximizing ice time, and minimizing various costs associated with ice time. *Id.* at 89. Jalbert

further testified that Cokinos has contributed to improved revenue and reduction of expenses,

improved the facility, and in six-month's time significantly enhanced the Rink's long-term

prospects. *Id.* at 115–16, 118.

Based upon this due diligence, Jalbert identified various factors which supported the

revenue and expense projections. *Id.* at 72–77. The following are among the various factors

enumerated by Jalbert to support revenue projections:

(a)     Substantial increase in committed ice rental hours from approximately
        4,400 hours for the 2022/2023 season to approximately 5,014 hours for the
        2023/2024 season.

(b)     Increasing the previous premium ice time from 4 p.m. to 9 p.m., to 3:30 p.m. to 9:30 p.m., thereby increasing the hours for which the Rink would charge a premium rental rate.

(c)     An understanding and utilization of the Athlete Trax software to better schedule ice rentals.

(d)     Providing for the rental of half sheets of ice to increase utilization and rental fees.

(e)     Management's identification of new sources of revenue such as locker room rentals, installing solar panels, instituting the Academy Room and Shoot to Score, leasing the gym for a fee, and selling sponsorships.

*Id.* at 73–77.

Regarding projected expenses, Jalbert interviewed management as to the basis for expenses included in the Projections, reviewed contracts for services, and considered the Debtors' procurement system for 2023 and beyond. *Id.* at 71. In addition, Jalbert and Swanson compared the actual cash expenses for the period August 2022 through April 2023, when the Projections were filed, to the expenses set forth in the Projections, concluding that the Projections were consistent with the prior actual cash expenses for similar periods. *Id.* Based upon his due diligence, Jalbert opined the projections were reasonable and achievable. *Id.* at 79. Furthermore, based upon the Projections, along with the Plan Loan, Plan contribution, and concern of the DIP debt to equity, the scaling in interest payments, Jalbert opined the Plan is feasible. *Id.* at 81.

SHS offered the testimony of Paul E. Costantino as an expert to opine as to the reasonableness of the Projections and the feasibility of the Plan. Tr. Day 7, Costantino Test., 16. Costantino is a CPA with extensive accounting and financial advisory experience in many sectors. *Id.* at 10–16. He has substantial experience in preparing and reviewing financial projections and had a former client that operated an ice rink. *Id.* at 12–13. Costantino identified that he reviewed the original plan projections filed in April 2022, the Projections filed in April 2023, the Monthly Operating Reports, the Keystone Rink Appraisal, the Plan, and "all the filings

for the [C]ourt." *Id.* at 17.  Costantino did not interview the Debtors' management, was not

aware of any of the assumptions management had made in connection with the preparation of the

Projections, and was not made aware of any contemplated post-confirmation improvements in

the operations of the Debtors' business. *Id.* at 75–76.  Because Costantino did not interview

Ice's management, he had no basis to assess their experience or abilities to either operate or

manage a rink. *Id.* at 76–79.  Further, because he had no interaction with Ice's current

management, his assessment of the Projections was limited to historical information based upon

prior management. *Id.*  For example, he candidly agreed that he had no way to know if the

projected decrease in payroll was reasonable or not. *Id.* at 77–78.  Instead, he assumed that those

projections were not achievable based on historic information. *Id.* at 78.

Costantino indicated that he had been provided with the contracts upon which the

Debtors and Jalbert relied in supporting the revenue projections set forth in the Projections, but

he did not review them. *Id.* at 73.  When he formed his opinion, Costantino was unaware that the

contracts supported a significant increase in ice rental hours from approximately 4,400 hours for

the 2022/2023 season to between 4,700-5,014 hours for the 2023/2024 season. *Id.* at 74–75.

Those increases in the ice rental hours resulted in a substantial  increase in the projected

revenues, which  Costantino acknowledged is "more support for the reasonableness of the

revenue [projections]." *Id.* at 75.  Similarly, Costantino was unaware that the Rink management

had instituted numerous operational changes which substantially enhanced profitability. *Id.* at

72–73, 76–78.  For example, he was unaware that the Rink began renting half sheets of ice, *id.* at

72, or that the Rink had changed its hourly rates, *id.* at 78.

Costantino also did not factor into his opinion the impact that new management had on

the Debtors' operations and had no factual basis to do so. *Id.* at 78–79.  Costantino

acknowledged that the information regarding these operational changes was something that he

would have wanted to know about in order to assess their impact on the reasonableness of the

Projections.  *Id.* at 79.  Costantino could not point to any specific operating expense line in the

Projections he concluded was too low.  *Id.* at 88–89.  On direct examination, Costantino offered

two spreadsheets which compared "2022 Actual Income Statement Results to 2023 Actual

Results and Original Projections and Amended Projections" and summarized results.  *FRE 1006

Summary - NESV, ICE- 2022 & 2023 YTD Actual Compared to Projections*, Ex. 234; *FRE 1006

Summary - NESV, ICE- Proposed & Amended Comparison Excel*, Ex. 235.  Costantino testified

on cross-examination that the income statement information that he utilized in preparing those

spreadsheets came from "Part 4 of the Monthly Operating Reports which is the income

statements."  Tr. Day 7, Costantino Test., 63.  Costantino testified that the income statements in

the Monthly Operating Reports were prepared on an accrual basis.  He further testified that he

assumed that the initial projections and the Projections were also prepared on an accrual basis.

*Id.* at 64–65.  Jalbert, however, testified that the initial projections and Projections were prepared

on a cash basis.  Tr. Day 2, Jalbert Test., 134–35, 137.  Accordingly, Costantino's assumption

supporting conclusions drawn from those spreadsheets was incorrect.  Tr. Day 7, Costantino

Test., 65–66.  Costantino also was not facile with the reduction in the amount of interest that

would be paid on a monthly basis to SHS.  After considering the calculation of application of the

Plan Rate to the remaining claim of SHS, Costantino conceded that there would be a material

decrease in the interest expense for the SHS debt.  *Id.* at 71–72.  In arriving at his opinion with

respect to feasibility, Costantino was unaware that the Plan provides that the accrued

administrative expenses were to be paid at confirmation from the SP Plan Contribution, as to

which he testified "[i]t helps a lot."  *Id.* at 81.  Costantino was also unaware that Ashcroft was

converting its $7.5 million claim to equity.  *Id.*

After considering all the evidence, including my assessment of the expert testimony, I

conclude that the Plan Proponents have met their burden under § 1129(a)(11) to prove feasibility. While always a difficult assessment, particularly for debtors that have had operating losses before and after the petition date, the evidence provides reasonable assurance that confirmation of the Plan is not likely to be followed for a need for further reorganization.  While historic performance is a necessary check on future projections, in some circumstances historic performance should be given less weight.  I credit Jalbert's opinion that the Debtors' historical performance is not a particularly useful indicator of future performance in this case.  Tr. Day 2, Jalbert Test., at 59:12-18; 87:19–88:15.

Prior to the petition date, the Debtors were in development mode, and Ice was just commencing operations.  *See id.* at 59.  The Rink closed during the COVID pandemic and, when it re-opened, faced the challenges of many businesses.  *See id.*  Jalbert's assessment was that, until Cokinos was employed, Ice did not have the right management team in place.  *See id.*  I credit his observation that Ice has operated on a tight budget funding losses through DIP financing and that bankruptcy can have a significant effect on the operations of an ice rink in advance booking of the rink for leagues and programs when consumers may be wary of placing large up-front deposits or concerned that the reorganization may fail.  *See id.* at 58–61, 88–90. Further, Ice became embroiled in litigation with CSM before it could even begin operation of the Rink, which was at least a distraction for management.  In part, because of the mechanic's lien filed against Ice's real property by CSM, the Debtors' relationship with their senior secured lender, HarborOne, became adversarial.  HarborOne subsequently sold its loans to SHS who immediately took an aggressive approach to collection of the loans and asserting a claim for default interest that was disputed by the Debtors.  All these factors support giving less weight to the Debtors' historic performance.

Upon confirmation, SP will provide the Plan Loan of approximately $12,000,000, which

will be used to pay the Debtors' outstanding real estate taxes and make an $11,500,000 payment to SHS.  No payments will be due on the Plan Loan for six months following the effective date, after which the Plan Loan will be paid only from the Debtors' Net Cash Flow on a quarterly basis.[20]  The Plan Loan, therefore, will be paid on terms substantially more beneficial to the Debtors than the existing obligation to SHS.  SP will also provide the Plan Contribution in an amount necessary to pay the Debtors' administrative claims, including professional fees, fund a cash dividend to the holders of allowed non-priority unsecured claims, and provide $500,000 of working capital to the Debtors.  The DIP financing will be converted to equity in NESV Holding, which will own 100% of the new equity interests in the Debtors.  Ashcroft, likewise, will exchange its secured claim of approximately $7.5 million for an equity interest in NESV Holding.

Because SP must make the Plan Payment on the effective date of the Plan, I accept the testimony of Patel that funds are available for that purpose.  The plan will not become effective unless that payment is made, and SP has funded its DIP Loans to the Debtors consistently and with no issues appearing in the record.  I also find that it is more likely than not that the Reorganized Debtors will be able to refinance or sell property to make the balloon payments required to be made to SHS and CSM three years from the effective date of the Plan.

In support of feasibility, the Plan Proponents also argue that the Plan provides the Debtors with the ability to sell their properties for specified release prices, which would provide additional funds to pay any secured claims of SHS and CSM and to fund the Debtors' ongoing operations.  Under the Plan, each Reorganized Debtor will be liable for paying allowed claims. Plan, § 5.9.  While I do not give great weight to historic performance of the Debtors, given the

---

[20] "Net Cash Flow" is defined under the Plan to mean (a) the book balance of the Reorganized Debtors' Cash, minus (b) (i) incurred and unpaid expenses, and (ii) a working capital reserve of $500,000.  *See* Plan, § 1.51. Payments on account of the Plan Loan, therefore, will not be made unless the Debtors have at least $500,000 of working capital.

lack of historic support for the projections offered by the Plan Proponents, my finding of

feasibility is bolstered by the value of the assets of the Reorganized Debtors.  I find that it is

more likely than not that the Reorganized Debtors will not likely require liquidation or the need

for further financial reorganization after confirmation of the Plan.

### E.  Good Faith

Section 1129(a)(3) requires that the proponents of a plan propose the plan "in good faith

and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  While good faith is not

defined, it is "generally interpreted to mean that there exists a reasonable likelihood that the plan

will achieve a result consistent with the objective and purposes of the Bankruptcy Code."  *In re*

*Weber*, 209 B.R. 793, 797 (Bankr. D. Mass. 1997) (internal quotations and citations omitted).

"These [objectives] include maximizing value, providing the debtor a fresh start, and reaching

compromise among disparate constituencies."  *In re Charles St. African Methodist Episcopal*

*Church of Bos.*, 578 B.R. at 97 (citations omitted).  To examine good faith in proposal of a plan,

"[t]he plan must be viewed in light of the totality of the circumstances surrounding confection of

the plan."  *In re Weber*, 209 B.R. at 797 (quotations and citations omitted).

The evidence supports a finding that the Plan is the product of good-faith negotiations

among the Plan Proponents.  Exs. 171–72, 198–201, 203–06, 213, 219; Tr. Day 3, Patel Test.,

59, 62–63, 65–66; Tr. Day 4, Patel Test., 17, 20, 22–29, 34–36, 42–44, 102–09; Tr. Day 1,

Silberberg Test., at 30:25–31:22; Silberberg Aff., ¶¶ 37–41.  Each of the Plan Proponents was

represented by its own legal counsel.  Plan; Tr. Day 4, Patel Test., 126; Tr. Day 5, Sullivan Test.,

187.  The purpose of the Plan is to preserve the going-concern value of the Ice's business and

assets and the fair market value of the Land Debtors' properties so that those values can be used

to effectuate the Plan and satisfy the Debtors' allowed claims as provided in the Bankruptcy

Code.  *See* Plan; Projections; JLL Land Debtors Appraisal; Keystone Rink Appraisal and Dylag

Aff.; Silberberg Aff..  There is a reasonable likelihood that the Plan will achieve a result

consistent with the objective and purposes of the Bankruptcy Code.  *See In re Weber*, 209 B.R. at

797; *see also* Plan; Projections; JLL Land Debtors Appraisal; Keystone Rink Appraisal and

Dylag Aff.; Silberberg Aff.

 The "plan consolidation" contemplated under the Plan is proposed in good faith and is

appropriate under the facts and circumstances of this case.  Plan, § 5.9.  The Plan Proponents do

not argue that, absent the Plan, there is a basis for the estates of these debtors to be substantively

consolidated; instead, the Plan provides that, to effectuate the Plan and satisfy allowed claims as

provided in the Plan, on the effective date each Reorganized Debtor and its assets will be liable

for all obligations established by the Plan.  Plan, § 5.1.  Other than considerations for a

determination under § 1129(a)(10), SHS and CMS do not identify any prejudice to any creditor

created by this structure.  CSM benefits from the structure in that it provides recourse to

Reorganized Debtors when its claim is only against Ice.  Given the restructuring of collateral for

the claims of SHS and CMS and the capital structure of the Debtors, I find the Plan and the

consolidation provisions have been proposed in good faith and not by any means prohibited by

law.  In assessing feasibility and whether the Plan is fair and equitable, the plan consolidation

structure provided some support for my findings.  The main complaint by SHS and CSM was

that a substantive consolidation of the Debtors would eliminate their argument that the Plan

Proponents had not satisfied § 1129(a)(10) on a "per debtor" basis because Ashcroft is not a

creditor of one of the Debtors.  My ruling adopting the "per plan" approach eliminates this

consideration as a basis for an objection for lack of good faith.  Moreover, while Ashcroft does

not have a claim against Land East, Land East has no significant creditors other than SHS.  SHS

will be paid the full amount of its allowed secured claim under the Plan and will retain liens

valued well in excess of those claims.  The Plan effectively provides for the substantial $11.5

million paydown of the SHS claim in exchange for a release of the SHS mortgage covering the Land East property and other collateral.  No creditor of Land East is prejudiced by application of the "per plan" provision of § 1129(a)(10).  Further, the limited "plan consolidation" provided by the Plan is proposed in good faith in order to effectuate the Plan.

## IV.     CONCLUSION

For the reasons stated, I will enter an order overruling the Objections and confirming the Plan, if the Plan is modified as provided in this memorandum.  Within seven days, the Plan Proponents shall file a notice attaching either a proposed form of order consistent with my rulings or a statement that the Plan Proponents are unwilling to modify the Plan.  To the extent there is a disagreement as to whether the form of order accurately captures the modifications described in this memorandum, parties in interest may file objections to the proposed form of confirmation order within three business days of it being filed on the docket.  Objections to confirmation of the Plan are preserved for purposes of appeal notwithstanding whether SHS or CSM object to the proposed form of confirmation order.

By the Court,

Dated: April 15, 2024

_____
Christopher J. Panos
United States Bankruptcy Judge